Michael Vaughn, et al. v. Russell E. Taylor
Russell E. Taylor v. Michael Vaughn, et al.


Exhibit 1
to Notice of Removal

State Court File

**FILED**

MICHAEL VAUGHN and
TIMOTHY KENDRICK,

6 | 30 | 3:15 am/pm

Bobby L. Russell _____ DC
**CIRCUIT COURT CLERK**
**SULLIVAN COUNTY, TN.**

    Plaintiffs,

v.

    Docket No. C43098 (C)

RUSSELL E. TAYLOR,
MICHAEL SCHROCK, III,
GREG C. MARCUM,
TONY L. HUFF, and HOLSTON HEMP LLC,

    Defendants.

## COMPLAINT

Come the Plaintiffs, by and through counsel, and for their cause of action show to the

Court as follows:

### I. PARTIES

1.    The Plaintiffs are residents and citizens of Sullivan County, Tennessee.

2.    Defendant, Holston Hemp LLC is a limited liability company with its principal address

as 474 Lakeside Dock Drive, Kingsport, Tennessee 37663-4152, and it may be served

through its registered agent, Kimberly D. Rhoton at 215 Cumberland Street, Kingsport,

Tennessee 37660-4809.

3.    Defendant, Russell E. Taylor is a resident and citizen of Bristol, Virginia, and may be

served in Sullivan County at either 1601 FairRidge Place, Kingsport, Tennessee 37660,

or at his place of business at 1043 Ford Town Road, Kingsport, Tennessee 37660.

4.    Defendant, Michael Schrock, III is a resident and citizen of Sullivan County, Tennessee,

and may served at 1064 Sussex Dr., Kingsport, Tennessee 37660.

5.    Defendant, Greg C. Marcum may be served with process at 1012 Smith Hollow Road,

Gate City, Virginia 24251.

6.   Defendant, Tony L. Huff is a resident and citizen of Sullivan County, Tennessee, and may be served at 474 Lakeside Dock Drive, Kingsport, Tennessee, 37663.

## II. JURISDICTION

7.   This Court has jursidiction over this matter because the conduct alleged and avered herein occurred in Sullivan County, Tennessee.  Holston Hemp LLC has its principal place of business in Sullivan County, Tennessee, and the Defendants Michael Schrock, III, Greg C. Marcum, and Tony L. Huff, upon information of belief, are the owners of Holston Hemp LLC.  CPH Brands, LLC ("CPH") had its principal place of business in Sullivan County, Tennessee, and Defendant Russell E. Taylor, and the Plaintiffs were the owners of CPH.

## III. FACTS

8.   On or about January 23, 2019, Plaintiffs Michael Vaughn ("Vaughn") and Timothy Kendrick ("Kendrick") along with Defendant Russell E. Taylor ("Taylor") caused to be formed a limited liability company named CPH.

9.   On or about January 23, 2019, Plaintiffs Vaughn and Kendrick and Defendant Taylor executed an Operating Agreement for CPH.  A copy of the Operating Agreement is attached hereto as Exhibit A.

10.  On or about January 23, 2019, CPH entered into a lease agreement with Taylor Properties #1, L.P. for the lease of real property located at 1736 North Eastman Road, Kingsport, Tennessee, 37664-2310.  A copy of the Lease Agreement is attached hereto as Exhibit B.  The lease was on a month to month basis and could be terminated by the landlord or tenant upon thirty (30) days advance written notice.  The lease was executed

on behalf of CPH by Defendant Taylor.

11. On or about January 24, 2019, Plaintiffs Vaughn and Kendrick and Defendant Taylor each entered into an agreement known as AGREEMENT OF COVENANT NOT TO COMPETE, NON-DISCLOSURE AND NON-UTILIZATION. A copy of said agreements are attached hereto as collective Exhibit C.

12. Prior to the formation of CPH, the Plaintiffs were engaged in the hemp and CBD business and had formed a limited liability company known as Hemponix Laboratories LLC. The Plaintiffs were desirous of growing hemp inside and processing hemp, and were looking for a building which would be suitable. The Plaintiffs met Defendant Taylor in early January, 2019. Defendant Taylor showed them a building which may have been suitable for their business purposes. During the process of looking at buildings with Defendant Taylor, the parties discussed Taylor becoming involved with the business, and after having discussions over a period of a couple of weeks, Defendant Russell and the Plaintiffs agreed to enter into a business relationship. At that time, the parties formed CPH, entered into a lease agreement, and each signed the AGREEMENT OF COVENANT NOT TO COMPETE, NON-DISCLOSURE AND NON-UTILIZATION.

13. As is reflected in the OPERATING AGREEMENT FOR CPH, Michael Vaughn contributed $288,000, which consisted of all equipment currently purchased with his funds, all licenses, applied for/and issued however they were owned. In exchange, Plaintiff Vaughn received 24.5% financial interest and 24.5% governance interest in CPH.

14. Plaintiff Kendrick received 24.5% financial interest and 24.5% governance interest in

CPH in exchange for $1.

15. Defendant Taylor received 51% financial interest and 51% governance interest in exchange for $100,000 cash and Defendant Taylor was to arrange a lease between CPH and Taylor Properties #1, L.P. for up to three (3) months with the rent under the lease being accrued, and the rent to be paid from the initial cash flow of CPH prior to distributions to members. In addition, Taylor agreed to advance up to $36,000 for initial business expenses which was to be repaid prior to any distributions to members. Taylor also agreed to provide up to $4,200 plus a convenience fee of 3% for the acquisition and rental of a cold press machine which would be repaid prior to any distribution to members.

16. Prior to the creation of CPH, the Plaintiffs and Defendant Taylor made the decision to initially process hemp and manufacture CBD rather than growing hemp. CPH purchased various equipment in order to manufacture CBD oil and other products derived therefrom. In addition, CPH purchased a large amount of hemp which was to be processed for the manufacture of CBD oil and its derivatives. CPH purchased 1,300 pounds of hemp from Oregon which was shipped to CPH in Sullivan County, Tennessee.

17. CPH acquired the appropriate liability insurance for the manufacture of CBD.

18. CPH manufactured various CBD products.

19. CPH developed unique packaging for its products as well as various unique marketing materials for its products, and CPH developed various trade names and marks which were unique and took action to protect them. CPH developed a unique manufacturing process.

20. CPH acquired various machines and equipment including a cold press, labeling machine, computers and various other equipment and fixtures which were necessary to the business. CPH made substantial improvements to the leased premises including the installation of security equipment.

21. CPH, by and through the Plaintiffs, obtained all necessary licenses through the State of Tennessee, to grow and process hemp.

22. After the formation of CPH, the Plaintiffs worked diligently to build and enhance the business of CPH and were assisted by family members and others for no compensation. The Plaintiffs had agreed with Defendant Taylor that they would be paid $2,000 per week and were paid only four weeks. In spite of the fact that they were not being paid by CPH, the Plaintiffs continued to work and devoted 100% of their efforts to the growth and development of CPH.

23. On or about April 26, 2019, the Plaintiffs were escorted off of the leased premises by the property manager whom they believed was employed by the owner of the premises, Taylor Properties #1, L.P. Accompanying the property manager were people who were armed.

24. Other than going to the premises with a police escort on one occasion, the Plaintiffs were not allowed to return to the business premises.

25. From the formation of the business in January, 2019, until the Plaintiffs were escorted from the business premises on April 26, 2019, CPH's business grew at a tremendous rate such that the Plaintiffs, with the help of others, could not keep up with the demand for CPH's products. It was discussed prior to April 26, 2019, that CPH needed to hire additional employees. Upon information and belief, the Plaintiffs aver that CPH was

profitable or had the ability to be profitable prior to April 26, 2019.

26. The Plaintiffs aver that on April 26, 2019, CPH had inventory with a value exceeding $5,000,000. In addition, CPH owned equipment, and it had a unique manufacturing process and intellectual property.

27. On or about April 26, 2019, CPH had a substantial value as an ongoing business in addition to owning valuable assets.

28. On or about April 26, 2019, Defendant Taylor communicated to the Plaintiffs that Defendant Taylor intended to unilaterally "shut down" the business. At that time, it was discussed between the parties that Defendant Taylor would sell his ownership interest in CPH for $50,000 if he had payment in full by May 3, 2019 at 12:00 p.m. and the funds had to clear the bank. Defendant Taylor stated that this would basically be a full asset purchase of all the inventory and supplies in the building, not including fixtures, as fixtures were part of the premises. In addition, it would require a full month's rent up front and a refundable security deposit in order for CPH to remain in the building which was owned by Taylor's family. The rent was to be somewhere around $6,000 per month. In addition, the Plaintiffs would have to pay all utilities, maintenance, property taxes, and property insurance. However, Defendant Taylor made it clear that the purchase of his interest in CPH was separate from the lease of the premises.

29. On May 2, 2019, Plaintiffs were provided with a document called Escrow Agreement RC: CPH BRANDS, LLC that required the payment of $64,335.54 and allowed the Plaintiffs four (4) hours to conduct an inventory of raw material, finished product, equipment and machinery located at the business's premises. The escrow agreement also provided that in event the Plaintiffs purchased Defendant Taylor's interest, CPH

was obligated to enter into a new lease with Taylor Properties #1, L.P. with rent of $6,200.70 per month, triple net with pro-rated taxes and insurance paid each month and a one month's security deposit. It also provided for mutual releases. The total amount to be paid toward the lease was $14,335.54.

30.     Prior to May 2, 2019, the Defendant Taylor never informed the Plaintiffs that it would require $64,335.54 to complete the transaction. Prior to May 2, 2019, Defendant Taylor had stated that he would sell his ownership interest for $50,000 but that the lease of the building was not necessary as they were two different things. On May 2, 2019, Defendant Taylor included in the terms of the sale that they would have to lease the premises and pay $14,335.54. A copy of the proposed Escrow Agreement is attached hereto as Exhibit D.

31.     The Plaintiffs were able to pay $50,000 on May 2, 2019, but were unable to pay the additional $14,335.54 which was included by Defendant Taylor on May 2, 2019 and only provided the Plaintiffs with less than 24 hours to have available the additional funds. On May 3, 2019, the Plaintiffs were unable to pay in full $64,335.54 and the purchase of Defendant Taylor's interest did not occur.

32.     After May 2, 2019, the Plaintiffs had no further contact with Defendant Taylor. They received no notices relative to the business of CPH, received no information regarding the CPH's business or the disposition of CPH's assets. The Plaintiffs never received an explanation as to the actions taken by Defendant Taylor in having them removed from the business premises and being expelled from CPH.

33.     On or about May 14, 2019, Defendant Holston Hemp, LLC ("Holston Hemp") was formed and its initial filing was made with the Tennessee Secretary of State.

34.   Upon information and belief, Holston Hemp is owned by Defendants Schrock, Marcum, and Huff.

35.   At a time which is unknown to the Plaintiffs, Holston Hemp and its owners began the manufacture and sell of products which are the same as the products that were sold by CPH.  Upon information and belief, Holston Hemp obtained the inventory which was owned by CPH at the time that the Plaintiffs were expelled from the business premises, and Holston Hemp used the packaging which belonged to CPH, used CPH's unique marketing materials, trade names, brand name such as "Hemponix," and in effect, took all of the assets of CPH including its intellectual property.  Holston Hemp operated its business in the same building that CPH had occupied.  In effect, Defendants took over every aspect of CPH's business and began operating it just as CPH had operated except without the Plaintiffs.

36.   After January 3, 2019, Defendant Taylor controlled all financial matters for CPH. Defendant Taylor kept such financial matters secret and did not share financial information with the Plaintiffs.  When CPH was formed, the parties agreed that the checking account should require two signatures on each check.  At some point, Defendant Taylor had the bank change the signature requirement to only his signature, thus eliminating the Plaintiffs involvement in disbursing funds.  The only financial information received by the Plaintiffs was a K-1 for the year 2019 showing a small loss for CPH.

37.   The Tennessee Secretary of State website shows that CPH Brands, LLC was dissolved on June 10, 2019.

38.   The Plaintiffs received no notice of the transfer of any of the assets of CPH to

Defendants Holston Hemp, Huff, Marcum, and Schrock.

39. The Plaintiffs received no notice from Defendant Taylor that CPH was to be dissolved. No meeting was held relative to such dissolution.

40. The Plaintiffs received no funds or property of any kind from CPH as part of the winding up of CPH Brands, LLC.

**Count I –Breach of Fiduciary Duty**

41. The allegations and averments of paragraphs 1-40 are incorporated herein by reference as if fully stated verbatim.

42. The Plaintiffs allege and aver that Defendant Taylor breached his fiduciary to CPH and the Plaintiffs and breached his duty of loyalty to CPH and the Plaintiffs pursuant to Tenn. Code Ann. §48-249-403 and to the Plaintiffs in failing to account to the LLC and to the Plaintiffs for the property, profit and benefit derived by him in the conduct and winding up of CPH's business, including the use of CPH's property, and the appropriation of the opportunity of CPH and further, by competing with the business of CPH prior to the termination of CPH. Defendant Taylor further breached his fiduciary duty to CPH and the Plaintiffs in the conduct of and winding up of CPH's business by engaging in intentional misconduct, knowing violation of law, and grossly negligent and reckless conduct.

43. Defendant Taylor breached his fiduciary duty to CPH and the Plaintiffs when he engaged in conflict of interest transactions in violation of Tenn. Code Ann. §48-249-404 in that the transactions with the other Defendants were not in the best interest of CPH but were only meant to benefit Defendant Taylor.

### Count II – Breach of Duty of Good Faith and Fair Dealings

44. The allegations and averments of Paragraph 1-43 are incorporated herein by reference as is stated verbatim.

45. The Plaintiffs allege and aver that Defendant Taylor breached his duty of good faith and fair dealing pursuant to Tenn. Code Ann. §48-249-403(d) by failing to act in good faith and deal fairly by excluding the Plaintiffs from the business of CPH, and by transferring all of the assets of CPH to Defendant Holston Hemp, Huff, Marcum and Schrock for less than their fair value.

### Count III – Dissolution and winding up of CPH pursuant to Tenn. Code Ann. §48-249-601, et seq.

46. The allegations and averments of paragraphs 1-45 are incorporated herein by reference as if stated verbatim.

47. The Plaintiffs allege and aver that Defendant Taylor wrongfully dissolved and terminated CPH. The Plaintiffs aver that Defendant Taylor failed to provide them with notice of the proposed dissolution, winding up and termination of CPH as required by Tenn. Code Ann. §48-249-603 and that no meeting was held of the members at which a vote was taken to dissolve the CPH, followed by winding up and termination of CPH.

### Count IV- Fraud

48. The allegations and averments of paragraphs 1-47 are incorporated herein by reference as if fully stated verbatim.

49. The Plaintiffs allege and aver that the Defendants intentionally deprived them of their property and rights by their exclusion from the business of CPH and the transfer of the assets of CPH to the Defendants. The transfer of the assets of CPH was accomplished

by the means of deception in that the Defendants had no means to protect their interests since the Defendants failed to speak or provide information that the Defendants had a duty to disclose.

50. The Plaintiffs aver that the actions of the Defendants were intentional, unlawful, and were meant to deprive the Plaintiffs of the property and their rights. The Plaintiffs aver that the Defendant Taylor transferred the valuable assets of CPH to the Defendants Holston Hemp, Schrock, Marcum and Huff without notice to the Plaintiffs, under the guise of his authority as President and majority member of CPH, and Defendants Holston Hemp, Schrock, Marcum and Huff knew or had reason to know that Defendant Taylor did not have the authority to make such transfer and the assets transferred had a value which was substantially greater than any consideration paid and that the Plaintiffs did not know of such transfer.

**Count V- Conspiracy**

51. The allegations and averments of paragraphs 1-50 are incorporated herein by reference as if fully stated verbatim.

52. The Plaintiffs allege and aver that all of the Defendants have acted and knowingly conspired and acted in concert to defeat the rights of the Plaintiffs and to deprive CPH of its property and to have such property transferred to the Defendants.

53. Furthermore, the Defendants have knowingly acted with sole and intentional purpose of depriving the Plaintiffs of their property to which they are entitled and have actively concealed their actions.

54. That as a result of this conspiracy, all of the Defendants should be liable to the Plaintiffs for the amount of the Judgment entered against one or all.

**Count VI- Punitive Damages**

55.  The allegations and averments of paragraphs 1-54 are incorporated herein by reference as is stated verbatim.

56.  The Plaintiffs assert that the Defendants named herein have intentionally conspired to defraud the Plaintiffs and otherwise defeat the rights of the Plaintiffs thereby entitling the Plaintiffs to punitive damages.

**Count VII- Breach of Contract**

57.  The allegations and averments of Paragraphs 1-56 are incorporated herein by reference as if fully stated verbatim.

58.  The Plaintiffs aver that the Plaintiffs and Defendant Taylor entered into the Operating Agreement of CPH Brands, LLC and the Plaintiffs aver that the Defendants breached the terms of the Operating Agreement as follows:

    a.  Article 3.2 provides that no member shall have the right to withdraw or reduce his contributed capital or receive any assets of the company, and no member shall have priority over any other member as to the return of contributed capital. The Plaintiffs aver that Defendant Taylor withdrew or reduced his contributed capital and received assets of the company and gave himself priority over the Plaintiffs on the return of contributed capital in violation of the Operating Agreement.

    b.  Article 5.1 of the Operating Agreement provides that each member shall keep the other members informed at all times concerning the company's operation. The Plaintiffs aver that Defendant Taylor breached his obligation as he failed to inform them of the company's operations and dissolution and did so intentionally and in violation of the Plaintiff's rights.

c.    The Defendant failed to give notice of meetings as provided or as required in Article 5.5 of the Operating Agreement as they were members entitled to notice not less than ten (10) days nor more than two months before the date of the meeting. Plaintiffs aver that they received no notice of any meetings relative to the dissolution and winding up of the CPH's business.

d.    Plaintiffs aver that Defendant Taylor breached Article 8.1 of the Operating Agreement by failing to be just and faithful to the Plaintiffs at all times, failing to give the Plaintiffs full information and truthful explanation of all matters relating to the affairs of the company and failing to afford every assistance in the Member's power in carrying on the company's business for the Member's mutual advantage.

e.    Plaintiffs aver that they were effectively expelled from CPH by Defendant Taylor on or after April 26, 2019 in violation of Article 9.2 of the Operating Agreement which provides that no member shall have any power or authority to expel any member unless such membership would jeopardize the licenses or other regulatory approval of the business.

f.    Article 11.3 of the Operating Agreement provides for minority members to have tag along rights such that if the majority approves a sale of the company or all of the assets, then disapproving members must be allowed to tag along with the sale on the same terms and conditions. The Plaintiffs aver that Defendant Taylor breached the Operating Agreement by failing to afford the Plaintiffs their rights as minority members.

g.    The Plaintiffs aver that the Defendant Taylor sold, transferred or conveyed either

the LLC or its assets and the Plaintiffs were not treated in the same manner as the majority member, Defendant Taylor as required by Article 11.3 of the Operating Agreement.

h.    Article 14.1 of the Operating Agreement provides for events causing dissolution including action of the Members pursuant to Tenn. Code Ann. §48-249-603 or upon the occurrences listed in Tenn. Code Ann. §48-249-601(a). The Plaintiffs aver that there was no occurrence of any event specified in Tenn. Code Ann.§ 48-249-601(a) and that pursuant to Tenn. Code Ann. § 48-249-603, the proposed dissolution of CPH was required to be submitted for approval in a meeting of members. Notice was to be provided to each member, whether or not entitled to vote. The Plaintiffs aver that Defendant Taylor caused CPH to be dissolved in violation of the terms of Article 14.1 of the Operating Agreement.

i.    Defendant Taylor breached the Operating Agreement by failing to properly wind up the affairs of CPH pursuant to Article 14.3 in that Taylor did not distribute the assets as provided in Article 14.4.

**Count VIII –Unjust Enrichment**

59.    The allegations and averments in Paragraphs 1-58 are incorporated herein by reference as if stated verbatim.

60.    The Plaintiffs aver that the Defendants have been unjustly enriched as the assets of CPH were transferred to the Defendants for less than fair and adequate consideration thereby unjustly enriching the Defendants.

**Count IX –Accounting**

61.    The allegations and averments in Paragraphs 1-60 are incorporated herein and by

reference as if stated verbatim.

62.     The Plaintiffs aver that the Court should order Defendant Taylor to account for all funds
        and other property which came into his possession as a member and president of CPH
        and to account for any and all expenditures made and especially any transactions
        between Defendant Taylor and/or CPH and Defendants Holston Hemp, Marcum, and
        Huff.

WHEREFORE, PLAINTIFFS PRAY:

1.      That process issue requiring the Defendants to appear and answer;

2.      That the Court order the Defendant Taylor to account as requested in Count IX of the
        Complaint;

3.      That the Plaintiffs be awarded a Judgment against the Defendants in the amount not to
        exceed $6,000,000 in compensatory damages;

4.      That the Plaintiffs be awarded Judgment against the Defendants in an amount not to
        exceed $5,000,000 in punitive damages;

5.      That the Plaintiffs be awarded their reasonable attorney's fees, litigation expenses and
        discretionary expenses;

6.      That a jury try this action;

7.      That the costs of this cause be taxed to the Defendants; and

8.      For such other and further relief to which the Plaintiffs may be entitled.

Respectfully submitted this the ___1___ day of ___June___, 2020.

_____

BRENT R. WATSON, #010154

Attorney for Plaintiffs
BUNSTINE, WATSON & BECKER
800 S. Gay Street, Suite 2001
Knoxville, Tennessee 37929
(865) 523-3022

## COST BOND

We, Michael Vaughn and Timothy Kendrick, as Principals, and Brent R. Watson, as Surety, are held and firmly bound unto the Sullivan County Circuit Court, for the payment of all costs awarded against the Principal. To that end, we bind ourselves, our heirs, executors and administrators.

The Principal is commencing legal proceedings in the Sullivan County Circuit Court. If the Principals shall pay all costs which are adjudged against them, then this obligation is void. If the Principals fail to pay, then the surety shall undertake to pay all costs adjudged against the Principal. Mandated at T.C.A. §20-12-120 et seq.

**PRINCIPAL**S
Michael Vaughn
817 Indian Trail Drive, Kingsport, TN 37660
Timothy Kendrick
3233 Forest View Road, Kingsport, TN 37660

PRINCIPAL

**SURETY**
BRENT R. WATSON, #010154
BUNSTINE, WATSON & BECKER
800 South Gay Street, Suite 2001
Knoxville, Tennessee 37929
(865) 523-3022

SURETY

STATE OF TENNESSEE )
)
COUNTY OF Sullivan )

OATH

Comes Michael Vaughn, after being duly sworn, and makes oath that the foregoing Complaint is true and correct to the best of his knowledge, information, and belief.

This the _1_ day of _June_ , 2020.

_____
MICHAEL VAUGHN

Sworn to and subscribed before

me this the _1st_ day of _June_ , 2020.

_____
NOTARY PUBLIC

My Commission Expires: _5.22.23_

STATE OF TENNESSEE        )
                          )
COUNTY OF _Sullivan_      )

## OATH

       Comes Timothy Kendrick, after being duly sworn, and makes oath that the information contained in the foregoing Complaint is true and correct to the best of his knowledge, information, and belief.

       This the ___1___ day of ___June___, 2020.


_____
TIMOTHY KENDRICK

Sworn to and subscribed before

me this the __1st__ day of ___June___, 2020.


_____
NOTARY PUBLIC

My Commission Expires: ___5.22.23___



## OPERATING AGREEMENT
## OF
## CPH BRANDS, LLC

THIS OPERATING AGREEMENT, (the "Agreement") is made and entered into and shall be effective as of this 23rd day of January, 2019, and is by and among CPH BRANDS, LLC, hereinafter referred to as the "Company" and **MICHAEL VAUGHN, TIMOTHY KENDRICK** and **RUSSELL E. TAYLOR** (collectively the initial "Members" and each, individually, a "Member").

### WITNESSETH:

WHEREAS, the Company has been formed as a limited liability company under the Tennessee Revised Limited Liability Company Act and the Members desire to set forth their mutual rights and obligations in this Agreement; and

WHEREAS, the Members desire that the Company be managed by its Members.

NOW, THEREFORE, in consideration of the mutual promises, covenants and undertakings hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement hereto agree as follows:

## ARTICLE I
## DEFINITIONS

1.1 **Definitions**. As used herein, the following terms shall have the indicated meanings:

    (a)    "Act" means the Tennessee Revised Limited Liability Company Act, being set forth in **Tennessee Code Annotated** at Sections 48-249-101, *et seq.*, as it may be amended from time to time.

    (b)    "Agreement" means this Operating Agreement and as it may be amended from time to time.

    (c)    "Articles" means the Articles of Organization referred to in Section 2.1 of this Agreement.

    (d)    "Available Cash Flow" means all cash receipts of the Company received during the calendar quarter and on hand at the end of each calendar quarter of each year, less (i) provision for payment of all liabilities of the Company due within thirty (30) days from the end of the quarter (including those which are in dispute) and (ii) provisions for adequate reserves for income tax liabilities of the Company and Members attributable to the Company; (iii) provision for reasonably anticipated expenses and contingencies (which may include Company indebtedness), but without deduction for depreciation or any other non-cash expenses; and (iv) provision of any other application of cash receipts described in Section 4.4.

1



$RT$ $MV$ $TMK$

(e)   "Business Assets" means the assets being contributed to the Company by the Members as set forth in Exhibit "A" to the Agreement and all other assets acquired by the Company which are used in its business operations.

(f)   "Capital Account" means, as to any Member, the capital account maintained for the Member in accordance with the Code and the regulations promulgated thereunder, including, but not limited to, the rules regarding the maintenance of partners' capital accounts set forth in Treasury Regulation Section 1.704-1.

(g)   "Code" means the Internal Revenue Code of 1986, as amended from time to time.

(h)   "Company" means CPH BRANDS, LLC, the limited liability company formed by the parties to this Agreement.

(i)   "Contributed Capital" means, with respect to any Member as of any particular time, the cumulative amount of all cash and other property, tangible or intangible, contributed by or on behalf of the Member to the Company and credited to his Capital Account, less all distributions of Contributed Capital made by the Company to the Member.

(j)   "Financial Interest" means each Member's fractional right, expressed as a percentage, to share (i) distributions of Available Cash Flow of the Company and (ii) receipt of liquidation distributions of the Company.

(k)   "Governance Interest" means each Member's fractional right, expressed as a percentage, to vote on matters presented to a vote of Members as provided in this Agreement. Each Member's initial Governance Interest shall be as set forth on Exhibit "A" attached hereto and incorporated herein by reference.

(l)   "Members" means, collectively, and "Member" means, individually, those persons listed on Exhibit "A" hereto, and any additional members admitted pursuant to the provisions of this Agreement.

(m)   "Membership Interest" means the aggregate of each Member's (i) Financial Interest, (ii) Governance Interest", and (iii) the rights to transfer or assign either or both of the Financial Interest or the Governance Interest.

(n)   "Net Losses" means the excess of all expenses of the Company over all income of the Company (including the amount of any gains or losses recognized by the Company on the sale or other disposition of Company assets) during a calendar year, all as determined in accordance with the method of accounting utilized by the Company for federal income tax purposes.

(o)   "Net Profits" means the excess of all income of the Company over all expenses of the Company (including the amount of any gains or losses recognized by the Company on the sale or other disposition of Company assets) during a calendar year, all as determined in

2

RT MVTHK

accordance with the method of accounting utilized by the
Company for federal income tax purposes.

(p)   "Termination Event" shall be a dissociation of a member under the
Act.

## ARTICLE II
## FORMATION, PURPOSE AND BUSINESS

2.1   **Articles of Organization**. The Articles of Organization as filed with the
Tennessee Secretary of State on January 23, 2019 are hereby adopted and ratified by the
Members. In the event of a conflict between the terms of this Agreement and the terms
of the Articles of Organization, the terms of the Articles of Organization shall prevail.

2.2   **Adoption**. The parties hereto adopt this Agreement as the Operating
Agreement under and pursuant to the Act, subject to the terms and conditions set forth in
the Agreement.

2.3   **Name**. The name of the Company is CPH BRANDS, LLC. The
Company may conduct its business under any name chosen by the Members and the
Members may change the name under which the Company conducts its business in their
sole discretion from time to time. The Company shall file any assumed or fictitious name
certificates as may be required to conduct business in any state.

2.4   **Purpose**. The business to be conducted by the Company shall be (a) to
acquire, develop and/or grow plant products; (b) process such raw material into lawful
products for distribution at wholesale or sale at retail; and (c) to carry on any and all
activities necessary, proper, convenient, or advisable in connection therewith; and (d) to
undertake any other related lawful business activity, except as otherwise provided by the
laws of the State of Tennessee.

## ARTICLE III
## CAPITAL

3.1   **Initial Contributed Capital**. The Members will make initial
contributions to the capital of the Company in the amounts set forth on Exhibit "A"
attached hereto pursuant to contribution agreements.

3.2   **Withdrawal and Return of Contributed Capital**. No Member shall
have the right to withdraw or reduce his Contributed Capital, or to receive any assets of
the Company, except as specifically provided in this Agreement. No Member shall have
the right to demand or receive property other than cash in return for his Contributed
Capital, and no Member shall have priority over any other Member as to the return of
Contributed Capital.

3.3   **Statements of Membership Interests**. Membership Interests shall not be
represented by certificates. Within five (5) days after the written request of any Member,
the Company shall provide to the Member a written statement of the Member's
Membership Interest as of the date the Company makes the written statement. The
statement of Membership Interest shall not be deemed to be a certificated security, a
negotiable instrument, a bond or a stock certificate, and shall not be a vehicle by which
any transfer of any Member's Membership Interest may be effected.

3

## ARTICLE IV
## PROFITS, LOSSES, CASH FLOW

4.1     Capital Accounts. The Company will maintain for each Member an account to be designated the Member's "Capital Account". Each Capital Account shall be established and maintained in accordance with the provisions of Treas. Regs. Section 1.704-1(b)(2)(iv), which requires that the Capital Account shall be maintained at book value, and shall be interpreted and applied in a manner consistent with these Treasury Regulations. Accordingly, the Members shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes in accordance with Treas. Regs. Section 1.704-1(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Treas. Regs. Section 1.704-1(b). In general, each Capital Account shall be credited or debited according to the provisions of 4.3, below. No interest shall be paid on Contributed Capital or on balances in Capital Accounts. In the event any Member transfers all or any portion of his Financial Interest in the Company in accordance with the terms of this Agreement, the Member's transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Financial Interest.

4.2     Additional Capital Contributions. If Members holding a majority of the voting power of the Governance Interests determine that additional contributions of capital shall be made to the Company, these contributions shall be made by the Members according to their Financial Interest within twenty (20) days from the date this determination is made. If a Member does not make his proportionate contribution of capital, then the other Members shall have the option either to make a contribution to capital or make and treat their excess contributions as a loan to the Company and this option shall be available to each Member making a contribution. If a Member elects to treat his contribution as a loan, the loan shall constitute a debt of the Company and shall bear interest as provided in Section 13.1. Principal and accrued interest on any such loan shall be paid in full before any distribution shall be made to a Member in the form of Net Profits or Available Cash Flow as provided in Section 4.5.

4.3     Allocations of Profit or Loss (including Gain or Loss on Disposition). For purposes of determining Capital Account balances under this Section 4.3, Gain or Loss on disposition shall be allocated prior to reducing Capital Accounts by the distributions of Capital Receipts from the disposition.

4.3.1   Profit (including Gain or Loss on disposition) shall be allocated among the Members in the following order of priority:

4.3.1.1 First, to the Members in proportion to, and to the extent of, any deficit balances in their respective Capital Accounts until all such Capital Accounts have been restored to zero;

4.3.1.2 Second, after giving effect to the allocations made pursuant to Section 4.3.1.1, among the Members as necessary to cause the Capital Account balance of each Member to at least equal such Member's unrepaid Contributed Capital;

4

4.3.1.3 Third, among the Members in proportion to their then respective Financial Interests.

4.3.2 Loss shall be allocated among the Members in the following order of priority:

4.3.2.1 First,; among the Members as necessary to cause the Capital Account balance of each Member to equal such Members' unrepaid Capital Contributions

4.3.2.2 Second, after giving effect to the allocations made pursuant to Section 4.3.2.1, among the Members as necessary to cause the Capital Account balance of each Member to equal zero;

4.3.2.3 Third, after giving effect to the allocations made pursuant to Sections 4.3.2.1 and 4.3.2.2, among the Members in proportion to their respective Financial Interests.

4.3.3 If there is insufficient Profit, Loss Or Gain or Loss on disposition to allocate to the Members pursuant to any subsection of Section 3.1 to cause every Member's Capital Account balance to equal the entire Capital Account balance described in such subsection with respect to such Member, the Profit or Loss (including Gain or Loss on Disposition) available to be allocated among the Members pursuant to said subsection shall be allocated in proportion to the amounts thereof that would have been allocated to each Member pursuant to such subsection if there had been sufficient amounts thereof to fully satisfy the requirements of such subsection with respect to every Member.

4.3.4 Except as is otherwise provided in this Article 4, an allocation of Company taxable income or taxable loss to a Member shall be treated as an allocation to such Member of the same share of each item of income, gain, loss and deduction that has been taken into account in computing such taxable income or taxable loss.

4.4 **Application of Cash Receipts**. Cash receipts of the Company shall be applied: (i) first to pay any federal, state or local taxes of any kind owed by the Company; (ii) to pay operating expenses, debt service requirements and other obligations of the Company currently due; (iii) to make capital expenditures or improvements or reduce indebtedness of the Company in the manner which the Members shall determine; and (iv) to fund a reasonable working capital reserve as may be established from time to time by the Members. The Net Profit or Net Loss of the Company shall be determined by reducing all income of the Company by all direct and indirect expenses for personnel, cost or materials, operational and all other reasonable, ordinary and necessary costs and expenses which shall be incurred in connection with or which shall be related to the operation of the Company.

4.5 **Distribution of Available Cash Flow**. The Members shall make periodic distributions of Available Cash Flow to the Members as of the dates and in the amounts as Members owning a majority of the Governance Interests shall agree. No distributions shall be made pursuant to this Agreement unless, after the distribution is made, the assets of the Company are in excess of all liabilities of the Company, determined on the cash method of accounting, except liabilities to Members on account of their contribution to the capital of the Company. Distributions shall be made on the following basis:

5

4.5.1 To each Member an amount equal to his unrepaid Contributed Capital. If there are inadequate funds to repay all Contributed Capital, then the repayment shall be proportional.

4.5.2 Any remaining balance shall be distributed to the Members (and holders of Financial Interests) in proportion to their Capital Account balances.

## ARTICLE V
## MEMBERS

5.1     **Management.**

(a) The management of the business and affairs of the Company shall be vested in its Members. It shall be the duty of each Member to keep the other Members informed at all times concerning the Company operations.

(b) No Member shall liable to the other Members or to the Company for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred by this Agreement. A Member shall be liable only for his acts and/or omissions amounting to gross negligence and for those involving intentional wrongdoing.

5.2     **Admission of New Members.** Except as hereinafter set forth, no other person or entity shall become a Member without the consent of the Members holding a majority of the voting power of the Governance Interests.

5.3     **Annual Meeting.** The annual meeting of the Members of the Company for the transaction of all business which may come before it shall be held at the principal office of the Company in the State of Tennessee on the second Saturday of January each year.

5.4     **Special Meetings.** Special meetings of Members may be called for any purpose or purposes by the Chief Manager or a Member upon providing to the Secretary a written demand for the meeting. The demand or demands must describe the purpose or purposes for which the meeting is to be held.

5.5     **Notice of Meetings.** A written notice of each meeting of Members stating the place, date and time of the meeting and, in the case of a special meeting, describing the purpose or purposes for which the meeting is called, shall be given to each Member entitled to a notice of the meeting not less than ten (10) days nor more than two (2) months before the date of the meeting. The notice shall be given as provided in Section 16.1 and shall be effective as provided in the Act.

5.6     **Waiver of Notice.** A Member may waive any notice required to be given by the Act, the Articles, or this Agreement before or after the date and time stated in the Notice. The waiver must be in writing, signed by the Member entitled to the Notice and delivered to the Company and filed in the Company's minutes or records, except that a Member's attendance or participation in a meeting may constitute a waiver of notice under the Act. Neither the business to be transacted at, nor the purpose of, any meeting of the Members need be specified in any waiver of notice.

5.7     **Quorum.**     At all meetings of the Members, the Members holding a majority of the voting power of the Governance Interests entitled to vote at a meeting, present or represented by proxy, shall constitute a quorum. If a quorum is not present at any properly called meeting, a majority of the voting power present in person or by proxy

Case 2:21-cv-00061-TRM-CRW   Document 1-1   Filed 03/23/21   Page 26 of 272   PageID #: 31

may adjourn the meeting from time to time and from place to place, without notice other than announcement at the meeting of the new date, time and place, until Members holding a majority of the voting power of the Governance Interests entitled to vote shall attend. At any adjourned meeting at which a quorum is present, any business can be transacted which could have been transacted at the meeting originally called. Provided, if the adjournment is for more than thirty (30) days or if, after the adjournment, a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

     5.8    **Chairman.** The President of the Company shall act as Chairman at the Members' meeting. The Members may appoint any Member to act as Chairman in the absence of the President from any meeting or with his consent, if present. The Secretary of the Company shall act as secretary at all meetings of the Members. If the Secretary is not present, the presiding officer may appoint any person to act as secretary of the meeting and keep the minutes of the proceedings.

     5.9    **Voting.** Members shall take action by the affirmative vote of the Members holding a majority of the Governance Interests present and entitled to vote on that item of business, unless the Articles, this Agreement or the Act provides otherwise.

     5.10    **Adjournment.** Subject to Section 5.7, if a meeting of Members is adjourned to another date, time or place, notice need not be given of the adjourned meeting if the new date, time and place are announced at the meeting before the adjournment. At the adjourned meeting, the Company may transact any business which might have been transacted at the time originally designated for the meeting if a quorum existed at the time originally designated for the meeting.

     5.11    **Agency.**

          (a)    Proxies. A Member may appoint a proxy to vote at a meeting of Members or otherwise act for him by signing an appointment form, either personally or by his attorney-in-fact. An appointment of a proxy is effective when received by the Secretary or other manager or agent authorized to tabulate votes. An appointment is valid for eleven (11) months unless another period is expressly provided for in the appointment form. An appointment of a proxy is revocable by the Member, unless the appointment form conspicuously states that it is irrevocable and the appointment is coupled with an interest.

          (b)    Organizational Members. Membership Interest of this Company standing in the name of a corporation, partnership, limited liability company, trust or other organization may be voted by the agent or proxy designated by the governing board, chief executive officer of such organization or trustee of any trust.

     5.12    **Action by Written Consent.** Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting if all Members consent to the taking of the action without a meeting, by signing one or more written consents describing the action taken and indicating each Member's vote or abstention on the action. The affirmative vote of the aggregate Governance Interests which would be necessary to authorize or take action at a meeting of Members is the act of the Members without a meeting. The written consent or consents shall be included in the minutes or filed with the Company's records reflecting the action taken. Action taken by written consent is effective when the last Member signs the consent, unless the consent specifies a different effective date.

## ARTICLE VI
## MANAGEMENT/CHIEF MANAGER AND SECRETARY

6.1     **Management**. The management of the business and affairs of the Company shall be vested in the Members.

6.2     **President**. The President of the Company shall be elected by the affirmative vote of a majority of the Governance Interests. The President shall: (a) see that all orders and resolutions of the Members are carried into effect; (b) upon authorization, by order or resolution of the Members, sign and deliver in the name of the Company any deeds, mortgages, deeds of trust, bonds, contracts or other instruments pertaining to the business of the Company, except in cases where the authority to sign and deliver is required by law to be exercised by another person or expressly delegated by this Agreement or the Members; and (c) perform other duties prescribed by the Members. In the event the Company has a vacancy in the office of Secretary, and there is no assistant secretary, any notices, documents, or other matters that otherwise are required to go to the Secretary may be delivered to the President. The President, who must be a Member, shall hold office until the date a successor is elected. The initial president is Russell E. Taylor.

6.3     **Secretary**. The Secretary of the Company shall be elected by the affirmative vote of a majority of the Governance Interests. The Secretary shall: (a) keep accurate membership records for the Company; (b) maintain records of and, whenever necessary, certify all proceedings of the Members of the Company; (c) receive notices required to be sent to the Secretary and keep a record of these notices in the records of the Company; and (d) upon authorization, by order or resolution of the Members, sign with the President and deliver in the name of the Company any deeds, mortgages, deeds of trust, bonds, contracts or other instruments pertaining to the business of the Company, except in cases where the authority to sign and deliver is required by law to be exercised by another person or expressly delegated by this Agreement or the Members; and (e) perform other duties prescribed by the Members. The Secretary, who does not have to be a Member and who cannot also be the President, shall hold office until the date a successor is elected. The Members may elect one or more assistant secretaries to carry out the functions of the Secretary when the Secretary is unavailable.

6.4     **Treasurer**. The Treasurer of the Company shall be elected by the affirmative vote of a majority of the Governance Interests. The Treasurer shall maintain the accounts and financial records of the Company, receive income and pay expenses. The Treasurer, who does not have to be a Member, shall hold office until the date a successor is elected. The Members may elect one or more assistant treasurers to carry out the functions of the Treasurer when the Treasurer is unavailable. The Treasurer may also be the chief financial officer of the Company.

6.5     **Chief Compliance Officer.** The Chief Compliance Officer of the Company shall be elected by the affirmative vote of a majority of the Governance Interests. The Chief Compliance Office shall be responsible for implementing the procedures and policies necessary to establish compliance by the Company of regulatory rules, regulations, laws and rulings applicable to the business of the Company.

8

## ARTICLE VII
## FISCAL MATTERS

7.1    Books and Records.  Full and accurate books and records of the Company (including, without limitation, all information and records required by the Act) shall be maintained at its principal place of business showing all receipts and expenditures, assets and liabilities, profits and losses, and all other records necessary for recording the Company's business affairs.  All Members shall have access to the books and records of the Company, during regular business hours, at the Company's principal place of business, upon provision of notice in writing by any Member of the Company at least five (5) business days before the date on which any Member desires to inspect the books and records.

7.2    Fiscal Year.  The fiscal year of the Company shall end on December 31 of each year.

7.3    Tax Status; Elections.  Notwithstanding any provision hereto to the contrary, solely for purposes of the United States federal income tax laws, each of the Members hereby recognizes that the Company will be subject to all provisions of Sub-Chapter K of Chapter 1 of Subtitle A of the Code; provided, however, that the filing of U.S. Partnership Returns of Income shall not be construed to extend the purposes of the Company or expand the obligations or liabilities of the Members.  At the request of any Member, the Company shall file an election under Section 754 of the Code.  The Company shall elect a method of accounting based upon the advice and recommendations of the Company's appointed accountants.

7.4    Bank Accounts.  All funds of the Company shall be deposited to the credit of its accounts in its name at commercial banks or other financial institutions which are designated by the Members.  All orders for the payment or withdrawal of any funds of the Company shall require the signature of the individuals as designated by the Members.  All bank accounts shall require the signature of at least two members.  The handling of all accounts shall require, at a minimum,  that persons writing the checks and making deposits do not balance the account statements.

## ARTICLE VIII
## CONDUCT OF MEMBERS

8.1    (a)  Each Member shall:

(i)    Punctually pay his separate debts and indemnify the Company against the same and all expenses on account thereof;

(ii)    Pay all monies, checks and negotiable instruments received by the Member on account of the Company to the Company's bank account and within the normal course of business after receipt;

(iii)    Be just and faithful to the other Members and, at all times, give to the other Members full information and truthful explanations of all matters relating to the affairs of the Company and afford every assistance in the Member's power in carrying on the Company's business for the Member's mutual advantage.

(b)    No Member shall make, draw, accept or endorse any promissory note or obligation for the payment of money or pledge the credit of the Company in any

9

manner without the written consent of the other Members owning a majority of the Governance Interests.

## ARTICLE IX
## WITHDRAWAL AND EXPULSION OF A MEMBER

9.1     <u>Withdrawal of a Member</u>.  Any Member may withdraw from the Company at any time upon not less than thirty (30) days prior written notice to the Company ("Termination Event").  No Member shall be entitled to any distribution from the Company as a result of the Member's withdrawal.  A Member who has withdrawn shall have no right to vote on any matter to be determined by the Members.  A Member who has withdrawn shall have no liability or obligation to make any additional contribution of capital to the Company determined by the Members subsequent to such Member's withdrawal.

9.2     <u>Expulsion of a Member</u>.  The Members shall not have any power or authority to expel any Member except in the event that a Member's continued membership will jeopardize the licenses or other regulatory approval of the business.

9.3     <u>Continuation of the Company</u>.  If a Member: (a) becomes bankrupt; (b) attempts to transfer any part of the Member's Membership Interest to any person or entity other than in accordance with the provisions of Section 11.2 herein; or (c) becomes physically or mentally incapacitated ("Termination Events") or upon the occurrence of any other Termination Event as defined in Sections 8.1(b), 9.1 or 10.4 of this Agreement, the Remaining Members shall have the right to continue the existence and business of the Company upon the consent of Members holding a majority of the voting power of the Governance Interests, without regard to the interest of the Terminating Member, provided this consent is obtained no later than ninety (90) days after the occurrence of the Termination Event.  At any time due to a Termination Event, if less than two Members remain (or no Member remains if the provisions of the Act if effect at that time only require a limited liability company to have one member), the Company shall thereafter dissolve and conduct only those activities which are necessary to wind up its affairs.

## ARTICLE X
## DETRIMENTAL CONDUCT OF MEMBERS

10.1     <u>Company Option to Purchase</u>.  If any of the events enumerated in Sections 8.1(b), 9.1 or 10.4 occur ("Termination Events"), the Member who acted or with respect to whom the act has occurred (herein "Terminating Member") shall be obligated to offer his Membership Interest for sale to the Company pursuant to Section 11.2(d).  Except as otherwise provided in this Agreement, if any of the events described in Section 9.3 occur, the Member with respect to whom the act has occurred or the Member's estate ("Terminating Member") shall be obligated to offer his Membership Interest for sale to the Company pursuant to Section 11.2(d).  The Company or the Remaining Members (if the Company assigns this right to the Remaining Members) shall have the right and option to either purchase the Terminating Member's Membership Interest, to dissolve and terminate the Company or to treat the event as not being a Terminating Event.

10

10.2  Process to Purchase. If the Company or its assigns elects to purchase the Terminating Member's Interest, it or they shall serve written notice of the election upon the Terminating Member within the time period specified in Section 11.2(d) after the Company has received notice of the Termination Event. The purchase shall be consummated within the designated time period after the date written notice is served by the Company, or its assigns, or as of the date the value of the Membership Interest to be purchased has been determined pursuant to Section 12.1 or 12.2, whichever shall last occur. The amount and method of computing the purchase price, the percentage and manner of purchase, the method of payment, interest rates and the other rights and obligations of the Terminating Member, the Company and the Remaining Members shall be the same as provided in ARTICLE XII and ARTICLE XIII.

10.3  Process to Dissolve and Terminate. If the Company and/or Members holding a majority of the voting power of the Governance Interest, without regard to the interest of the Terminating Member, elect to dissolve and terminate the Company, they shall serve written notice of this election upon the Terminating Member and all other Members who have not voted to dissolve the Company within thirty (30) days after they have received notice of the occurrence of the Termination Event. The procedure for dissolution and termination shall be as provided in Sections 14.3 and 14.4.

10.4  Termination Events. Termination events shall include the following:

10.4.1  A Member becomes bankrupt, insolvent or makes an assignment for the benefit of his creditors or his assets become subject to administration in any kind of voluntary or involuntary creditor's proceedings.

10.4.2  A Member withholds any cash or other assets from the Company contrary to the terms of this Agreement.

10.4.3  A Member has materially breached or is unable to perform his material obligations under this Agreement or the continued association of that Member with the Company is detrimental to the best interests of the Company or will cause the Company to lose its licenses necessary to the operation of the business.

10.4.4  A Member performs any grossly negligent or intentional act which, in the reasonable opinion of the Remaining Members, materially damages the reputation or assets of the Company.

10.4.5  A Member's Membership Interest is subject to being sold or is sold, attached or otherwise acquired through judicial process or other operation of law;

10.4.6  The occurrence of an event described in Sections 8.1(b), 9.1 or 9.3.

10.5  Closing of Purchase. If the Company and/or the Remaining Members elect to purchase the Membership Interest of the Terminating Member, the amount and method of computing the purchase price, the percentage and manner of purchase, the method of payment, interest rates and the other rights and obligations of the Terminating Member, the Company and Remaining Members shall be the same as provided in ARTICLE XII and ARTICLE XIII.

11

## ARTICLE XI
## TRANSFER; RESTRICTIONS

11.1    Definitions.  For purposes of this Agreement, the "transfer" or "assignment" of an interest in the Company shall mean any transfer, alienation, sale, assignment or other disposition of all or any part of an existing Membership Interest in the Company, whether voluntarily or involuntarily, whether for or without consideration, and shall include a transfer by operation of law, transfer incident to divorce, foreclosure, judicial sale or otherwise ("Termination Event").

11.2    Transfer or Assignment of Membership Interest.  No transfer or assignment of a Membership Interest in the Company shall be made except on the following conditions:

        (a)    A Member may freely transfer the Member's Financial Interest in the Company to an *inter vivos* trust for the benefit of any one or more of the Member, Member's spouse or Member's descendants without the consent of the Company or any other Member.

        (b)    A Member may freely transfer the Member's Membership Interest by will or intestacy.

        (c)    A Member may freely transfer the Member's Membership Interest in the Company to any other individual or entity who owns a Membership Interest in the Company as of the date of the transfer.

        (d)    Russell E. Taylor may transfer any part of his Financial and Governance Interests to Morgan A. Taylor with terms at his sole discretion.

        (e)    Members holding a majority of the voting power of the Governance Interest, without regard to the interest of the Member proposing to transfer his interest, consent to the proposed transfer or assignment of the Member's Membership Interest in writing after full disclosure by the Member of the proposed transaction.

        (f)    With respect to any proposed voluntary or assignment to a third party:

        (i)    In the event that any Member desires to make a bona fide transfer or assignment of his Membership Interest in the Company to a person other than as expressly permitted in this Section 11.2 or if a majority of the Remaining Members do not consent to the proposed transfer as provided in Section 11.2(d), then the Member desiring to make the transfer or assignment ("Transferring Member") must first give the Company the option to buy the Member's Membership Interest.  The Transferring Member shall deliver written notice to the Company, which notice shall state the name of the prospective bona fide purchaser and the price and terms offered by the prospective purchaser. The Company shall have the option to purchase the Membership Interest of the Transferring Member at the price and on the same terms as set forth in the written notice.  The Company shall have fifteen (15) days following the receipt of the notice to exercise this option by giving notice of the election to the transferring Member and the Remaining Members.  If the Company does not exercise its option to purchase, the Remaining Members shall have the option to buy the Transferring Member's Membership Interest for a period of fifteen (15) days thereafter.  During the first ten (10) days, each Member shall have the option to purchase a percentage of the offered Membership Interest equal to the Member's percentage Membership Interest without

12

regard to the interest of the Transferring Member. If the Remaining Members do not exercise the option to purchase the offered interest, the Members desiring to purchase a portion of the offered Membership Interest shall be entitled, for a period of five (5) additional days, to purchase the balance of the offered Membership Interest by giving notice of the election to the Transferring Member and the Remaining Members. However, in no event shall the Transferring Member be required to sell less than all of the Membership Interest offered.

(ii)     In the event the option is not exercised within either fifteen (15) day period, as applicable, it shall expire and be of no further force and effect. If the Remaining Members holding a majority vote of the Governance Interest consent to the proposed transfer or assignment, the Membership Interest of the Transferring Member may be sold to the identified purchaser, but not for less than the price stated in the written notice or on the terms and conditions materially different from those stated in the written notice. If the proposed third party sale is not consummated within ninety (90) days after the expiration of the option period, the Transferring Member may not sell his Membership Interest in the company without again offering the Company or the Remaining Members the option to purchase, as provided in Section 11.2 (f)(i).

(iii)     The foregoing provisions shall be binding upon any transferee of a Membership Interest in the Company. A person who receives a transfer of a Governance Interest that is authorized by or complies with the provisions of this Section 11.2, and who affirmatively agrees in writing to be bound by the provisions of this Agreement shall become a Member as of the effective date of the transfer.

(iv)     In the event the option is not exercised within the applicable option periods and if the Remaining Members holding a majority vote of the Governance Interest do not consent to the proposed transfer or assignment of the Transferring Member's Membership Interest, the Company and/or the Remaining Members shall immediately proceed to dissolve and terminate the Company under the provisions of Sections 14.3 and 14.4.

(v)     Notwithstanding the foregoing, in no event shall any Member transfer or assign all or any part of his Membership Interest in the Company, no person or entity shall be admitted to the Company as a Member, and no Member shall withdraw from the Company if this action would result in a sale or exchange of 50% or more of the total Financial Interest in the capital and profits of the Company within a twelve month period, so that the Company would be considered as terminated under Section 708 of the Code, or so as to prevent the Company from continuing the use of accelerated methods of depreciation previously used by the Company in connection with depreciable property of the Company, without the prior approval of the Members holding a majority vote of the Governance Interests.

11.3.   **Tag Along/Drag Along Rights**. While a majority of the Governance Interests may vote to sell the Company or substantially all of its assets, no Member may refuse to sell his Membership Interest if the majority so approves a sale and the Members selling their interests must allow the disapproving Member)s) to tag along with a sale under the same terms and conditions.

13

## ARTICLE XII
## VALUE OF MEMBER'S INTEREST

12.1 **Value by Agreement.** It is anticipated that there will be no setting of value by agreement since all Members intend to remain members.

12.2 **Value Without Agreement.**

12.2.1 In the event the Members fail to agree or cannot agree as to the Value of the Company, the purchase price of a Terminating Member's Membership Interest shall be determined as follows: The Company (or the Remaining Members, if applicable) electing to purchase the Membership Interest shall appoint a business valuation expert; the Terminating member, or his successor in interest, shall also appoint a business valuation expert. Each such expert shall be a Certified Valuation Analyst, a CPA Accredited in Business Valuations or comparable qualification, and shall be free of any interest in the Company or with any Member. Each expert shall determine the fair market value of the Company. The average of the two valuations shall determine the value of the Company; provided, however, if the fair market value of the Company shown by the two experts differs by more than ten percent (10%), the two experts shall select a third expert who shall make the same determination of the Company's fair market value and the average of the two valuations closest in value shall be the fair market value of the Company. No allowance shall be made for good will or other intangible assets except as those assets that have been reflected on the Company books. The value of the Company so determined shall be final and binding for the purposes of this Agreement. The value so determined shall then be multiplied by the ownership percentage of the Terminating Member to determine its fair market value. No discount shall be allowed based on any presumed lack of marketability of the Membership Interest, lack of liquidity or premium based on control.

12.2.2 In the event the Company or the Terminating Member shall refuse or shall be unable to appoint an expert or in the event the experts appointed shall be unable to agree as to the identity of the third expert, then the appointment shall be made on a petition filed by any interested party with a court of competent jurisdiction in Sullivan County, Tennessee. If such proceedings shall be required, the costs thereof, including reasonable attorneys fees, shall be borne by the party whose failure to act resulted in the necessity to file the petition.

## ARTICLE XIII
## PAYMENT OF PURCHASE PRICE AND CLOSING

13.1 **Payment.** The purchase price for the Membership Interest of a Terminating Member shall be paid to the terminating Member or to his personal representative as follows: The purchase price shall be paid in cash as of the date specified for the purchase of the Terminating Member's Membership Interest under the provision of Section 11.2(d); provided, however, if the purchase price for the Membership Interest exceeds Twenty-five Thousand Dollars ($25,000.00), the first Twenty-five Thousand Dollars ($25,000.00) of the purchase price shall be paid in cash as

14

of the specified date. On the same date, the Company shall execute and deliver a negotiable promissory note (the "Note") for the balance of the purchase price, payable to the Terminating Member or his personal representative. The Note shall be dated as of the date of the Termination Event and shall be payable in five (5) equal annual installments of principal plus interest on the unpaid principal balance at the prime lending rate published in the Wall Street Journal nearest the initial date before the Note, to be applicable for the initial 12 month period. The interest rate shall be adjusted as of each anniversary date based on the prime lending rate similarly determined. The first payment of principal, plus accrued interest, shall be due and payable 12 months after the date of the Note, with a like payment of principal, plus accrued interest, due and payable on the same day of each succeeding year until the principal balance, together with all accrued interest thereon, has been paid in full. The maker of the Note shall have the option to prepay any portion or all of the principal owed on the Note, plus accrued interest to date o payment, at any time prior to maturity and without penalty.

13.2    **Closing.** Simultaneously with the delivery of the Note to the Terminating Member or to his personal representative, the Terminating Member or his personal representative shall deliver to the Company duly executed instruments assigning, conveying and transferring good and marketable title to the Terminating Member's entire Membership Interest, free from any liens or encumbrances or rights of others therein other than those which are Company obligations and which have been taken into account in determining the value of the Terminating Member's Membership Interest. At the same time, the Company shall deliver to the Terminating Member or his personal representative proper instruments by which it shall assume sole liability for all claims against and all obligations of the Company, and by which it shall agree to hold the Terminating Member or his estate free and harmless from any liability to the Company creditors only if the obligations have been taken into account in determining the value of the Membership Interest.

13.3    **Transfer of Entire Interest.** The transfer of the Terminating Member's Membership Interest shall consist of all his right, title and interest in and to the Company, its firm name and all assets thereof, including, without limitation, his Capital Account at the date of the Termination Event, his share of any undrawn profits for any fiscal year up to the date of the Termination Event and his share of profits from the beginning of the fiscal year in which the Termination Event occurs and for all periods after the Termination Event. The Membership Interest of the Terminating Member shall not be deemed to include any debts or liabilities of the Company owed him for loans and advances made by him and these debts shall be repaid by the Company as required by the terms of the loans and advances.

## ARTICLE XIV
## DISSOLUTION AND TERMINATION

14.1    **Events Causing Dissolution.** The Company shall be dissolved (a) by action of the Members pursuant to **Tennessee Code Annotated Section 48-249-603**; (b) upon the occurrence of any event specified in **Tennessee Code Annotated** Section 48-249-601(a); (c) upon the loss or failure to obtain within four (4) weeks after the filing of Articles of Organization for the Company of the licenses necessary to conduct the

15

business; (d) upon the sale or other disposition of all or substantially all of the assets of the Company and the distribution of the net proceeds therefrom; or (e) as may be otherwise provided by law or by this Agreement.

14.2 **Continuation in Certain Circumstances upon Dissolution.** If an event described in Section 14.1(b) occurs and if at that time there are at least two Remaining Members of the Company (or at least one remaining Member if the provisions of the Act in effect at that time only require a limited liability company to have one member), the Company may be continued by the consent of the Remaining Members holding a majority of the Governance Interests, provided consent is obtained no later than ninety (90) days after the occurrence of the event described in Section 14.1(b). If consent is properly obtained, then the Company shall not be dissolved and shall not be required to be liquidated. In the event consent is not obtained, then the Company shall be dissolved in accordance with provisions of Section 14.3.

14.3 **Winding Up Affairs on Dissolution.** Except as provided in Section 14.2, upon the occurrence of any event described in Section 14.1, the Company shall be dissolved by the Members or other persons required or permitted by law to carry out the dissolution. In that event, the person or persons shall promptly notify all Members of the dissolution; shall wind up the affairs of the Company; shall prepare and file all instruments or documents required by law to be filed to reflect the dissolution of the Company; and, after paying or providing for the payment of all liabilities and obligations of the Company, shall distribute the assets of the Company as provided by the terms of this Agreement.

14.4 **Distributions Upon Termination.** Upon dissolution of the Company and the winding up of its affairs, all assets of the Company shall be distributed as set forth below:

(a) To pay all outstanding liabilities and expenses of the Company, including liquidating expenses and obligations;

(b) To establish reserves for unknown or contingent liabilities including, without limitation, reserves for environmental matters, as the Members may determine;

(c) To each Member an amount equal to his unpaid Capital Contributions.. If there are inadequate funds to repay all Capital Contributions, then the repayment shall be proportional.

(d) Any remaining balance shall be distributed to the Members (and holders of any Financial Interests) in proportion to their Capital Account balances.

## ARTICLE XV
## PERMISSIBLE ACTIVITIES

15.1 **Dealings with the Company.** In its discretion and from time to time, the Company may perform or purchase or acquire from any Member or from any entity in which any Member has an equity interest, any goods or services which may at any time be necessary, proper, convenient or advisable in carrying on the business affairs of the Company or in disposing of some or all of its assets. Provided, the compensation or price paid to the Member or related entity for these goods or services shall not materially

16

exceed that generally prevailing in comparable transactions in the geographical area in which the Company conducts business.

15.2    **Members Engaging in other Business**.  A Member may engage in and/or possess an interest in other business ventures, independently or with others, but not in competition with the Company; the Members agree to execute covenants not to compete with the Company extending from the date of this Agreement to three years from the date of their departure from the Company in a market area of all jurisdictions where the business or any part of the business can be lawfully conducted within the States, Provinces and territories of the United States and Canada.  Neither the Company nor any Member shall have any legal rights by virtue of this Agreement in or to any Member's independent ventures or to any income or profits which may be derived therefrom.  A Member shall be under no obligation to present a business or investment opportunity to the company even if the opportunity is of a character which, if presented to the Company, could be taken by the Company.  Each Member shall have the right to invest for his own account or to recommend to others any particular business or investment opportunity.

15.3    **Members Incurring Expenses in Behalf of the Company**.  As member managers, each Member shall be responsible for routine expenses, e.g., phone charges, mileage, office type supplies, etc. and may report these as permitted on their individual income tax returns.  Items that are purchased for the Company, e.g., repair and maintenance items or advances by a Member for the payment of services for the Company shall be reimbursed by the Company.  A Member may request to advance funds or incur expenses in behalf of the Company and may, upon consent of the Members holding a majority of the Governance Interests, obtain reimbursement for those advances or expenses.

## ARTICLE XVI
## GENERAL PROVISIONS

16.1    **Notices**.  All notices, consents, waivers, directions, requests, votes or other instruments or communications provided for under this Agreement shall be in writing, signed by the party giving the same, and shall be deemed properly given three (3) business days after mailing if sent by registered or certified mail, postage prepaid, addressed:

(a)    In the case of the Company, to the President at the address shown on Exhibit A.

(b)    In the case of any Member, to the address shown on Exhibit A; or to any other address which a Member may specify in writing to the Remaining Members.

16.2    **Integration**.  This Agreement embodies the entire agreement and understanding among the Members and supersedes all prior agreements and understandings, if any, among and between the Members relating to the subject matter hereof.

16.3    **Applicable Law**.  This Agreement and the rights of the Members shall be governed by and construed and enforced in accordance with the laws of the State of Tennessee.

Case 2:21-cv-00061-TRM-CRW   Document 1-1   Filed 03/23/21   Page 37 of 272   PageID #: 42

16.4    **Severability.** In the event any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and any other application thereof shall not in any way be affected or impaired thereby.

16.5    **Binding Effect.** Except as herein otherwise provided to the contrary, this Agreement shall be binding upon and inure to the benefit of, the Members and their respective heirs, executors, administrators, successors, transferees and assigns; provided, however, this provision shall not be construed to create a right of transfer or assignment in addition to those set forth elsewhere in this Agreement.

16.6    **Terminology.** All personal pronouns used in this Agreement, whether used in the masculine, feminine, or neuter gender, shall include all other genders; and the singular shall include the plural, and vice versa, where appropriate. Titles and Articles are for convenience only and neither limit nor amplify the provisions of the Agreement.

16.7    **Amendment.** This Agreement may be amended, modified or supplemented only by a writing executed by all Members and persons holding a Financial Interest.

16.8    **Section Captions.** Section and other captions contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

IN WITNESS WHEREOF, this Agreement is executed effective as of the date first above written and may be executed in counterparts.

CPH BRANDS, LLC

By: _____
President

_____
Michael Vaughn

_____
Timothy Kendrick

_____
Russell E. Taylor

18

Exhibit A
Operating Agreement
CPH Brands, LLC

Initial Contributed Capital
Initial Financial Interests
Initial Governance Interests

| | Initial Financial Interest | Initial Governance Interest | Initial Contributed Capital |
|---|---|---|---|
| Michael Vaughn<br>3334 Bloomingdale rd.<br>Kpt. TN. 37660 | 24.5% | 24.5% | $288,000.00, consisting of all equipment currently purchased with his funds for the business; all licenses, applied for and/or issued, however owned. |
| Timothy Kendrick<br>3233 Forest view Rd<br>Kpt TN 37660 | 24.5% | 24.5% | $1.00 |
| Russell E. Taylor<br>1043 Fordtown Road<br>Kingsport, TN 37663 | 51% | 51% | $100,000.00 cash* |

*

- Russell Taylor, a part owner of Taylor Properties #1, L.P., the owner of 1736 N. Eastman Road, Kingsport, TN, has arranged for a lease between the Company and the owner. For up to Three (3) months, the rent under said lease shall be accrued, but does not have to be paid. Thereafter, rent shall be paid currently and the accrued rent shall be caught up from initial cash flow of the business prior to distributions to members.

- Russell Taylor agrees also to advance up to $36,000.00 for initial business expenses, which shall be repaid prior to any distributions to members.

19

- Russell Taylor agrees to provide up to $4,200, plus a convenience fee of 3% for the acquisition or rental of the cold press machine, which shall be repaid prior to any distributions to members.

Lease Agreement

**THIS LEASE AGREEMENT** ("Lease") is made as of January 23, 2019 by and among Taylor Properties #1, L.P., with offices at 1043 Fordtown Road, Kingsport, Tennessee 37663 ("Landlord") and CPH BRANDS, LLC, a Tennessee limited liability company ("Tenant") whose address for notice is 1736 North Eastman Road, Kingsport TN 37664.

WITNESSETH:

1.  Demise.

For and in consideration of the Rent (as hereinafter defined) and other amounts hereinafter stipulated to be paid and the provisions of this Lease, Landlord hereby demises and lets to Tenant, and Tenant hereby takes and leases from Landlord, subject to the provisions hereinafter set forth, that certain parcel of land located in the 11th Civil District of Sullivan County Tennessee, City of Kingsport, commonly referred to as 1736 North Eastman Road, approximately 2.01 acres more or less, being more particularly described as Lot 7, as shown on plat of record in the Register's Office for Sullivan County at Blountville Tennessee in Plat Book 38, page 100, together with all buildings and improvements located thereon and that certain 30' ingress and egress easement as shown on said plat (the "Premises").

2.  Title; Condition of Premises.

The Premises are demised and let without representations or warranties, express or implied, by Landlord, as to the state of the title thereto existing at the commencement of the term of this Lease, as to the zoning of the Premises at the commencement of the term of this Lease, as to any state of facts which an accurate survey or physical inspection might show, and to all applicable laws, rules, regulations, ordinances, and restrictions now or hereafter in effect. Tenant has leased the Premises and accepts the same, AS IS WHERE IS AND WITHOUT ANY WARRANTIES OF ANY NATURE, EXPRESS OR IMPLIED, IT BEING THE INTENTION OF THE LANDLORD AND TENANT EXPRESSLY TO NEGATE AND EXCLUDE ALL WARRANTIES EXPRESS OR IMPLIED, IN FACT OR BY LAW, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.

3.  Use.

The Premises may be used and occupied for the operation of a **pharmaceutical processing facility** and office space incidental thereto and for no other purpose. Tenant shall obtain all necessary permits, registrations, and approvals for any alterations of the Premises and for the conduct of its business in the Premises and shall comply strictly with the terms and conditions of such permits, if any, and with all applicable laws, rules, regulations, zoning or other ordinances, and restrictive covenants affecting the Premises or the Tenant's operations in or about the Premises. Tenant shall not use, or permit to be used, all or any portion of the Premises for any illegal purpose or activity or in any way that would constitute a nuisance.

4.  Term.

Commencing on the date hereof (the "Commencement Date") Tenant shall lease the Premises on a month to month basis (the "Term") which shall continue until terminated by either Landlord or Tenant upon thirty (30) days' advance written notice delivered by the terminating party to the other party on or before the first day of a calendar month.

5.  Rent.



1

Case 2:21-cv-00061-TRM-CRW   Document 1-1   Filed 03/23/21   Page 41 of 272   PageID #: 46

A.      Base Rent (as hereinafter defined) shall accrue hereunder commencing on the Commencement Date. Rent shall be payable to Landlord at the address specified above, in advance, without notice, demand, offset or abatement. As used herein "Rent" shall mean Base Rent together with any and all other payments or charges which are the responsibility of the Tenant hereunder, including but not limited to, real property taxes, insurance, utilities, maintenance or other expenses whether paid to Landlord or a third party. Each consecutive twelve-month period during the Term beginning with the Rent Commencement Date is herein called a "Lease Year."

B.      Commencing on the Commencement Date Tenant shall pay to Landlord monthly base rent ("Base Rent") in the amount of One Thousand and no/100 Dollars ($1,000.00) per month. In addition to all other rights and remedies hereunder and not in lieu thereof, in the event rent is not paid within ten (10) days of the date due (excluding any initial partial month), Tenant shall pay to Landlord a late fee equal to five percent (5%) of the amount then due and owing. Landlord and Tenant agree and acknowledge that this amount represents a fair estimation of Landlord's damages in the event rent is not paid timely.

6.      Late Payment.

In the event Tenant fails, for any reason whatsoever, to pay Rent on or before such payment shall become due and owing, it is agreed that the amount thus due shall bear interest at the rate of ten percent (10%) per annum, such interest to accrue continuously on any unpaid balance due to Landlord by Tenant during the period commencing with the aforesaid due date and terminating with the date in which Tenant makes full payment of all amounts owing to Landlord at the time of said payment (including the five percent (5%) late fee set forth herein). Notwithstanding this late payment provision, Tenant may defer payment of rent without late payment fee or interest for up to the first three months of the term and, thereafter, shall pay the subsequent months currently and pay the deferred portion from business cash flow as it is received.

7.      [Reserved]

8.      Gross Lease.

This Lease is and shall be deemed and construed to be a gross lease. From the moment that Tenant shall first enter into the Premises, Landlord shall be responsible for the following expenses.

A.      **Utilities**. Landlord covenants and agrees to retain all utility billings in Landlord's name and to pay fully and promptly all utility charges billed if any for each and every month in the Term. As used herein the term "utility" is used to mean all electricity, gas, oil, water, sewer, garbage service, security services and any other type of service provided for or furnished to or for the benefit of the Premises.

B.      **Alterations, Maintenance and Repair**. Tenant shall be responsible for all costs, expenses and fees associated with improvements to the Premises and shall maintain the Premises at Tenant's sole risk, cost, and expense. Tenant shall at all times maintain the Premises in a clean, sightly and safe condition free from any dangerous condition, nuisance, or waste, in compliance with all applicable laws, and shall make all repairs thereto, ordinary and extraordinary, foreseen and unforeseen. Landlord does not warrant that the HVAC system will be adequate for Tenant's particular purpose. Tenant, at Tenant's sole installation and maintenance cost, may extend or add additional duct work or capacity to the HVAC system.

C.      **Taxes**. Landlord shall pay all real property taxes assessed against the Premises.

D.      **Other Expenses**. Tenant shall pay all other expenses of any nature or kind relating to the Premises, now or hereafter existing. Tenant, at Tenant's sole cost and expense shall maintain the insurance coverage set forth herein below.

9.      Indemnification,

2

Tenant is and shall be in exclusive control of the Premises and Landlord shall not have any liability to Tenant or any third party in connection therewith. Therefore, notwithstanding any allegation or determination of relative responsibility, Tenant shall pay, and shall protect, indemnify and hold Landlord harmless from and against, any and all liabilities, losses, damages, costs, expenses (including, without limitation, attorneys' fees and expenses), causes of action, suits, claims, demands, or judgments, of any nature whatsoever, whether foreseen or unforeseen, ordinary or extraordinary, arising or alleged to arise, (collectively "Liabilities") from or in connection with (i) any injury to, or the death of, any person or any damage to or loss of property, (ii) the violation by Tenant of any provisions of this Lease or of any law, rule, regulation, ordinance, restriction, or insurance policy, now or hereafter in effect, or of any agreement to which Tenant is a party or by which it is bound, now or hereafter in effect, or of any agreement of which Tenant has notice and which is now in effect, affecting or applicable to the possession, use, occupancy, maintenance or repair of the Premises or any portion thereof or of adjoining passageways, sidewalks or streets; (iii) any subletting of the Premises or assignment of the Lease. This provision shall survive the termination or expiration of this Lease.

10.     Alterations and Additions; Encumbrances.

Tenant shall not subject the fee title, the Premises, or any interest therein to any easements, encumbrances, restrictions, covenants or conditions or to any liens of mechanics, laborers, materialmen, contractors or subcontractors, or to any other liens or charges whatsoever arising out of the construction, maintenance or repair of buildings, structures, or other improvements, or arising in any other manner. Tenant agrees to immediately discharge (either by payment or by filing of the necessary bond, or otherwise) any mechanic's, materialmen's, or other lien against the Premises which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies, or equipment alleged to have been furnished to or for Tenant or any subtenant in, upon or about the Premises.

11.     Condemnation and Casualty.

A.      In the event that the title to all or substantially all of the Premises shall be taken by condemnation proceedings or any right of eminent domain, this Lease shall terminate and expire on the date of such taking and Landlord and Tenant shall each be entitled to receive the proceeds resulting from such taking attributable to its interest provided Tenant's award for condemnation does not diminish or subtract from Landlord's award. Tenant acknowledges it will not be entitled to condemnation proceeds until Landlord is made whole. In the event of a partial taking which does not take the building, Tenant acknowledges that Landlord shall be entitled to the entire award.

B.      A casualty loss suffered on the Premises shall not cause an abatement of Rent, and Tenant shall promptly demolish and reconstruct any damaged improvements so as to maintain a sightly and safe Premises.

12.     Insurance.

A.      Tenant shall, at all times during the term hereof and at its sole cost and expense, maintain and keep in force the following policies of insurance which shall be acceptable to Landlord in amount, substance, and carrier:

        (1.)    Insurance for Tenant's personal property located on the Premises, the building, and the leasehold improvements in the amount of the full insurable value of such personal property, building, and leasehold improvements, with full replacement cost endorsement (no deduction for depreciation), against loss or damage caused by fire and any of the risks covered by insurance of the type now known as "fire, extended coverage, and broad form perils, with deductibles consistent with insurance industry practices." Adequate limits of liability must be maintained to comply with appropriate coinsurance requirements.

        (2.)    Statutory Worker's Compensation insurance (as applicable).

        (3.)    Commercial general liability insurance policy, including (but not limited to) insurance against assumed or contractual liability under this Lease, with respect to liability arising out of the ownership, use, occupancy, or maintenance of the Premises and all areas appurtenant thereto, to afford protection with respect to

3

personal injury, death or property damage or not less than One Million Dollars ($1,000,000) per occurrence combined single limit Three Million Dollars ($3,000,000) general aggregate (but not less than $1,000,000 per location aggregate); and

B.      Every insurance policy relating to the Premises (excluding Tenant's personal property) shall name Landlord as an additional insured, and shall provide that 30 days prior to cancellation, written notice of cancellation shall be given to Landlord, shall not be invalidated by any act or neglect of Landlord or Tenant, nor by any foreclosure or any other proceedings or notices thereof relating to the Premises or any interest therein, nor by any change in the title or ownership of the Premises for purposes more hazardous than are permitted by such policy. No such policy shall contain a provision relieving the issuer thereof of liability for any loss by reason of the existence of other policies of insurance covering the Premises against the peril involved.

C.      Tenant shall deliver to Landlord promptly after the execution and delivery of this Lease, certificates of insurance evidencing all the insurance that is then required to be maintained by Tenant, and Tenant shall, not less than 30 days prior to the expiration or material change of any insurance, deliver certificates of insurance to Landlord evidencing the renewal or change of such insurance.

D.      Tenant shall request its insurance carrier to endorse all applicable policies waiving the carriers' right of recovery under subrogation or otherwise, in favor of the Landlord and provide a certificate of insurance verifying this waiver.

13.     Expiration or Termination.

In the event of the expiration or termination of this Lease for any reason, the obligation and liabilities of Tenant, actual or contingent, under this Lease which shall have arisen, but which shall not have been performed or satisfied, shall survive such termination. Tenant shall remain obligated to deliver all proceeds of insurance then held by Tenant in respect of any casualty, which occurred prior to such termination.

14.     Subletting; Assigning.

A.      Tenant shall not assign this Lease nor sublet the Premises without the prior written consent of Landlord. Notwithstanding any such subletting or assignment, Tenant shall remain primarily liable for all of its obligations under this Lease and such obligation shall continue undiminished and as the obligations of a principal as though no such subletting or assignment had been made. Any sublease or assignment by Tenant not in compliance with the provisions of this Section shall be void.

B.      Landlord may mortgage, assign, convey, or otherwise transfer its estate, right, title, and interest hereunder or in the Premises, or any portion thereof, without the consent of Tenant. Tenant shall subordinate its interest in this Lease and attorn to any mortgagee of the Premises, provided that such mortgagee agrees not to disturb Tenant's possession of the Premises so long as it is not in default hereunder. In the event of any such transfer of title of its estate in this Lease, Landlord shall automatically be relieved of all its obligations upon the transferee's assuming such obligations. Any estate, right, title, or interest assigned as permitted by this Section may be assigned and reassigned in like manner by any assignee thereof.

C.      Tenant shall provide an estoppel certificate from time to time within ten (10) days of Landlord's request, confirming that the lease is in full effect and that no default exists hereunder. Any estoppel not returned by Tenant within ten (10) days following request therefor shall be deemed given and Tenant shall be deemed to have waived any adverse matters possibly contained in such estoppel.

15.     Advances by Landlord.

If Tenant fails to make or perform any payment or act on its part to be made or performed under this Lease, then Landlord may (but need not), without waiving any default or releasing Tenant from any obligation, make such payment or perform such act for the account and at the cost and expense of Tenant. All amounts so paid by Landlord

4

and all necessary and incidental costs and expenses (including, but not limited to, attorneys' fees and expenses) incurred in connection with the performance of any such act by Landlord, together with interest at the highest rate allowable under the applicable law from the date of the making of such payment or of the incurring of such costs and expenses by Landlord, shall be payable by Tenant to Landlord on demand as additional Rent.

16.    Conditional Limitations - Events of Default and Remedies.

A.    Any of the following occurrences or acts shall constitute an "Event of Default" under this Lease:

(1.)    If Tenant shall:

(a)    Fail or refuse to timely pay Rent when due, or other monetary sum payable hereunder; or

(b)    Default in the observance or performance of any provisions of this Lease to be observed or performed by Tenant hereunder; or

(c)    If the Premises shall be abandoned by Tenant for a period of thirty (30) consecutive days, provided, however, that the Premises shall not be deemed to have been abandoned if Tenant shall observe and perform the provisions of this Lease to be observed and performed by Tenant and if Tenant is continuing to manage and operate the Premises; or

(d)    If Tenant shall file a petition in bankruptcy or for reorganization or for an arrangement pursuant to the Bankruptcy Act or under any similar federal or state law, now or hereafter in effect, or shall be adjudicated a bankrupt or become insolvent, or shall make an assignment for the benefit of its creditors, or shall admit in writing its inability to pay its debts generally as they become due, or shall be dissolved, or shall suspend payment of its obligations, or shall take any corporate action in furtherance of any of the foregoing; or

(e)    If a petition or answer shall be filed proposing the adjudication of Tenant as a bankrupt or its reorganization pursuant to the Bankruptcy Act or any similar federal or state law, now or hereafter in effect, and (i) Tenant shall consent to the filing thereof, or (ii) such petition or answer shall not be discharged or denied within sixty (60) days after the filing thereof; or

(f)    If a receiver, trustee, or liquidator (or other similar official) shall be appointed for or take possession or charge of Tenant or of all or any substantial portion of the business or assets of Tenant or of Tenant's estate or interest in the Premises, and shall not be discharged within sixty (60) days thereafter or if Tenant shall consent to or acquiesce in such appointment.

(g)    If Tenant rejects this Lease after filing a petition in bankruptcy or insolvency or for reorganization or arrangement under Federal bankruptcy laws or under any state insolvency act.

B.    This Lease and the term and estate hereby granted are subject to the limitation that whenever an Event of Default shall have occurred, Landlord may, at its election, during the continuance of such Event of Default:

(1)    Proceed by appropriate judicial proceedings, either at law or in equity, to enforce performance or observance by Tenant of the applicable provisions of this Lease or to recover damages for the breach thereof; or

(2)    By written notice to Tenant, as provided herein, terminate this Lease, whereupon Tenant's estate and all rights of Tenant to the use of the Premises shall forthwith terminate as though this Lease had never been made, but Tenant shall remain liable as hereinafter provided; and thereupon Landlord shall have the immediate right of re-entry and possession of the Premises and the right to remove any or all persons or property there from and alter locks and other security devices at the Premises; and Landlord may thenceforth hold, possess, and enjoy the Premises free from any rights of Tenant and any person claiming through or under Tenant; and Landlord shall have the right to recover forthwith from Tenant:

(a) any and all Rent and all other amounts payable by Tenant hereunder which may then be due and unpaid or which may then be accrued and unpaid;



Case 2:21-cv-00061-TRM-CRW   Document 1-1   Filed 03/23/21   Page 45 of 272   PageID #: 50

(b) as liquidated damages for loss of the bargain and not as a penalty, an amount equal to the excess of the aggregate of all unpaid Rent which would have been payable if this Lease had not been terminated prior to the end of the Term over the aggregate fair rental value of the Premises at the date of termination of this Lease for the period from such termination date to the end of the Term both discounted in accordance with accepted financial practice to then-present worth; provided, however, the Landlord shall not owe any sums to Tenant if such discounted fair rental value is greater than such discounted unpaid rent; and

(c) any and all damages and expenses (including, without limitation, attorneys' fees and expenses), which Landlord shall have sustained by reason of the breach of any provision of this Lease or the termination of this Lease.

C.      Unless the Term of this Lease shall have terminated or as permitted by law, if Landlord shall obtain possession of the Premises or any portion thereof following an Event of Default hereunder, Landlord shall have the right, without notice, to repair or alter the Premises or any portion thereof in such manner as the Landlord may deem appropriate consistent with Tenant's obligations as provided in this Lease, to put the same in good order and to make the same rentable, and shall have the right to re-let the Premises or any portion thereof, and Tenant agrees to pay to Landlord on demand all fees, costs, and expenses incurred by Landlord in obtaining possession, and in repairing and putting the Premises or any portion thereof in good order and condition, and in reletting the Premises or any portion thereof including reasonable fees and expenses of attorneys, engineers, mechanics, and other skilled persons, and other reasonable expenses and commissions.

D.      At the request of Landlord upon the occurrence of an Event of Default hereunder, Tenant will quit and surrender the Premises to Landlord or its agents, and Landlord may without further notice enter upon, re-enter and repossess the Premises by summary proceedings, ejectment or otherwise. The words "enter", "re-enter", and "re-entry" are not restricted to their technical meaning.

E.      No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy, and every right and remedy shall be cumulative and in addition to any other legal or equitable right or remedy given hereunder, now or hereafter existing. The failure of Landlord to insist upon the strict performance of any provision or to exercise any option, right, power, or remedy contained in this Lease shall not be construed as a waiver or relinquishment thereof for the future. Receipt by Landlord of any Rent payable hereunder with knowledge of the breach of any provisions contained in this Lease shall not constitute a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless made under the signature of an officer of Landlord. Landlord shall be entitled, to the extent permitted by law, to injunctive relief in case of the violation, or attempted or threatened violation, of any provision of this Lease, or to a decree compelling observance or performance of any provision of this Lease, or to any other legal or equitable remedy.

F.      Should Landlord deem it necessary in Landlord's sole discretion to retain an attorney or other third party consultant for the purpose of enforcing or interpreting this Lease, or resolving a dispute with Tenant, even if no formal legal proceedings are instituted by Landlord or Tenant, then the Tenant shall pay Landlord's reasonable attorneys fees.

17.      Notices.

Any notice provided for in or permitted under this Lease shall be made in writing and may be given or served by (i) delivering the same in person to the party to be notified, (ii) if to Tenant, by delivery to the Premises, including posting of the Premises, (iii) depositing the same in the mail, postage prepaid, registered or certified with return receipt requested, and addressed to the last known address of the party to be notified, or (iv) by a nationally known expedited delivery service. If notice is deposited in the mail, it will be effective three (3) days from the mailing thereof provided the notice is sent to the last known address of the party to be notified. If sent by express service, the notice shall be effective upon receipt by the party to be notified. For the purpose of notice, the addresses of the parties shall be until changed:

If to Landlord:          Taylor Properties #1, L.P.
                         Mr. Stewart A. Taylor
                         1043 Fordtown Road

6

Kingsport, TN 37663

With copy to          T. Arthur Scott, Jr.
                      Attorney at Law
                      Nevermore Lane
                      Kingsport TN 37664

If to Tenant:         delivered or posted at Premises

18.     Surrender.

A.      Upon the expiration or earlier termination of the term of this Lease, Tenant shall surrender the Premises to Landlord empty, clean, and ready for immediate occupancy by a subsequent lessee, in the same condition in which the Premises were originally received from Landlord except as repaired, rebuilt, restored, altered, or added to as permitted by any provision of this Lease or as agreed upon in writing by Landlord and Tenant and except for ordinary wear and tear. Any personal property of Tenant or any allowed subtenant which shall remain in the Premises after the termination of this Lease and the removal of Tenant or such subtenant from the Premises, may, at the option of Landlord, be deemed to have been abandoned by Tenant or such subtenant and may be either retained by Landlord as its property or be disposed of, without accountability, in such a manner as Landlord may see fit (including having the same stored at the risk and expense of Tenant), or if Landlord shall give written notice to Tenant to such effect, such property shall be removed by Tenant at Tenant's sole cost and expense.

B.      Except for surrender upon the expiration or earlier termination of the term hereof, no surrender to Landlord of this Lease or of the Premises or any portion thereof or of any interest therein shall be valid or effective unless agreed to and accepted under signature of Landlord, and no act by any other representative or agent of Landlord, and no act by Landlord, other than such an agreement and acceptance so signed, shall constitute an acceptance of any such surrender.

C.      Upon the expiration or termination of this Lease and surrender of the Premises to Landlord, Tenant shall provide to Landlord, at Tenant's sole cost and expense, an environmental report certifying that the Premises is free of Toxic and Hazardous Substances (as hereinafter defined), unlawful substances, and controlled substances.

D.      In the event that Tenant holds over or Tenant fails to surrender the Premises upon the termination or expiration of this Lease, then the Base Rent for the holdover period shall be the then Base Rent, as adjusted, plus an additional 25% as a holdover fee.

19.     Severability.

Each provision contained in this Lease shall for all purposes be construed to be separate and independent. The breach of any provision hereof by Landlord shall not discharge or relieve Tenant from Tenant's obligation to observe and perform each provision of this Lease, unless such breach materially interferes with Tenant's use of the Premises. If the application of any provision hereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, and the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and each provision of this Lease shall be valid and shall be enforceable to the full extent permitted.

20.     Entire Agreement.

Landlord and Tenant intend this Lease to represent the entire agreement and expression of the agreement by and between the parties hereto. Landlord and Tenant also intend this Lease to be fully integrated and constitute a full and final expression of the Landlord and Tenant's understanding and all prior and contemporaneous agreements, representations, and otherwise, whether oral or written, are merged in this Lease. This Lease may not be modified orally or in any other manner than by an agreement in writing signed by all parties hereto or their respective successors in interest.

7

21. Tenant Finish.

Tenant shall make alterations to the Premises in accordance with the plans submitted to Landlord for approval, subject to any requirements, changes or conditions requested by Landlord. Subsequent to the initial improvements to the Premises Tenant may, at Tenant's sole cost and expense, construct and install such tenant finish desired by Tenant and approved by Landlord prior to the commencement of any alterations.

With respect to the initial alterations or any subsequent alterations, Tenant shall submit to Landlord in advance Tenant's planned alterations, a construction budget and evidence of financial ability to complete the project. Landlord may refuse to consent to such alterations, or require modifications to the construction plan. Landlord may require additional conditions including, but not limited to, escrow of funds designated to complete the alterations and progress reports as to the status of the construction. All construction work performed on the Premises shall be performed in a good and workmanship like manner, in compliance with all governmental requirements, and in such a manner to minimize any interference with the transaction of business adjacent businesses. Tenant shall indemnify Landlord from and against any liability, loss or damage resulting from such work, and Tenant shall, upon request, furnish bond against such loss, liability or damage. Landlord shall have the right to approve Tenant's contractor, and to require such further assurances from Tenant and Tenant's contractor, as Landlord deems necessary in its sole discretion.

22. Signage.

Tenant at Tenant's sole cost shall be entitled to install its signage on the exterior of the Premises and shall be entitled to install on the Premises a monument sign identifying Tenant's business, all in compliance with all rules, laws, ordinances, deed restrictions, and permits. The location, dimensions, appearance of the proposed sign shall be approved by Landlord, not to be unreasonably withheld. Landlord will cooperate, at no expense to Landlord with seeking the necessary approvals and permits for Tenant's signage.

23. Memorandum of Lease.

This Lease shall not be recorded or circulated without Landlord's prior consent, provided, however; either party hereto may record a memorandum of this Lease containing a brief description of the Premises, the parties hereto and the Term.

24. Governing Law.

This Lease shall be governed and construed in accordance with the laws of the State of Tennessee to the exclusion of the laws of all other jurisdictions.

25. Jurisdiction and Venue.

Landlord and Tenant agree that this Lease was made and entered into, executed, delivered and to be performed in Sullivan County, Tennessee. Should any litigation occur as a result of or arising out of this Agreement Landlord and Tenant agree that proper venue for such litigation shall be Sullivan County, Tennessee, to the exclusion of all other jurisdictions and venues, with the exception of the Federal Court for the Eastern District of Tennessee located in Greeneville, Tennessee, should federal law require that suit be brought in that court.

26. Force Majeure.

In the event that the Landlord shall be delayed, hindered, or prevented from the performance of any act required hereunder, by reason of governmental restrictions, scarcity of labor, materials, strikes, or for reasons beyond its control, the performance of such acts shall be excused for the period of delay, and the period for the performance of any such acts shall be extended for the period necessary to complete performance after the end of the period of such delay.

8

27. Headings.

The headings of this Lease are inserted only as a matter of convenience and are for reference only and in no way define, limit, or describe the scope of this Lease or the intent of any provision of this Lease.

28. Real Estate Brokers.

Tenant represents that it has had no dealings with any real estate broker for which Tenant expects Landlord to pay the broker or reimburse Tenant with respect to this Lease in any manner. Tenant shall hold Landlord harmless from all damages resulting from any claims asserted against Landlord by any real estate broker or finder with whom Tenant has purportedly dealt.

29. Successors and Assigns, Joint and Several Liability.

This Lease shall be binding upon Landlord, its successors and assigns, and upon Tenant, its successors and assigns. If more than one person or party joins in this Lease as Tenant, then each of such person or parties shall be and is jointly and severally liable for all of the obligations and conditions of Tenant under this Lease and the term "Tenant' when used in this lease shall include each and all of said persons or parties.

30. Identity of Drafter.

This Lease shall be construed without regard to the identity of the drafter and as though the parties participated equally in drafting the same.

31. Environmental Matters.

Neither Tenant, its successors or assigns, nor any permitted assignee, permitted sublessee, licensee or other person or entity at the direction or with the consent of Tenant shall (i) manufacture, treat, use, store or dispose of any Toxic or Hazardous Substance on the Premises in violation of any Environmental Law, (ii) permit the "release" of a Toxic or Hazardous Substance on or from the Premises.

Tenant indemnifies and covenants and agrees, at its sole cost and expense, to indemnity, protect and save Landlord harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, or expenses of any kind or of any nature whatsoever (including, without limitation, attorney's fees and expert's fees) which may at any time by imposed upon, incurred by or asserted or awarded against Landlord arising from or out of any Toxic or Hazardous Substance on, in, under or affecting the Premises, relating to or alleged to relate to Tenant's use or occupancy of the Premises, or arising during the Term hereof.

As used in this Lease:

A. "Toxic or Hazardous Substances" shall include, without limitation, petroleum, natural gas, liquids, asbestos, radioactive materials or any other substances defined as a "hazardous substance," "hazardous material" or "toxic substance" (or words of similar meaning or import) in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601, et, seq.), the Hazardous Materials Transportation Act as amended (49 U.S.C. § 1801 et seq.), the Resource Conservation and Recovery Act as amended (42 U.S.C. §6901, et seq.) and under all other Environmental Laws.

B. "Environmental Laws" shall include without limitation those federal laws listed in (a) above, the Federal Water Pollution Control Act as amended (33 U.S.C. §1251, et seq.), the Clean Air Act as amended (42 U.S.C. §7401 et seq.), and any other federal laws or laws of the jurisdiction in which the Premises are located, and the regulations there under (including local, state and/or federal laws or regulations) and any amendments thereto that govern: the existence, clean-up and/or remediation of contamination on the Premises; the protection of the environment from spilled, deposited, released or otherwise emplaced Toxic or Hazardous Substances; the control of Toxic or

9

Hazardous Substances; or the use, generation, transport, treatment, removal or recovery of Toxic or Hazardous Substances, including without limitation building materials.

The term "release" shall have the meaning given to such term in Section 101(22) of CERCLA (42 U.S.C. §9601 et seq.), the Hazardous Materials Transportation Act as amended (49 U.S.C. §1801 et seq.), the Resource Conservation and Recovery Act as amended (42 U.S.C. §6901 et seq.), and under all other Environmental Laws.

32.    Execution of Lease.

Should Landlord provide an executed Lease to Tenant then Tenant shall have fifteen (15) business days to return to Landlord an original Lease executed by Tenant, or Landlord shall have the right to terminate its offer to lease, and this Lease shall be of no force and effect.

33.    Right of Offer.

Provided no Event of Default, no notice of termination of lease delivered by either party, and no notice of Landlord that a sale of the Premises has been contracted with a third party, has occurred during the Term hereof, Tenant shall have the right to offer to purchase the Premises at a net purchase price to the Landlord of Nine Hundred Thousand Dollars ($900,000.00).    Tenant shall exercise its right of offer by providing Landlord thirty (30) days advance written notice together with tendering an amount equal to two (2) month's pre-paid Base Rent.    The Tenant shall close the purchase within thirty (30) days thereafter.    The pre-paid Base Rent shall be credited at closing to Base Rent which accrues from the date of the notice to the date of the consummation of the closing on a pro-rated basis. Landlord shall deliver title to the Premises in "AS IS" physical condition, by Special Warranty Deed, subject to all matters of record, but free and clear of any deed of trusts or mortgages. Should Landlord elect to accomplish the purchase as a tax deferred 1031 exchange, then Tenant shall cooperate with same, at no additional expense to Tenant.    All closing costs, recording fees, commissions and fees shall be the expense of the Tenant such that the net proceeds of the purchase to Landlord shall be no less than Nine Hundred Thousand Dollars.    This Lease and the obligation to pay Rent hereunder shall terminate on the date of closing, and real property taxes for the year in which the sale occurs shall not be pro-rated, but shall be the responsibility of the Tenant.    Tenant's right of offer to purchase the Premises shall terminate and be of no force and effect upon the expiration or termination of this Lease or the sale or transfer of the Premises to a third party.

IN WITNESS WHEREOF, this instrument has been duly executed by the parties hereto as of the day and year first above written.

//Signature page to follow//



Case 2:21-cv-00061-TRM-CRW   Document 1-1   Filed 03/23/21   Page 50 of 272   PageID #: 55

**TAYLOR PROPERTIES #1, L.P.**

By: Tri-Cities Consolidation Corp., its General
Partner

By: _____
     Stewart **Taylor**
     President

**CPH BRANDS, LLC**

By: _____
     Russell E. **Taylor**
     President

11



# AGREEMENT OF COVENANT NOT TO COMPETE, NON-DISCLOSURE AND NON-UTILIZATION

**THIS AGREEMENT OF COVENANT NOT TO COMPETE, NON-DISCLOSURE AND NON-UTILIZATION** (this "**Agreement**") is made and entered into this 24th day of January, 2019, by and between **CPH BRANDS, LLC**, a Tennessee limited liability company (the "**Company**") and **RUSSELL E. TAYLOR** (the "**Recipient**");

## WITNESSETH:

**WHEREAS**, by Operating Agreement dated January 23, 2019, Recipient has become a member in the Company; and

**WHEREAS**, the Company is engaged in starting a business whereby Recipient and the other parties to the Operating Agreement will obtain Proprietary and Confidential Information of the Business, its trade secrets, its opportunities for expansion and its customers; and

**WHEREAS**, the parties to the Operating Agreement have an interest in protecting the value of the Company.

NOW, THEREFORE, in consideration of the recited benefits above, the parties agree as follows:

## ARTICLE 1 DEFINITIONS

1.1. **Defined Terms**. As used herein, the terms below shall have the following meanings:

"**Business**" means the business of the Company in the growing, processing, purchase of raw material and sale of finished product derived from industrial hemp. Recipient and Company acknowledge that the trend of expanded legalization of related raw material and products may in the future result in opportunities for expansion into those raw materials and products. Accordingly, the Business shall also extend to those related raw materials and products as they become lawful in any of the Territory defined herein.

"**Customer**" means any Person which is a customer or Prospective Customer of the Company or, to the knowledge of the Recipient, an entity that is a direct or indirect parent, subsidiary or sister entity of a Customer or Prospective Customer on the Termination Date or which was a customer of the Company or an entity that is a direct or indirect parent, subsidiary or sister entity of a Customer within three (3) years prior to the Termination Date.

"**Effective Date**" means the date hereof.

"**Goodwill Consideration**" means the value received by the Recipient in his becoming a member in the Company as consideration for the covenants made by the Recipient to protect the Company's Goodwill.

"**Governmental Entity**" means any government or agency, district, bureau, board, commission, court, department, official, political subdivision, tribunal, taxing authority or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"**Law**" means any constitutional provision, statute or other law, rule, regulation, or interpretation of any Governmental Entity and any Order.

"**Order**" means any decree, injunction, judgment, order, award, ruling, assessment or writ by a court, administrative agency, other Governmental Entity, arbitrator or arbitration panel.

"**Person**" means an individual, corporation, partnership, limited partnership, limited liability company, syndicate, person, trust, association or entity or government, political subdivision, agency or instrumentality of a government.

"**Proprietary and Confidential Information**" means any information of the Company that is not generally known to the public or to the Company's competitors in the industry, is used in the business of the Company, and gives the Company an advantage over businesses that do not know the information. "Proprietary and confidential information" includes but is not limited to: know-how (other than general know-how known within the industry), trade secrets, employee lists, customer lists, supplier lists, referral source lists, sales representative list, broker/commissioned agent list, costs, profits or margin information, markets, sales, pricing policies, operational methods, plans for future development, data drawings, samples, processes, products, software, the financial condition, results of operations, business, properties, assets, liabilities, or future prospects of the Company with respect to the Business. Because of the nature and sensitivity of this information, the Recipient acknowledges that the Company has legitimate business and competitive interests and legal rights to require non-disclosure of the information to other companies and/or individuals and to require that it be used only for the Company's benefit.

"**Prospective Customer**" means, at any particular time, any Person to whom the Company, through any of its officers, employees, agents or consultants (or persons acting in a similar capacity) has within twelve (12) months prior to such time offered (by means of a personal meeting, telephone call, letter, email, written proposal or other direct communication) to provide the services and/or sell or market the services of the Company, except where such offer was made on a website or as a part of a blanket mailing/emailing, telemarketing, or advertising, such as through magazines, newspapers, emails, and sponsorship of public events and does not result in a request by the recipient for further information or presentation.

"**Restricted Period**" means the period beginning with the Effective Date and ending on the Termination Date.

"**Sales Representatives**" means the Company's sales representatives, brokers, commissioned agents or other Persons having similar functions with respect to the Business, regardless of whether such Persons are employed by the Company or are independent, and regardless of whether they are dedicated solely to the Business or not.

"**Supplier**" means any Person which (i) is or was a supplier of any product or service, including subcontractors and sub-consultants, to the Company on the Termination Date or which, prior to the Termination Date, was a supplier to, or subcontractor or sub-consultant of, the Company within three (3) years prior to the Termination Date, or (ii) is a vendor of the Company on the Termination Date, or which, prior to the Termination Date, was a vendor to the Company within three (3) years prior to the Termination Date; provided, however, that "Supplier" is meant to include only Persons who provide or provided the Company with goods and services specific to the Business and does not include generic suppliers of stationery or office equipment, insurance companies, landlords, utilities, healthcare providers, lawyers, accountants and other suppliers of generic goods and services.

"**Termination Date**" shall mean the date which is three (3) years after the date when the Recipient no longer is a member in the Company.

"**Territory**" shall mean the (i) United States of America, including its States, districts, territories and commonwealths and (ii) Canada, including its provinces, territories and commonwealths. Recipient acknowledges that Company is beginning business with the strategy of expanding the Business into additional areas as it becomes lawful to do so.

## ARTICLE 2 COVENANTS TO PROTECT THE COMPANY'S PROPRIETARY AND CONFIDENTIAL INFORMATION AND GOODWILL

### 2.1. Proprietary and Confidential Information.

2.1.1. **General**. The Recipient acknowledges that the Company is engaged in a competitive industry. The Recipient further acknowledges that, as part of his being a member in the Company, he will have access to and/or gain knowledge of the Company's Proprietary and Confidential Information that is vital to the Goodwill, interests and success of the Company. As consideration for this Agreement the Company agrees to continue to provide the Company's Proprietary and Confidential Information, which will enable the Recipient to perform (or continue performing) his job with the Company. The Recipient acknowledges that the provision of the Proprietary and Confidential Information is necessary and desirable for the Recipient's personal success at the Company.

2.1.2. **Non-Disclosure and Non-Use**. In order to protect the Company's Proprietary and Confidential Information and the Company's Goodwill, and in exchange for the Goodwill Consideration, the Recipient agrees he shall not disclose, nor use, directly or indirectly, either for the Recipient's own benefit or for the benefit of any other individual or business, any Proprietary and Confidential Information, except in the carrying out of his responsibilities for Company. The Recipient further acknowledges that, irrespective of this Agreement, he has a duty not to disclose the Company's Proprietary and Confidential

Information and contractually warrants that he will not violate this duty. Notwithstanding any contrary provision of this Agreement, the Recipient may disclose or use any such information (i) as has become generally available to the public other than through a breach of this Agreement by the Recipient, (ii) as may be required in any report, statement or testimony required to be submitted to any Governmental Entity having or claiming to have jurisdiction over it, or as may be otherwise required by applicable Law, or as may be required in response to any summons or subpoena or in connection with any litigation, (iii) as may be required to obtain any governmental approval or Consent required in order to consummate the transactions contemplated by this Agreement or the Stock Sale Agreement or (iv) as may be necessary to establish the Recipient's rights under this Agreement; provided, further, that in the case of clause (ii), the Recipient shall promptly notify the party to whom it is obliged to keep such information confidential and, to the extent practicable, provide such party a reasonable opportunity to prevent public disclosure of such information. All files, records, inventories, accounts, lists, or other documents, in whatever form maintained, relating to the Company's Proprietary and Confidential Information, whether prepared by the Recipient or otherwise coming into the Recipient's possession during his employment with Company, shall be the exclusive property of Company and shall be delivered to the Company upon termination of membership for any reason, or upon the Company's request.

        **2.2.**   **Non-Solicitation**. In exchange for the Goodwill Consideration and in order to protect the Company's Proprietary and Confidential Information and the Company's Goodwill, the Recipient hereby covenants that during the Restricted Period the Recipient shall not directly or indirectly through any Person:

        2.2.1. employ, solicit for employment or consultancy or induce to become employed or to be a consultant to any individual who is, or was at any time during the three (3) year period prior to the Termination Date, an employee, consultant or Sales Representative of the Company, (ii) cause such individual to terminate or refrain from renewing or extending his or her employment by or consulting relationship or Sales Representative relationship with the Company, or (iii) cause such individual to become employed by or enter into a consulting relationship or Sales Representative relationship with a Person other than the Company and its Affiliates.

        2.2.2. solicit, persuade or induce any Customer or any Sales Representative to terminate, reduce, disrupt or refrain from renewing or extending its contractual or other relationship with the Company in regard to the purchase of services sold, by the Company; or

        2.2.3. solicit, persuade or induce any Supplier to terminate, reduce, disrupt or refrain from renewing or extending his, her or its contractual or other relationship with the Company, directly or indirectly in regard to the sale of products similar or identical to those sold by the Company.

        2.2.4. solicit, persuade or induce any business that is a potential acquisition candidate of the Company that was identified to the Recipient during employment with the Company to terminate, reduce, disrupt or refrain from renewing or extending acquisition discussions with the Company.

**2.3.** **Non-Compete**. In exchange for the Goodwill Consideration and in order to protect the Company's Proprietary and Confidential Information and the Company's Goodwill, the Recipient hereby covenants that during the Restricted Period the Recipient shall not directly or indirectly, in his own capacity or through one or more Affiliates, whether as owner, consultant, executive, partner, member, manager, officer, director, venturer, agent, through stock ownership, investment of capital, lending of money or property, rendering of services, or otherwise, engage or assist others to engage in the Business in the Territory or engage in any business dealings related to the Business; provided, that the Recipient may own not more than three (3%) percent of the outstanding shares of a company engaged in such Business if such shares are listed on The New York Stock Exchange, The NASDAQ Stock Exchange or another national securities exchange.

**2.4.** **Non-Disparagement**. The Recipient agrees n o t to in any way publicly disparage the Company, members, equity holders, officers, directors, employees or agents or the Company and the Company agrees not to in any way publicly disparage the Recipient, in either case, other than as required by Law or in connection with enforcing their respective rights under this Agreement in good faith.

**2.5.** **Equitable Relief.**

2.5.1. The Recipient acknowledges that a breach of the covenants contained in this Article 2, will cause irreparable damage to the Business and the Company, the amount of which will be difficult to ascertain, and that the remedies at Law for any such breach will be inadequate. Accordingly, nothing in this Agreement shall prevent a party from seeking preliminary injunctive relief from a court of competent jurisdiction. The Recipient agrees that, in addition to any other remedy which may be available at Law or in equity, any Person within the Company shall be entitled to specific performance and injunctive relief with or without posting a bond (as determined by any court of competent jurisdiction) to prevent any actual, intended or likely breach.

2.5.2. The parties acknowledge that the time, scope and other provisions of this Article 2 have been specifically negotiated by sophisticated commercial parties, each who could consult separate qualified counsel, and agree that all such provisions are reasonable and fair and necessary to protect the interests of the Company and to prevent the Recipient from unfairly taking advantage of contacts established during employment by the Company. Accordingly, the Recipient agrees not to contest the validity or enforceability of any provision of Article 2 of this Agreement. In the event that any provision in this Article 2 or any other provision contained in this Agreement shall be determined by any court of competent jurisdiction to be unenforceable such provisions shall be interpreted to extend only over the maximum period of time for which they may be enforceable and/or over the maximum geographical area as to which it may be enforceable and/or to the maximum extent in all other respects as to which they may be enforceable, all as determined by any such court in such action so as to be enforceable to the extent consistent with then applicable law.

## ARTICLE 3 MISCELLANEOUS PROVISIONS.

**3.1.** **Assignment and Successors**. The rights and obligations of the Company under this Agreement may be assigned and shall inure to the benefit of and be binding upon the

successors and assigns of the Company. The Recipient's rights or obligations hereunder may not be assigned to or assumed by any other person.

3.2. **Notices**. Any notice, request, instruction or other document or communication to be given hereunder shall be in writing and shall be deemed to have been duly given (i) if mailed, at the time when mailed in any general or branch office of the United States Postal Service, enclosed in a registered or certified postage-paid envelope, (ii) if sent by facsimile transmission, when so sent and receipt acknowledged by an appropriate facsimile receipt, or (iii) if sent by other means (including e-mail), when actually received by the party to which such notice has been directed, in each case at the respective addresses or numbers set forth below or such other address or number as such party may have fixed by notice; provided, however, that in the event of delivery under clauses (ii) or (iii) (otherwise than by receipted hand delivery), such notice shall be promptly followed by notice pursuant to clause (i):

If to any Person in the Company, to the Company:

CPH BRANDS, LLC

1736 N. Eastman Road

Kingsport, TN 37664

E-mail: _russell+1601@gmail.com_

With a copy (which shall not constitute notice) to

_Russell Taylor_

_1043 Fordtown Road_

_Kingsport, TN 37663_

E-mail: _russell+1601@gmail.com_

If to the Recipient:

Russell E. Taylor

1043 Fordtown Road

Kingsport, TN 37663

E-mail: russell@trieliteholdingsllc.com

With a copy (which shall not constitute notice) to:

_Same as above_

_Same as above_

E-mail:

**3.3.** **Severability**. If any provision or portion of this Agreement shall be or become illegal, invalid or unenforceable in whole or in part for any reason, such provision shall be ineffective only to the extent of such illegality, invalidity or unenforceability without invalidating the remainder of such provision or the remaining provisions of this Agreement. Upon such determination that any term or other provision is illegal, invalid, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the agreements contemplated hereby are fulfilled to the extent possible.

**3.4.** **Amendment, Waiver etc..** This Agreement may only be amended by a writing signed by all parties.

**3.5.** **Counterparts**. This Agreement may be executed and delivered (including by facsimile or .pdf transmission) in counterparts, and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

**3.6.** **Non-Waiver of Rights and Breaches**. No failure or delay of any party hereto in the exercise of any right given to such party hereunder shall constitute a waiver thereof unless the time specified herein for the exercise of such right has expired, nor shall any single or partial exercise of any right preclude other or further exercise thereof or of any other right. The waiver of a party hereto of any default of any other party shall not be deemed to be a waiver of any subsequent default or other default by such party, whether similar or dissimilar in nature.

**3.7.** **Governing Law**. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TENNESSEE WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.

**3.8.** **Dispute Resolution**: Consent to Jurisdiction.

3.8.1. Costs. The Company, on the one hand, and the Recipient, on the other hand, shall bear their own costs, expenses and legal fees in the event of any action with regards to this Agreement.

3.8.2. Consent to Jurisdiction/Venue. Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any court of competent jurisdiction sitting in Sullivan County, Tennessee.

**3.9.** **Expenses**. Each party shall bear his or its own fees and expenses in connection with the preparation, negotiation and execution of this Agreement.

**3.10.** **Survival**. Unless otherwise provided herein, the provisions of Articles 2 and 3 hereof shall survive the termination of the Restriction Period or termination of this Agreement.

**3.11. Interpretation.** The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The language in all parts of this Agreement shall in all cases be construed according to its fair meaning, and not strictly for or against any party hereto. In this Agreement, unless the context otherwise requires, the masculine, feminine and neuter genders and the singular and the plural include one another.

**3.12 Member Enforcement.** The parties hereto acknowledge that this Agreement is entered into as a requirement of Operating Agreement and, therefore, the members in the Company are third party beneficiaries of this Agreement and may enforce the provisions of this Agreement independent of whether the Company proceeds on its own to enforce them.

**3.13. Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes any prior agreement or understanding among them respect to the subject matter hereof.

**IN WITNESS WHEREOF**, the parties, intending to be legally bound, executed this Agreement as of the date first above written.

**THE COMPANY**

CPH BRANDS, LLC

By: _____

Name: _Russell Taylor_
Title: _President_

**RECIPIENT**

_____

## AGREEMENT OF COVENANT NOT TO COMPETE,
## NON-DISCLOSURE AND NON-UTILIZATION

THIS AGREEMENT OF COVENANT NOT TO COMPETE, NON-DISCLOSURE AND NON-UTILIZATION (this "**Agreement**") is made and entered into this 24th day of January, 2019, by and between **CPH BRANDS, LLC**, a Tennessee limited liability company (the "**Company**") and **MICHAEL VAUGHN** (the "**Recipient**");

### WITNESSETH:

**WHEREAS**, by Operating Agreement dated January 23, 2019, Recipient has become a member in the Company; and

**WHEREAS**, the Company is engaged in starting a business whereby Recipient and the other parties to the Operating Agreement will obtain Proprietary and Confidential Information of the Business, its trade secrets, its opportunities for expansion and its customers; and

**WHEREAS**, the parties to the Operating Agreement have an interest in protecting the value of the Company.

NOW, THEREFORE, in consideration of the recited benefits above, the parties agree as follows:

## ARTICLE 1  DEFINITIONS

**1.1.**    **Defined Terms**.  As used herein, the terms below shall have the following meanings:

"**Business**" means the business of the Company in the growing, processing, purchase of raw material and sale of finished product derived from industrial hemp.  Recipient and Company acknowledge that the trend of expanded legalization of related raw material and products may in the future result in opportunities for expansion into those raw materials and products.  Accordingly, the Business shall also extend to those related raw materials and products as they become lawful in any of the Territory defined herein.

"**Customer**" means any Person which is a customer or Prospective Customer of the Company or, to the knowledge of the Recipient, an entity that is a direct or indirect parent, subsidiary or sister entity of a Customer or Prospective Customer on the Termination Date or which was a customer of the Company or an entity that is a direct or indirect parent, subsidiary or sister entity of a Customer within three (3) years prior to the Termination Date.

"**Effective Date**" means the date hereof.

"**Goodwill Consideration**" means the value received by the Recipient in his becoming a member in the Company as consideration for the covenants made by the Recipient to protect the Company's Goodwill.

"**Governmental Entity**" means any government or agency, district, bureau, board, commission, court, department, official, political subdivision, tribunal, taxing authority or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"**Law**" means any constitutional provision, statute or other law, rule, regulation, or interpretation of any Governmental Entity and any Order.

"**Order**" means any decree, injunction, judgment, order, award, ruling, assessment or writ by a court, administrative agency, other Governmental Entity, arbitrator or arbitration panel.

"**Person**" means an individual, corporation, partnership, limited partnership, limited liability company, syndicate, person, trust, association or entity or government, political subdivision, agency or instrumentality of a government.

"**Proprietary and Confidential Information**" means any information of the Company that is not generally known to the public or to the Company's competitors in the industry, is used in the business of the Company, and gives the Company an advantage over businesses that do not know the information. "Proprietary and confidential information" includes but is not limited to: know-how (other than general know-how known within the industry), trade secrets, employee lists, customer lists, supplier lists, referral source lists, sales representative list, broker/commissioned agent list, costs, profits or margin information, markets, sales, pricing policies, operational methods, plans for future development, data drawings, samples, processes, products, software, the financial condition, results of operations, business, properties, assets, liabilities, or future prospects of the Company with respect to the Business. Because of the nature and sensitivity of this information, the Recipient acknowledges that the Company has legitimate business and competitive interests and legal rights to require non-disclosure of the information to other companies and/or individuals and to require that it be used only for the Company's benefit.

"**Prospective Customer**" means, at any particular time, any Person to whom the Company, through any of its officers, employees, agents or consultants (or persons acting in a similar capacity) has within twelve (12) months prior to such time offered (by means of a personal meeting, telephone call, letter, email, written proposal or other direct communication) to provide the services and/or sell or market the services of the Company, except where such offer was made on a website or as a part of a blanket mailing/emailing, telemarketing, or advertising, such as through magazines, newspapers, emails, and sponsorship of public events and does not result in a request by the recipient for further information or presentation.

"**Restricted Period**" means the period beginning with the Effective Date and ending on the Termination Date.

MV

2

"**Sales Representatives**" means the Company's sales representatives, brokers, commissioned agents or other Persons having similar functions with respect to the Business, regardless of whether such Persons are employed by the Company or are independent, and regardless of whether they are dedicated solely to the Business or not.

"**Supplier**" means any Person which (i) is or was a supplier of any product or service, including subcontractors and sub-consultants, to the Company on the Termination Date or which, prior to the Termination Date, was a supplier to, or subcontractor or sub-consultant of, the Company within three (3) years prior to the Termination Date, or (ii) is a vendor of the Company on the Termination Date, or which, prior to the Termination Date, was a vendor to the Company within three (3) years prior to the Termination Date; provided, however, that "Supplier" is meant to include only Persons who provide or provided the Company with goods and services specific to the Business and does not include generic suppliers of stationery or office equipment, insurance companies, landlords, utilities, healthcare providers, lawyers, accountants and other suppliers of generic goods and services.

"**Termination Date**" shall mean the date which is three (3) years after the date when the Recipient no longer is a member in the Company.

"**Territory**" shall mean the (i) United States of America, including its States, districts, territories and commonwealths and (ii) Canada, including its provinces, territories and commonwealths. Recipient acknowledges that Company is beginning business with the strategy of expanding the Business into additional areas as it becomes lawful to do so.

## ARTICLE 2   COVENANTS TO PROTECT THE COMPANY'S PROPRIETARY AND CONFIDENTIAL INFORMATION AND GOODWILL

### 2.1.   Proprietary and Confidential Information.

2.1.1. **General.** The Recipient acknowledges that the Company is engaged in a competitive industry. The Recipient further acknowledges that, as part of his being a member in the Company, he will have access to and/or gain knowledge of the Company's Proprietary and Confidential Information that is vital to the Goodwill, interests and success of the Company. As consideration for this Agreement the Company agrees to continue to provide the Company's Proprietary and Confidential Information, which will enable the Recipient to perform (or continue performing) his job with the Company. The Recipient acknowledges that the provision of the Proprietary and Confidential Information is necessary and desirable for the Recipient's personal success at the Company.

2.1.2. **Non-Disclosure and Non-Use.** In order to protect the Company's Proprietary and Confidential Information and the Company's Goodwill, and in exchange for the Goodwill Consideration, the Recipient agrees he shall not disclose, nor use, directly or indirectly, either for the Recipient's own benefit or for the benefit of any other individual or business, any Proprietary and Confidential Information, except in the carrying out of his responsibilities for Company. The Recipient further acknowledges that, irrespective of this Agreement, he has a duty not to disclose the Company's Proprietary and Confidential

3

Information and contractually warrants that he will not violate this duty. Notwithstanding any contrary provision of this Agreement, the Recipient may disclose or use any such information (i) as has become generally available to the public other than through a breach of this Agreement by the Recipient, (ii) as may be required in any report, statement or testimony required to be submitted to any Governmental Entity having or claiming to have jurisdiction over it, or as may be otherwise required by applicable Law, or as may be required in response to any summons or subpoena or in connection with any litigation, (iii) as may be required to obtain any governmental approval or Consent required in order to consummate the transactions contemplated by this Agreement or the Stock Sale Agreement or (iv) as may be necessary to establish the Recipient's rights under this Agreement; provided, further, that in the case of clause (ii), the Recipient shall promptly notify the party to whom it is obliged to keep such information confidential and, to the extent practicable, provide such party a reasonable opportunity to prevent public disclosure of such information. All files, records, inventories, accounts, lists, or other documents, in whatever form maintained, relating to the Company's Proprietary and Confidential Information, whether prepared by the Recipient or otherwise coming into the Recipient's possession during his employment with Company, shall be the exclusive property of Company and shall be delivered to the Company upon termination of membership for any reason, or upon the Company's request.

**2.2.** **Non-Solicitation.** In exchange for the Goodwill Consideration and in order to protect the Company's Proprietary and Confidential Information and the Company's Goodwill, the Recipient hereby covenants that during the Restricted Period the Recipient shall not directly or indirectly through any Person:

**2.2.1.** employ, solicit for employment or consultancy or induce to become employed or to be a consultant to any individual who is, or was at any time during the three (3) year period prior to the Termination Date, an employee, consultant or Sales Representative of the Company, (ii) cause such individual to terminate or refrain from renewing or extending his or her employment or consulting relationship or Sales Representative relationship with the Company, or (iii) cause such individual to become employed by or enter into a consulting relationship or Sales Representative relationship with a Person other than the Company and its Affiliates.

**2.2.2.** solicit, persuade or induce any Customer or any Sales Representative to terminate, reduce, disrupt or refrain from renewing or extending its contractual or other relationship with the Company in regard to the purchase of services sold, by the Company; or

**2.2.3.** solicit, persuade or induce any Supplier to terminate, reduce, disrupt or refrain from renewing or extending his, her or its contractual or other relationship with the Company, directly or indirectly in regard to the sale of products similar or identical to those sold by the Company.

**2.2.4.** solicit, persuade or induce any business that is a potential acquisition candidate of the Company that was identified to the Recipient during employment with the Company to terminate, reduce, disrupt or refrain from renewing or extending acquisition discussions with the Company.

4

**2.3.** **Non-Compete.** In exchange for the Goodwill Consideration and in order to protect the Company's Proprietary and Confidential Information and the Company's Goodwill, the Recipient hereby covenants that during the Restricted Period the Recipient shall not directly or indirectly, in his own capacity or through one or more Affiliates, whether as owner, consultant, executive, partner, member, manager, officer, director, venturer, agent, through stock ownership, investment of capital, lending of money or property, rendering of services, or otherwise, engage or assist others to engage in the Business in the Territory or engage in any business dealings related to the Business; provided, that the Recipient may own not more than three (3%) percent of the outstanding shares of a company engaged in such Business if such shares are listed on The New York Stock Exchange, The NASDAQ Stock Exchange or another national securities exchange.

**2.4.** **Non-Disparagement.** The Recipient agrees n o t to in any way publicly disparage the Company, members, equity holders, officers, directors, employees or agents or the Company and the Company agrees not to in any way publicly disparage the Recipient, in either case, other than as required by Law or in connection with enforcing their respective rights under this Agreement in good faith.

### 2.5. Equitable Relief.

2.5.1. The Recipient acknowledges that a breach of the covenants contained in this Article 2, will cause irreparable damage to the Business and the Company, the amount of which will be difficult to ascertain, and that the remedies at Law for any such breach will be inadequate. Accordingly, nothing in this Agreement shall prevent a party from seeking preliminary injunctive relief from a court of competent jurisdiction. The Recipient agrees that, in addition to any other remedy which may be available at Law or in equity, any Person within the Company shall be entitled to specific performance and injunctive relief with or without posting a bond (as determined by any court of competent jurisdiction) to prevent any actual, intended or likely breach.

2.5.2. The parties acknowledge that the time, scope and other provisions of this Article 2 have been specifically negotiated by sophisticated commercial parties, each who could consult separate qualified counsel, and agree that all such provisions are reasonable and fair and necessary to protect the interests of the Company and to prevent the Recipient from unfairly taking advantage of contacts established during employment by the Company. Accordingly, the Recipient agrees not to contest the validity or enforceability of any provision of Article 2 of this Agreement. In the event that any provision in this Article 2 or any other provision contained in this Agreement shall be determined by any court of competent jurisdiction to be unenforceable such provisions shall be interpreted to extend only over the maximum period of time for which they may be enforceable and/or over the maximum geographical area as to which it may be enforceable and/or to the maximum extent in all other respects as to which they may be enforceable, all as determined by any such court in such action so as to be enforceable to the extent consistent with then applicable law.

## ARTICLE 3 MISCELLANEOUS PROVISIONS.

**3.1.** **Assignment and Successors.** The rights and obligations of the Company under this Agreement may be assigned and shall inure to the benefit of and be binding upon the

5

successors and assigns of the Company. The Recipient's rights or obligations hereunder may not be assigned to or assumed by any other person.

      **3.2.**   <u>Notices</u>.   Any notice, request, instruction or other document or communication to be given hereunder shall be in writing and shall be deemed to have been duly given (i) if mailed, at the time when mailed in any general or branch office of the United States Postal Service, enclosed in a registered or certified postage-paid envelope, (ii) if sent by facsimile transmission, when so sent and receipt acknowledged by an appropriate facsimile receipt, or (iii) if sent by other means (including e-mail), when actually received by the party to which such notice has been directed, in each case at the respective addresses or numbers set forth below or such other address or number as such party may have fixed by notice; <u>provided, however</u>, that in the event of delivery under clauses (ii) or (iii) (otherwise than by receipted hand delivery), such notice shall be promptly followed by notice pursuant to clause (i):

If to any Person in the Company, to the Company:

             CPH BRANDS, LLC

             1736 N. Eastman Road

             Kingsport, TN 37664

             E-mail: _____

With a copy (which shall not constitute notice) to

             _____

             _____

             _____

             E-mail:

If to the Recipient:

             Michael Vaughn

             _____

             _____

             E-mail:

With a copy (which shall not constitute notice) to:

             _____

             _____

6

E-mail:

     **3.3.**   **Severability.** If any provision or portion of this Agreement shall be or become illegal, invalid or unenforceable in whole or in part for any reason, such provision shall be ineffective only to the extent of such illegality, invalidity or unenforceability without invalidating the remainder of such provision or the remaining provisions of this Agreement. Upon such determination that any term or other provision is illegal, invalid, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the agreements contemplated hereby are fulfilled to the extent possible.

     **3.4.**   **Amendment, Waiver etc,.** This Agreement may only be amended by a writing signed by all parties.

     **3.5.**   **Counterparts.** This Agreement may be executed and delivered (including by facsimile or .pdf transmission) in counterparts, and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

     **3.6.**   **Non-Waiver of Rights and Breaches.** No failure or delay of any party hereto in the exercise of any right given to such party hereunder shall constitute a waiver thereof unless the time specified herein for the exercise of such right has expired, nor shall any single or partial exercise of any right preclude other or further exercise thereof or of any other right. The waiver of a party hereto of any default of any other party shall not be deemed to be a waiver of any subsequent default or other default by such party, whether similar or dissimilar in nature.

     **3.7.**   **Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TENNESSEE WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.

     **3.8.**   **Dispute Resolution:** Consent to Jurisdiction.

     3.8.1. Costs. The Company, on the one hand, and the Recipient, on the other hand, shall bear their own costs, expenses and legal fees in the event of any action with regards to this Agreement.

     3.8.2. Consent to Jurisdiction/Venue. Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any court of competent jurisdiction sitting in Sullivan County, Tennessee.

     **3.9.**   **Expenses.** Each party shall bear his or its own fees and expenses in connection with the preparation, negotiation and execution of this Agreement.

     **3.10.**  **Survival.** Unless otherwise provided herein, the provisions of Articles 2 and 3 hereof shall survive the termination of the Restriction Period or termination of this Agreement.

MV

Case 2:21-cv-00061-TRM-CRW   Document 1-1   Filed 03/23/21   Page 66 of 272   PageID #: 71

**3.11. Interpretation.** The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The language in all parts of this Agreement shall in all cases be construed according to its fair meaning, and not strictly for or against any party hereto. In this Agreement, unless the context otherwise requires, the masculine, feminine and neuter genders and the singular and the plural include one another.

**3.12 Member Enforcement.** The parties hereto acknowledge that this Agreement is entered into as a requirement of Operating Agreement and, therefore, the members in the Company are third party beneficiaries of this Agreement and may enforce the provisions of this Agreement independent of whether the Company proceeds on its own to enforce them.

**3.13. Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes any prior agreement or understanding among them respect to the subject matter hereof.

**IN WITNESS WHEREOF**, the parties, intending to be legally bound, executed this Agreement as of the date first above written.

THE COMPANY

CPH BRANDS, LLC

By: _Michael Vaughn_
Name:
Title: CEO

RECIPIENT

MV

Case 2:21-cv-00061-TRM-CRW   Document 1-1   Filed 03/23/21   Page 67 of 272   PageID #: 72

# AGREEMENT OF COVENANT NOT TO COMPETE,
## NON-DISCLOSURE AND NON-UTILIZATION

**THIS AGREEMENT OF COVENANT NOT TO COMPETE, NON-DISCLOSURE AND NON-UTILIZATION** (this "**Agreement**") is made and entered into this 24th day of January, 2019, by and between **CPH BRANDS, LLC**, a Tennessee limited liability company (the "**Company**") and **TIMOTHY KENDRICK** (the "**Recipient**");

### WITNESSETH:

**WHEREAS**, by Operating Agreement dated January 23, 2019, Recipient has become a member in the Company; and

**WHEREAS**, the Company is engaged in starting a business whereby Recipient and the other parties to the Operating Agreement will obtain Proprietary and Confidential Information of the Business, its trade secrets, its opportunities for expansion and its customers; and

**WHEREAS**, the parties to the Operating Agreement have an interest in protecting the value of the Company.

**NOW, THEREFORE**, in consideration of the recited benefits above, the parties agree as follows:

## ARTICLE 1   DEFINITIONS

    **1.1.**   **Defined Terms.** As used herein, the terms below shall have the following meanings:

        "**Business**" means the business of the Company in the growing, processing, purchase of raw material and sale of finished product derived from industrial hemp. Recipient and Company acknowledge that the trend of expanded legalization of related raw material and products may in the future result in opportunities for expansion into those raw materials and products. Accordingly, the Business shall also extend to those related raw materials and products as they become lawful in any of the Territory defined herein.

        "**Customer**" means any Person which is a customer or Prospective Customer of the Company or, to the knowledge of the Recipient, an entity that is a direct or indirect parent, subsidiary or sister entity of a Customer or Prospective Customer on the Termination Date or which was a customer of the Company or an entity that is a direct or indirect parent, subsidiary or sister entity of a Customer within three (3) years prior to the Termination Date.

        "**Effective Date**" means the date hereof.

        "**Goodwill Consideration**" means the value received by the Recipient in his becoming a member in the Company as consideration for the covenants made by the Recipient to protect the Company's Goodwill.

"**Governmental Entity**" means any government or agency, district, bureau, board, commission, court, department, official, political subdivision, tribunal, taxing authority or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"**Law**" means any constitutional provision, statute or other law, rule, regulation, or interpretation of any Governmental Entity and any Order.

"**Order**" means any decree, injunction, judgment, order, award, ruling, assessment or writ by a court, administrative agency, other Governmental Entity, arbitrator or arbitration panel.

"**Person**" means an individual, corporation, partnership, limited partnership, limited liability company, syndicate, person, trust, association or entity or government, political subdivision, agency or instrumentality of a government.

"**Proprietary and Confidential Information**" means any information of the Company that is not generally known to the public or to the Company's competitors in the industry, is used in the business of the Company, and gives the Company an advantage over businesses that do not know the information. "Proprietary and confidential information" includes but is not limited to: know-how (other than general know-how known within the industry), trade secrets, employee lists, customer lists, supplier lists, referral source lists, sales representative list, broker/commissioned agent list, costs, profits or margin information, markets, sales, pricing policies, operational methods, plans for future development, data drawings, samples, processes, products, software, the financial condition, results of operations, business, properties, assets, liabilities, or future prospects of the Company with respect to the Business. Because of the nature and sensitivity of this information, the Recipient acknowledges that the Company has legitimate business and competitive interests and legal rights to require non-disclosure of the information to other companies and/or individuals and to require that it be used only for the Company's benefit.

"**Prospective Customer**" means, at any particular time, any Person to whom the Company, through any of its officers, employees, agents or consultants (or persons acting in a similar capacity) has within twelve (12) months prior to such time offered (by means of a personal meeting, telephone call, letter, email, written proposal or other direct communication) to provide the services and/or sell or market the services of the Company, except where such offer was made on a website or as a part of a blanket mailing/emailing, telemarketing, or advertising, such as through magazines, newspapers, emails, and sponsorship of public events and does not result in a request by the recipient for further information or presentation.

"**Restricted Period**" means the period beginning with the Effective Date and ending on the Termination Date.

2

"**Sales Representatives**" means the Company's sales representatives, brokers, commissioned agents or other Persons having similar functions with respect to the Business, regardless of whether such Persons are employed by the Company or are independent, and regardless of whether they are dedicated solely to the Business or not.

"**Supplier**" means any Person which (i) is or was a supplier of any product or service, including subcontractors and sub-consultants, to the Company on the Termination Date or which, prior to the Termination Date, was a supplier to, or subcontractor or sub-consultant of, the Company within three (3) years prior to the Termination Date, or (ii) is a vendor of the Company on the Termination Date, or which, prior to the Termination Date, was a vendor to the Company within three (3) years prior to the Termination Date; provided, however, that "Supplier" is meant to include only Persons who provide or provided the Company with goods and services specific to the Business and does not include generic suppliers of stationery or office equipment, insurance companies, landlords, utilities, healthcare providers, lawyers, accountants and other suppliers of generic goods and services.

"**Termination Date**" shall mean the date which is three (3) years after the date when the Recipient no longer is a member in the Company.

"**Territory**" shall mean the (i) United States of America, including its States, districts, territories and commonwealths and (ii) Canada, including its provinces, territories and commonwealths. Recipient acknowledges that Company is beginning business with the strategy of expanding the Business into additional areas as it becomes lawful to do so.

## ARTICLE 2  COVENANTS TO PROTECT THE COMPANY'S PROPRIETARY AND CONFIDENTIAL INFORMATION AND GOODWILL

### 2.1.  Proprietary and Confidential Information.

2.1.1.  **General.** The Recipient acknowledges that the Company is engaged in a competitive industry. The Recipient further acknowledges that, as part of his being a member in the Company, he will have access to and/or gain knowledge of the Company's Proprietary and Confidential Information that is vital to the Goodwill, interests and success of the Company. As consideration for this Agreement the Company agrees to continue to provide the Company's Proprietary and Confidential Information, which will enable the Recipient to perform (or continue performing) his job with the Company. The Recipient acknowledges that the provision of the Proprietary and Confidential Information is necessary and desirable for the Recipient's personal success at the Company.

2.1.2.  **Non-Disclosure and Non-Use.** In order to protect the Company's Proprietary and Confidential Information and the Company's Goodwill, and in exchange for the Goodwill Consideration, the Recipient agrees he shall not disclose, nor use, directly or indirectly, either for the Recipient's own benefit or for the benefit of any other individual or business, any Proprietary and Confidential Information, except in the carrying out of his responsibilities for Company. The Recipient further acknowledges that, irrespective of this Agreement, he has a duty not to disclose the Company's Proprietary and Confidential

3

Information and contractually warrants that he will not violate this duty. Notwithstanding any contrary provision of this Agreement, the Recipient may disclose or use any such information (i) as has become generally available to the public other than through a breach of this Agreement by the Recipient, (ii) as may be required in any report, statement or testimony required to be submitted to any Governmental Entity having or claiming to have jurisdiction over it, or as may be otherwise required by applicable Law, or as may be required in response to any summons or subpoena or in connection with any litigation, (iii) as may be required to obtain any governmental approval or Consent required in order to consummate the transactions contemplated by this Agreement or the Stock Sale Agreement or (iv) as may be necessary to establish the Recipient's rights under this Agreement; provided, further, that in the case of clause (ii), the Recipient shall promptly notify the party to whom it is obliged to keep such information confidential and, to the extent practicable, provide such party a reasonable opportunity to prevent public disclosure of such information. All files, records, inventories, accounts, lists, or other documents, in whatever form maintained, relating to the Company's Proprietary and Confidential Information, whether prepared by the Recipient or otherwise coming into the Recipient's possession during his employment with Company, shall be the exclusive property of Company and shall be delivered to the Company upon termination of membership for any reason, or upon the Company's request.

**2.2.** **Non-Solicitation.** In exchange for the Goodwill Consideration and in order to protect the Company's Proprietary and Confidential Information and the Company's Goodwill, the Recipient hereby covenants that during the Restricted Period the Recipient shall not directly or indirectly through any Person:

**2.2.1.** employ, solicit for employment or consultancy or induce to become employed or to be a consultant to any individual who is, or was at any time during the three (3) year period prior to the Termination Date, an employee, consultant or Sales Representative of the Company, (ii) cause such individual to terminate or refrain from renewing or extending his or her employment by or consulting relationship or Sales Representative relationship with the Company, or (iii) cause such individual to become employed by or enter into a consulting relationship or Sales Representative relationship with a Person other than the Company and its Affiliates.

**2.2.2.** solicit, persuade or induce any Customer or any Sales Representative to terminate, reduce, disrupt or refrain from renewing or extending its contractual or other relationship with the Company in regard to the purchase of services sold, by the Company; or

**2.2.3.** solicit, persuade or induce any Supplier to terminate, reduce, disrupt or refrain from renewing or extending his, her or its contractual or other relationship with the Company, directly or indirectly in regard to the sale of products similar or identical to those sold by the Company.

**2.2.4.** solicit, persuade or induce any business that is a potential acquisition candidate of the Company that was identified to the Recipient during employment with the Company to terminate, reduce, disrupt or refrain from renewing or extending acquisition discussions with the Company.

4

2.3.    **Non-Compete**. In exchange for the Goodwill Consideration and in order to protect the Company's Proprietary and Confidential Information and the Company's Goodwill, the Recipient hereby covenants that during the Restricted Period the Recipient shall not directly or indirectly, in his own capacity or through one or more Affiliates, whether as owner, consultant, executive, partner, member, manager, officer, director, venturer, agent, through stock ownership, investment of capital, lending of money or property, rendering of services, or otherwise, engage or assist others to engage in the Business in the Territory or engage in any business dealings related to the Business; provided, that the Recipient may own not more than three (3%) percent of the outstanding shares of a company engaged in such Business if such shares are listed on The New York Stock Exchange, The NASDAQ Stock Exchange or another national securities exchange.

2.4.    **Non-Disparagement**. The Recipient agrees n o t to in any way publicly disparage the Company, members, equity holders, officers, directors, employees or agents or the Company and the Company agrees not to in any way publicly disparage the Recipient, in either case, other than as required by Law or in connection with enforcing their respective rights under this Agreement in good faith.

2.5.    **Equitable Relief.**

2.5.1. The Recipient acknowledges that a breach of the covenants contained in this Article 2, will cause irreparable damage to the Business and the Company, the amount of which will be difficult to ascertain, and that the remedies at Law for any such breach will be inadequate. Accordingly, nothing in this Agreement shall prevent a party from seeking preliminary injunctive relief from a court of competent jurisdiction. The Recipient agrees that, in addition to any other remedy which may be available at Law or in equity, any Person within the Company shall be entitled to specific performance and injunctive relief with or without posting a bond (as determined by any court of competent jurisdiction) to prevent any actual, intended or likely breach.

2.5.2. The parties acknowledge that the time, scope and other provisions of this Article 2 have been specifically negotiated by sophisticated commercial parties, each who could consult separate qualified counsel, and agree that all such provisions are reasonable and fair and necessary to protect the interests of the Company and to prevent the Recipient from unfairly taking advantage of contacts established during employment by the Company. Accordingly, the Recipient agrees not to contest the validity or enforceability of any provision of Article 2 of this Agreement. In the event that any provision in this Article 2 or any other provision contained in this Agreement shall be determined by any court of competent jurisdiction to be unenforceable such provisions shall be interpreted to extend only over the maximum period of time for which they may be enforceable and/or over the maximum geographical area as to which it may be enforceable and/or to the maximum extent in all other respects as to which they may be enforceable, all as determined by any such court in such action so as to be enforceable to the extent consistent with then applicable law.

**ARTICLE 3   MISCELLANEOUS PROVISIONS.**

3.1.    **Assignment and Successors**. The rights and obligations of the Company under this Agreement may be assigned and shall inure to the benefit of and be binding upon the

5

THK

successors and assigns of the Company. The Recipient's rights or obligations hereunder may not be assigned to or assumed by any other person.

      3.2.   Notices.   Any notice, request, instruction or other document or communication to be given hereunder shall be in writing and shall be deemed to have been duly given (i) if mailed, at the time when mailed in any general or branch office of the United States Postal Service, enclosed in a registered or certified postage-paid envelope, (ii) if sent by facsimile transmission, when so sent and receipt acknowledged by an appropriate facsimile receipt, or (iii) if sent by other means (including e-mail), when actually received by the party to which such notice has been directed, in each case at the respective addresses or numbers set forth below or such other address or number as such party may have fixed by notice; provided, however, that in the event of delivery under clauses (ii) or (iii) (otherwise than by receipted hand delivery), such notice shall be promptly followed by notice pursuant to clause (i):

If to any Person in the Company, to the Company:

          CPH BRANDS, LLC

          1736 N. Eastman Road

          Kingsport, TN 37664

          E-mail: _____

With a copy (which shall not constitute notice) to

          _____

          _____

          _____

          E-mail:

If to the Recipient:

          Timothy Kendrick

          _____

          _____

          E-mail:

With a copy (which shall not constitute notice) to:

          _____

          _____

6

E-mail:

**3.3.** **Severability**. If any provision or portion of this Agreement shall be or become illegal, invalid or unenforceable in whole or in part for any reason, such provision shall be ineffective only to the extent of such illegality, invalidity or unenforceability without invalidating the remainder of such provision or the remaining provisions of this Agreement. Upon such determination that any term or other provision is illegal, invalid, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the agreements contemplated hereby are fulfilled to the extent possible.

**3.4.** **Amendment, Waiver etc.**. This Agreement may only be amended by a writing signed by all parties.

**3.5.** **Counterparts**. This Agreement may be executed and delivered (including by facsimile or .pdf transmission) in counterparts, and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

**3.6.** **Non-Waiver of Rights and Breaches**. No failure or delay of any party hereto in the exercise of any right given to such party hereunder shall constitute a waiver thereof unless the time specified herein for the exercise of such right has expired, nor shall any single or partial exercise of any right preclude other or further exercise thereof or of any other right. The waiver of a party hereto of any default of any other party shall not be deemed to be a waiver of any subsequent default or other default by such party, whether similar or dissimilar in nature.

**3.7.** **Governing Law**. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TENNESSEE WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.

**3.8.** **Dispute Resolution**: Consent to Jurisdiction.

**3.8.1.** Costs. The Company, on the one hand, and the Recipient, on the other hand, shall bear their own costs, expenses and legal fees in the event of any action with regards to this Agreement.

**3.8.2.** Consent to Jurisdiction/Venue. Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any court of competent jurisdiction sitting in Sullivan County, Tennessee.

**3.9.** **Expenses**. Each party shall bear his or its own fees and expenses in connection with the preparation, negotiation and execution of this Agreement.

**3.10.** **Survival**. Unless otherwise provided herein, the provisions of Articles 2 and 3 hereof shall survive the termination of the Restriction Period or termination of this Agreement.

7

**3.11. Interpretation.** The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The language in all parts of this Agreement shall in all cases be construed according to its fair meaning, and not strictly for or against any party hereto. In this Agreement, unless the context otherwise requires, the masculine, feminine and neuter genders and the singular and the plural include one another.

**3.12** **Member Enforcement.** The parties hereto acknowledge that this Agreement is entered into as a requirement of Operating Agreement and, therefore, the members in the Company are third party beneficiaries of this Agreement and may enforce the provisions of this Agreement independent of whether the Company proceeds on its own to enforce them.

**3.13. Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes any prior agreement or understanding among them respect to the subject matter hereof.

**IN WITNESS WHEREOF**, the parties, intending to be legally bound, executed this Agreement as of the date first above written.

**THE COMPANY**

CPH BRANDS, LLC

By: _Timothy Kendrick_
Name:
Title: C OO

**RECIPIENT**



EXHIBIT

D

## ESCROW AGREEMENT
## RE:
## CPH BRANDS, LLC

**THIS ESCROW AGREEMENT**, (the "Agreement") is made and entered into and shall be effective as of this 3rd day of May, 2019, and is by and among **CPH BRANDS, LLC**, hereinafter referred to as the "Company", **MICHAEL VAUGHN** and **TIMOTHY KENDRICK** ("Purchasers") and **RUSSELL E. TAYLOR** ("Seller").

WITNESSETH:

WHEREAS, Seller owns 51% of Company and Purchasers own 49% of Company; and

WHEREAS, by action of the members of the Company on April 26, 2019, the Company began to wind down its operations; and

WHEREAS, Purchasers proposed to Seller to purchase his 51% interest for the sum of $50,000.00 to be paid by 12:00 noon on May 3, 2019 and to cause the Company to enter into a new lease for its location at 1736 North Eastman Road, Kingsport, Tennessee.

NOW, THEREFORE, in consideration of the mutual promises, covenants and undertakings hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement hereto agree as follows:

1

1.  **Escrow**. Purchasers, upon the execution of this Agreement, deposit immediately available funds to the T. Arthur Scott, Jr. Escrow Account in the amount of $64,335.54.

2.  **Inventory**. Following that deposit, Purchasers shall be given accompanied access to the Company's facility for four hours to conduct an inventory of raw material, finished product, equipment and machinery.

3.  **Assignment of Seller's Interest**. At the end of the four hour period, if Purchasers have found no material change in the raw material, finished product, equipment and machinery from what existed at the opening of business on April 26, 2019, adjusted for sales and receipts for such sales, then the escrowed funds shall become non-refundable and shall be disbursed as hereinafter set out and Seller shall deliver to Purchasers an assignment of his 51% interest in the Company and his resignation as President of the Company, which shall be taken by Purchasers subject to any liabilities of the Company.

4.  **Material Adverse Change**. If Purchasers contend there is a material change, then they shall specifically identify in writing the changes they claim to be material. For this purpose, "material change" shall mean aggregate changes amounting to more than $10,000.00 adverse. Purchasers shall then elect to continue with the purchase of Seller's 51% interest or cancel the purchase and receive return of the funds in escrow.

5.  **Cancellation of Purchase**. If Purchasers elect to cancel the purchase, then the escrowed funds shall be returned to them and the Company shall continue the process of liquidation without interference by Purchasers. In that event,

2

Purchasers shall be allowed accompanied access to the premises to remove personal effects.

6. **Lease**. If the purchase of Seller's interest proceeds, then the Company shall enter into a new lease with Taylor Properties #1, L.P., with rent at $6,270 per month, triple net with pro rated taxes and insurance paid each month and a one month security deposit. As the current lease is in default, the improvements to the current facility, including, but not limited to all fixtures, the security fence, equipment and system shall remain with the landlord after the Company vacates the premises. The lease shall have a term of _____. Until the new lease is signed, the Purchasers shall not take possession of the premises.

7. **Mutual Release**. In either event, this Agreement replaces any prior agreements or understandings between the parties and the execution of this Agreement binds all parties to this resolution. In consideration of the payment, and the covenants and agreements contained herein, the parties do hereby release and forever discharge, and by these presents do for themselves, and their successors, and assigns release and forever discharge the other parties and their heirs, personal representatives, agents, successors, and assigns of and from any and all claims, demands, damages, actions, causes of action, or suits at law or in equity, of whatsoever kind or nature, whether known or unknown, and including, but not limited to, any claim arising out of or related in any way to the facts or circumstances referenced above. This Agreement shall be a complete bar to all claims, demands, damages, actions, causes of action, or

3

suits at law or in equity, of whatsoever kind or nature, which could have been brought by the parties for any and all injuries or damages of whatsoever nature arising or to arise from the facts and circumstances indicated or referenced above.

8. Disbursement of Escrow.

   a. If the purchase transaction proceeds, then the escrowed funds, without further direction from any party, shall be disbursed by the Escrow Agent as follows:

      i. $50,000.00 to Russell E. Taylor.

      ii. $8,065.54 to Taylor Properties #1, L.P. as first month's rent of $6,270.00 and $1,795.54 for one month's prorated property taxes and property insurance.

      iii. $6,270.00 to Taylor Properties #1, L.P. as security and damage deposit.

   b. If the purchase transaction does not proceed, then the escrowed funds, without further direction from any party, shall be disbursed by the Escrow Agent to the Purchasers.

9. Escrow Agent. The parties hereto jointly and severally agree to hold the Escrow Agent harmless from any and all claims, demands, actions and costs of any sort.

IN WITNESS WHEREOF, this Agreement is executed effective as of the date first above written and may be executed in counterparts. Escrow Agent joins in this

4

Agreement solely for the purpose of agreeing to the provisions that deal with the escrowed funds.

CPH BRANDS, LLC

By: _____
          Russell E. Taylor, President

PURCHASERS:

_____
Michael Vaughn

_____
Timothy Kendrick

SELLER:

_____
Russell E. Taylor

ESCROW AGENT:

_____
T. Arthur Scott, Jr.

# THE RHOTON LAW FIRM

Kimberley D. Rhoton, Esq.
Founding Attorney
*Licensed in TN and VA
kim@rhotonlawfirm.com

215 Cumberland Street
Kingsport, TN 37660
Phone (423)723-0493
Fax (423)723-0494

July 31, 2020

Bobby L. Russell, Clerk
Circuit Court of Sullivan County
225 West Center Street
Kingsport, TN 37660

> RE: Michael Vaughn and Timothy Kendrick v. Russell E. Taylor,
> Michael Schrock, III, Greg C. Marcum, Tony L. Huff and
> Holston Hemp, LLC
> Case No. C43098(c)

Dear Mr. Russell:

Enclosed for filing in the above-referenced matter please find the Notice of Appearance. By copy of this letter I am forwarding a copy of same to Brent Watson, counsel for Plaintiff. Also, by copy of this letter, I am confirming with Brent that we have agreed that I will have an additional 30 days to file responsive pleadings on behalf of Defendants Schrock, Marcum, Huff and Holston Hemp.

Sincerely,

Kimberley D. Rhoton, Esq.

Enclosure (Notice of Appearance)
xc: w/enc. Brent R. Watson, Esq. (Notice of Appearance) BY EMAIL & FIRST CLASS MAIL
    w/enc. Michael Schrock, III (Notice of Appearance)
    w/enc. Greg C. Marcum (Notice of Appearance)
    w/enc. Tony L. Huff (Notice of Appearance)
    w/enc. Russell E. Taylor (Notice of Appearance)

# IN THE CIRCUTI COURT FOR SULLIVAN COUNTY, TENNESSEE

MICHAEL VAUGHN and
TIMOTHY KENDRICK

      Plaintiffs.

v.

RUSSELL E. TAYLOR,
MICHAEL SCHROCK, III,
GREG C. MARCUM,
TONY L. HUFF, and HOLSTON HEMP, LLC

      Defendants

**FILED**
8-4-20 10:10 am/pm
Bobby L. Russell ___DC
CIRCUIT COURT CLERK
SULLIVAN COUNTY, TN.

Case No.: C43098(c)

## NOTICE OF APPEARANCE

      Please take notice that the undersigned attorney hereby enters an appearance as counsel of record for Defendants, Michael Schrock, III, Greg C. Marcum, Tony L. Huff and Holston Hemp, LLC, and requests that copies of all notices and filings be directed to her at 215 Cumberland Street, Kingsport, Tennessee 37660.

DATED: _July 31_, 2020.

                              Respectfully submitted,

                              KIMBERLEY D. RHOTON, ESQ.
                              Attorney for Defendants
                              215 Cumberland Street
                              Kingsport, Tennessee 37660
                              BPR #022552
                              Phone 423 723-0493
                              Fax 423-723-0494
                              Email kim@rhotonlawfirm.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and exact copy of the foregoing NOTICE OF APPEARANCE was served on July 31, 202 via First Class Mail, postage prepaid and addressed to:

Brent R. Watson, Esq.
Counsel for Plaintiffs
BUNSTINE, WATSON & BECKER
800 South Gay Street, Suite 2001
Knoxville, TN 37929

Michael Schrock, III
1064 Sussex Drive
Kingsport, TN 37660

Greg C. Marcum
1012 Smith Hollow Road
Gate City, VA 24251

Tony L. Huff
474 Lakeside Dock Drive
Kingsport, TN 37663

Russell E. Taylor
1043 Ford Town Road
Kingsport, TN 37660

_____
KIMBERLEY D. RHOTON, ESQ.

# IN THE CIRCUIT COURT FOR SULLIVAN COUNTY, TENNESSEE

**MICHAEL VAUGHN and
TIMOTNY KENDRICK,**

    **Plaintiffs.**

v.

                       **Docket No. C43098(C)**

**RUSSELL E. TAYLOR,
MICHAEL SCHROCK, III,
GREG C. MARCUM,
TONY L. HUFF, and HOLSTON HEMP LLC,**

    **Defendants**



## MOTION TO DISMISS FOR FAILURE TO PLEAD FRAUD AND CONSPIRACY WITH PARTICULARITY AGAINST THE HOLSTON DEFENDANTS

COMES NOW the Defendants, Holston Hemp LLC, a Tennessee Limited Liability Company, Michael Schrock, III, Greg C. Marcum, and Tony L. Huff, (hereinafter collectively referred to as "the Holston Defendants"),by and through undersigned counsel, Kimberley D. Rhoton, Esq. and the same do hereby by and through counsel, pursuant to *Rules 9.02* and *12.02 of the Tennessee Rules of Civil Procedure*, moves this Court for an order dismissing the complaint of Plaintiff for failure to state fraud with particularity. In support of this motion, Defendant B would show this Court as follows:

## PROCEDURAL HISTORY AND FACTS

1. Defendant Holston Hemp is a Tennessee Limited Liability Company owned by Mr.

Gregory Marcum and Mr. Anthony Huff. *See Exhibit A attached hereto.*

2. Mr. Schrock works with the Defendant Holston Hemp but is not a member yet has been sued as one. A review of the Secretary of State's website would have let counsel now that there are only two members of the Defendant entity. *See attached Exhibit A.*

3. On or about April of 2019, Holston Hemp, LLC entered into discussions with Mr. Russell Taylor to lease a premise at 1736 North Eastman Road, Kingsport, Tennessee for their hemp company in which they were planning on processing hemp grown by one of the members.

4. Defendant Mr. Taylor, at that time, offered to sell the Holston Defendants certain assets already at the premises for Fifty Thousand and 00/100 Dollars ($50,000.00) but also specifically excluding some assets retaining them in the Company.

5. On or about May 21, 2019, the Parties held a closing purchasing the specified $50,000.00 in assets of the Company known as CPH, LLC whose Members were both Plaintiffs and Defendant Russell Taylor. A closing was held, a Bill of Sale was provided and all documents were signed by Defendant Russell Taylor as a majority member of the Company pursuant to his actual authority as specified at Article V and Article VI which, along with notice of a meeting being held, was presented to the Holston Defendants counsel as proof of the authorization of Defendant Russell Taylor, as majority member, being authorized to sign all documents at closing. *See CPH, LLC Operating Agreement attached to Plaintiffs Complaint a Exhibit A at Art V & VI.*

6. This suit was filed June 1, 2020 and until that date no letter, demand, investigation or request of the registered agent of the Holston Defendant's Company, Holston Hemp, LLC, or any of its members was attempted to try to determine whether any set of facts existed that could prove whether the Holston Defendants actually defrauded or conspired with the Defendant Taylor as accused of in the Complaint.

2

## TENNESSEE RULES OF CIVIL PROCEDURE AND ACCOMPANYING CASELAW

Rule 9.02 of The Tennessee Rules of Civil require any count of fraud to specifically allege some circumstances constituting the act of fraud describing that count though it "must be set forth with particularity". *Id.* Rule 9.02 is described as not allowing mere general allegations of fraud and mistake and calls them insufficient and requires the person filing to "particularize" by using the language in Rule 8.01 that a 'short and plain' statement is what must be used factually but just some set of facts as to the conduct that shows fraud. *Id.* The Tennessee Court of Appeals recently determined that a failure to plead fraud with factual particularity will result in a dismissal of the case. *See Taylor v. Promise, No. M2017-01908-COA-R3-CV, 2019 Tenn. App. LEXIS 51 (Ct. App. Jan. 31, 2019)*

The Tennessee appeals court in 2016 also stated regarding pleadings requiring specific allegations to state a claim that if the complaint provides no specific facts to apply to the elements of the claim then the complaint fails to allege the facts with sufficient detail to show the intent or knowledge of the person accused. *See Haynes v. Bass, 2016 Tenn. App. LEXIS 404 (Tenn. Ct. App. June 9, 2016).* In that case, the court dismissed the plaintiff's civil conspiracy claim because the complaint provided no specific facts to apply the elements of the claim to and the court ruled the complaint held no factual allegations or other detail of how the Defendant engaged in a common scheme with others sufficient to show or allege a conspiracy which requires more than one person acting in concert together with the intent to deprive the accuser of a right of some sort. *Id.*

3

## ANALYSYS

In the Complaint, the Holston Defendants have been accused of fraud and conspiracy and these are the only counts against them averred. They have not been accused of even one specific fact that any of the individual defendants actually physically did that even if true would show they had knowledge of the Plaintiffs' objections to the sale and thus acted in concert with the Plaintiff's partner (hereinafter "Defendant Taylor") in intending to deny the Plaintiffs their interest percentage of the value of what the company had or was worth or made in the sale oand likewise no fact has been alleged that even suggests the assets sold to the Holston Defendants was for less than fair market value except a sweeping allegation that $6 million dollars was what the assets were worth yet his own facts do not allege the Holston Defendants set the price, got paid outside of the closing by the Defendant Taylor, no set of facts have been plead showing any of the Holston Defendants made a dime off the endeavor or that they intended to deprive the Plaintiffs of the assets or income and the Holston Defendants were not in the company with the Plaintiffs, did not know the plaintiffs so could not have intended to defraud them. In addition, no fact has been alleged in the complaint to indicate any member of Holston Hemp, LLC knew of a higher value of the assets at all because no values have been alleged in the complaint other than a huge number being placed on unidentified assets of $6 million with no description or evidence of value whatsoever thus the Holston Defendants could not possibly know the value of the remaining assets of CPH Brands, LLC but of which no set of facts have been alleged that indicate the Holston Defendants received $6 million in assets or that CPH Brands, LLC even had $6 million in assets yet the suit is alleging the same.

In the present case and at the closing of the small, $50,000.00 asset purchase from Defendant Taylor through CBH Brands, LLC, the complaint alleges no fact and since counsel

4

has not been shown any fact that even suggests that the Holston Defendants knew the objections to the sale existed yet the Plaintiff generally avers to prove a conspiracy and fraud that the Holston Defendants "either did know or should have known" which is nothing more than a general averment and shows no facts exist since "should have known" is alleged which is exactly what is disallowed pursuant to Rule 9.02. In fact, we now know that when the sale took place and the Holston Defendants took possession of some of the assets of the Company, despite being represented by a different attorney at the time, unbeknownst to the closing attorney for the Holston Defendant, no notice was received by anyone of an objection, no person objected and no person notified the closing attorney for the Holston Defendants and most important; their attorney did not contact the Defendant Holston Hemp's closing attorney to stop the sale or object nor did they file any injunctive action; all of which all would have been factual allegations to assert or impugn knowledge on any one of the Holston Defendants yet none of those things alleged and thus no factual assertion of knowledge or intent to defraud and/or conspire has been put forth in the Complaint which, pursuant to the Tennessee Rules of Civil Procedure, render the complaint insufficient for failing to state a fraud or conspiracy claim with particularity and being those are the only two allegations clearly against the Holston Defendants' this case should be dismissed as to the Holston Defendants.

In fact, the very hemp flower product the Plaintiffs are filing this lawsuit alleging the Defendants colluded to deprive them of they failed to mention they regained possession and sold pocketing to a local third party hemp store for over $50,000.00 and the same was verified by this counsel through the Sullivan County Police Department when Defendant Huff filed a police report reporting the theft and the same is being investigated currently by Ms. Teresa Nelson,

Esq., a prosecutor with the Sullivan County prosecutor's office and an open investigation exists currently into whether or not to indict the Plaintiffs for the theft. *See the attached Police Report.*

Thus, no set of facts or specific fact allegations have been alleged against the Defendants Holston Hemp or the individual Defendants Marcum, Huff or Schrock that alleges or even indicates that they knew that the Plaintiffs objected to the sale much less an allegation that would support conspiracy and fraud or that the Holston Defendants intentionally or unlawfully conspired or deceived the Plaintiffs and likewise no fact is averred showing Holston Hemp gave any monies other than the $50,000.00 to Defendant Taylor, no facts have been alleged showing how the Holston Defendants deceived the Plaintiffs nor is there any fact alleged that even indicates the Holston Defendants had any coordinated effort with anyone to deprive the Plaintiffs of their assets or the value of the assets $50,000.00 nor did they have any indication that was not going to be divided with the Plaintiffs right after the sale in accord with their membership interests. In fact, the Holston Defendants had no way of knowing the contentious nature of the relationship with the members of CPH Brands, LLC, no way of knowing Taylor if Taylor informed them of the sale other than the notice presented and currently the Holston Defendants still do not know whether sufficient notice was provided by Defendant Taylor or if it even had to be provided because not all of the assets were sold to the Holston Defendants and the Holston Defendants owed no legal duty to the Plaintiffs by the Holston Defendants and none is alleged in the Complaint yet the Plaintiffs make it sound like the Holston Defendants had the same duty to them as Taylor but none of the members of CPH Brands, LLC were members of Holston Hemp and none are doing business together with the Taylor Defendant so no duty existed.

The Plaintiffs themselves signed the operating agreement which authorized Mr. Taylor to

6

have the rights set forth therein including the superior right, as majority member, to govern the company as he saw fit as long as he notified the Plaintiffs but no duty is imposed upon the Holston Defendants to notify anyone. Thus, no factual allegation of collusion has been averred by the Plaintiffs whatsoever, no factual allegations showing that the Holston Defendants knew Taylor was not going to share the proceeds with the other Members and finally, no showing of any legal Duty has been alleged much less that the Holston Defendants had a duty to notify the Members of a company that their majority member was selling some assets of the Company when he had a right to govern the company's business pursuant to the operating agreement if he held a majority interest. Finally, these Holston Defendants certainly have no knowledge of any assets being worth substantially more than what they paid since the very product they purchased was allegedly stolen by the Plaintiffs and is evidenced by a police report rendering the Holston Defendants' $50,000.00 investment in the assets a total loss to the Holston Defendants but the Plaintiffs received, according to the investigator over that amount for the product taken from the premises and no factual allegation has been proffered to the court in the complaint to further the allegation that the assets sold to the Defendants were worth "substantially more" than $50,000.00 and these Defendants find it laughable to allege that any of the assets purchased by the Holston Defendants was worth $6 million and again; no proof was even alleged as to what was the character of these assets.

Finally, these Defendants have since ended operations at the leased premises because their product was stolen, the production equipment was stolen and they have now, to add insult to injury, been accused of purchasing Six Million in assets for $50,000.00 without a single fact being asserted to prove it and without a single asset being listed as sold to them, its value or any factual allegation of knowledge by the Holston Defendants of any dispute during the sale, no

7

factual allegation of the assets worth nor any factual allegation describing the deception, fraud or conspiracy that the Plaintiffs so easily throw around in the complaint and to beat it all the Plaintiffs are currently under criminal investigation for allegedly stealing from the true victims here; Holston Hemp, LLC and the individual defendants, two of which hold professional licenses and are publicly accused of fraud and conspiracy without any factual allegation of any of them acting outside the scope of their company authority giving rise to a personal claim at all yet their personal names are being smeared with allegations of fraud, conspiracy and deceit and their licenses could be at risk.

In conclusion, the Holston Defendants requests that the case be dismissed for not asserting fraud or conspiracy with specificity pursuant to the Tennessee Rules and for failing to state a claim upon which relief can be granted for the reasons asserted herein, that the Plaintiff be required to pay reasonable attorney's fees in defending this case in a reasonable amount since the complaint fails on its face and counsel spent three months trying to reason with Plaintiffs' counsel supplying all evidence it could to prove no collusion, conspiracy or deceit was present and all costs of this court appearance and for filing a frivolous and unsubstantiated complaint alleging specific allegation without specificity as required by rules of this court are being asked to be reimbursed to the Holston Defendants herewith.

8

Counsel for all Holston Defendants.

KIMBERLEY D. RHOTON, ESQ.
215 Cumberland Street
Kingsport, TN 37660
(423) 723-0493 (phone)
(423) 723-0494 (fax)
kim@rhotonlawfirm.com
BPR# 022552

9

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of September, 2020, this Motion to Dismiss was served by US mail First Class to the following:

Brent R. Watson, Esq.
800 S. Gay Street Suite 2001
Knoxville Tennessee 37929

_____
KIMBERLEY D. RHOTON, ESQ.

10

# IN THE CIRCUIT COURT FOR SULLIVAN COUNTY, TENNESSEE

MICHAEL VAUGHN and )
TIMOTHY KENDRICK, )
)
    Plaintiffs, )
)
v. )    Docket No. C43098(C)
)
RUSSELL E. TAYLOR, )
MICHAEL SCHROCK, III, )
GREG C. MARCUM, )
TONY L. HUFF, and )
HOLSTON HEMP LLC, )
)
    Defendants. )

_____

RUSSELL E. TAYLOR, )
)
    Counterclaim Plaintiff, )
)
v. )
)
MICHAEL VAUGHN and )
TIMOTHY KENDRICK, )
)
    Counterclaim Defendants. )

**FILED**

10-22-20  2:10 pm

Bobby L. Russell
CIRCUIT COURT CLERK
SULLIVAN COUNTY, TN.

## MOTION TO DISMISS

Pursuant to Tenn. R. Civ. P. 3, 4.03, 8.05(1), 9.02, and 12.02, defendant

Russell E. Taylor ("Taylor"), by counsel, moves the Court to dismiss this action filed by

plaintiffs Michael Vaughn ("Vaughn") and Timothy Kendrick ("Kendrick"), on the

following grounds:

    1.    The Court lacks jurisdiction over the person of Taylor under Tenn.

R. Civ. P. 12.02(2).

Bristol: 939548-1

2. There is an insufficiency of process under Tenn. R. Civ. P. 12.02(4) and an insufficiency of service of process under Tenn. R. Civ. P. 12.02(5) because service was not made on Taylor within 90 days after issuance of the summons as required by Tenn. R. Civ. P. 3 and the summons has not been returned stating the reasons for failure to serve as required by Tenn. R. Civ. P. 4.03(1).

3. The complaint fails to state a claim upon which relief can be granted under Tenn. R. Civ. P. 12.02(6).

4. The company in question, CPH Brands, LLC, is a member-managed Tennessee limited liability company ("LLC"). Complaint, Exhibit A, Operating Agreement.

5. Vaughn and Kendrick lack standing to assert claims belonging to the LLC. *Keller v. Estate of McRedmond*, 495 S.W.3d 852, 877 (Tenn. 2016). These claims include the claim that Taylor breached his fiduciary duty, the claim that Taylor misappropriated or failed to account for assets, and the claim that Taylor breached his duties in winding up the business.

6. Vaughn and Kendrick have also failed to allege sufficient facts supporting their claims.

7. Under the Tennessee Revised Limited Liability Company Act, the "only fiduciary duties" a member owes are the "duty of loyalty" and the "duty of care" described in § 48-209-403(b) and (c). Tenn. Code Ann. § 48-249-403(a).

Bristol: 939548-1

8.    The duty of loyalty is limited to a duty to account to the LLC, to refrain from dealing with the LLC as a person with an adverse interest to the LLC, and to refrain from competing with the LLC. Tenn. Code Ann. § 48-29-403(b).

9.    The duty of care is limited to refraining from engaging in "grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law." Tenn. Code Ann. § 48-249-403(c).

10.    A member of an LLC is required to discharge his duties "consistently with the obligation of good faith and fair dealing, but a member does not violate his duties "merely because the member's conduct also furthers the member's own interest." Tenn. Code Ann. §§ 480-249-403(d), 48-249-403(e).

11.    Under § 48-249-403(m), a member "is not liable for any action taken as a member, manager, director or officer, or any failure to take action, if the member, manager, director or officer performs its duties in compliance with this section."

12.    As majority owner, Taylor had the right to direct a sale of the assets of the LLC.  Complaint, Exhibit A, Sections 5.1, 14.1.

13.    The complaint itself shows that Vaughn and Kendrick were informed of the LLC's plan to wind down its business as Exhibit D recites that the LLC decided to do so on April 26, 2019.

14.    Vaughn and Kendrick do not allege sufficient facts showing that Taylor breached his duty of loyalty or his duty of care in selling the assets of the LLC.

15.    Nor do Vaughn and Kendrick allege sufficient facts showing that Taylor engaged in a "conflict of interest transaction" in violation of Tenn. Code Ann. §

3

Bristol: 939548-1

48-249-404. Section 48-249-404(a) only applies to "a transaction with the LLC." Vaughn and Kendrick have not identified any transaction that Taylor had "with the LLC."

16.    As a result, Count I–Breach of Fiduciary Duty, Count II–Breach of Duty of Good Faith as Fair Dealing, and Count III–Dissolution fail to state a claim.

17.    Count IV–Fraud is barred by Tenn. Code Ann. § 48-249-403, which limits duties of a member of an LLC to those stated in the section.

18.    In any event, Vaughn and Kendrick failed to allege, with the required particularity, sufficient facts to support their claim of fraud. Vaughn and Kendrick have not identified any false representation of material fact or shown that they relied upon it to their detriment. *Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012).

19.    Likewise, Count V–Conspiracy is barred by Tenn. Code Ann. §48-249-403, which limits the duties of a member of an LLC.

20.    In any event, Vaughn and Kendrick have failed to allege sufficient facts supporting their claim of conspiracy. Vaughn and Kendrick have not shown that the defendants engaged in any unlawful act or that they employed unlawful means. *Kincaid v. Southtrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006).

21.    Count VI–Punitive Damages is based on the claims of fraud and conspiracy, which are insufficient for the reasons stated above.

22.    Count VII–Breach of Contract is based on the Operating Agreement. The Operating Agreement is governed by the Tennessee Revised Limited Liability Company Act. Because Vaughn and Kendrick have not alleged sufficient facts showing

4

Bristol: 939548-1

that Taylor violated the Act, Count VII fails to state a claim upon which relief can be granted.

23.     Likewise, Count VIII–Unjust Enrichment and Count IX–Accounting are barred by § 48-249-403, which governs and limits the liability of a member of an LLC.

24.     The complaint otherwise fails to state a claim for the reasons stated in the accompanying memorandum.

WHEREFORE, the complaint should be dismissed with prejudice and Taylor awarded his costs and attorney's fees pursuant to Tenn. Code Ann. § 20-12-119(c).

## ANSWER

Without waiving the foregoing Motion to Dismiss, but relying expressly thereon, pursuant to Tenn. R. Civ. P. 8.02, 8.03, and 12.02, defendant Russell E. Taylor ("Taylor"), by counsel, for his answer to the complaint filed against him by Michael Vaughn ("Vaughn") and Timothy Kendrick ("Kendrick"), states as follows:

1.     The allegations in paragraph 1 are admitted.

2.     The allegations in paragraph 2 are admitted.

3.     Responding to the allegations in paragraph 3, Taylor admits that he is a resident of Washington County, Virginia, and that he may be served in accordance with law. As stated in his motion to dismiss, Taylor denies that he has been served.

4.     The allegations in paragraph 4 are admitted.

5.     The allegations in paragraph 5 are admitted

5

6. The allegations in paragraph 6 are admitted.

## JURISDICTION

7. Responding to the allegations in paragraph 7, Taylor admits that relevant events occurred in Sullivan County, Tennessee. The remaining allegations in paragraph 7 are denied.

## FACTS

8. The allegations in paragraph 8 are admitted.

9. The allegations in paragraph 9 are admitted.

10. The allegations in paragraph 10 are admitted.

11. The allegations in paragraph 11 are admitted.

12. Responding to the allegations in paragraph 12, Taylor admits that Vaughn and Kendrick claimed to have experience in the hemp and CBD business and that they met with him in January 2019 about leasing a building. Based on the representations of Vaughn and Kendrick, Taylor further admits that he, Vaughn, and Kendrick agreed to form CPH Brands, LLC ("LLC"). The remaining allegations in paragraph 12 are denied.

13. Responding to the allegations in paragraph 13, Taylor admits that Vaughn was supposed to make a contribution of $288,000 consisting of equipment and licenses for a 24.5% interest in the LLC, but Taylor denies that Vaughn made any such contribution. The remaining allegations in paragraph 13 are denied.

14. Responding to the allegations in paragraph 14, Taylor admits that Kendrick was to receive a 24.5% interest in the LLC based on a contribution by him of

6

$1.00 and a contribution by Vaughn of $288,000 consisting of equipment and licenses. The remaining allegations in paragraph 14 are denied.

15.     Responding to the allegations in paragraph 15, Taylor admits that he received a 51% interest for the contributions described in the Operating Agreement. Taylor further admits that he paid expenses for the LLC, which were supposed to be repaid prior to any distributions, as stated in the Operating Agreement. Taylor also paid other expenses for the LLC, which were supposed to be repaid prior to any distributions. The remaining allegations in paragraph 15 are denied.

16.     Responding to the allegations in paragraph 16, Taylor admits that the LLC processed hemp and that it acquired hemp from Oregon. Some of the hemp was purchased, and some of it was acquired in exchange for part of the product. The remaining allegations in paragraph 16 are denied.

17.     The allegations in paragraph 17 are admitted.

18.     The allegations in paragraph 18 are admitted.

19.     Responding to the allegations in paragraph 19, Taylor admits that the LLC manufactured, packaged, marketed products, but he denies that the processes were unique. The remaining allegations in paragraph 19 are denied.

20.     Responding to the allegations in paragraph 20, Taylor admits that the LLC acquired a cold press and other equipment and that it made some improvements to the premises. The remaining allegations in paragraph 20 are denied.

21.     The allegations in paragraph 21 are denied.

Bristol: 939548-1

22. Responding to the allegations in paragraph 22, Taylor admits that Vaughn and Kendrick and others performed certain work for the LLC. Taylor states that the LLC made all agreed payments for such work. The remaining allegations in paragraph 22 are denied.

23. Responding to the allegations in paragraph 23, Taylor admits that Vaughn and Kendrick were informed to leave the premises on April 26, 2019. The remaining allegations in paragraph 23 are denied.

24. Responding to the allegations in paragraph 24, Taylor admits that Vaughn and Kendrick were prohibited from entering the premises after April 26, 2019. Taylor admits that Vaughn and Kendrick unlawfully entered the premises and took property without authority on May 22, 2019, resulting in a call to law enforcement. The remaining allegations in paragraph 24 are denied.

25. The allegations in paragraph 25 are denied.

26. Responding to the allegations in paragraph 26, Taylor admits that the LLC owned certain property. The remaining allegations in paragraph 26 are denied.

27. The allegations in paragraph 27 are denied.

28. Responding to the allegations in paragraph 28, Taylor admits that the parties conferred about the business on April 26, 2019, and that it was decided, by a majority vote of the members of the LLC, that the LLC would wind down its business. Taylor further admits that, at the request of Vaughn and Kendrick, Taylor made a proposal to sell his interest in the LLC to Vaughn and Kendrick on the terms that were

8

later stated in the Escrow Agreement. The remaining allegations in paragraph 28 are denied.

29. Responding to the allegations in paragraph 29, Taylor admits that Vaughn and Kendrick were provided with an Escrow Agreement with the terms as stated therein. The remaining allegations in paragraph 29 are denied.

30. Responding to the allegations in paragraph 30, Taylor admits that Exhibit D is a copy of the Escrow Agreement. The remaining allegations in paragraph 30 are denied.

31. Responding to the allegations in paragraph 31, Taylor admits that Vaughn and Kendrick did not purchase Taylor's interest in the LLC. The remaining allegations in paragraph 31 are denied.

32. The allegations in paragraph 32 are denied.

33. The allegations in paragraph 33 are admitted.

34. The allegations in paragraph 34 are not known, and they are therefore denied.

35. Responding to the allegations in paragraph 35, Taylor admits that Holston Hemp purchased certain assets of the LLC and leased the building for a time. Taylor denies that Holston Hemp purchased any intellectual property of the LLC. The remaining allegations in paragraph 35 are denied.

36. Responding to the allegations in paragraph 36, Taylor admits that he was majority owner of the LLC and had all rights of majority owner. Taylor admits that the LLC issued K-1s. Taylor states that Vaughn and Kendrick voluntarily removed

Case 2:21-cv-00061-TRM-CRW   Document 1-1   Filed 03/23/21   Page 102 of 272   PageID #: 107

themselves from the checking account. The remaining allegations in paragraph 36 are denied.

37. The allegations in paragraph 37 are admitted.

38. The allegations in paragraph 38 are denied.

39. The allegations in paragraph 39 are denied.

40. Responding to the allegations in paragraph 40, Taylor admits that the LLC did not distribute any property to Vaughn and Kendrick. The remaining allegations in paragraph 40 are denied.

COUNT I–CLAIM FOR BREACH OF FIDUCIARY DUTY

41. Responding to the allegations in paragraph 1-40, Taylor adopts and incorporated by reference his answer in paragraphs 1-40 above.

42. The allegations in paragraph 42 are denied.

43. The allegations in paragraph 43 are denied.

COUNT II–CLAIM FOR BREACH OF DUTY
OF GOOD FAITH AND FAIR DEALING

44. Responding to the allegations in paragraph 44, Taylor adopts and incorporates by reference his answer in paragraphs 1-43 above.

45. The allegations in paragraph 45 are denied.

COUNT III–DISSOLUTION AND WINDING UP

46. Responding to the allegations in paragraph 46, Taylor adopts and incorporates by reference his answer in paragraphs 1-45 above.

47. The allegations in paragraph 47 are denied.

10

## COUNT IV–CLAIM FOR FRAUD

48.     Responding to the allegations in paragraph 48, Taylor adopts and incorporates by reference his answer in paragraphs 1-47 above.

49.     The allegations in paragraph 49 are denied.

50.     The allegations in paragraph 50 are denied.

## COUNT V–CLAIM FOR CONSPIRACY

51.     Responding to the allegations in paragraph 51, Taylor adopts and incorporates by reference his answer in paragraphs 1-50 above.

52.     The allegations in paragraph 52 are denied.

53.     The allegations in paragraph 53 are denied.

54.     The allegations in paragraph 54 are denied.

## COUNT VI–CLAIM FOR PUNITIVE DAMAGES

55.     Responding to the allegations in paragraph 55, Taylor adopts and incorporates by reference his answer in paragraphs 1-54 above.

56.     The allegations in paragraph 56 are denied.

## COUNT VII–CLAIM FOR BREACH OF CONTRACT

57.     Responding to the allegations in paragraph 57, Taylor adopts and incorporates by reference his answer in paragraphs 1-56 above.

58.     Responding to the allegations in paragraph 58, Taylor admits that he, Vaughn, and Kendrick entered into an Operating Agreement with terms as stated therein. The remaining allegations in paragraph 58 are denied.

COUNT VIII–CLAIM FOR UNJUST ENRICHMENT

59.     Responding to the allegations in paragraph 59, Taylor adopts and incorporates by reference his answer in paragraphs 1-58 above.

60.     The allegations in paragraph 60 are denied.

COUNT IX–CLAIM FOR AN ACCOUNTING

61.     Responding to the allegations in paragraph 61, Taylor adopts and incorporates by reference his answer in paragraphs 1-60 above.

62.     The allegations in paragraph 62 are denied.

TO ALL COUNTS

63.     Taylor denies that Vaughn and Kendrick are entitled to the relief requested or to any relief.

64.     All allegations not expressly admitted are denied.

65.     Taylor denies that he has any liability to Vaughn and Kendrick under the Tennessee Revised Limited Liability Company Act, the Operating Agreement, or the complaint filed in this case.

66.     The claims of Vaughn and Kendrick are subject to and limited by the Tennessee Civil Justice Act of 2011, Tenn. Code Ann. §§ 29-39-101 to -104.

67.     Any award for punitive damages would violate the United States Constitution and Tennessee Constitution, including but not limited to, principles of procedural and substantive due process and prohibitions against excessive fines. Further, any award must conform to requirements stated in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008); *Philip Morris U.S.A. v. Williams*, 549 U.S. 346 (2007); *State Farm Mut. Auto*

*Ins. Co. v. Campbell*, 538 U.S. 408 (2003); *BMW of N. Am. Inc. v. Gore*, 517 U.S. 559 (1996), and their progeny. In this case, an award for punitive damages cannot satisfy these requirements.

## AFFIRMATIVE DEFENSES

68.    The Court lacks jurisdiction over the person of Taylor, and there is an insufficiency of process and service of process for the reasons stated in Taylor's motion to dismiss.

69.    The complaint fails to state a claim upon which relief can be granted for the reasons stated in Taylor's motion to dismiss.

70.    The rights, duties and liabilities of the parties are governed by the Tennessee Revised Limited Liability Company Act, Tenn. Code Ann. §§ 48-249-101 to -1133. In particular, § 48-249-403 states the standards of conduct for members and precludes any liability for acts or omissions in compliance with such standards. At all relevant times, Taylor complied with such standards.

71.    There was a failure of consideration for the Operating Agreement because Vaughn did not make and did not intend to make his required contributions and Kendrick aided and abetted such failure.

72.    Vaughn and Kendrick intentionally or negligently misrepresented the equipment that Vaughn would contribute to the LLC. Vaughn did not have such equipment and never intended to make such contribution.

73.    Vaughn and Kendrick intentionally or negligently misrepresented the licenses that Vaughn would contribute to the business.  Vaughn never held such licenses and never intended to make such contribution.

74.    Vaughn breached the Operating Agreement by failing to contribute equipment, and Kendrick aided and abetted such breach.

75.    Vaughn breached the Operating Agreement by failing to contribute licenses, Kendrick aided and abetted such breach.

76.    Vaughn and Kendrick have waived and are estopped from asserting the claims in this case by their failure to give notice of any objections to the sale of assets by the LLC.

77.    Vaughn and Kendrick have waived and estopped from asserting the claims in this case by unlawfully taking equipment from the property.

78.    The claims of Vaughn and Kendrick are barred by the doctrine of unclean hands and fraud.

79.    The claims of Vaughn and Kendrick are barred by their comparative fault.

A JURY TRIAL IS DEMANDED.

## COUNTERCLAIM

Pursuant to Tenn. R. Civ. P. 13.01 and 13.02, counterclaim plaintiff Russell E. Taylor ("Taylor") asserts this counterclaim against counterclaim defendants Michael Vaughn ("Vaughn") and Timothy Kendrick ("Kendrick").

Bristol: 939548-1

## INTRODUCTION

25. This is a counterclaim for fraud and misrepresentation by Vaughn and Kendrick in the formation of CPH Brands, LLC ("LLC"). Specifically, Vaughn and Kendrick misrepresented that Vaughn would contribute equipment and licenses to the LLC that Vaughn did not have and could not convey. As a result, Taylor was induced to make contributions and loans to the LLC that he never would have made. Taylor therefore seeks damages against Vaughn and Kendrick for the contributions and unpaid loans that Taylor made.

## JURISDICTION

26. The Court has jurisdiction of this counterclaim under Rule 13 of the Tennessee Rules of Civil Procedure.

## FACTS

27. In January 2019, Vaughn and Kendrick induced Taylor to invest in the LLC through a number of fraudulent misrepresentations.

28. Vaughn and Kendrick told Taylor that they were knowledgeable and experienced in the hemp and CBD business, which was not true.

29. Vaughn and Kendrick told Taylor that Vaughn owned and would contribute $288,000 worth of equipment to the LLC, which was not true.

30. Vaughn and Kendrick told Taylor that Vaughn had licenses and would contribute them to the LLC and ensure that the LLC had all necessary licenses to operate, which was not true.

Bristol-959548-1

15

31.    Taylor believed and relied upon these misrepresentations to his
detriment by making a contribution of $100,000 to the LLC, by arranging a lease of
property for the LLC, by advancing operating expenses to the LLC, and by providing
funds for the rental of a cold press machine for the LLC.

COUNT ONE–INTENTIONAL MISREPRESENTATION–EQUIPMENT

32.    Taylor adopts and incorporates by reference the facts stated in
paragraph 1-7 above.

33.    Vaughn and Kendrick represented to Taylor that Vaughn owned
$288,000 of equipment and that he would contribute it to the LLC.

34.    The representations were false when they were made.

35.    The representations involved material facts.

36.    Vaughn and Kendrick knew the representations were false or did not
believe them to be true or made the representations recklessly without knowing whether
they were true.

37.    Taylor did not know the representations were false, and he was
justified in relying upon the representations.

38.    As a result, Taylor has been damaged.

COUNT TWO–INTENTIONAL MISREPRESENTATION–LICENSES

39.    Taylor adopts and incorporates by reference the facts stated in
paragraphs 1-7 above.

40.    Vaughn and Kendrick represented to Taylor that Vaughn had
licenses and that he would contribute them to the LLC.

41.     The representations were false when they were made.

42.     The representations involved material facts.

43.     Vaughn and Kendrick knew the representations of fact were false or did not believe them to be true or made the representations recklessly without knowing whether they were true.

44.     Taylor did not know the representations were false, and he was justified in relying upon the representations.

45.     As a result, Taylor has been damaged.

### COUNT THREE–IN THE ALTERNATIVE–
### NEGLIGENT MISREPRESENTATION–EQUIPMENT

46.     Taylor adopts and incorporates by reference the facts, stated in paragraph 1-7 above.

47.     In the course of a business transaction, Vaughn and Kendrick falsely represented to Taylor that Vaughn owned $288,000 of equipment and that he would contribute it to the LLC.

48.     Vaughn and Kendrick supplied this information to induce Taylor to invest in the LLC and to loan money to the LLC.

49.     Taylor justifiably relied upon this false information.

50.     Vaughn and Kendrick failed to exercise reasonable care or competence in communicating the information to Taylor.

51.     As a result, Taylor has been damaged.

## COUNT FOUR–IN THE ALTERNATIVE–
## NEGLIGENT MISREPRESENTATION–LICENSES

52.     Taylor adopts and incorporates by reference the facts, stated in paragraph 1-7 above.

53.     In the course of a business transaction, Vaughn and Kendrick falsely represented to Taylor that Vaughn held licenses and that he would contribute them to the LLC.

54.     Vaughn and Kendrick supplied this information to induce Taylor to invest in the LLC and to loan money to the LLC.

55.     Taylor justifiably relied upon this false information.

56.     Vaughn and Kendrick failed to exercise reasonable care or competence in communicating the information to Taylor.

57.     As a result, Taylor has been damaged.

## COUNT FIVE–PUNITIVE DAMAGES

58.     Taylor adopts and incorporates by reference the facts stated in paragraphs 1-21.

59.     Vaughn and Kendrick acted maliciously, intentionally, fraudulently, or recklessly, and punitive damages should be awarded against them.

WHEREFORE, Taylor prays:

A.     That Taylor be awarded judgment against Vaughn and Kendrick, jointly and severally, in an amount not to exceed $200,000 for compensatory damages;

B. That Taylor be awarded judgment against Vaughn and Kendrick,

jointly and severally, in an amount not to exceed $200,000 for punitive damages;

C. That Taylor be awarded his prejudgment interest, costs, expenses,

and attorney's fees;

D. That the Court grant such other relief as a nature of the case may

require.

A JURY TRIAL IS DEMANDED.

Respectfully submitted,

RUSSELL E. TAYLOR

By Counsel

Wade W. Massie
BPR# 020567
PENN, STUART & ESKRIDGE
208 E. Main Street
Abingdon, Virginia 24210
Telephone: 276/623-4409
Facsimile: 276/628-5621
wmassie@pennstuart.com

By _____ w/ permission by Karissa H. Range
Wade W. Massie

Karissa H. Range
BPR #034277
PENN, STUART & ESKRIDGE
804 Anderson Street
Bristol, Tennessee 37620
Telephone: 423/793-4808
Facsimile: 423/793-4900
krange@pennstuart.com

By _____
Karissa H. Range

19

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been mailed and

emailed to

>Brent R. Watson, Esq.
>BUNSTINE, WATSON & BECKER
>800 S. Gay Street, Suite 2001
>Knoxville, Tennessee 37929
>bwatson@bwblawyer.com
>Counsel for Plaintiffs and Counterclaim Defendants

>Kimberley D. Rhoton, Esq.
>215 Cumberland Street
>Kingsport, Tennessee 37660
>kim@rhotonlawfirm.com
>Counsel for Defendants Michael Schrock, III,
>  Greg C. Marcum, and Holston Hemp LLC

this 22nd day of October, 2020.

Karissa H. Range

IN THE CIRCUIT COURT FOR SULLIVAN COUNTY, TENNESSEE

| | | |
|---|---|---|
| MICHAEL VAUGHN and<br>TIMOTHY KENDRICK, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No. C43098(C) |
| | ) | |
| RUSSELL E. TAYLOR, | ) | |
| MICHAEL SCHROCK, III, | ) | |
| GREG C. MARCUM, | ) | |
| TONY L. HUFF, and | ) | |
| HOLSTON HEMP LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**FILED**

D-22-20 2.10

Bobby L. Russell

CIRCUIT COURT CLERK

SULLIVAN COUNTY, TN.

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

Comes now the defendant Russell E. Taylor ("Taylor"), by counsel, and for

his memorandum of law in support of his motion to dismiss, states as follow:

    I.    INTRODUCTION

In this case, minority members of an LLC—Vaughn and Kendrick—are

attempting to bring a direct action against the majority member—Taylor—alleging

breach of fiduciary duty and misappropriation of assets. Because any claims belong to

CPH Brands, LLC (the "LLC"), not to individual members, the complaint must be

dismissed.

As discussed herein, the claims of the minority members also fail on their

merits. As majority member, Taylor had the right to dissolve the LLC, to sell its assets,

and to use the proceeds to pay the debts of the LLC. Under the Tennessee Revised

Limited Liability Company Act, Vaughn and Kendrick must show that Taylor engaged in

1

any "grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law." Tenn. Code Ann. § 48-249-403(c). The complaint fails to state facts supporting any such conduct by Taylor.

The only misconduct in this case was on the part of Vaughn and Kendrick. As the complaint states, the LLC sold its assets to Holston Hemp LLC. The evidence will show that this sale took place on May 21, 2019. The next day, after learning of the sale, Vaughn and Kendrick entered the premises of Holston Hemp and took the property that CPH Brands had sold to Holston Hemp. Yet, Vaughn and Kendrick have filed this case claiming assets that they themselves wrongly seized and later sold.

II.     STANDARD OF REVIEW

A 12.02(6) motion to dismiss for failure to state a claim "tests only the sufficiency of the complaint, not the strength of the proof. The resolution of the motion is determined by an examination of the pleadings alone." *Leggett v. Duke Energy Corp.*, 308 S.W.3d 843, 851 (Tenn. 2010); *see Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 938 (Tenn. 1994). "In adjudicating such motions, courts 'must construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences.'" *Ellithorpe v. Weismar* 479 S.W.3d 818, 823-24 (Tenn. 2015) (quoting *Phillips v. Montgomery Cty.*, 442 S.W.3 233, 237 (Tenn. 2014)).

"[W]hile pleadings are to be liberally construed, 'the need for some degree of coherence has not been totally abandoned. Tenn. R. Civ. P. 8.01 still requires that the facts upon which a claim for relief is founded must be stated in the complaint.'" *Webb v.*

2

*Nashville Area Habitat for Humanity, Inc.*, 2010 WL 1539846, at \*2 (Tenn. Ct. App. Apr. 16, 2010) (quoting *Demers v. Whittenburg*, No. M2003-00184-COA-R3-CV, 2004 WL 1196109, at \*11 (Tenn. Ct. App. May 27, 2004), *appeal denied*, 2004 WL 1196109 (Tenn. Dec. 20, 2004)); *see also Swallows v. Western Electric Co., Inc.*, 543 S.W.2d 581, 583 (Tenn. Ct. App. 1976) ("The Tennessee Rules of Civil Procedure, while simplifying and liberalizing pleading, do not relieve the plaintiff in a tort action of the burden of averring facts sufficient to show the existence of a duty owed by the defendant, a breach of the duty, and damages resulting therefrom.").

A court may dismiss a complaint based on the defenses of lack of jurisdiction, insufficiency of process, and insufficiency of service of process. Tenn. R. Civ. P. 12.02(2), 12.02(4) and 12.02(5). "A court acquires personal jurisdiction over a defendant when the defendant is served with process." *McNeary v. Baptist Mem'l Hosp.*, 360 S.W.3d 429, 436 (Tenn. Ct. App. 2011).

III.    LEGAL ANALYSIS

A.    THE COURT LACKS PERSONAL JURISDICTION OVER TAYLOR BECAUSE THE PLAINTIFFS FAILED TO PROPERLY AND TIMELY SERVE TAYLOR

Rule 3 sets forth the requirements for commencing a lawsuit by timely filing a complaint and issuing process, while Rule 4 sets forth the requirements to effect proper service of process. These rules should be read together. *Id.* at 437. When a plaintiff fails to properly issue and serve process on a defendant in accordance with Rules 3 and 4.01, the court does not possess personal jurisdiction over the defendant. *Id.* at 438-39.

3

Here, the complaint was filed on June 1, 2020. No service has been made upon Taylor, let alone within the required 90 days. *See* Tenn. R. Civ. P. 3. The plaintiffs have further failed to return the summons stating the reasons for their failure to serve as required by Tenn. R. Civ. P. 4.03(1). Because Vaughn and Kendrick have failed to properly issue and serve process on Taylor, the court lacks jurisdiction over Taylor, and the complaint should be dismissed against him.

> B.  THE PLAINTIFFS LACK STANDING TO ASSERT
> CLAIMS THAT BELONG TO THE LLC

Counts I, II, and III against Taylor are premised on allegations of breaches of fiduciary duties and misappropriation of company assets related to the winding up of the LLC and the sale of its assets. However, Vaughn and Kendrick lack standing to pursue these claims.

"Tennessee recognizes the presumption that a corporation is a distinct legal entity, wholly separate and apart from its shareholders, officers, directors, or affiliate corporations." *Collier v. Greenbrier Developers, LLC*, 358 S.W.3d 195, 200 (Tenn. Ct. App. 2009) (internal citations and quotations omitted) "Moreover, [a] limited liability company has an existence separate from its members and managers . . . [and] may only appear in court through counsel." *Id.* (internal citations and quotations omitted).

Based on the presumption of a company's separate legal identify from its members, a member generally does not have standing to assert a claim on behalf of the company. The Tennessee Supreme Court identified the following test to determine the standing of a member to sue on behalf of the corporation:

4

> [A] court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.

*Keller v. Estate of McRedmond*, 495 S.W.3d 852, 876 (Tenn. 2016) (internal citations omitted). The Court has further noted that "any action by shareholders for harm resulting from a breach of fiduciary duty to the corporation arising from mismanagement and self-dealing belongs to the corporation, not to the shareholders." *Id.* (internal citations omitted).

Here, pursuant to *Keller*, any claims for breach of fiduciary duty and misappropriation of assets belong to the LLC. Consequently, the plaintiffs lack standing to assert such claims, and Counts I, II, and III should be dismissed with prejudice.

C.      COUNTS I, COUNT II, AND COUNT III FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Under the Tennessee Revised Limited Liability Company Act (the "Act"), the "only fiduciary duties" a member owes are the "duty of loyalty" and the "duty of care" described in § 48-209-403(b) and (c). Tenn. Code Ann. § 48-249-403(a). The duty of loyalty is limited to a duty to account to the LLC, to refrain from dealing with the LLC as a person with an adverse interest to the LLC, and to refrain from competing with the LLC. *Id.* at § 48-29-403(b). The duty of care is limited to refraining from engaging in "grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law." *Id.* at § 48-249-403(c).

5

A member of an LLC is required to discharge his duties "consistently with the obligation of good faith and fair dealing," but a member does not violate his duties "merely because the member's conduct also furthers the member's own interest." *Id.* at §§ 480-249-403(d), 48-249-403(e). Under § 48-249-403(m), a member "is not liable for any action taken as a member, manager, director or officer, or any failure to take action, if the member, manager, director or officer performs its duties in compliance with this section."

As majority owner, Taylor had the right to direct a sale of the assets of the LLC. Complaint, Exhibit A, Sections 5.1, 14.1. The complaint itself shows that Vaughn and Kendrick were informed of the LLC's plan to wind down its business as Exhibit D recites that the LLC decided to do so on April 26, 2019. Because the members participated in the meeting in which the LLC decided to wind down its business, there can be no violation of any duties owed by Taylor in effectuating the LLC's decision. *See, e.g.*, *Rock Ivy Holding, LLC v. RC Props., LLC*, 464 S.W.3d 623, 641 (Tenn. Ct. App. 2014).

Vaughn and Kendrick do not allege sufficient facts showing that Taylor breached his duty of loyalty or his duty of care in selling the assets of the LLC. In winding down a LLC, a member only must refrain from "engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law." Tenn. Code Ann. § 48-249-4039(c). Vaughn and Kendrick do not allege that Taylor was grossly negligent, reckless, or engaged in intentional misconduct or a knowing violation of the law in winding down the LLC's affairs consistent with the April 26, 2019 meeting.

6

Finally, Vaughn and Kendrick fail to allege sufficient facts showing that Taylor engaged in a "conflict of interest transaction" in violation of Tenn. Code Ann. § 48-249-404. Section 48-249-404(a) only applies to "a transaction with the LLC." Vaughn and Kendrick have not identified any transaction that Taylor had "with the LLC."

As a result, Count I–Breach of Fiduciary Duty, Count II–Breach of Duty of Good Faith as Fair Dealing, and Count III–Dissolution fail to state a claim.

> ### D. COUNT IV FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

In Count IV, the plaintiffs allege a cause of action for fraud. To succeed on a claim of fraud, a plaintiff must prove the following elements:

> (1) intentional misrepresentation of a material fact; (2) knowledge that the representation was false—that the misrepresentation was made knowingly or recklessly or without belief or regard for its truth; (3) reasonable reliance on the misrepresentation by the plaintiff and resulting damages; (4) "that the misrepresentation relates to an existing or past fact[.]"

*Dog House Invests., LLC v. Teal Props., Inc.*, 448 S.W.3d 905, 916 (Tenn. Ct. App. 2014) (quoting *Stacks v. Saunders* 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990)). Rule 9.02 requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

It is well-established that "[a] claim of fraud is deficient if the complaint fails to state with particularity an intentional misrepresentation of a material fact." *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 41 (Tenn. Ct. App. 2006) (internal citations omitted). "To pass the particularity test, the actors should be identified and the substance

7

of each allegation should be pled." *Id.* (internal citations omitted). When a complaint alleges fraud and fails to allege particularized allegations of misrepresentations and the reasonableness of reliance on such misrepresentations, the claim of fraud fails as a matter of law. *See Black v. Black*, 166 S.W.3d 699, 705 (Tenn. 2005); *see also PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 549 (Tenn. Ct. App. 2012) ("In short, without information as to what representations were made and by whom, these pleadings are vague and do not satisfy the liberal pleading requirements of Tennessee Rule of Civil Procedure 8.01 (for negligent misrepresentations), much less the heightened requirements of Tennessee Rule of Civil Procedure 9.02 (for intentional or fraudulent misrepresentations)".).

Here, the facts as alleged by Vaughn and Kendrick do not state a cause of action for fraud. At no point do the plaintiffs allege any misrepresentation made by Taylor. Further, the plaintiffs fail to plead that they relied on a representation made by Taylor—justifiably so or otherwise. Accordingly, Count IV–Fraud fails a matter of law.

E.    COUNT V FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

In Count V, Vaughn and Kendrick allege a conspiracy among the defendants, but they fail to identify any underlying illegal act.

"The elements of a cause of action for civil conspiracy are: (1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury." *Kincaid*, 221 S.W.3d at 38.

"[C]onspiracy claims must be pled with some degree of specificity". *McGee v. Best*, 106 S.W.3d 48, 64 (Tenn. Ct. App. 2002) (citing *Haynes v. Harris*, No. 01A01-9810-CV-00518, 1999 WL 317946, at *2 (Tenn. Ct. App. 1999)). "Conclusory allegations, however, unsupported by material facts will not be sufficient to state such a claim." *Kincaid*, 221 S.W.3d at 38.

"An essential element of a conspiracy claim is that the conspiring parties intend to accomplish an unlawful purpose, or a lawful purpose by unlawful means." *Id.* at 39 (internal citations omitted). When the action complained of is lawful, then there can be no conspiracy. *Id.*

Here, the complaint fails to identify any illegal actions taken. Vaughn and Kendrick complain that the assets of the LLC were sold. However, such a sale is lawful and permissible by the Operating Agreement. Vaughn and Kendrick also complain that Taylor chose to dissolve the LLC. As the majority member of the LLC, under the Operating Agreement and the Act, Taylor had the right to vote his majority interest to dissolve the LLC and effect a wind down. As Exhibit D shows, by action of the LLC on April 26, 2019, the LLC decided to wind down its affairs. Furthermore, the complaint fails to allege any of the necessary elements of conspiracy with the degree of the specificity required by law. Accordingly, Count V–Conspiracy fails to state a claim upon which relief can be granted.

F.    COUNT VI FAILS TO STATE A CLAIM UPON WHICH
RELIEF CAN BE GRANTED

Count VI seeks an award of punitive damages. "[B]ecause punitive damages are to be awarded only in the most egregious of cases, a plaintiff must prove the defendant's intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). "[P]unitive damages are intended to punish a defendant, to deter him from committing acts of a similar nature, and to make a public example of him" and "are thus appropriate only in the most egregious cases." *Dog House Invests., LLC*, 448 S.W.3d 905, 915 (internal quotations and citations omitted). Even if a plaintiff can demonstrate a breach of contract, generally speaking, in the absence of fraud, there is no basis for punitive damages. *Id.* (citing *Next Generation, Inc. v. Wal–Mart, Inc.*, 49 S.W.3d 860, 866 (Tenn. Ct. App. 2000)).

Here, Vaughn and Kendrick fail to establish any fraudulent actions of Taylor or any other intentional, malicious, or reckless conduct. Likewise, Vaughn and Kendrick fail to establish any conspiracy that Taylor participated in. The allegations in the complaint clearly fail to rise to the level of egregiousness required for punitive damages. Accordingly, Count VI–Punitive Damages fails to state a claim upon which relief can be granted.

G.    COUNT VII FAILS TO STATE A CLAIM UPON WHICH
RELIEF CAN BE GRANTED

Count VII alleges a breach of certain provisions of the Operating Agreement. As an initial matter, the Operating Agreement is governed by the Act.

Because Vaughn and Kendrick have not alleged any facts showing that Taylor violated the Act, Count VII fails to state a claim upon which relief can be granted.

Furthermore, the complaint fails to establish a breach of the provisions cited by Vaughn and Kendrick. While Vaughn and Kendrick allege that "Taylor withdrew or reduced his capital," these are conclusory allegations with no underlying supporting facts. Furthermore, the Operating Agreement specifically contemplates that Taylor would receive a repayment of monies by the LLC before the plaintiffs received any distributions.

Vaughn and Kendrick also allege that Taylor did not keep them informed about the LLC's operations. However, as evidenced by the Escrow Agreement, "by action of the members of the Company on April 26, 2019, the Company began to wind down its operations." Accordingly, it is evident by the plaintiffs' own exhibit that they were aware of Taylor's actions and a proper meeting was held to effectuate such actions. Accordingly, Count VII–Breach of Contract fails to state a claim upon which relief can be granted.

> H.    COUNT VIII AND COUNT XI FAIL TO STATE A CLAIM
>       UPON WHICH RELIEF CAN BE GRANTED

Section 48-249-403 governs and limits the liability of a member of a LLC, effectively barring both Count VIII and Count XI. Furthermore, the complaint fails to establish that Taylor received any of the assets of CPH or how Taylor was unjustly enrichment by any of CPH's assets. Consequently, Count VIII–Unjust Enrichment and Count XI–Accounting fail to state a claim upon which relief can be granted.

11

IV.    CONCLUSION

Based on the foregoing, the complaint should be dismissed with prejudice

and Taylor awarded his costs and attorney's fees.

Respectfully submitted,

RUSSELL E. TAYLOR

By Counsel

Wade W. Massie
 BPR# 020567
PENN, STUART & ESKRIDGE
208 E. Main Street
Abingdon, Virginia 24210
Telephone:  276/623-4409
Facsimile:  276/628-5621
wmassie@pennstuart.com

By Wade W Massie    w/ permission by
                              Karissa Range
   Wade W. Massie


Karissa H. Range
 BPR #034277
PENN, STUART & ESKRIDGE
804 Anderson Street
Bristol, Tennessee 37620
Telephone: 423/793-4808
Facsimile:  423/793-4900
krange@pennstuart.com

By _____
   Karissa H. Range

12

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been mailed and

emailed to

Brent R. Watson, Esq.
BUNSTINE, WATSON & BECKER
800 S. Gay Street, Suite 2001
Knoxville, Tennessee 37929
bwatson@bwblawyer.com
Counsel for Plaintiffs

Kimberley D. Rhoton, Esq.
215 Cumberland Street
Kingsport, Tennessee 37660
kim@rhotonlawfirm.com
Counsel for Defendants Michael Schrock, III,
  Greg C. Marcum, and Holston Hemp LLC

this 22nd day of October, 2020.

Karissa H. Range

IN THE CIRCUIT COURT FOR SULLIVAN COUNTY, TENNESSEE

MICHAEL VAUGHN and )
TIMOTHY KENDRICK, )
)
Plaintiffs, )
)
v. )  Docket No. C43098(C)
)
RUSSELL E. TAYLOR, )
MICHAEL SCHROCK, III, )
GREG C. MARCUM, )
TONY L. HUFF, and )
HOLSTON HEMP LLC, )
)
Defendants. )

**FILED**

6-22-20  2:10

Bobby L. Russell
CIRCUIT COURT CLERK
SULLIVAN COUNTY, TN.

## NOTICE OF APPEARANCE

Please take notice that the undersigned appear as counsel for defendant

Russell E. Taylor in this case.

Respectfully submitted,

RUSSELL E. TAYLOR

By Counsel

Wade W. Massie
BPR# 020567
PENN, STUART & ESKRIDGE
208 E. Main Street
Abingdon, Virginia 24210
Telephone: 276/623-4409
Facsimile: 276/628-5621
wmassie@pennstuart.com

By _Wade W. Massie_  w/m permission by Kanssa Kerge
Wade W. Massie

Karissa H. Range
BPR #034277
PENN, STUART & ESKRIDGE
804 Anderson Street
Bristol, Tennessee 37620
Telephone: 423/793-4808
Facsimile: 423/793-4900
krange@pennstuart.com

By _____
Karissa H. Range

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been mailed and

emailed to

Brent R. Watson, Esq.
BUNSTINE, WATSON & BECKER
800 S. Gay Street, Suite 2001
Knoxville, Tennessee 37929
bwatson@bwblawyer.com
Counsel for Plaintiffs


Kimberley D. Rhoton, Esq.
215 Cumberland Street
Kingsport, Tennessee 37660
kim@rhotonlawfirm.com
Counsel for Defendants Michael Schrock, III,
  Greg C. Marcum, and Holston Hemp LLC


this 22nd day of October, 2020.


_____
Karissa H. Range

2

# THE RHOTON LAW FIRM

Kimberley D. Rhoton, Esq.
Founding Attorney
*Licensed in TN and VA
kim@rhotonlawfirm.com

215 Cumberland Street
Kingsport, TN 37660
Phone (423)723-0493
Fax (423)723-0494

November 17, 2020

Bobby L. Russell, Clerk
Circuit Court of Sullivan County
225 W. Center Street
Kingsport, TN 37660

> RE: Michael Vaughn and Timothy Kendrick
> vs. Russell E. Taylor, et al
> Case No.: C43098(C)

Dear Mr. Russell:

Enclosed please find the Notice of Hearing in the above-referenced matter. Please file, date stamp and return a copy of same to our office in the envelope we have provided. Thank you for your assistance and cooperation in this regard.

Sincerely,

Karen Powers, ACP

Enclosures (Notice; SASE)
xc: w/enc. Brent R. Watson, Esq. (Notice) VIA EMAIL & FIRST CLASS MAIL
w/enc. Wade W. Massie, Esq. (Notice) VIA EMAIL & FIRST CLASS MAIL
w/enc. Karissa H. Range, Esq. (Notice) VIA EMAIL & FIRST CLASS MAIL
w/enc. Michael Schrock, III (Notice)
w/enc. Greg C. Marcum (Notice) VIA EMAIL ONLY
w/enc. Tony L. Huff (Notice) VIA EMAIL ONLY

## IN THE CIRCUIT COURT FOR SULLIVAN COUNTY, TENNESSEE

**MICHAEL VAUGHN and**
**TIMOTHY KENDRICK,**

      **Plaintiffs**

v.

**RUSSELL E. TAYLOR,**
**MICHAEL SCHROCK, III,**
**GREG C. MARCUM,**
**TONY L. HUFF and**
**HOLSTON HEMP LLC**

      **Defendants**

**Docket No.:   C43098(C)**

FILED

11/23/20 11:00 am/pm DC

Bobby L. Russell
CIRCUIT COURT CLERK
SULLIVAN COUNTY, TN

### NOTICE OF HEARING

      YOU ARE HEREBY NOTIFIED that on the 2nd day of March, 2021 at the hour of 9:00 a.m., or as soon thereafter as counsel may be heard, the undersigned will move the Circuit Court for Sullivan County, Tennessee, **801 Anderson Street, Room 223, Bristol, Tennessee,** for the relief requested in their Motion to Dismiss filed on September 1, 2020.

                        Respectfully submitted,

                        MICHAEL SCHROCK, III,
                        GREG C. MARCUM,
                        TONY L. HUFF and
                        HOLSTON HEMP LLC

                        BY COUNSEL

Attorney for Defendants
Michael Schrock, III,
Greg C. Marcum, Tony L.
Huff and Holston Hemp LLC

Kimberley D. Rhoton, Esq.
215 Cumberland Street
Kingsport, TN 37660
BPR#022552
Phone:  (423) 723-0493
Fax:  (423) 723-0494
Email:  kim@rhotonlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been mailed and/or emailed to the following this *14th* day of *November*, 2020.

Brent R. Watson, Esq,
BUNSTINE, WATSON & BECKER
800 S. Gay Street, Suite 2001
Knoxville, TN 37929
bwatson@bwblawyer.com
Counsel for Plaintiffs

Wade W. Massie, Esq.
PENN, STUART & ESKRIDGE
208 E. Main Street
Abingdon, VA 24210
wmassie@pennstuart.com
Counsel for Defendant, Russell E. Taylor

Karissa H. Range, Esq.
PENN, STUART & ESKRIDGE
804 Anderson Street
Bristol, TN 37620
krange@pennstuart.com
Counsel for Defendant, Russell E. Taylor

Michael Schrock, III
1064 Sussex Drive
Kingsport, TN 37660

Greg C. Marcum
1012 Smith Hollow Road
Gate City, VA 24251

Tony L. Huff
474 Lakeside Dock Drive
Kingsport, TN 37663

KIMBERLEY D. RHOTON, ESQ.

**PENN STUART**

ABINGDON | BRISTOL | JOHNSON CITY | RICHMOND

804 ANDERSON ST., BRISTOL, TN 37620

PENNSTUART.COM

**Karissa H. Range**

krange@pennstuart.com
D: 423 793 4808
F: 423 793 4848

November 24, 2020

Mr. Bobby L. Russell
Circuit Court Clerk for Sullivan County
225 West Center Street
Kingsport, TN 37660

      Re:    *Michael Vaughn and Timothy Kendrick v. Russell E. Taylor, Michael Schrock,*
           *III, Greg C. Marcum, Tony L. Huff,* and *Holston Hemp, LLC*
           Case No. C43098(C)
           PS&E File No. 9530-2

Dear Mr. Russell:

      Enclosed, please find a Notice of Hearing for filing in the above referenced matter.

      By copy of this letter, I am serving a copy of same on counsel of record.

      Should you have any questions or need any additional information, please do not
hesitate to contact me at your convenience.

              Sincerely yours,

              PENN, STUART & ESKRIDGE

              By: Karissa H. Range

Enclosure
cc:    Brent R. Watson, Esq. (w/enc.)
       Kimberly D. Rhoton, Esq. (w/enc.)

Bristol: 946408-1

IN THE CIRCUIT COURT FOR SULLIVAN COUNTY, TENNESSEE

MICHAEL VAUGHN and )
TIMOTHY KENDRICK, )
)
Plaintiffs, )
)
v. )   Docket No. C43098(C)
)
RUSSELL E. TAYLOR, )
MICHAEL SCHROCK, III, )
GREG C. MARCUM, )
TONY L. HUFF, and )
HOLSTON HEMP LLC, )
)
Defendants. )

**FILED**

11-30-20 11:23

Bobby L. Russell
CIRCUIT COURT CLERK
SULLIVAN COUNTY, TN.

## NOTICE OF HEARING

Please take notice that the undersigned will present its Motion to Dismiss to the Court

for a hearing and ruling on March 2, 2021 at 9:00 a.m. in the Circuit Court for Sullivan County,

Tennessee, at Bristol.

You are hereby notified to be present at said time and place and to take such action in

the premises as you may be advised.

Respectfully submitted,

RUSSELL E. TAYLOR

By Counsel

Abingdon: 1134490-1

Wade W. Massie (BPR# 020567)
PENN, STUART & ESKRIDGE
208 E. Main Street
Abingdon, Virginia 24210
Telephone: 276/623-4409
Facsimile: 276/628-5621
wmassie@pennstuart.com

Karissa H. Range (BPR #034277)
PENN, STUART & ESKRIDGE
804 Anderson Street
Bristol, Tennessee 37620
Telephone: 423/793-4808
Facsimile: 423/793-4900
krange@pennstuart.com

By: _____
                Karissa H. Range

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of November, 2020, a true copy of the foregoing

has been mailed and e-mailed to:

> Brent R. Watson, Esq.
> BUNSTINE, WATSON & BECKER
> 800 S. Gay Street, Suite 2001
> Knoxville, Tennessee 37929
> bwatson@bwblawyer.com
> Counsel for Plaintiffs

> Kimberley D. Rhoton, Esq.
> 215 Cumberland Street
> Kingsport, Tennessee 37660
> kim@rhotonlawfirm.com
> Counsel for Defendants Michael Schrock, III,
>   Greg C. Marcum, and Holston Hemp LLC

_____
                Karissa H. Range

Abingdon: 1134490-1

# BUNSTINE, WATSON & BECKER

## ATTORNEYS AT LAW
### AN ASSOCIATION

NICHOLAS D. BUNSTINE*
BRENT R. WATSON*
JERROLD L. BECKER
SUZANNE NICOLE PRICE*
EMILY K. STULCE
*RULE 31 LISTED GENERAL CIVIL
MEDIATOR

FIRST TENNESSEE PLAZA
800 SOUTH GAY STREET, SUITE 2001
KNOXVILLE, TENNESSEE 37929

TELEPHONE (865) 523-3022
(865) 523-0466
TELECOPIER (865) 637-0137

December 17, 2020

Bobby L. Russell
Circuit Court Clerk
Sullivan County, TN
P.O. Box 585
140 Blountville Bypass
Blountville, TN 37617

     Re:    Michael Vaughn, et al. v. Russell E. Taylor, et al.
            Sullivan County Circuit Court No. C43098(C)

Dear Mr. Russell:

     Please find enclosed for filing the Answer to Counterclaim in the above captioned matter. I have enclosed a self addressed envelope and would appreciate you returning a filed copy to us. If you should have any questions, please feel free to contact me.

               Sincerely,

               Brent R. Watson

BRW/pkr
Enclosures
cc:    Wade W. Massie via email and U.S. Mail
       Karissa H. Range via email and U.S. Mail
       Kimberly D. Rhotan via email and U.S. Mail
       Timothy Kendrick via email
       Micheal Vaughn via email

IN THE CIRCUIT COURT FOR SULLIVAN COUNTY, TENNESSEE

MICHEAL VAUGHN and
TIMOTHY KENDRICK,                    )
                                     )
          Plaintiff,                 )
                                     )
v.                                   )          Docket No. C43098(C)
                                     )
RUSSELL E. TAYLOR,                   )
MICHAEL SCHROCK, III,                )
GREG C. MARCUM,                      )
TONY L. HUFF and                     )
HOLSTON HEMP LLC,                    )
                                     )
          Defendants.                )
_____

RUSSELL E. TAYLOR,                   )
                                     )
          Counterclaim Plaintiff,    )
                                     )
v.                                   )
                                     )
MICHEAL VAUGHN and                   )
TIMOTHY KENDRICK,                    )
                                     )
          Counter-Defendants.        )

## ANSWER TO COUNTERCLAIM

Come the Plaintiffs/Counter-Defendants and in answer to the Counterclaim, say:

1.  With regard to paragraph 25 of the Counterclaim, the Counter-Defendants can neither admit or deny that this is a counterclaim for fraud and misrepresentation. However, the Counter-Defendants deny that they made any material misrepresentation of any kind. It is further denied that Taylor was induced to make contributions and loans to the LLC that he never would have made. The Counter-Defendants deny the remaining allegations contained in paragraph 25 of the Counterclaim

2.  The Counter-Defendants are without sufficient information or knowledge to either admit or deny the allegations contained in paragraph 26 of the Counterclaim.

3.  The Counter-Defendants deny the allegations contained in paragraph 27 of the

Counterclaim.

4. In regard to paragraph 28 of the Counterclaim, the Counter-Defendants truthfully told Taylor about their knowledge and experience in the Hemp and CBD business and nothing they told to Taylor regarding their knowledge and experience was false.

5. The allegations contained in paragraph 29 of the Counterclaim are denied.

6. In regard to paragraph 30 of the Counterclaim, Vaughn and Kendrick contributed any licenses that they acquired to the LLC. The remaining allegations contained in paragraph 30 of the Counterclaim are denied.

7. With regard paragraph 31 of the Counterclaim, it is denied that the Counter-Defendants made any misrepresentations to Taylor whatsoever. Therefore, it is denied that Taylor believed and relied upon any misrepresentations to his detriment. The Counter-Defendants deny the remaining allegations contained in paragraph 31 of the Counterclaim.

8. The Counter-Defendants restate their responses to paragraphs 25 through 31 as there are no answers required to paragraphs 1 through 7 of the pleading.

9. The Counter-Defendants deny the allegations contained in paragraph 33 of the Counterclaim except that Vaughn and Kendrick did agree to contribute certain assets to the LLC.

10. The allegations contained in paragraph 34 of the Counterclaim are denied.

11. The allegations contained in paragraph 35 of the Counterclaim are denied.

12. The allegations contained in paragraph 36 of the Counterclaim are denied.

13. With regard to paragraph 37 of the Counterclaim, the Counter-Defendants deny that they made representations which were false or that Taylor relied upon any misrepresentations. The remaining allegations contained in paragraph 37 of the Counterclaim are denied.

14. The allegations contained in paragraph 38 of the Counterclaim are denied.

15. The Counter-Defendants restate their responses to paragraphs 25 through 31 as if fully set forth herein. No response is required of the Counter-Defendants to paragraphs 1 through 7 of the pleading.

16. With regard to paragraph 40 of the Counterclaim, it is admitted that Vaughn and Kendrick contributed any licenses they obtained to the LLC. The remaining allegations contained in paragraph 40 of the Counterclaim are denied.

17.   The allegations contained in paragraph 41 of the Counterclaim are denied.

18.   The allegations contained in paragraph 42 of the Counterclaim are denied.

19.   With regard to paragraph 43 of the Counterclaim it is denied that Vaughn and Kendrick made any representations which were false. The remaining allegations contained in paragraph 43 of the Counterclaim are denied.

20.   The allegations contained in paragraph 44 of the Counterclaim are denied.

21.   The allegations contained in paragraph 45 of the Counterclaim are denied.

22.   With regard to paragraph 46 of the Counterclaim, the Counter-Defendants restate their responses to paragraphs 25 through 31 as if fully set forth herein. The Counter Defendants are not required to respond to the allegations contained in paragraphs 1 through 7 of the pleading.

23.   The allegations contained in paragraph 47 of the Counterclaim are denied.

24.   The allegations contained in paragraph 48 of the Counterclaim are denied.

25.   The allegations contained in paragraph 49 of the Counterclaim are denied.

26.   The allegations contained in paragraph 50 of the Counterclaim are denied.

27.   The allegations contained in paragraph 51 of the Counterclaim are denied.

28.   With regard to the allegations contained in paragraph 52 of the Counterclaim, the Counter-Defendants restate their responses to paragraphs 25 through 31 as if fully set forth herein. The Counter Defendants are not required to file a response to paragraphs 1 through 7 of the pleading.

29.   With regard to paragraph 53 of the Counterclaim, it is denied that the Counter-Defendants made any false representations to Taylor regarding licenses.

30.   With regard to paragraph 54 of the Counterclaim, Counter-Defendants deny that they supplied any false information to induce Taylor to invest in the LLC and to loan money to the LLC.

31.   The Counter-Defendants deny the allegations contained in paragraph 55 of the Counterclaim.

32.   The Counter-Defendants deny the allegations contained in paragraph 56 of the Counterclaim.

33. The Counter-Defendants deny the allegations contained paragraph 57 of the Counterclaim.

34. The Counter-Defendants restate their responses to paragraphs 25 through 31 as if fully set forth herein. The Counter-Defendants deny that they are required to answer paragraphs 1 through 21 of the pleading.

35. The Counter-Defendants deny the allegations contained in paragraph 59 of the Counterclaim.

36. As an affirmative defense, the Counter-Defendants aver that the Counterclaim fails to state a claim upon which relief may be granted.

Respectfully submitted this the ___ day of _____, 2020.

BRENT R. WATSON, # 010154
Attorney for Plaintiffs/Counter - Defendants
BUNSTINE, WATSON & BECKER
800 S. Gay Street, Suite 2001
Knoxville, Tennessee 37929
(865) 523-3022

Certificate of Service

I hereby certify that a true and exact copy of the foregoing has been mailed to Wade W. Massie, 208 E. Main Street, Abingdon, Virginia 24210, Karissa H. Range, 804 Anderson Street, Bristol, Tennessee 37620, and Kimberly D. Rhoton, 215 Cumberland Street, Kingsport, Tennessee 37660 by U.S. Mail with sufficient postage thereupon to carry same to its destination.

This the ___ day of _____, 2020.

BRENT R. WATSON

IN THE CIRCUIT COURT FOR SULLIVAN COUNTY, TENNESSEE

MICHAEL VAUGHN and )
TIMOTHY KENDRICK, )
)
Plaintiffs, )
)
v. )
)
RUSSELL E. TAYLOR, )
MICHAEL SCHROCK, III, )
GREG C. MARCUM, )
TONY L. HUFF, and )
HOLSTON HEMP LLC, )
)
Defendants. )

RUSSELL E. TAYLOR, )
)
Counterclaim Plaintiff, )
)
v. )
)
MICHAEL VAUGHN and )
TIMOTHY KENDRICK, )
)
Counterclaim Defendants. )

**FILED**
1-29-21 10:32 am
Bobby L. Russell DC
CIRCUIT COURT CLERK
SULLIVAN COUNTY, TN.

Docket No. C43098(C)

## AGREED ORDER

On this day came the parties, by counsel, to confirm that a hearing has been requested for March 2, 2021, on the Motion to Dismiss filed by Defendants Michael Schrock, III, Greg C. Marcum, Tony L. Huff, and Holston Hemp LLC, and the Motion to Dismiss filed by Russell E. Taylor. The parties have agreed to participate remotely having the hearing conducted via Zoom teleconference.

Bristol-942302-1

Based on the agreement of counsel and under the circumstances of the current pandemic, it is hereby **ORDERED** that this case shall be set for hearing on March 2, 2021, at 1:00 p.m., before the Honorable E. G. Moody, Chancellor. It is understood that the Clerk and Master shall coordinate and provide the necessary Zoom information to counsel of record.

_____
JUDGE

REQUESTED:

_____
Wade W. Massie (BPR# 020567)
Karissa H. Range (BPR #034277)
PENN, STUART & ESKRIDGE
208 East Main Street
Abingdon, VA 24210
Telephone: 276/623-4409
Facsimile: 276/628-5621
wmassie@pennstuart.com
krange@pennstuart.com
Counsel for Defendant and Counter Plaintiff Russell E. Taylor

SEEN AND AGREED:

with permission
by Karissa Range

_____
Brent R. Watson, Esq.
BUNSTINE, WATSON & BECKER
800 S. Gay Street, Suite 2001
Knoxville, Tennessee 37929
bwatson@bwblawyer.com
Counsel for Plaintiffs and Counterclaim Defendants

_Kimberley D. Rhoton_  with permission by Kewisso Range

Kimberley D. Rhoton, Esq.
215 Cumberland Street
Kingsport, Tennessee 37660
kim@rhotonlawfirm.com
Counsel for Defendants Michael Schrock, III,
 Greg C. Marcum, and Holston Hemp LLC

# THE RHOTON LAW FIRM

Kimberley D. Rhoton, Esq.
Founding Attorney
*Licensed in TN and VA
kim@rhotonlawfirm.com

215 Cumberland Street
Kingsport, TN 37660
Phone (423)723-0493
Fax (423)723-0494

February 16, 2021

Bobby L. Russell, Clerk
Circuit Court of Sullivan County
225 W. Center Street
Kingsport, TN 37660

> RE: Michael Vaughn and Timothy Kendrick
> vs. Russell E. Taylor, et al
> Case No.: C43098(C)

Dear Mr. Russell:

Enclosed for filing in the above-referenced matter please find the Incident Report of the Kingsport Police Department dated 05/28/2019. This document was referenced as being attached to our Motion to Dismiss on page 6. By copy of this letter I am providing a copy of same to counsel of record.

Thank you for your assistance and cooperation in this regard and we apologize for any inconvenience.

Sincerely,

Karen Powers, ACP

Enclosure (Incident Report)
xc:  w/enc. Brent R. Watson, Esq. (Incident Report) VIA EMAIL ONLY
     w/enc. Wade W. Massie, Esq. (Incident Report) VIA EMAIL ONLY
     w/enc. Karissa H. Range, Esq. (Incident Report) VIA EMAIL ONLY
     w/enc. Michael Schrock, III (Incident Report)
     w/enc. Greg C. Marcum (Incident Report) VIA EMAIL ONLY
     w/enc. Tony L. Huff (Incident Report) VIA EMAIL ONLY

# Kingsport Police Department

1736 N Eastman Rd, Kingsport, TN

| | | |
|---|---|---|
| District | 4 | |
| Occurred: | 05/23/2019 11:50 — 05/28/2019 11:30 | |
| Reported: | 05/28/2019 12:39 | |
| Approved: | 06/01/2019 08:25 | |
| | ☑ Complainant wishes to prosecute | |

*Lat./Long.:* 36.5411881, -82.522211
*Arrived:* 05/28/2019 11:30

*Approved By:* Ed Ragsdale
*Memo Routing:*
*How Call Received:* Walk-in
*Weather:* Clear
*Use of Force:* No
*Is the number of suspects known?* Yes

**FILED**
2/17/2021  2:35 am/pm
Bobby L. Russell  *ρiC*  DC
**CIRCUIT COURT CLERK**
**SULLIVAN COUNTY, TN.**

| Officer | Involvement | Employee # | Car # |
|---|---|---|---|
| M. Swayze | Reporting | 1846 | 2354 |

## Offense

| | | |
|---|---|---|
| *Description:* | **23D Theft from Building** | |
| *Reported:* | 05/28/2019 12:39 | |

*Status:* Completed
*Location of Offense:* Commercial/Office Building
*Type of Business:* Unknown/Other
*Commercial Cargo Theft:* No
*Tools Used:* Physical
*Point of Entry/Exit/Entry:* Door- front
*Point of Entry/Exit/Exit* Door - front
*How Entered:* Through unlocked door
*Security Used:* None/Unknown
*Gang Activity:* None/Unknown
*Type of Gang:* Not Applicable/Unknown
*Offender(s) Suspected of Using:* Unknown/None of above
*Drug Related:* No
*Involved Identity Theft:* No

## Victim & Complainant

| | |
|---|---|
| *Name:* | **Huff, Tony L** |
| *SSN:* | [redacted] |
| *Home Phone:* | [redacted] |
| *Cell Phone:* | [redacted] |
| *Email:* | [redacted] |
| *Sex:* | Male |
| *Date of Birth:* | 09/27/1962 (56) |
| *Height:* | [redacted] |
| *Hair Color:* | Blonde |
| *Ethnic:* | Non-Hispanic |
| *Gang Affiliation:* | None |
| *Occupation:* | Owner of Holston LLC |
| *Work Phone:* | [redacted] |
| *Victim Type:* | Individual |
| *Related Offenses:* | 23D |
| *Reported:* | 05/28/2019 12:39 |

*Alias:*
*Driver's License:* [redacted]
*Address:* 474 Lakeside Dock Dr
*City/State/Zip:* Kingsport, TN 37663-4152

*Race:* White
*Marital Status:* Single
*Weight:* [redacted]
*Eye Color:* Blue
*Language:* English

*Employer:* Holston LLC
*Work Address:* 1736 N Eastman Rd
*City/State/Zip:* Kingsport, TN 37660
*LEOKA Type:*
*LEOKA Activity:*
*LEOKA Assignment:*
*LEOKA Other Agency:*
*Gang Member Identifiers:* Not Applicable
*Subject Arrested:* No
*Resident of jurisdiction:* Yes
*College student in this county:* No/Unknown
*Offense occurred on campus:* No

*SMT & Additional Information:*

## Victim

| | |
|---|---|
| Name: | **Holston HHL LLC** |
| SSN: | [redacted] |
| Home Phone: | [redacted] |
| Cell Phone: | [redacted] |
| Email: | [redacted] |
| Sex: | |
| Date of Birth: | |
| Height: | [redacted] |
| Hair Color: | |
| Ethnic: | |
| Gang Affiliation: | |
| Occupation: | |
| Work Phone: | [redacted] |
| Victim Type: | **Business** |
| Related Offenses: | **23D** |
| Reported: | **05/28/2019 12:39** |

| | |
|---|---|
| Alias: | |
| Driver's License: | [redacted] |
| Address: | 1736 N Eastman Rd |
| City/State/Zip: | Kingsport, TN 37660 |
| Race: | |
| Marital Status: | |
| Weight: | [redacted] |
| Eye Color: | |
| Language: | |
| Employer: | |
| Work Address: | |
| City/State/Zip: | |
| LEOKA Type: | |
| LEOKA Activity: | |
| LEOKA Assignment: | |
| LEOKA Other Agency: | |

SMT & Additional Information:

## Suspect

| | |
|---|---|
| Name: | **Kendrick, Timothy H** |
| SSN: | [redacted] |
| Home Phone: | [redacted] |
| Cell Phone: | [redacted] |
| Email: | [redacted] |
| Sex: | **Male** |
| Date of Birth: | **11/25/1985 (33)** |
| Height: | [redacted] |
| Hair Color: | **Brown** |
| Ethnic: | **Non-Hispanic** |
| Gang Affiliation: | **None** |
| Occupation: | **Unemployed** |
| Work Phone: | [redacted] |
| Victim Type: | |
| Related Offenses: | |
| Reported: | **05/28/2019 12:39** |

| | |
|---|---|
| Alias: | |
| Driver's License: | [redacted] |
| Address: | 3233 Forest View Rd |
| City/State/Zip: | Kingsport, TN 37660-6323 |
| Race: | **White** |
| Marital Status: | **Single** |
| Weight: | [redacted] |
| Eye Color: | **Brown** |
| Language: | **English** |
| Employer: | |
| Work Address: | |
| City/State/Zip: | |
| LEOKA Type: | |
| LEOKA Activity: | |
| LEOKA Assignment: | |
| LEOKA Other Agency: | |
| Gang Member Identifiers: | Not Applicable |
| Subject Arrested: | No |

SMT & Additional Information:

## Suspect

| | |
|---|---|
| Name: | **Vaughn, Michael B** |
| SSN: | [redacted] |
| Home Phone: | [redacted] |
| Cell Phone: | [redacted] |
| Email: | [redacted] |
| Sex: | Male |
| Date of Birth: | 12/26/1979 (39) |
| Height: | [redacted] |
| Hair Color: | Brown |
| Ethnic: | Non-Hispanic |
| Gang Affiliation: | None |
| Occupation: | Unemployed |
| Work Phone: | [redacted] |
| Victim Type: | |
| Related Offenses: | |
| Reported: | 05/28/2019 12:39 |

| | |
|---|---|
| Alias: | |
| Driver's License: | [redacted] |
| Address: | 3334 Bloomingdale Rd |
| City/State/Zip: | Kingsport, TN 37660 |
| Race: | White |
| Marital Status: | Unknown |
| Weight: | [redacted] |
| Eye Color: | Brown |
| Language: | English |
| Employer: | |
| Work Address: | |
| City/State/Zip: | |
| LEOKA Type: | |
| LEOKA Activity: | |
| LEOKA Assignment: | |
| LEOKA Other Agency: | |
| Gang Member Identifiers: | Not Applicable |

SMT & Additional Information:

### Victim/Suspect Relationships

| Victim | Relationship | Suspect |
|---|---|---|
| Huff, Tony L | Stranger | Kendrick, Timothy H |
| Huff, Tony L | Stranger | Vaughn, Michael B |

## Property

| | |
|---|---|
| Item Type: | **Hemp Flower** |
| Brand: | [redacted] |
| Serial No.: | [redacted] |
| Caliber: | |
| Quantity: | 26 Pound |
| Status: | Stolen |
| Description: | [redacted] |
| Insurance Co.: | |
| Recovered: | |
| Related Offense: | 23D |
| Owner: | Huff, Tony L |
| Race: | White |
| Date of Birth: | |
| Phone: | [redacted] |
| Reported: | 05/28/2019 12:39 |

| | |
|---|---|
| Property Class: | Consumable Goods |
| Model: | [redacted] |
| OAN: | [redacted] |
| Color: | Green |
| Value: | $ 59000.00 |
| Evidence No.: | [redacted] |
| Insurance Phone: | |
| Recovery Address: | |
| City/State/Zip: | |
| SSN: | |
| Sex: | Male |
| Address: | 474 Lakeside Dock Dr |
| City/State/Zip: | Kingsport, TN 37663-4152 |

## Narrative/Case Notes

Reported 05/28/2019 11:30      Reported By M. Swayze

Narrative On 05/28/2019 at 11:30 hours, Officer M. Swayze (1846/Unit 3107) responded to a Theft from Building at 1736 N Eastman Rd., Holston HHL LLC. Owner and Victim, Tony Huff, came to the Justice Center to report a late theft from the business located on Eastman Road in the old Taylor Cutlery Building. He said he took possession and ownership of the property on Tuesday, 5/21/19. On Thursday, 5/23/19, there was an incident that occurred on the property involving prior employees of the previous owner, Russell Taylor. See incident #: 19-011231. Mr. Huff said he and his Employee, Michael "Trey" Schrock, were at the facility when he saw Timothy Hendrick and Michael Vaughn come into the front doors without consent or permission. When the trespassers continued into the building and began rummaging through the building, Huff called Robert Henderson who is the former Security Officer for the previous owners. Henderson told Mr. Huff and Mr. Schrock to leave the premises once he arrived, which they promptly did. Mr. Huff said he had 4 rubber maid containers ($15 each) with a total of 26 lbs of Hawaiian Haze Variety Strain Hemp Flower (valued at $58,890), a Mobile Lab (valued at $7,500) and a Dell Laptop (valued at $1,000) stored on the property. Sometime after the incident with Hendrick and Vaughn, these items were discovered missing. Huff estimates the total loss at $67,450 and believes Hendrick and Vaughn were involved in the theft. Huff said he met with them of Friday, 5/24/19, at Barberitos, next to Food City on Clinchfield, but they denied any knowledge. Mr. Huff said he then came to the Police Dept, after the meeting with Hendrick and Vaughn, to make the report but he had to leave before and officer arrived. He came back this morning to file this report with a sense of urgency in hopes to try and get back the hemp and mobile lab which have the most value. This incident will be forwarded to CID for further follow up and I also spoke with Det. Sgt. Martin Taylor to make him aware of the report.

The business has security cameras and alarms but they were not active or recording. The perimeter security gate had also been unlocked an opened at approx 1000 by Schrock due to HVAC and Plumbers needing access to the property to do work. Huff said he checked with Grifols Plasma Center and spoke with "Kat" (unknown last name) who told him that they do have video surveillance that may possibly show suspects entering the property during the time frame in question.

## IN THE CIRCUIT COURT FOR SULLIVAN COUNTY, TENNESSEE

MICHAEL VAUGHAN and )
TIMOTHY KENDRICK, )
)
    Plaintiffs, )
)
v. )    Docket No. C43098(C)
)
RUSSELL E. TAYLOR, )
MICHAEL SCHROCK, III, )
GREG C. MARCUM, )
TONY L. HUFF and )
HOLSTON HEMP LLC, )
)
    Defendants. )

_____

RUSSELL E. TAYLOR, )
)
    Counterclaim Plaintiff, )
)
v. )
)
MICHAEL VAUGHAN and )
TIMOTHY KENDRICK, )
)
    Counter-Defendants. )

**FILED**

Z-25-21  10:25 am

Bobby L. Russell
**CIRCUIT COURT CLERK**
**SULLIVAN COUNTY, TN.**

## MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS

Come the Plaintiffs/Counter-Defendants, by and through counsel, and show to the Court as follows:

The following is a brief outline of a portion of the facts and the Complaint and Amended Complaint contain many other facts which must be considered.

### I. FACTS

1. Plaintiffs and the Defendant, Russell E. Taylor, formed a limited liability company known as CPH Brands, LLC ("CPH") on or about January 23, 2019. The parties entered into an

Operating Agreement which was attached to the original Complaint as Exhibit A. The Operating Agreement was a contract between the parties and CPH and each of the parties owed a duty to the other parties not to breach the terms of the Operating Agreement.

After the formation of CPH, the parties operated a business which processed hemp into CBD oil and other products. The parties leased a building from an entity which had ties to Defendant Taylor. The parties also each signed an Agreement of Covenant Not to Compete, Non-Disclosure and Non-Utilization.

2. Defendant Taylor handled all of the financial affairs for the business and refused to inform the Plaintiffs of the financial condition of the business. The business was successful and growing, and on or about April 26, 2019, the business had approximately one hundred (100) gallons of CBD oil with a value in excess of Two Million Dollars ($2,000,000) and had one thousand (1,000) pounds of unprocessed materials and two hundred (200) pounds of flowers. In all, the business products had a value in excess of Two Million Dollars ($2,000,000).

3. On April 26, 2019, the Plaintiffs were forcibly removed from the business premises by persons who were armed with weapons. Thereafter, the Plaintiffs and Defendant Taylor had discussions wherein Defendant Taylor agreed that the Plaintiffs could buy his interest in the business for Fifty Thousand Dollars ($50,000). He offered to allow them four (4) hours to inspect the business premises to learn the condition of it. They were to complete the transaction on May 3, 2019. The parties agreed, but at the last minute, Defendant Taylor demanded that they also sign a lease for the business premises owned by an entity related to Defendant Taylor, and pay an additional Fourteen Thousand Dollars ($14,000). The Plaintiffs were unable to meet the terms demanded by Defendant Taylor and the Plaintiffs were never allowed back on the business

premises except on one occasion when Plaintiff Timothy Kendrick was able to retrieve a portion of his personal property.

4. No other information was ever provided to the Plaintiffs regarding the disposition of CPH and its assets except that they received a K-1 for the year 2019 indicating that CPH had a small loss.

5. The Plaintiffs together owned a forty-nine percent (49%) financial interest in the business and a forty-nine percent (49%) governance interest in CPH. On or about June 10, 2019, CPH was dissolved with the Tennessee Secretary of State. It has been claimed in this case that the assets of CPH were sold to Holston Hemp, LLC on or about May 14, 2019. Defendant Taylor has never accounted to the Plaintiffs for the operation of the business or the liquidation of the business.

6. Until on or about April 26, 2019, CPH was a thriving business with assets exceeding Two Million Dollars ($2,000,000) and with customers wanting to purchase its products. Approximately fifty days later, CPH was dissolved by Defendant Taylor with no accounting to the Plaintiffs, no payment made to the Plaintiffs, no meeting being held, no vote being taken and no notice given to the Plaintiffs.

## II.  LEGAL STANDING

7. A Rule 12.02(6) Motion challenges the legal sufficiency of the Complaint, not the strength of the Plaintiffs' proof or evidence. "A defendant who files a motion to dismiss 'admits the truth of all of the relevant and material allegations contained in the complaint, but ... asserts that the allegations fail to establish a cause of action.'" Webb v. Nashville Area Habitat for Humanity, 346 S.W.3d 422, 426 (Tenn. July 21, 2011) (quoting Brown v. Tenn. Title Loans, Inc., 328 S.W.3d 850, 854 (Tenn.2010)). In considering a motion to dismiss, courts 'must

construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences.'" Webb, 346 S.W.3d at 426 (quoting Tigg v. Pirelli Tire Corp., 232 S.W.3d 28, 31-32 (Tenn. 2007)). A trial court should grant a motion to dismiss "only when it appears the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." Crews v. Buckman Labs, Int'l, Inc., 782 S.W.3d 852-857 (Tenn. 2002). Under Tenn. R. Civ. P. 8, "Tennessee follows a liberal notice pleading standard which recognizes that the primary purpose of pleadings is to provide notice of the issues presented to the opposing party in court." Webb 346 S.W.3d at 426. Tennessee adheres to the notice pleading standard. Id at 437.

### III. BREACH OF FIDUCIARY DUTY AND DUTY OF GOOD FAITH AND FAIR DEALINGS

8. There is no question under T.C.A. § 48-249-403 that Defendant Taylor owed a fiduciary duty to CPH and to the Plaintiffs. He had a duty of loyalty and a duty of care. He also had a duty of good faith and fair dealings. Given the facts as summarized herein and as stated in the Complaint and the Amended Complaint, there can be no question that the Complaint and Amended Complaint state facts which, if taken as true, clearly show that Defendant Taylor breached his fiduciary duty to CPH and to the Plaintiffs and that Defendant Taylor breached his duty of good faith and fair dealings.

9. Defendant Taylor expelled the Plaintiffs from the business with no cause, and took a thriving business with assets having a value more than Two Million Dollars ($2,000,000) and dissolved the entity approximately forty-five (45) days after expelling the Plaintiffs without notice to the Plaintiffs and without the Plaintiffs receiving anything from the business. Defendant Taylor also owed duties to the Plaintiffs as contained in the Operating Agreement which were

breached through the expulsion of the Plaintiffs from the business and Defendant Taylor unilaterally disposing of all of the assets of the business.

## IV. DISSOLUTION AND WINDING UP

10. Defendant Taylor dissolved the limited liability company and apparently liquidated its assets without notice to the Plaintiffs, without a meeting and without a vote which are all required by T.C.A. § 48-249-603. Since Defendant Taylor gave the Plaintiffs no notice, the Plaintiffs had no opportunity to take action to protect their interests. The facts supporting Defendant Taylor's breach of his obligations to the Plaintiffs relative to the dissolution and winding up of the business are clearly stated in the Complaint and Amended Complaint.

## V. FRAUD

11. The Complaint and Amended Complaint clearly state facts which would support a claim for fraud based upon the fraudulent scheme perpetrated by Defendant Taylor to take the Plaintiffs' property through deception. By statute and under the terms of the Operating Agreement, Defendant Taylor had a duty to account and to give notice to the Plaintiffs and he did neither. Defendant Taylor appeared to give the Plaintiffs an opportunity to purchase his interest in the business, but Defendant Taylor refused after the Plaintiffs agreed. Defendant Taylor deprived the Plaintiffs of their interest in CPH and their interest in the value of the business through this fraudulent scheme.

12. Defendant Taylor had a duty to disclose material facts due to his confidential and fiduciary relationship with the Plaintiffs. Further, Defendant Taylor had special knowledge that he knew the Plaintiffs did not have and could not discover. Defendant Taylor had a duty to disclose information regarding the operation of the business and the dissolution and liquidation and he intentionally withheld this material information from the Plaintiffs.

## VI. PUNITIVE DAMAGES

13. The facts stated in the Complaint certainly support the allegations by the Plaintiffs that Defendant Taylor acted maliciously, intentionally, fraudulently and/or recklessly and the facts do support a claim for punitive damages.

## VII. BREACH OF CONTRACT

14. The Complaint states nine specific breaches of the Operating Agreement by Defendant Taylor. The Operating Agreement contains the terms under which the parties agreed CPH would be operated and each of the members would conduct himself. Defendant Taylor breached the duties which he owed the Plaintiffs under their Agreement through his actions or inactions as described in the facts alleged in the Complaint and the Amended Complaint.

## VIII. UNJUST ENRICHMENT

15. Under the laws governing limited liability companies and under the terms of the Operating Agreement, the Plaintiffs had the right to receive their proportionate interest in CPH either through receiving their share of the profits and/or their proportionate share of value of CPH upon liquidation. The Plaintiffs received nothing. Defendant Taylor disposed of or sold the assets of the business and received the benefits therefrom as well as the profits of the business. Therefore, Defendant Taylor received more than he was entitled to receive and was therefore unjustly enriched.

## IX. ACCOUNTING

16. The Plaintiffs have alleged that Defendant Taylor failed to account to them for the assets and for the funds which came into his hands. The Plaintiffs have stated facts to support their claim that they are legally entitled to an accounting from Defendant Taylor. Defendant

Taylor had an obligation to account to the Plaintiffs both under the laws governing limited liability companies and the terms of the Operating Agreement.

## X. DAMAGES

17. The Plaintiffs allege that they have been deprived of their valuable property and their business interests as a result of the wrongful acts of Defendant Taylor. The Plaintiffs have alleged that the assets of the business were worth millions of dollars at the time they were forcibly expelled from the business and the business had additional value as a going concern. The Plaintiffs were deprived of the value of their interests in the business and the assets of the business as a result of the actions of Defendant Taylor and thereby the Plaintiffs have been damaged.

## XI. CONCLUSION

18. The Plaintiffs aver that the Complaint and Amended Complaint allege sufficient facts to state claims upon which relief may be granted and request that the Court deny the Motion to Dismiss filed by Defendant Taylor.

Respectfully submitted this the 24 day of February 2021.

BRENT R. WATSON, # 010154
Attorney for Plaintiffs/Counter-Defendants
BUNSTINE, WATSON & BECKER
800 S. Gay Street, Suite 2001
Knoxville, Tennessee 37929
(865) 523-3022

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been mailed to Wade W. Massie, 208 E. Main Street, Abingdon, Virginia 24210, Karissa H. Range, 804 Anderson Street, Bristol, Tennessee 37620, and Kimberly D. Rhoton, 215 Cumberland Street, Kingsport, Tennessee 37660, by U.S. Mail with sufficient postage thereupon to carry same to its destination and facsimile transmission.

This the 24 day of _February_, 2021.

BRENT R. WATSON

## IN THE CIRCUIT COURT FOR SULLIVAN COUNTY, TENNESSEE

MICHAEL VAUGHN and )
TIMOTHY KENDRICK, )
)
     Plaintiff, )
)
v. )     Docket No. C43098(C)
)
RUSSELL E. TAYLOR, )
MICHAEL SCHROCK, III, )
GREG C. MARCUM, )
TONY L. HUFF and )
HOLSTON HEMP LLC, )
)
     Defendants. )
_____ )
)
RUSSELL E. TAYLOR, )
)
     Counterclaim Plaintiff, )
)
v. )
)
MICHAEL VAUGHN and )
TIMOTHY KENDRICK, )
)
     Counter-Defendants. )

**FILED**

2|24|21   11:14 am/pm

Bobby L. Russell   DC
CIRCUIT COURT CLERK
SULLIVAN COUNTY, TN.

## NOTICE OF VOLUNTARY DISMISSAL

Come the Plaintiffs, by and through counsel, and hereby give notice pursuant to Rule

41.01 of the *Tennessee Rules of Civil Procedure* of taking a voluntary non-suit without prejudice

to the refiling as to Defendants, Michael Schrock, III, Greg C. Marcum, Tony L. Huff, and

Holston Hemp, LLC.

Respectfully submitted this the 22 day of February, 2021.

BRENT R. WATSON, # 010154
Attorney for Plaintiffs
BUNSTINE, WATSON & BECKER
800 S. Gay Street, Suite 2001
Knoxville, Tennessee 37929
(865) 523-3022

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been mailed to Wade W. Massie, 208 E. Main Street, Abingdon, Virginia 24210, Karissa H. Range, 804 Anderson Street, and Kimberly D. Rhoton, 215 Cumberland Street, Kingsport, Tennessee 37660 by U.S. Mail with sufficient postage thereupon to carry same to its destination, email and facsimile transmission.

This the 22 day of February, 2021.

BRENT R. WATSON

MICHAEL VAUGHAN and )
TIMOTHY KENDRICK, )
)
    Plaintiffs, )
)
v. )        Docket No. C43098(C)
)
RUSSELL E. TAYLOR, )
MICHAEL SCHROCK, III, )
GREG C. MARCUM, )
TONY L. HUFF and )
HOLSTON HEMP LLC, )
)
    Defendants. )

**FILED**
8 24 21 11:14 am pm
Bobby L. Russell DC
CIRCUIT COURT CLERK
SULLIVAN COUNTY, TN.

RUSSELL E. TAYLOR, )
)
    Counterclaim Plaintiff, )
)
v. )
)
MICHAEL VAUGHAN and )
TIMOTHY KENDRICK, )
)
    Counter-Defendants. )

## PLAINTIFFS' RESPONSE TO RUSSELL E. TAYLOR'S MOTION TO DISMISS

    Come the Plaintiffs/Counter-Defendants and in response to the Motion to Dismiss, state as follows:

1.    The Plaintiffs deny that the Complaint is deficient and does not state a claim upon which relief may be granted as alleged in the Motion to Dismiss. However, out of an over abundance of caution, the Plaintiffs have filed herewith a Motion to Amend the original Complaint to more fully state their causes of action. In addition, the Plaintiffs have filed a Notice of Voluntary Dismissal pursuant to

Rule 41 of the *Tennessee Rules of Civil Procedure* relative to Defendants Michael

Schrock, III, Greg C. Marcum, Tony L. Huff and Holston Hemp, LLC.

2.    Defendant Taylor has alleged that the Complaint should be dismissed for lack of

jurisdiction over the person pursuant to Rule 12.02(2) of the *Tennessee Rules of*

*Civil Procedure*. The Summons in this matter was issued upon the filing of the

Complaint on June 1, 2020. Rule 4.03 and Rule 3 of the *Tennessee Rules of Civil*

*Procedure* provide that in the event the Summons is not served within ninety (90)

days, the Plaintiff may obtain new summonses from time to time and if the

process is not served within ninety (90) days from issuance, the Plaintiff cannot

rely upon the original commencement to toll the running of the statute of

limitations unless Plaintiff continues the action by obtaining issuance of new

process within one year from the issuance of the previous process or if no process

is issued then one year from the filing of the Complaint. In this case, service of

process was not obtained within ninety (90) days of the issuance of the Summons.

However, on October 22, 2020, prior to the Plaintiffs issuing alias process,

Defendant Taylor filed an Answer and filed a Counter-Complaint. The Plaintiff is

still within one year from the issuance of the original Summons so the Plaintiff

can issue an alias summons and obtain service of process.

In this cause, the Defendant has made an appearance by filing an Answer and then

filing a Counter-Complaint to which the original Plaintiffs have filed a Response.

The Defendant has waived his right to raise the issue of insufficiency of process.

However, in the event the Court finds that such defense is applicable, then the

Court should set aside Defendant Taylor's Answer and Counter-Complaint until

such time as the Plaintiffs have process issued and service of process is returned. Since the Plaintiffs may still obtain service of process, this is not grounds to have the action dismissed.

3. The Plaintiffs deny that the Complaint fails to state a claim upon which relief can be granted under *Tennessee Rules of Civil Procedure* 12.02(6).

4. It is admitted that CPH is a member managed Tennessee Limited Liability Company.

5. The Plaintiffs deny that they lack standing to assert the claims stated in the Complaint. Due to the actions of Defendant Taylor, CPH was dissolved without any notice to the Plaintiffs.

6. The Plaintiffs deny that they failed to allege sufficient facts supporting their claims.

7. The Plaintiffs agree that under the Tennessee Revised Limited Liability Company Act, a member owes the duty of loyalty and the duty of care described in T.C.A. § 48-249-403(b) and (c).

8. It is admitted that T.C.A. § 48-249-403(b) sets forth provisions regarding duty of loyalty.

9. It is admitted that T.C.A. § 48-249-403(c) sets forth provisions regarding duty of care.

10. It is admitted that T.C.A. § 48-249-403(d) sets forth provisions regarding a member's duty of good faith and fair dealing and T.C.A. § 48-249-403(e) sets forth provisions regarding the furtherance of members' own interest.

11. It is admitted that T.C.A. § 48-249-403(m) makes provisions for protection of members who perform their duties in compliance with this section.

12. The Plaintiffs deny that Defendant Taylor had the right to direct the sale of the assets of the LLC as was done in this case and is set forth in the Amended Complaint.

13. It is denied that the Complaint shows that Plaintiffs Vaughn and Kendrick were informed of the LLC's plan to wind down its business. T.C.A. § 48-249-603 requires that the members be provided notice of a proposed dissolution and a meeting be held of the members at which time a vote is to be taken. No notice was provided by Defendant Taylor, there was not a meeting of the members, nor was there a vote taken.

14. The Complaint and Amended Complaint clearly show that Defendant Taylor breached his duty of loyalty and his duty of care not only in the sale of the assets of the LLC but also in the conduct of the business. Defendant Taylor failed to account, failed to provide information to the other members and forcibly expelled the other members without explanation.

15. Defendant Taylor certainly had a conflict of interest when he sold or disposed of the assets of the company.

16. It is denied that the Amended Complaint fails to state a cause of action for breach of fiduciary duty, breach of duty of good faith and fair dealing and failure to comply with the statutory requirements regarding dissolution.

17. The Plaintiffs deny that fraud is barred by T.C.A. § 48-249-403 and especially in light of the allegations contained in the Amended Complaint which clearly show

that Defendant Taylor did not perform his duties in compliance with the other provisions of T.C.A. § 48-249-403.

18. The Complaint and the Amended Complaint clearly state facts sufficient to support the allegation of fraudulent conduct on behalf of Defendant Taylor.

19. The allegation regarding conspiracy has been removed from the Amended Complaint.

20. The allegations have been removed from the Amended Complaint regarding conspiracy.

21. The Amended Complaint requests punitive damages based upon not only the fraudulent conduct of Defendant Taylor but it further alleges that Defendant Taylor acted maliciously, intentionally, fraudulently and/or recklessly.

22. The parties entered into the Operating Agreement and the Agreement clearly states that all of the parties agree to the terms thereof. Each of the parties agreed to assume certain responsibilities relative to the Operating Agreement. As clearly alleged in the Complaint, Defendant Taylor breached the terms of the Operating Agreement.

23. T.C.A. § 48-249-403(m) does limit the liability of a member or any action taken by the member if he performs his duties in compliance with T.C.A. § 48-249-403. The Complaint and Amended Complaint clearly allege that Defendant Taylor did not perform his duties in compliance with this section.

WHEREFORE, the Plaintiffs aver that Defendant Taylor's Motion should be denied as the Complaint and Amended Compliant clearly state the facts which support the causes of action alleged.

Respectfully submitted this the 22 day of February , 2021.

BRENT R. WATSON, # 010154
Attorney for Plaintiffs/Counter-Defendants
BUNSTINE, WATSON & BECKER
800 S. Gay Street, Suite 2001
Knoxville, Tennessee 37929
(865) 523-3022

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been mailed to Wade W. Massie, 208 E. Main Street, Abingdon, Virginia 24210, Karissa H. Range, 804 Anderson Street, Bristol, Tennessee 37620, and Kimberly D. Rhoton, 215 Cumberland Street, Kingsport, Tennessee 37660, by U.S. Mail with sufficient postage thereupon to carry same to its destination and facsimile transmission.

This the 22 day of February , 2021.

BRENT R. WATSON

## IN THE CIRCUIT COURT FOR SULLIVAN COUNTY, TENNESSEE

MICHAEL VAUGHN and )
TIMOTHY KENDRICK, )
　 )
　　　Plaintiff, )
　 )
v. )　　　　Docket No. C43098(C)
　 )
RUSSELL E. TAYLOR, )
MICHAEL SCHROCK, III, )
GREG C. MARCUM, )
TONY L. HUFF and )
HOLSTON HEMP LLC, )
　 )
　　　Defendants. )
────────────────── )
　 )
RUSSELL E. TAYLOR, )
　 )
　　　Counterclaim Plaintiff, )
　 )
v. )
　 )
MICHAEL VAUGHN and )
TIMOTHY KENDRICK, )
　 )
　　　Counter-Defendants. )

FILED
2 24 21 11 14 am/pm
Bobby L. Russell　　DC
CIRCUIT COURT CLERK
SULLIVAN COUNTY. TN.

## MOTION TO AMEND COMPLAINT

Come the Plaintiffs, by and through counsel, and pursuant to Rule 15.01 of the *Tennessee Rules of Civil Procedure* move this Honorable Court to allow them to amend their Complaint and in support thereof shows to the Court that Defendant Russell E. Taylor has filed a Motion to Dismiss alleging that the Complaint contained insufficient facts and allegations to support causes of action pled by the Plaintiffs as well as other grounds. Although the Plaintiffs believe that the original Complaint does state claims upon which relief may be granted, the Plaintiffs seek to amend their Complaint out of an abundance of caution. The Defendant has filed an Answer to the

original Complaint and a Counter-Complaint. The Defendant will not be prejudiced by allowing the Amended Complaint. The Plaintiffs have taken a Non-Suit as to Defendants, Michael Schrock, III, Greg C. Marcum, Tony L. Huff and Holston Hemp, LLC and the allegations regarding these Defendants have been removed. A copy of the proposed Amended Complaint, without the original exhibits, is attached hereto as Exhibit 1.

Respectfully submitted this the 22 day of February, 2021.

BRENT R. WATSON, # 010154
Attorney for Plaintiffs
BUNSTINE, WATSON & BECKER
800 S. Gay Street, Suite 2001
Knoxville, Tennessee 37929
(865) 523-3022

## NOTICE OF HEARING

You are hereby notified that Plaintiffs' counsel will appear on the 2nd day of March, 2021, at 1:00 p.m. by Zoom or as soon thereafter as may be heard before the Honorable E. G. Moody, Chancellor for Sullivan County, Tennessee, for the purpose of hearing the above Motion.

This the 22 day of February, 2021.

BRENT R. WATSON

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been mailed to Wade W. Massie, 208 E. Main Street, Abingdon, Virginia 24210, Karissa H. Range, 804 Anderson Street, and Kimberly D. Rhoton, 215 Cumberland Street, Kingsport, Tennessee 37660 by U.S. Mail with sufficient postage thereupon to carry same to its destination, email and facsimile transmission.

This the 22 day of February, 2021.

BRENT R. WATSON

## IN THE CIRCUIT COURT FOR SULLIVAN COUNTY, TENNESSEE

MICHAEL VAUGHN and )
TIMOTHY KENDRICK, )
            )
       Plaintiff, )
            )
v. )              Docket No. C43098(C)
            )
RUSSELL E. TAYLOR, )
            )
       Defendant. )
            )
———————————— )
            )
RUSSELL E. TAYLOR, )
            )
           Counter-Plaintiff, )
            )
v. )
            )
MICHAEL VAUGHN and )
TIMOTHY KENDRICK, )
            )
           Counter-Defendants. )

## AMENDED COMPLAINT

Come the Plaintiffs, by and through counsel, and for their cause of action show to the

Court as follows:

## I. PARTIES

1. The Plaintiffs are residents and citizens of Sullivan County, Tennessee.

2. Defendant, Russell E. Taylor is a resident and citizen of Bristol, Virginia, and may be

    served in Sullivan County at either 1601 Fair Ridge Place, Kingsport, Tennessee 37660,

    or at his place of business at 1043 Ford Town Road, Kingsport, Tennessee 37660.



EXHIBIT
1

## II. JURISDICTION

3.    This Court has jurisdiction over this matter because the conduct alleged and averred

herein occurred in Sullivan County, Tennessee. CPH Brands ("CPH") had its principal

place of business in Sullivan County, Tennessee, and the Defendant Russell E. Taylor and

the Plaintiffs were the owners of CPH.

## III. FACTS

4.    On or about January 23, 2019, Plaintiffs Michael Vaughn ("Vaughn") and Timothy

Kendrick ("Kendrick") along with Defendant Russell E. Taylor ("Taylor") caused to be

formed a limited liability company named CPH.

5.    On or about January 23, 2019, Plaintiffs Vaughn and Kendrick and Defendant Taylor

executed an Operating Agreement for CPH. A copy of the Operating Agreement is

attached hereto as Exhibit A.

6.    On or about January 23, 2019, CPH entered into a lease agreement with Taylor Properties

#1, L.P. for the lease of real property located at 1736 North Eastman Road, Kingsport,

Tennessee, 37664-2310. A copy of the Lease Agreement is attached hereto as Exhibit B.

The lease was on a month to month basis and could be terminated by the landlord or

tenant upon thirty (30) days advance written notice. The lease was executed on behalf of

CPH by Defendant Taylor.

7.    On or about January 24, 2019, Plaintiffs Vaughn and Kendrick and Defendant Taylor

each entered into an agreement known as AGREEMENT OF COVENANT NOT TO

COMPETE, NON-DISCLOSURE AND NON-UTILIZATION. A copy of said

agreements are attached hereto as collective Exhibit C.

8.　Prior to the formation of CPH, the Plaintiffs were engaged in the hemp and CBD business and had formed a limited liability company known as Hemponix Laboratories LLC. The Plaintiffs were desirous of growing hemp inside and processing hemp, and were looking for a building which would be suitable. The Plaintiffs met Defendant Taylor in early January, 2019. Defendant Taylor showed them a building which may have been suitable for their business purposes. During the process of looking at buildings with Defendant Taylor, the parties discussed Taylor becoming involved with the business, and after having discussions over a period of a couple of weeks, Defendant Russell and the Plaintiffs agreed to enter into a business relationship. At that time, the parties formed CPH, entered into a lease agreement, and each signed the AGREEMENT OF COVENANT NOT TO COMPETE, NON-DISCLOSURE AND NON-UTILIZATION.

9.　As is reflected in the OPERATING AGREEMENT FOR CPH, Michael Vaughn contributed $288,000, which consisted of all equipment currently purchased with his funds, all licenses, applied for/and issued however they were owned. In exchange, Plaintiff Vaughn received 24.5% financial interest and 24.5% governance interest in CPH.

10.　Plaintiff Kendrick received 24.5% financial interest and 24.5% governance interest in CPH in exchange for $1.

11.　Defendant Taylor received 51% financial interest and 51% governance interest in exchange for $100,000 cash and Defendant Taylor was to arrange a lease between CPH and Taylor Properties #1, L.P. for up to three (3) months with the rent under the lease being accrued, and the rent to be paid from the initial cash flow of CPH prior to distributions to members. In addition, Taylor agreed to advance up to $36,000 for initial

business expenses which was to be repaid prior to any distributions to members. Taylor also agreed to provide up to $4,200 plus a convenience fee of 3% for the acquisition and rental of a cold press machine which would be repaid prior to any distribution to members.

12. Prior to the creation of CPH, the Plaintiffs and Defendant Taylor made the decision to initially process hemp and manufacture CBD rather than growing hemp. CPH purchased various equipment in order to manufacture CBD oil and other products derived therefrom. In addition, CPH purchased a large amount of hemp which was to be processed for the manufacture of CBD oil and its derivatives. CPH purchased 1,300 pounds of hemp from Oregon which was transported to CPH in Sullivan County, Tennessee.

13. CPH acquired the appropriate liability insurance for the manufacture of CBD.

14. CPH manufactured various CBD products.

15. CPH developed unique packaging for its products as well as various unique marketing materials for its products, and CPH developed various trade names and marks which were unique and took action to protect them. CPH developed a unique manufacturing process.

16. CPH acquired various machines and equipment including a cold press, labeling machine, computers and various other equipment and fixtures which were necessary to the business. CPH made substantial improvements to the leased premises including the installation of security equipment.

17. CPH, by and through the Plaintiffs, obtained all necessary licenses through the State of Tennessee, to grow and process hemp.

18. After the formation of CPH, the Plaintiffs worked diligently to build and enhance the business of CPH and were assisted by family members and others for no compensation. The Plaintiffs had agreed with Defendant Taylor that they would be paid $2,000 per week and were paid only four weeks. In spite of the fact that they were not being paid by CPH, the Plaintiffs continued to work and devoted 100% of their efforts to the growth and development of CPH.

19. On or about April 26, 2019, the Plaintiffs were escorted off of the leased premises by the property manager whom they believed was employed by the owner of the premises, Taylor Properties #1, L.P. Accompanying the property manager were people who were armed. The Plaintiffs aver that they were expelled from the property at the direction of Defendant Taylor.

20. Other than going to the premises with a police escort on one occasion, Plaintiff Timothy Kendrick was not allowed to return to the business premises at all. The Plaintiff Michael Vaughn never returned to the business premises.

21. From the formation of the business in January, 2019, until the Plaintiffs were escorted from the business premises on April 26, 2019, CPH's business grew at a tremendous rate such that the Plaintiffs, with the help of others, could not keep up with the demand for CPH's products. It was discussed between the parties prior to April 26, 2019, that CPH needed to hire additional employees. Upon information and belief, the Plaintiffs aver that CPH was profitable or had the ability to be profitable prior to April 26, 2019.

22. The Plaintiffs aver that on April 26, 2019, CPH had inventory with a value exceeding $5,000,000. In addition, CPH owned equipment, and it had a unique manufacturing process and intellectual property.

23. On or about April 26, 2019, CPH had a substantial value as an ongoing business in addition to owning valuable assets.

24. On or about April 26, 2019, Defendant Taylor communicated to the Plaintiffs that Defendant Taylor intended to unilaterally "shut down" the business. At that time, it was discussed between the parties that Defendant Taylor would sell his ownership interest in CPH for $50,000 if he had payment in full by May 3, 2019 at 12:00 p.m. and the funds had to clear the bank. Defendant Taylor stated that this would basically be a full asset purchase of all the inventory and supplies in the building, not including fixtures, as fixtures were part of the premises. In addition, it would require a full month's rent up front and a refundable security deposit in order for CPH to remain in the building which was owned by Taylor's family. The rent was to be somewhere around $6,000 per month. In addition, the Plaintiffs would have to pay all utilities, maintenance, property taxes, and property insurance if they wanted to remain in the building. However, Defendant Taylor made it clear that the purchase of his interest in CPH was separate from the lease of the premises.

25. On May 2, 2019, Plaintiffs were provided with a document called Escrow Agreement RE: CPH BRANDS, LLC that required the payment of $64,335.54 and allowed the Plaintiffs four (4) hours to conduct an inventory of raw material, finished product, equipment and machinery located at the business's premises. The escrow agreement also provided that in event the Plaintiffs purchased Defendant Taylor's interest, CPH was obligated to enter into a new lease with Taylor Properties #1, L.P. with rent of $6,200.70 per month, triple net with pro-rated taxes and insurance paid each month and a one month's security

deposit. It also provided for mutual releases. The total amount to be paid toward the lease was $14,335.54.

26. Prior to May 2, 2019, the Defendant Taylor never informed the Plaintiffs that it would require $64,335.54 to complete the transaction. Prior to May 2, 2019, Defendant Taylor had stated that he would sell his ownership interest for $50,000 but that the lease of the building was not necessary as they were two different things. On May 2, 2019, Defendant Taylor included in the terms of the sale that they would have to lease the premises and pay $14,335.54. A copy of the proposed Escrow Agreement is attached hereto as Exhibit D.

27. The Plaintiffs were able to pay $50,000 on May 2, 2019, but were unable to pay the additional $14,335.54 which was included by Defendant Taylor on May 2, 2019 and only provided the Plaintiffs with less than 24 hours to have available the additional funds. On May 3, 2019, the Plaintiffs were unable to pay in full $64,335.54 and the purchase of Defendant Taylor's interest did not occur.

28. After May 2, 2019, the Plaintiffs had no further contact with Defendant Taylor. They received no notices relative to the business of CPH, received no information regarding the CPH's business or the disposition of CPH's assets. The Plaintiffs never received an explanation as to the actions taken by Defendant Taylor in having them removed from the business premises and being expelled from CPH.

29. On or about May 14, 2019, Defendant Holston Hemp, LLC ("Holston Hemp") was formed and its initial filing was made with the Tennessee Secretary of State.

30. At a time which is unknown to the Plaintiffs, Holston Hemp and its owners began the manufacture and sell of products which are the same as the products that were sold by

CPH. Holston Hemp used the packaging which belonged to CPH, used CPH's unique marketing materials, trade names, brand name such as "Hemponix," and in effect, began using all of the assets of CPH including its intellectual property. Holston Hemp operated its business in the same building that CPH had occupied. In effect, Defendants took over every aspect of CPH's business and began operating it just as CPH had operated except without the Plaintiffs. Within a short period of time, Holston Hemp was employing more than twenty (20) people in its business.

31. After January 3, 2019, Defendant Taylor controlled all financial matters for CPH. Defendant Taylor kept such financial matters secret and refused to share financial information with the Plaintiffs. When CPH was formed, the parties agreed that the checking account should require two signatures on each check. At some point, Defendant Taylor had the bank change the signature requirement to only his signature, thus eliminating the Plaintiffs involvement in disbursing funds. The only financial information received by the Plaintiffs was a K-1 for the year 2019 which showed that CPH had a small loss for the year.

32. The Tennessee Secretary of State website shows that CPH Brands, LLC was dissolved on June 10, 2019.

33. The Plaintiffs received no notice of the transfer of any of the assets of CPH to Holston Hemp.

34. The Plaintiffs received no notice from Defendant Taylor that CPH was to be dissolved. No meeting was held relative to such dissolution. The members did not vote on the dissolution.

35. The Plaintiffs received no funds or property of any kind from CPH other than four weeks salary and received nothing from the dissolution and liquidation of CPH Brands, LLC.

36. Upon information and belief, the Plaintiffs allege that Defendant Taylor had a relationship with Holston Hemp and its owners and that Defendant Taylor continued in the same business which CPH operated but rather than the Plaintiffs as owners, Michael Schrock, III, Greg C. Marcum and Tony L. Huff operated the business with Defendant Taylor as Holston Hemp, LLC.

37. The Plaintiffs aver that prior to the Notice of Dissolution being filed with the Secretary of State, the Plaintiffs received no notice, no LLC document, no meeting was held and no vote was taken.

38. Plaintiffs contributed their personal property to the business of CPH as well as their work and efforts for which they received. The Plaintiffs were excluded from the business on and after April 26, 2019 and received none of their contributed property and assets nor were they compensated for their labor. The Plaintiffs received no distribution from the liquidation of the business.

39. Prior to being expelled from the business, CPH received thirteen hundred (1,300) pounds of hemp. One thousand (1,000) pounds of hemp was to be processed by CPH and one-half of the oil derived from it was to be given to the seller of the hemp. Three Hundred (300) pounds of hemp was purchased for approximately Thirty Thousand Dollars ($30,000). Approximately two hundred (200) pounds of hemp was processed into approximately thirty-three (33) gallons of oil which was returned to the seller of the hemp in Oregon. Upon information and belief, Defendant Taylor refused to send additional oil to the seller of the hemp which left CPH with a debt owed to the seller. Defendant Taylor

made representations to the seller that CPH did not have any other material with which to produce oil to satisfy its obligations. Defendant Taylor did not satisfy this outstanding obligation of CHP as part of the liquidation and dissolution.

40. During the time prior to the Plaintiffs being expelled from the business, CPH had produced approximately one hundred (100) gallons of CBD oil in addition to the oil that was sent to Oregon. The value of the oil was in excess of Two Million Dollars ($2,000,000). Immediately prior to being expelled from the business, Plaintiff Vaughn was contacted by a purchaser in Texas who wanted to purchase CBD oil from CPH. The customer wanted to purchase approximately Eight Hundred Thousand Dollars ($800,000) of oil. When the sale of oil was discussed with Defendant Taylor, Taylor would not agree for the sale of the oil. Within days of these discussions, Plaintiffs Vaughn and Kendrick were forcibly removed from the business premises. Defendant Taylor had also refused other sales.

41. At the time that the Plaintiffs were expelled from the business, CPH had approximately one thousand (1,000) pound of unprocessed material, two hundred (200) pounds of flowers and one hundred (100) gallons of oil. This inventory was worth millions of dollars. In spite of the value of the assets of the business, the Plaintiffs received nothing from the operation of the business and the liquidation of the business except four weeks of salary.

### Count I –Breach of Fiduciary Duty

42. The Plaintiffs allege and aver that Defendant Taylor breached his fiduciary duty to CPH and the Plaintiffs who were members and breached his duty of loyalty and duty of care to CPH and the Plaintiffs pursuant to Tenn. Code Ann. §48-249-403. The Plaintiffs allege

that Defendant Taylor failed to perform his duties in compliance with T.C.A. § 48-249-403 and is not entitled to the limitation of liability under T.C.A. § 48-249-403. Further, the Plaintiffs allege as follows:

A.    Defendant Taylor breached his duty of loyalty to Plaintiffs who were the LLC's other members as Taylor failed to account to the LLC for any property, profit or benefit derived by him in the conduct or winding up of the LLC's business or derived by him by use of the LLC's property including the appropriation of an opportunity of the LLC. The Plaintiffs aver that Defendant Taylor refused to account to the LLC and to Plaintiffs for income derived by the LLC from its operations and refused to disclose to the Plaintiffs the financial condition of the business. The Plaintiffs further allege that Defendant Taylor failed and refused to account to the LLC and to the Plaintiffs for any property, profit or benefit derived by him in winding up of the LLC's business. The Plaintiffs further allege that Defendant Taylor failed to account to the LLC for the appropriation of the business opportunity of the LLC by selling or otherwise disposing of the essential and necessary property of the business.

B.    Defendant Taylor breached his duty of care to the LLC and to the Plaintiffs in engaging in grossly negligent or reckless conduct, intentional misconduct or a knowingly violation of the law. Specifically, the Plaintiffs aver that Defendant Taylor disposed of all of the valuable assets of the LLC and the ongoing business of the LLC. The Plaintiffs aver that CPH had valuable assets and that CPH was valuable as a going concern and

Defendant Taylor disposed of the business for his own benefit and in a manner which did not benefit CPH or the Plaintiffs. The expulsion of the Plaintiffs and liquidation of the business were intentional misconduct on the part of Defendant Taylor.

43.    Defendant Taylor breached his fiduciary duty to CPH and the Plaintiffs when he engaged in conflict of interest transactions in violation of Tenn. Code Ann. §48-249-404 in that the liquidation of the business was not in the best interest of CPH but was only meant to benefit Defendant Taylor.

## Count II – Breach of Duty of Good Faith and Fair Dealings

44.    The allegations and averments of Paragraph 1-43 are incorporated herein by reference as is stated verbatim.

45.    The Plaintiffs allege and aver that Defendant Taylor breached his duty of good faith and fair dealing pursuant to Tenn. Code Ann. §48-249-403(d) by failing to act in good faith and deal fairly by excluding the Plaintiffs from the business of CPH, by violating the terms of the LLC operating agreement, by dissolving and liquidating the business without the Plaintiffs having an opportunity to participate and by disposing of the business assets in a way that did not benefit CPH and the Plaintiffs.

## Count III – Dissolution and winding up of CPH pursuant to Tenn. Code Ann. §48-249-601, et seq.

46.    The allegations and averments of paragraphs 1-45 are incorporated herein by reference as if stated verbatim.

47.    The Plaintiffs allege and aver that Defendant Taylor wrongfully dissolved and terminated CPH. The Plaintiffs aver that Defendant Taylor failed to provide them with notice of the

proposed dissolution, winding up and termination of CPH as required by Tenn. Code Ann. §48-249-603 and that no meeting was held of the members at which a vote was taken to dissolve the CPH, followed by winding up and termination of CPH.

48. Plaintiffs aver that Defendant Taylor wrongfully dissolved CPH and did so with the intention of depriving Plaintiffs of their ownership in CPH and in preventing them from protecting their interests or the interest of CPH. The Defendant has provided no information to the Plaintiffs regarding the liquidation of the business assets.

**Count IV- Fraud**

49. The allegations and averments of paragraphs 1-47 are incorporated herein by reference as if fully stated verbatim.

50. The Plaintiffs allege and aver that the Defendant intentionally deprived them of their property and rights by their exclusion from the business of CPH and the liquidation of the assets of CPH. The transfer of the assets of CPH was accomplished by means of deception in that the Plaintiffs had no means to protect their interests since the Defendant failed to speak or provide information that the Defendants had a duty to disclose.

51. The Plaintiffs aver that the actions of the Defendant were intentional, unlawful, and were meant to deprive the Plaintiffs of their property and their rights. The Plaintiffs aver that Defendant Taylor transferred the valuable assets of CPH without notice to the Plaintiffs, under the guise of his authority as majority member of CPH.

The Plaintiffs allege that Defendant Taylor had a duty to speak and inform them of the actions he was taking at CPH at all times. The Plaintiffs aver that prior to them being forcibly expelled from the business, Defendant Taylor refused to allow the Plaintiffs to sell products which would have brought substantial income and profit to the business.

Instead, Defendant Taylor excluded them from the business and disposed of the assets of the business to his own benefit. Defendant Taylor told the Plaintiffs on other occasions that various sales opportunities should not be taken such as an exclusive deal to sell millions of dollars of product through a drug store. The Plaintiffs aver that Defendant Taylor used a fraudulent scheme to deprive them of their property.

**Count V- Punitive Damages**

52.  The allegations and averments of paragraphs 1-54 are incorporated herein by reference as is stated verbatim.

53.  The Plaintiffs aver that Defendant Taylor acted maliciously, intentionally, fraudulently, and/or recklessly and punitive damages should be awarded to them. .

**Count VI- Breach of Contract**

54.  The allegations and averments of Paragraphs 1-56 are incorporated herein by reference as if fully stated verbatim.

55.  The Plaintiffs aver that the Plaintiffs and Defendant Taylor entered into the Operating Agreement of CPH Brands, LLC and the Plaintiffs aver that Defendant Taylor breached the terms of the Operating Agreement as follows:

a.  Article 3.2 provides that no member shall have the right to withdraw or reduce his contributed capital or receive any assets of the company, and no member shall have priority over any other member as to the return of contributed capital. The Plaintiffs aver that Defendant Taylor withdrew or reduced his contributed capital and received assets of the company and gave himself priority over the Plaintiffs on the return of contributed capital in violation of the Operating Agreement. The

Plaintiffs received nothing from the business and the Plaintiffs aver that Defendant Taylor profited from the business.

b. Article 5.1 of the Operating Agreement provides that each member shall keep the other members informed at all times concerning the company's operation. The Plaintiffs aver that Defendant Taylor breached his obligation as he failed to inform them of the company's operations and dissolution and did so intentionally and in violation of the Plaintiff's rights.

c. The Defendant failed to give notice of meetings as provided or as required in Article 5.5 of the Operating Agreement as the Plaintiffs were members entitled to notice not less than ten (10) days nor more than two months before the date of the meeting. Plaintiffs aver that they received no notice of any meetings relative to the operation and dissolution and winding up of the CPH's business.

d. Plaintiffs aver that Defendant Taylor breached Article 8.1 of the Operating Agreement by failing to be just and faithful to the Plaintiffs at all times, in failing to give the Plaintiffs full information and truthful explanation of all matters relating to the affairs of the company and failing to afford every assistance in his power in carrying on the company's business for the Members' mutual advantage.

e. Plaintiffs aver that they were effectively expelled from CPH by Defendant Taylor on or after April 26, 2019 in violation of Article 9.2 of the Operating Agreement which provides that no member shall have any power or authority to expel any member unless such membership would jeopardize the licenses or other regulatory approval of the business.

f.  Article 11.3 of the Operating Agreement provides for minority members to have tag along rights such that if the majority approves a sale of the company or all of the assets, then disapproving members must be allowed to tag along with the sale on the same terms and conditions. The Plaintiffs aver that Defendant Taylor breached the Operating Agreement by failing to afford the Plaintiffs their rights as minority members.

g.  The Plaintiffs aver that the Defendant Taylor sold, transferred or conveyed either the LLC or its assets and the Plaintiffs were not treated in the same manner as the majority member, Defendant Taylor as required by Article 11.3 of the Operating Agreement.

h.  Article 14.1 of the Operating Agreement provides for events causing dissolution including action of the Members pursuant to Tenn. Code Ann. §48-249-603 or upon the occurrences listed in Tenn. Code Ann. §48-249-601(a). The Plaintiffs aver that there was no occurrence of any event specified in Tenn. Code Ann.§ 48-249-601(a) and that pursuant to Tenn. Code Ann. § 48-249-603, the proposed dissolution of CPH was required to be submitted for approval in a meeting of members. Notice was to be provided to each member, whether or not entitled to vote. The Plaintiffs aver that Defendant Taylor caused CPH to be dissolved in violation of the terms of Article 14.1 of the Operating Agreement.

i.  Defendant Taylor breached the Operating Agreement by failing to properly wind up the affairs of CPH pursuant to Article 14.3 in that Taylor did not distribute the assets as provided in Article 14.4.

## Count VII – Unjust Enrichment

56. The allegations and averments in Paragraphs 1-58 are incorporated herein by reference as if stated verbatim.

57. The Plaintiffs aver that Defendant Taylor has been unjustly enriched as he sold or otherwise disposed of the assets of CPH for his own personal gain and was thereby unjustly enriched to the detriment of the Plaintiffs. The Plaintiffs aver that all of the owners of CPH had a right to receive a proportionate share of the value of the assets of CPH upon liquidation and had the right to recover all amounts owed to them prior to distribution. The Plaintiffs aver that they were not compensated for the time and effort they devoted to the business, the personal property they contributed to the business or any profit or gain upon dissolution. As a result, the Plaintiffs aver that Defendant Taylor was unjustly enriched.

## Count VIII – Accounting

58. The allegations and averments in Paragraphs 1-60 are incorporated herein by reference as if stated verbatim.

59. The Plaintiffs aver that the Court should order Defendant Taylor to account for all funds and other property which came into his possession as a member and president of CPH and to account for any and all expenditures made and especially any transactions between Defendant Taylor and/or CPH and Holston Hemp.

60. Under the terms of the Operating Agreement for CPH and T.C.A. § 48-249-403, Defendant Taylor had a duty and an obligation to account to CPH and to the Plaintiffs. Defendant Taylor failed to account for funds which came into his possession which were

paid during the operation of the business and the funds remaining after the liquidation and dissolution of CPH.

**Count IX – Damages**

61. The allegations and averments in Paragraphs 1-63 are incorporated herein by reference as if stated verbatim.

62. The Plaintiffs aver that they have been damaged as a result of the actions of the Defendant as set forth herein and have been deprived of their valuable property.

WHEREFORE, PLAINTIFFS PRAY:

1. That process issue requiring the Defendant to appear and answer;

2. That the Court order the Defendant Taylor to account to the Plaintiffs as demanded in the Complaint and as required by the Operating Agreement and T.C.A. § 48-248-403;

3. That the Plaintiffs be awarded a Judgment against the Defendant in the amount not to exceed $6,000,000 in compensatory damages;

4. That the Plaintiffs be awarded Judgment against the Defendant in an amount not to exceed $5,000,000 in punitive damages;

5. That the Plaintiffs be awarded their reasonable attorney's fees, litigation expenses and discretionary expenses;

6. That a jury try this action;

7. That the costs of this cause be taxed to the Defendant; and

8. For such other and further relief to which the Plaintiffs may be entitled.

Respectfully submitted this the _____ day of _____, 2021.

BRENT R. WATSON, #010154
Attorney for Plaintiffs
BUNSTINE, WATSON & BECKER
800 S. Gay Street, Suite 2001
Knoxville, Tennessee 37929
(865) 523-3022

## COST BOND

We, Michael Vaughn and Timothy Kendrick, as Principals, and Brent R. Watson, as Surety, are held and firmly bound unto the Sullivan County Circuit Court, for the payment of all costs awarded against the Principal. To that end, we bind ourselves, our heirs, executors and administrators.

The Principal is commencing legal proceedings in the Sullivan County Circuit Court. If the Principals shall pay all costs which are adjudged against them, then this obligation is void. If the Principals fail to pay, then the surety shall undertake to pay all costs adjudged against the Principal. Mandated at T.C.A. §20-12-120 et seq.

**PRINCIPALS**

Michael Vaughn
817 Indian Trail Drive
Kingsport, TN 37660

_____
PRINCIPAL

Timothy Kendrick
3233 Forest View Road
Kingsport, TN 37660

_____
PRINCIPAL

**SURETY**
BRENT R. WATSON, #010154
BUNSTINE, WATSON & BECKER
800 South Gay Street, Suite 2001
Knoxville, Tennessee 37929
(865) 523-3022

SURETY _____

**PENNSTUART**

ABINGDON | BRISTOL | JOHNSON CITY | RICHMOND

804 ANDERSON ST., BRISTOL, TN 37620

PENNSTUART.COM

Karissa H. Range

krange@pennstuart.com
D: 423 793 4808
F: 423 793 4848

February 25, 2021

Mr. Bobby L. Russell
Circuit Court Clerk for Sullivan County
225 West Center Street
Kingsport, TN 37660

> Re:  *Michael Vaughn and Timothy Kendrick v. Russell E. Taylor, Michael Schrock,*
> *III, Greg C. Marcum, Tony L. Huff,* and *Holston Hemp, LLC*
> Case No. C43098(C)
> PS&E File No. 9530-2

Dear Mr. Russell:

Enclosed please find a proposed Order that has been executed by counsel in the above case. We would appreciate you presenting the Order, with the file, to the Judge for consideration and entry.

Should you have any questions or need any additional information, please do not hesitate to contact me at your convenience.

Sincerely yours,

PENN, STUART & ESKRIDGE

By: Karissa H. Range

Enclosure
cc:  Brent R. Watson, Esq. (w/enc.)
     Kimberly D. Rhoton, Esq. (w/enc.)

IN THE CIRCUIT COURT FOR SULLIVAN COUNTY, TENNESSEE

MICHAEL VAUGHN and )
TIMOTHY KENDRICK, )
        )
        Plaintiffs, )
        )
v. )        Docket No. C43098(C)
        )
RUSSELL E. TAYLOR, )
MICHAEL SCHROCK, III, )
GREG C. MARCUM, )
TONY L. HUFF, and )
HOLSTON HEMP LLC, )
        )
        Defendants. )



**FILED**
3-2-21 10:50 pm
Bobby L. Russell   DC
CIRCUIT COURT CLERK
SULLIVAN COUNTY, TN.

RUSSELL E. TAYLOR, )
        )
        Counterclaim Plaintiff, )
        )
v. )
        )
MICHAEL VAUGHN and )
TIMOTHY KENDRICK, )
        )
        Counterclaim Defendants. )

## ORDER

Pursuant to Rule 41.01, plaintiffs Michael Vaughn and Timothy Kendrick

have filed a Notice of Voluntary Dismissal of this action as to defendants Michael Schrock,

III, Greg C. Marcum, Tony L. Huff, and Holston Hemp, LLC. Upon consideration of

which, it is ORDERED that this action be, and it is hereby, dismissed without prejudice as

to these defendants.

Pursuant to Rule 15.01, plaintiffs Michael Vaughn and Timothy Kendrick have filed a Motion to Amend their Complaint as to defendant Russell E. Taylor. Upon consideration of which, it is ORDERED that the Motion to Amend is granted, and plaintiffs shall file their Amended Complaint within 10 days of entry of this Order.

Currently, a hearing is scheduled for March 2, 2021, on defendants' Motions to Dismiss the Complaint. Because plaintiffs are voluntarily dismissing this action as to some of the defendants and filing an Amended Complaint as to the remaining defendant, it is ORDERED that the hearing on March 2, 2021, is cancelled. The Court will reschedule a hearing on a Motion to Dismiss the Amended Complaint.

ENTER: this _____ day of _____, 2021.

_____
Chancellor

Requested:

Brent R. Watson
 BPR No. 010154
BUNSTINE, WATSON & BECKER
800 S. Gay Street, Suite 2001
Knoxville, Tennessee 37929
Telephone: 865/523-3022
bwatson@bwblawyer.com

with permission
by Kansas Kerge

By _____
    Brent R. Watson
    Counsel for Plaintiffs

Seen:

Wade W. Massie
 BPR No. 020567
Karissa H. Range
 BPR No. 034277
PENN, STUART & ESKRIDGE
208 East Main Street
Abingdon, Virginia 24210
Telephone: 276/623-4409
Facsimile: 276/628-5621
wmassie@pennstuart.com
krange@pennstuart.com

By _Wade W Massie_      *with permission by Karissa Range*
      Wade W. Massie
      Counsel for Russell E. Taylor


Kimberley D. Rhoton
 BPR No. 022552
215 Cumberland Street
Kingsport, Tennessee 37660
Telephone: 423/723-0493
Facsimile: 423/723-0494
kim@rhotonlawfirm.com

By _Kimberley D. Rhoton_      *with permission by Karissa Range*
      Kimberley D. Rhoton
      Counsel for Michael Schrock, III,
      Greg C. Marcum, Tony L. Huff,
      and Holston Hemp LLC

3

## IN THE CIRCUIT COURT FOR SULLIVAN COUNTY, TENNESSEE

| | | |
|---|---|---|
| MICHAEL VAUGHN and<br>TIMOTHY KENDRICK, | ) )<br>) | **FILED** |
| | ) ) | 3\|18\|21 \|\|:04 am<br>Bobby L. Russell _____ DC |
| Plaintiff, | ) ) | **CIRCUIT COURT CLERK** |
| | ) | **SULLIVAN COUNTY, TN.** |
| v. | ) ) | Docket No. C43098(C) |
| RUSSELL E. TAYLOR, | ) ) ) | |
| Defendant. | ) ) ) | |
| RUSSELL E. TAYLOR, | ) ) ) | |
| Counter-Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| MICHAEL VAUGHN and<br>TIMOTHY KENDRICK, | ) ) ) | |
| Counter-Defendants. | ) ) | |

### AMENDED COMPLAINT

Come the Plaintiffs, by and through counsel, and for their cause of action show to the

Court as follows:

### I. PARTIES

1. The Plaintiffs are residents and citizens of Sullivan County, Tennessee.

2. Defendant, Russell E. Taylor is a resident and citizen of Bristol, Virginia, and may be

   served in Sullivan County at either 1601 Fair Ridge Place, Kingsport, Tennessee 37660,

   or at his place of business at 1043 Ford Town Road, Kingsport, Tennessee 37660.

## II. JURISDICTION

3.  This Court has jurisdiction over this matter because the conduct alleged and averred herein occurred in Sullivan County, Tennessee. CPH Brands ("CPH") had its principal place of business in Sullivan County, Tennessee, and the Defendant Russell E. Taylor and the Plaintiffs were the owners of CPH.

## III. FACTS

4.  On or about January 23, 2019, Plaintiffs Michael Vaughn ("Vaughn") and Timothy Kendrick ("Kendrick") along with Defendant Russell E. Taylor ("Taylor") caused to be formed a limited liability company named CPH.

5.  On or about January 23, 2019, Plaintiffs Vaughn and Kendrick and Defendant Taylor executed an Operating Agreement for CPH. A copy of the Operating Agreement is attached hereto as Exhibit A.

6.  On or about January 23, 2019, CPH entered into a lease agreement with Taylor Properties #1, L.P. for the lease of real property located at 1736 North Eastman Road, Kingsport, Tennessee, 37664-2310. A copy of the Lease Agreement is attached hereto as Exhibit B. The lease was on a month to month basis and could be terminated by the landlord or tenant upon thirty (30) days advance written notice. The lease was executed on behalf of CPH by Defendant Taylor.

7.  On or about January 24, 2019, Plaintiffs Vaughn and Kendrick and Defendant Taylor each entered into an agreement known as AGREEMENT OF COVENANT NOT TO COMPETE, NON-DISCLOSURE AND NON-UTILIZATION. A copy of said agreements are attached hereto as collective Exhibit C.

8.  Prior to the formation of CPH, the Plaintiffs were engaged in the hemp and CBD business and had formed a limited liability company known as Hemponix Laboratories LLC. The Plaintiffs were desirous of growing hemp inside and processing hemp, and were looking for a building which would be suitable. The Plaintiffs met Defendant Taylor in early January, 2019. Defendant Taylor showed them a building which may have been suitable for their business purposes. During the process of looking at buildings with Defendant Taylor, the parties discussed Taylor becoming involved with the business, and after having discussions over a period of a couple of weeks, Defendant Russell and the Plaintiffs agreed to enter into a business relationship. At that time, the parties formed CPH, entered into a lease agreement, and each signed the AGREEMENT OF COVENANT NOT TO COMPETE, NON-DISCLOSURE AND NON-UTILIZATION.

9.  As is reflected in the OPERATING AGREEMENT FOR CPH, Michael Vaughn contributed $288,000, which consisted of all equipment currently purchased with his funds, all licenses, applied for/and issued however they were owned. In exchange, Plaintiff Vaughn received 24.5% financial interest and 24.5% governance interest in CPH.

10. Plaintiff Kendrick received 24.5% financial interest and 24.5% governance interest in CPH in exchange for $1.

11. Defendant Taylor received 51% financial interest and 51% governance interest in exchange for $100,000 cash and Defendant Taylor was to arrange a lease between CPH and Taylor Properties #1, L.P. for up to three (3) months with the rent under the lease being accrued, and the rent to be paid from the initial cash flow of CPH prior to distributions to members. In addition, Taylor agreed to advance up to $36,000 for initial

business expenses which was to be repaid prior to any distributions to members. Taylor also agreed to provide up to $4,200 plus a convenience fee of 3% for the acquisition and rental of a cold press machine which would be repaid prior to any distribution to members.

12. Prior to the creation of CPH, the Plaintiffs and Defendant Taylor made the decision to initially process hemp and manufacture CBD rather than growing hemp. CPH purchased various equipment in order to manufacture CBD oil and other products derived therefrom. In addition, CPH purchased a large amount of hemp which was to be processed for the manufacture of CBD oil and its derivatives. CPH purchased 1,300 pounds of hemp from Oregon which was transported to CPH in Sullivan County, Tennessee.

13. CPH acquired the appropriate liability insurance for the manufacture of CBD.

14. CPH manufactured various CBD products.

15. CPH developed unique packaging for its products as well as various unique marketing materials for its products, and CPH developed various trade names and marks which were unique and took action to protect them. CPH developed a unique manufacturing process.

16. CPH acquired various machines and equipment including a cold press, labeling machine, computers and various other equipment and fixtures which were necessary to the business. CPH made substantial improvements to the leased premises including the installation of security equipment.

17. CPH, by and through the Plaintiffs, obtained all necessary licenses through the State of Tennessee, to grow and process hemp.

18.   After the formation of CPH, the Plaintiffs worked diligently to build and enhance the business of CPH and were assisted by family members and others for no compensation. The Plaintiffs had agreed with Defendant Taylor that they would be paid $2,000 per week and were paid only four weeks. In spite of the fact that they were not being paid by CPH, the Plaintiffs continued to work and devoted 100% of their efforts to the growth and development of CPH.

19.   On or about April 26, 2019, the Plaintiffs were escorted off of the leased premises by the property manager whom they believed was employed by the owner of the premises, Taylor Properties #1, L.P. Accompanying the property manager were people who were armed. The Plaintiffs aver that they were expelled from the property at the direction of Defendant Taylor.

20.   Other than going to the premises with a police escort on one occasion, Plaintiff Timothy Kendrick was not allowed to return to the business premises at all. The Plaintiff Michael Vaughn never returned to the business premises.

21.   From the formation of the business in January, 2019, until the Plaintiffs were escorted from the business premises on April 26, 2019, CPH's business grew at a tremendous rate such that the Plaintiffs, with the help of others, could not keep up with the demand for CPH's products. It was discussed between the parties prior to April 26, 2019, that CPH needed to hire additional employees. Upon information and belief, the Plaintiffs aver that CPH was profitable or had the ability to be profitable prior to April 26, 2019.

22.   The Plaintiffs aver that on April 26, 2019, CPH had inventory with a value exceeding $5,000,000. In addition, CPH owned equipment, and it had a unique manufacturing process and intellectual property.

23. On or about April 26, 2019, CPH had a substantial value as an ongoing business in addition to owning valuable assets.

24. On or about April 26, 2019, Defendant Taylor communicated to the Plaintiffs that Defendant Taylor intended to unilaterally "shut down" the business. At that time, it was discussed between the parties that Defendant Taylor would sell his ownership interest in CPH for $50,000 if he had payment in full by May 3, 2019 at 12:00 p.m. and the funds had to clear the bank. Defendant Taylor stated that this would basically be a full asset purchase of all the inventory and supplies in the building, not including fixtures, as fixtures were part of the premises. In addition, it would require a full month's rent up front and a refundable security deposit in order for CPH to remain in the building which was owned by Taylor's family. The rent was to be somewhere around $6,000 per month. In addition, the Plaintiffs would have to pay all utilities, maintenance, property taxes, and property insurance if they wanted to remain in the building. However, Defendant Taylor made it clear that the purchase of his interest in CPH was separate from the lease of the premises.

25. On May 2, 2019, Plaintiffs were provided with a document called Escrow Agreement RE: CPH BRANDS, LLC that required the payment of $64,335.54 and allowed the Plaintiffs four (4) hours to conduct an inventory of raw material, finished product, equipment and machinery located at the business's premises. The escrow agreement also provided that in event the Plaintiffs purchased Defendant Taylor's interest, CPH was obligated to enter into a new lease with Taylor Properties #1, L.P. with rent of $6,200.70 per month, triple net with pro-rated taxes and insurance paid each month and a one month's security

deposit. It also provided for mutual releases. The total amount to be paid toward the lease was $14,335.54.

26. Prior to May 2, 2019, the Defendant Taylor never informed the Plaintiffs that it would require $64,335.54 to complete the transaction. Prior to May 2, 2019, Defendant Taylor had stated that he would sell his ownership interest for $50,000 but that the lease of the building was not necessary as they were two different things. On May 2, 2019, Defendant Taylor included in the terms of the sale that they would have to lease the premises and pay $14,335.54. A copy of the proposed Escrow Agreement is attached hereto as Exhibit D.

27. The Plaintiffs were able to pay $50,000 on May 2, 2019, but were unable to pay the additional $14,335.54 which was included by Defendant Taylor on May 2, 2019 and only provided the Plaintiffs with less than 24 hours to have available the additional funds. On May 3, 2019, the Plaintiffs were unable to pay in full $64,335.54 and the purchase of Defendant Taylor's interest did not occur.

28. After May 2, 2019, the Plaintiffs had no further contact with Defendant Taylor. They received no notices relative to the business of CPH, received no information regarding the CPH's business or the disposition of CPH's assets. The Plaintiffs never received an explanation as to the actions taken by Defendant Taylor in having them removed from the business premises and being expelled from CPH.

29. On or about May 14, 2019, Defendant Holston Hemp, LLC ("Holston Hemp") was formed and its initial filing was made with the Tennessee Secretary of State.

30. At a time which is unknown to the Plaintiffs, Holston Hemp and its owners began the manufacture and sell of products which are the same as the products that were sold by

CPH. Holston Hemp used the packaging which belonged to CPH, used CPH's unique marketing materials, trade names, brand name such as "Hemponix," and in effect, began using all of the assets of CPH including its intellectual property. Holston Hemp operated its business in the same building that CPH had occupied. In effect, Defendants took over every aspect of CPH's business and began operating it just as CPH had operated except without the Plaintiffs. Within a short period of time, Holston Hemp was employing more than twenty (20) people in its business.

31. After January 3, 2019, Defendant Taylor controlled all financial matters for CPH. Defendant Taylor kept such financial matters secret and refused to share financial information with the Plaintiffs. When CPH was formed, the parties agreed that the checking account should require two signatures on each check. At some point, Defendant Taylor had the bank change the signature requirement to only his signature, thus eliminating the Plaintiffs involvement in disbursing funds. The only financial information received by the Plaintiffs was a K-1 for the year 2019 which showed that CPH had a small loss for the year.

32. The Tennessee Secretary of State website shows that CPH Brands, LLC was dissolved on June 10, 2019.

33. The Plaintiffs received no notice of the transfer of any of the assets of CPH to Holston Hemp.

34. The Plaintiffs received no notice from Defendant Taylor that CPH was to be dissolved. No meeting was held relative to such dissolution. The members did not vote on the dissolution.

35. The Plaintiffs received no funds or property of any kind from CPH other than four weeks salary and received nothing from the dissolution and liquidation of CPH Brands, LLC.

36. Upon information and belief, the Plaintiffs allege that Defendant Taylor had a relationship with Holston Hemp and its owners and that Defendant Taylor continued in the same business which CPH operated but rather than the Plaintiffs as owners, Michael Schrock, III, Greg C. Marcum and Tony L. Huff operated the business with Defendant Taylor as Holston Hemp, LLC.

37. The Plaintiffs aver that prior to the Notice of Dissolution being filed with the Secretary of State, the Plaintiffs received no notice, no LLC document, no meeting was held and no vote was taken.

38. Plaintiffs contributed their personal property to the business of CPH as well as their work and efforts for which they received. The Plaintiffs were excluded from the business on and after April 26, 2019 and received none of their contributed property and assets nor were they compensated for their labor. The Plaintiffs received no distribution from the liquidation of the business.

39. Prior to being expelled from the business, CPH received thirteen hundred (1,300) pounds of hemp. One thousand (1,000) pounds of hemp was to be processed by CPH and one-half of the oil derived from it was to be given to the seller of the hemp. Three Hundred (300) pounds of hemp was purchased for approximately Thirty Thousand Dollars ($30,000). Approximately two hundred (200) pounds of hemp was processed into approximately thirty-three (33) gallons of oil which was returned to the seller of the hemp in Oregon. Upon information and belief, Defendant Taylor refused to send additional oil to the seller of the hemp which left CPH with a debt owed to the seller. Defendant Taylor

made representations to the seller that CPH did not have any other material with which to produce oil to satisfy its obligations. Defendant Taylor did not satisfy this outstanding obligation of CHP as part of the liquidation and dissolution.

40.   During the time prior to the Plaintiffs being expelled from the business, CPH had produced approximately one hundred (100) gallons of CBD oil in addition to the oil that was sent to Oregon. The value of the oil was in excess of Two Million Dollars ($2,000,000). Immediately prior to being expelled from the business, Plaintiff Vaughn was contacted by a purchaser in Texas who wanted to purchase CBD oil from CPH. The customer wanted to purchase approximately Eight Hundred Thousand Dollars ($800,000) of oil. When the sale of oil was discussed with Defendant Taylor, Taylor would not agree for the sale of the oil. Within days of these discussions, Plaintiffs Vaughn and Kendrick were forcibly removed from the business premises. Defendant Taylor had also refused other sales.

41.   At the time that the Plaintiffs were expelled from the business, CPH had approximately one thousand (1,000) pound of unprocessed material, two hundred (200) pounds of flowers and one hundred (100) gallons of oil. This inventory was worth millions of dollars. In spite of the value of the assets of the business, the Plaintiffs received nothing from the operation of the business and the liquidation of the business except four weeks of salary.

Count I – Breach of Fiduciary Duty

42.   The Plaintiffs allege and aver that Defendant Taylor breached his fiduciary duty to CPH and the Plaintiffs who were members and breached his duty of loyalty and duty of care to CPH and the Plaintiffs pursuant to Tenn. Code Ann. §48-249-403. The Plaintiffs allege

that Defendant Taylor failed to perform his duties in compliance with T.C.A. § 48-249-403 and is not entitled to the limitation of liability under T.C.A. § 48-249-403. Further, the Plaintiffs allege as follows:

A. Defendant Taylor breached his duty of loyalty to Plaintiffs who were the LLC's other members as Taylor failed to account to the LLC for any property, profit or benefit derived by him in the conduct or winding up of the LLC's business or derived by him by use of the LLC's property including the appropriation of an opportunity of the LLC. The Plaintiffs aver that Defendant Taylor refused to account to the LLC and to Plaintiffs for income derived by the LLC from its operations and refused to disclose to the Plaintiffs the financial condition of the business. The Plaintiffs further allege that Defendant Taylor failed and refused to account to the LLC and to the Plaintiffs for any property, profit or benefit derived by him in winding up of the LLC's business. The Plaintiffs further allege that Defendant Taylor failed to account to the LLC for the appropriation of the business opportunity of the LLC by selling or otherwise disposing of the essential and necessary property of the business.

B. Defendant Taylor breached his duty of care to the LLC and to the Plaintiffs in engaging in grossly negligent or reckless conduct, intentional misconduct or a knowingly violation of the law. Specifically, the Plaintiffs aver that Defendant Taylor disposed of all of the valuable assets of the LLC and the ongoing business of the LLC. The Plaintiffs aver that CPH had valuable assets and that CPH was valuable as a going concern and

Defendant Taylor disposed of the business for his own benefit and in a manner which did not benefit CPH or the Plaintiffs. The expulsion of the Plaintiffs and liquidation of the business were intentional misconduct on the part of Defendant Taylor.

43. Defendant Taylor breached his fiduciary duty to CPH and the Plaintiffs when he engaged in conflict of interest transactions in violation of Tenn. Code Ann. §48-249-404 in that the liquidation of the business was not in the best interest of CPH but was only meant to benefit Defendant Taylor.

**Count II – Breach of Duty of Good Faith and Fair Dealings**

44. The allegations and averments of Paragraph 1-43 are incorporated herein by reference as is stated verbatim.

45. The Plaintiffs allege and aver that Defendant Taylor breached his duty of good faith and fair dealing pursuant to Tenn. Code Ann. §48-249-403(d) by failing to act in good faith and deal fairly by excluding the Plaintiffs from the business of CPH, by violating the terms of the LLC operating agreement, by dissolving and liquidating the business without the Plaintiffs having an opportunity to participate and by disposing of the business assets in a way that did not benefit CPH and the Plaintiffs.

**Count III – Dissolution and winding up of CPH pursuant to Tenn. Code Ann. §48-249-601, et seq.**

46. The allegations and averments of paragraphs 1-45 are incorporated herein by reference as if stated verbatim.

47. The Plaintiffs allege and aver that Defendant Taylor wrongfully dissolved and terminated CPH. The Plaintiffs aver that Defendant Taylor failed to provide them with notice of the

proposed dissolution, winding up and termination of CPH as required by Tenn. Code Ann. §48-249-603 and that no meeting was held of the members at which a vote was taken to dissolve the CPH, followed by winding up and termination of CPH.

48. Plaintiffs aver that Defendant Taylor wrongfully dissolved CPH and did so with the intention of depriving Plaintiffs of their ownership in CPH and in preventing them from protecting their interests or the interest of CPH. The Defendant has provided no information to the Plaintiffs regarding the liquidation of the business assets.

**Count IV- Fraud**

49. The allegations and averments of paragraphs 1-47 are incorporated herein by reference as if fully stated verbatim.

50. The Plaintiffs allege and aver that the Defendant intentionally deprived them of their property and rights by their exclusion from the business of CPH and the liquidation of the assets of CPH. The transfer of the assets of CPH was accomplished by means of deception in that the Plaintiffs had no means to protect their interests since the Defendant failed to speak or provide information that the Defendants had a duty to disclose.

51. The Plaintiffs aver that the actions of the Defendant were intentional, unlawful, and were meant to deprive the Plaintiffs of their property and their rights. The Plaintiffs aver that Defendant Taylor transferred the valuable assets of CPH without notice to the Plaintiffs, under the guise of his authority as majority member of CPH.

The Plaintiffs allege that Defendant Taylor had a duty to speak and inform them of the actions he was taking at CPH at all times. The Plaintiffs aver that prior to them being forcibly expelled from the business, Defendant Taylor refused to allow the Plaintiffs to sell products which would have brought substantial income and profit to the business.

Instead, Defendant Taylor excluded them from the business and disposed of the assets of

the business to his own benefit. Defendant Taylor told the Plaintiffs on other occasions

that various sales opportunities should not be taken such as an exclusive deal to sell

millions of dollars of product through a drug store. The Plaintiffs aver that Defendant

Taylor used a fraudulent scheme to deprive them of their property.

**Count V- Punitive Damages**

52.   The allegations and averments of paragraphs 1-54 are incorporated herein by reference as

is stated verbatim.

53.   The Plaintiffs aver that Defendant Taylor acted maliciously, intentionally, fraudulently,

and/or recklessly and punitive damages should be awarded to them. .

**Count VI- Breach of Contract**

54.   The allegations and averments of Paragraphs 1-56 are incorporated herein by reference as

if fully stated verbatim.

55.   The Plaintiffs aver that the Plaintiffs and Defendant Taylor entered into the Operating

Agreement of CPH Brands, LLC and the Plaintiffs aver that Defendant Taylor breached

the terms of the Operating Agreement as follows:

a.     Article 3.2 provides that no member shall have the right to withdraw or reduce his

contributed capital or receive any assets of the company, and no member shall

have priority over any other member as to the return of contributed capital. The

Plaintiffs aver that Defendant Taylor withdrew or reduced his contributed capital

and received assets of the company and gave himself priority over the Plaintiffs

on the return of contributed capital in violation of the Operating Agreement. The

Plaintiffs received nothing from the business and the Plaintiffs aver that
Defendant Taylor profited from the business.

b.　Article 5.1 of the Operating Agreement provides that each member shall keep the
other members informed at all times concerning the company's operation. The
Plaintiffs aver that Defendant Taylor breached his obligation as he failed to
inform them of the company's operations and dissolution and did so intentionally
and in violation of the Plaintiff's rights.

c.　The Defendant failed to give notice of meetings as provided or as required in
Article 5.5 of the Operating Agreement as the Plaintiffs were members entitled to
notice not less than ten (10) days nor more than two months before the date of the
meeting. Plaintiffs aver that they received no notice of any meetings relative to
the operation and dissolution and winding up of the CPH's business.

d.　Plaintiffs aver that Defendant Taylor breached Article 8.1 of the Operating
Agreement by failing to be just and faithful to the Plaintiffs at all times, in failing
to give the Plaintiffs full information and truthful explanation of all matters
relating to the affairs of the company and failing to afford every assistance in his
power in carrying on the company's business for the Members' mutual advantage.

e.　Plaintiffs aver that they were effectively expelled from CPH by Defendant Taylor
on or after April 26, 2019 in violation of Article 9.2 of the Operating Agreement
which provides that no member shall have any power or authority to expel any
member unless such membership would jeopardize the licenses or other
regulatory approval of the business.

f.     Article 11.3 of the Operating Agreement provides for minority members to have tag along rights such that if the majority approves a sale of the company or all of the assets, then disapproving members must be allowed to tag along with the sale on the same terms and conditions. The Plaintiffs aver that Defendant Taylor breached the Operating Agreement by failing to afford the Plaintiffs their rights as minority members.

g.     The Plaintiffs aver that the Defendant Taylor sold, transferred or conveyed either the LLC or its assets and the Plaintiffs were not treated in the same manner as the majority member, Defendant Taylor as required by Article 11.3 of the Operating Agreement.

h.     Article 14.1 of the Operating Agreement provides for events causing dissolution including action of the Members pursuant to Tenn. Code Ann. §48-249-603 or upon the occurrences listed in Tenn. Code Ann. §48-249-601(a). The Plaintiffs aver that there was no occurrence of any event specified in Tenn. Code Ann.§ 48-249-601(a) and that pursuant to Tenn. Code Ann. § 48-249-603, the proposed dissolution of CPH was required to be submitted for approval in a meeting of members. Notice was to be provided to each member, whether or not entitled to vote. The Plaintiffs aver that Defendant Taylor caused CPH to be dissolved in violation of the terms of Article 14.1 of the Operating Agreement.

i.     Defendant Taylor breached the Operating Agreement by failing to properly wind up the affairs of CPH pursuant to Article 14.3 in that Taylor did not distribute the assets as provided in Article 14.4.

## Count VII – Unjust Enrichment

56.   The allegations and averments in Paragraphs 1-58 are incorporated herein by reference as if stated verbatim.

57.   The Plaintiffs aver that Defendant Taylor has been unjustly enriched as he sold or otherwise disposed of the assets of CPH for his own personal gain and was thereby unjustly enriched to the detriment of the Plaintiffs. The Plaintiffs aver that all of the owners of CPH had a right to receive a proportionate share of the value of the assets of CPH upon liquidation and had the right to recover all amounts owed to them prior to distribution. The Plaintiffs aver that they were not compensated for the time and effort they devoted to the business, the personal property they contributed to the business or any profit or gain upon dissolution. As a result, the Plaintiffs aver that Defendant Taylor was unjustly enriched.

## Count VIII – Accounting

58.   The allegations and averments in Paragraphs 1-60 are incorporated herein by reference as if stated verbatim.

59.   The Plaintiffs aver that the Court should order Defendant Taylor to account for all funds and other property which came into his possession as a member and president of CPH and to account for any and all expenditures made and especially any transactions between Defendant Taylor and/or CPH and Holston Hemp.

60.   Under the terms of the Operating Agreement for CPH and T.C.A. § 48-249-403, Defendant Taylor had a duty and an obligation to account to CPH and to the Plaintiffs. Defendant Taylor failed to account for funds which came into his possession which were

paid during the operation of the business and the funds remaining after the liquidation and dissolution of CPH.

**Count IX – Damages**

61. The allegations and averments in Paragraphs 1-63 are incorporated herein by reference as if stated verbatim.

62. The Plaintiffs aver that they have been damaged as a result of the actions of the Defendant as set forth herein and have been deprived of their valuable property.

WHEREFORE, PLAINTIFFS PRAY:

1. That process issue requiring the Defendant to appear and answer;

2. That the Court order the Defendant Taylor to account to the Plaintiffs as demanded in the Complaint and as required by the Operating Agreement and T.C.A. § 48-248-403;

3. That the Plaintiffs be awarded a Judgment against the Defendant in the amount not to exceed $6,000,000 in compensatory damages;

4. That the Plaintiffs be awarded Judgment against the Defendant in an amount not to exceed $5,000,000 in punitive damages;

5. That the Plaintiffs be awarded their reasonable attorney's fees, litigation expenses and discretionary expenses;

6. That a jury try this action;

7. That the costs of this cause be taxed to the Defendant; and

8. For such other and further relief to which the Plaintiffs may be entitled.

Respectfully submitted this the 17 day of March, 2021.

BRENT R. WATSON, #010154
Attorney for Plaintiffs
BUNSTINE, WATSON & BECKER
800 S. Gay Street, Suite 2001
Knoxville, Tennessee 37929
(865) 523-3022

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been mailed to Wade W.

Massie, 208 E. Main Street, Abingdon, Virginia 24210, Karissa H. Range, 804 Anderson Street,

Bristol, Tennessee 37620, and Kimberly D. Rhoton, 215 Cumberland Street, Kingsport,

Tennessee 37660, by U.S. Mail with sufficient postage thereupon to carry same to its destination

and facsimile transmission.

This the 17 day of March, 2021.

BRENT R. WATSON

NICHOLAS D. BUNSTINE*
BRENT R. WATSON*
JERROLD L. BECKER
SUZANNE NICOLE PRICE*
EMILY K. STULCE
*RULE 31 LISTED GENERAL CIVIL
MEDIATOR

## BUNSTINE, WATSON & BECKER

### ATTORNEYS AT LAW
AN ASSOCIATION

FIRST TENNESSEE PLAZA
800 SOUTH GAY STREET, SUITE 2001
KNOXVILLE, TENNESSEE 37929

TELEPHONE (865) 523-3022
(865) 523-0466
TELECOPIER (865) 637-0137

March 18, 2021

Kingsport Law Court
City Hall
225 West Center Street
Kingsport, Tennessee 37660

      Re:    *Michael Vaughn, et al. v. Russell E. Taylor, et al.*
            Sullivan County Circuit Court No. C43098(C)

Dear Sir/Madam:

      Enclosed please find the original and a copy of the Amended Complaint with attached exhibits. Please files said Amended Complaint and return a stamped copy to our office in the enclosed self-addressed stamped envelope.

      Thank you for your assistance and if you should have any questions, please do not hesitate to contact our office.

                  Sincerely,

                  Pamela K. Roberts
                  Paralegal for Brent R. Watson

Enclosures
cc:    Wade W. Massie
       Karissa H. Range
       Kimberly D. Rhoton

# IN THE CIRCUIT COURT FOR SULLIVAN COUNTY, TENNESSEE

MICHAEL VAUGHN and
TIMOTHY KENDRICK,

     Plaintiff,

v.                         Docket No. C43098(C)

RUSSELL E. TAYLOR,

     Defendant.

_____

RUSSELL E. TAYLOR,

         Counter-Plaintiff,

v.

MICHAEL VAUGHN and
TIMOTHY KENDRICK,

        Counter-Defendants.

## AMENDED COMPLAINT

Come the Plaintiffs, by and through counsel, and for their cause of action show to the

Court as follows:

## I. PARTIES

1. The Plaintiffs are residents and citizens of Sullivan County, Tennessee.

2. Defendant, Russell E. Taylor is a resident and citizen of Bristol, Virginia, and may be

served in Sullivan County at either 1601 Fair Ridge Place, Kingsport, Tennessee 37660,

or at his place of business at 1043 Ford Town Road, Kingsport, Tennessee 37660.

## II. JURISDICTION

3.  This Court has jurisdiction over this matter because the conduct alleged and averred herein occurred in Sullivan County, Tennessee. CPH Brands ("CPH") had its principal place of business in Sullivan County, Tennessee, and the Defendant Russell E. Taylor and the Plaintiffs were the owners of CPH.

## III. FACTS

4.  On or about January 23, 2019, Plaintiffs Michael Vaughn ("Vaughn") and Timothy Kendrick ("Kendrick") along with Defendant Russell E. Taylor ("Taylor") caused to be formed a limited liability company named CPH.

5.  On or about January 23, 2019, Plaintiffs Vaughn and Kendrick and Defendant Taylor executed an Operating Agreement for CPH. A copy of the Operating Agreement is attached hereto as Exhibit A.

6.  On or about January 23, 2019, CPH entered into a lease agreement with Taylor Properties #1, L.P. for the lease of real property located at 1736 North Eastman Road, Kingsport, Tennessee, 37664-2310. A copy of the Lease Agreement is attached hereto as Exhibit B. The lease was on a month to month basis and could be terminated by the landlord or tenant upon thirty (30) days advance written notice. The lease was executed on behalf of CPH by Defendant Taylor.

7.  On or about January 24, 2019, Plaintiffs Vaughn and Kendrick and Defendant Taylor each entered into an agreement known as AGREEMENT OF COVENANT NOT TO COMPETE, NON-DISCLOSURE AND NON-UTILIZATION. A copy of said agreements are attached hereto as collective Exhibit C.

8.   Prior to the formation of CPH, the Plaintiffs were engaged in the hemp and CBD business and had formed a limited liability company known as Hemponix Laboratories LLC. The Plaintiffs were desirous of growing hemp inside and processing hemp, and were looking for a building which would be suitable. The Plaintiffs met Defendant Taylor in early January, 2019. Defendant Taylor showed them a building which may have been suitable for their business purposes. During the process of looking at buildings with Defendant Taylor, the parties discussed Taylor becoming involved with the business, and after having discussions over a period of a couple of weeks, Defendant Russell and the Plaintiffs agreed to enter into a business relationship. At that time, the parties formed CPH, entered into a lease agreement, and each signed the AGREEMENT OF COVENANT NOT TO COMPETE, NON-DISCLOSURE AND NON-UTILIZATION.

9.   As is reflected in the OPERATING AGREEMENT FOR CPH, Michael Vaughn contributed $288,000, which consisted of all equipment currently purchased with his funds, all licenses, applied for/and issued however they were owned. In exchange, Plaintiff Vaughn received 24.5% financial interest and 24.5% governance interest in CPH.

10.  Plaintiff Kendrick received 24.5% financial interest and 24.5% governance interest in CPH in exchange for $1.

11.  Defendant Taylor received 51% financial interest and 51% governance interest in exchange for $100,000 cash and Defendant Taylor was to arrange a lease between CPH and Taylor Properties #1, L.P. for up to three (3) months with the rent under the lease being accrued, and the rent to be paid from the initial cash flow of CPH prior to distributions to members. In addition, Taylor agreed to advance up to $36,000 for initial

business expenses which was to be repaid prior to any distributions to members. Taylor also agreed to provide up to $4,200 plus a convenience fee of 3% for the acquisition and rental of a cold press machine which would be repaid prior to any distribution to members.

12.    Prior to the creation of CPH, the Plaintiffs and Defendant Taylor made the decision to initially process hemp and manufacture CBD rather than growing hemp. CPH purchased various equipment in order to manufacture CBD oil and other products derived therefrom. In addition, CPH purchased a large amount of hemp which was to be processed for the manufacture of CBD oil and its derivatives. CPH purchased 1,300 pounds of hemp from Oregon which was transported to CPH in Sullivan County, Tennessee.

13.    CPH acquired the appropriate liability insurance for the manufacture of CBD.

14.    CPH manufactured various CBD products.

15.    CPH developed unique packaging for its products as well as various unique marketing materials for its products, and CPH developed various trade names and marks which were unique and took action to protect them. CPH developed a unique manufacturing process.

16.    CPH acquired various machines and equipment including a cold press, labeling machine, computers and various other equipment and fixtures which were necessary to the business. CPH made substantial improvements to the leased premises including the installation of security equipment.

17.    CPH, by and through the Plaintiffs, obtained all necessary licenses through the State of Tennessee, to grow and process hemp.

18. After the formation of CPH, the Plaintiffs worked diligently to build and enhance the business of CPH and were assisted by family members and others for no compensation. The Plaintiffs had agreed with Defendant Taylor that they would be paid $2,000 per week and were paid only four weeks. In spite of the fact that they were not being paid by CPH, the Plaintiffs continued to work and devoted 100% of their efforts to the growth and development of CPH.

19. On or about April 26, 2019, the Plaintiffs were escorted off of the leased premises by the property manager whom they believed was employed by the owner of the premises, Taylor Properties #1, L.P. Accompanying the property manager were people who were armed. The Plaintiffs aver that they were expelled from the property at the direction of Defendant Taylor.

20. Other than going to the premises with a police escort on one occasion, Plaintiff Timothy Kendrick was not allowed to return to the business premises at all. The Plaintiff Michael Vaughn never returned to the business premises.

21. From the formation of the business in January, 2019, until the Plaintiffs were escorted from the business premises on April 26, 2019, CPH's business grew at a tremendous rate such that the Plaintiffs, with the help of others, could not keep up with the demand for CPH's products. It was discussed between the parties prior to April 26, 2019, that CPH needed to hire additional employees. Upon information and belief, the Plaintiffs aver that CPH was profitable or had the ability to be profitable prior to April 26, 2019.

22. The Plaintiffs aver that on April 26, 2019, CPH had inventory with a value exceeding $5,000,000. In addition, CPH owned equipment, and it had a unique manufacturing process and intellectual property.

23. On or about April 26, 2019, CPH had a substantial value as an ongoing business in addition to owning valuable assets.

24. On or about April 26, 2019, Defendant Taylor communicated to the Plaintiffs that Defendant Taylor intended to unilaterally "shut down" the business. At that time, it was discussed between the parties that Defendant Taylor would sell his ownership interest in CPH for $50,000 if he had payment in full by May 3, 2019 at 12:00 p.m. and the funds had to clear the bank. Defendant Taylor stated that this would basically be a full asset purchase of all the inventory and supplies in the building, not including fixtures, as fixtures were part of the premises. In addition, it would require a full month's rent up front and a refundable security deposit in order for CPH to remain in the building which was owned by Taylor's family. The rent was to be somewhere around $6,000 per month. In addition, the Plaintiffs would have to pay all utilities, maintenance, property taxes, and property insurance if they wanted to remain in the building. However, Defendant Taylor made it clear that the purchase of his interest in CPH was separate from the lease of the premises.

25. On May 2, 2019, Plaintiffs were provided with a document called Escrow Agreement RE: CPH BRANDS, LLC that required the payment of $64,335.54 and allowed the Plaintiffs four (4) hours to conduct an inventory of raw material, finished product, equipment and machinery located at the business's premises. The escrow agreement also provided that in event the Plaintiffs purchased Defendant Taylor's interest, CPH was obligated to enter into a new lease with Taylor Properties #1, L.P. with rent of $6,200.70 per month, triple net with pro-rated taxes and insurance paid each month and a one month's security

deposit. It also provided for mutual releases. The total amount to be paid toward the lease was $14,335.54.

26. Prior to May 2, 2019, the Defendant Taylor never informed the Plaintiffs that it would require $64,335.54 to complete the transaction. Prior to May 2, 2019, Defendant Taylor had stated that he would sell his ownership interest for $50,000 but that the lease of the building was not necessary as they were two different things. On May 2, 2019, Defendant Taylor included in the terms of the sale that they would have to lease the premises and pay $14,335.54. A copy of the proposed Escrow Agreement is attached hereto as Exhibit D.

27. The Plaintiffs were able to pay $50,000 on May 2, 2019, but were unable to pay the additional $14,335.54 which was included by Defendant Taylor on May 2, 2019 and only provided the Plaintiffs with less than 24 hours to have available the additional funds. On May 3, 2019, the Plaintiffs were unable to pay in full $64,335.54 and the purchase of Defendant Taylor's interest did not occur.

28. After May 2, 2019, the Plaintiffs had no further contact with Defendant Taylor. They received no notices relative to the business of CPH, received no information regarding the CPH's business or the disposition of CPH's assets. The Plaintiffs never received an explanation as to the actions taken by Defendant Taylor in having them removed from the business premises and being expelled from CPH.

29. On or about May 14, 2019, Defendant Holston Hemp, LLC ("Holston Hemp") was formed and its initial filing was made with the Tennessee Secretary of State.

30. At a time which is unknown to the Plaintiffs, Holston Hemp and its owners began the manufacture and sell of products which are the same as the products that were sold by

CPH. Holston Hemp used the packaging which belonged to CPH, used CPH's unique

marketing materials, trade names, brand name such as "Hemponix," and in effect, began

using all of the assets of CPH including its intellectual property. Holston Hemp operated

its business in the same building that CPH had occupied. In effect, Defendants took over

every aspect of CPH's business and began operating it just as CPH had operated except

without the Plaintiffs. Within a short period of time, Holston Hemp was employing more

than twenty (20) people in its business.

31. After January 3, 2019, Defendant Taylor controlled all financial matters for CPH.

Defendant Taylor kept such financial matters secret and refused to share financial

information with the Plaintiffs. When CPH was formed, the parties agreed that the

checking account should require two signatures on each check. At some point, Defendant

Taylor had the bank change the signature requirement to only his signature, thus

eliminating the Plaintiffs involvement in disbursing funds. The only financial

information received by the Plaintiffs was a K-1 for the year 2019 which showed that

CPH had a small loss for the year.

32. The Tennessee Secretary of State website shows that CPH Brands, LLC was dissolved on

June 10, 2019.

33. The Plaintiffs received no notice of the transfer of any of the assets of CPH to Holston

Hemp.

34. The Plaintiffs received no notice from Defendant Taylor that CPH was to be dissolved.

No meeting was held relative to such dissolution. The members did not vote on the

dissolution.

35. The Plaintiffs received no funds or property of any kind from CPH other than four weeks salary and received nothing from the dissolution and liquidation of CPH Brands, LLC.

36. Upon information and belief, the Plaintiffs allege that Defendant Taylor had a relationship with Holston Hemp and its owners and that Defendant Taylor continued in the same business which CPH operated but rather than the Plaintiffs as owners, Michael Schrock, III, Greg C. Marcum and Tony L. Huff operated the business with Defendant Taylor as Holston Hemp, LLC.

37. The Plaintiffs aver that prior to the Notice of Dissolution being filed with the Secretary of State, the Plaintiffs received no notice, no LLC document, no meeting was held and no vote was taken.

38. Plaintiffs contributed their personal property to the business of CPH as well as their work and efforts for which they received. The Plaintiffs were excluded from the business on and after April 26, 2019 and received none of their contributed property and assets nor were they compensated for their labor. The Plaintiffs received no distribution from the liquidation of the business.

39. Prior to being expelled from the business, CPH received thirteen hundred (1,300) pounds of hemp. One thousand (1,000) pounds of hemp was to be processed by CPH and one-half of the oil derived from it was to be given to the seller of the hemp. Three Hundred (300) pounds of hemp was purchased for approximately Thirty Thousand Dollars ($30,000). Approximately two hundred (200) pounds of hemp was processed into approximately thirty-three (33) gallons of oil which was returned to the seller of the hemp in Oregon. Upon information and belief, Defendant Taylor refused to send additional oil to the seller of the hemp which left CPH with a debt owed to the seller. Defendant Taylor

made representations to the seller that CPH did not have any other material with which to produce oil to satisfy its obligations. Defendant Taylor did not satisfy this outstanding obligation of CHP as part of the liquidation and dissolution.

40.     During the time prior to the Plaintiffs being expelled from the business, CPH had produced approximately one hundred (100) gallons of CBD oil in addition to the oil that was sent to Oregon. The value of the oil was in excess of Two Million Dollars ($2,000,000). Immediately prior to being expelled from the business, Plaintiff Vaughn was contacted by a purchaser in Texas who wanted to purchase CBD oil from CPH. The customer wanted to purchase approximately Eight Hundred Thousand Dollars ($800,000) of oil. When the sale of oil was discussed with Defendant Taylor, Taylor would not agree for the sale of the oil. Within days of these discussions, Plaintiffs Vaughn and Kendrick were forcibly removed from the business premises. Defendant Taylor had also refused other sales.

41.     At the time that the Plaintiffs were expelled from the business, CPH had approximately one thousand (1,000) pound of unprocessed material, two hundred (200) pounds of flowers and one hundred (100) gallons of oil. This inventory was worth millions of dollars. In spite of the value of the assets of the business, the Plaintiffs received nothing from the operation of the business and the liquidation of the business except four weeks of salary.

## Count I – Breach of Fiduciary Duty

42.     The Plaintiffs allege and aver that Defendant Taylor breached his fiduciary duty to CPH and the Plaintiffs who were members and breached his duty of loyalty and duty of care to CPH and the Plaintiffs pursuant to Tenn. Code Ann. §48-249-403. The Plaintiffs allege

that Defendant Taylor failed to perform his duties in compliance with T.C.A. § 48-249-403 and is not entitled to the limitation of liability under T.C.A. § 48-249-403. Further, the Plaintiffs allege as follows:

A.    Defendant Taylor breached his duty of loyalty to Plaintiffs who were the LLC's other members as Taylor failed to account to the LLC for any property, profit or benefit derived by him in the conduct or winding up of the LLC's business or derived by him by use of the LLC's property including the appropriation of an opportunity of the LLC. The Plaintiffs aver that Defendant Taylor refused to account to the LLC and to Plaintiffs for income derived by the LLC from its operations and refused to disclose to the Plaintiffs the financial condition of the business. The Plaintiffs further allege that Defendant Taylor failed and refused to account to the LLC and to the Plaintiffs for any property, profit or benefit derived by him in winding up of the LLC's business. The Plaintiffs further allege that Defendant Taylor failed to account to the LLC for the appropriation of the business opportunity of the LLC by selling or otherwise disposing of the essential and necessary property of the business.

B.    Defendant Taylor breached his duty of care to the LLC and to the Plaintiffs in engaging in grossly negligent or reckless conduct, intentional misconduct or a knowingly violation of the law. Specifically, the Plaintiffs aver that Defendant Taylor disposed of all of the valuable assets of the LLC and the ongoing business of the LLC. The Plaintiffs aver that CPH had valuable assets and that CPH was valuable as a going concern and

Defendant Taylor disposed of the business for his own benefit and in a manner which did not benefit CPH or the Plaintiffs. The expulsion of the Plaintiffs and liquidation of the business were intentional misconduct on the part of Defendant Taylor.

43. Defendant Taylor breached his fiduciary duty to CPH and the Plaintiffs when he engaged in conflict of interest transactions in violation of Tenn. Code Ann. §48-249-404 in that the liquidation of the business was not in the best interest of CPH but was only meant to benefit Defendant Taylor.

**Count II – Breach of Duty of Good Faith and Fair Dealings**

44. The allegations and averments of Paragraph 1-43 are incorporated herein by reference as is stated verbatim.

45. The Plaintiffs allege and aver that Defendant Taylor breached his duty of good faith and fair dealing pursuant to Tenn. Code Ann. §48-249-403(d) by failing to act in good faith and deal fairly by excluding the Plaintiffs from the business of CPH, by violating the terms of the LLC operating agreement, by dissolving and liquidating the business without the Plaintiffs having an opportunity to participate and by disposing of the business assets in a way that did not benefit CPH and the Plaintiffs.

**Count III – Dissolution and winding up of CPH pursuant to Tenn. Code Ann. §48-249-601, et seq.**

46. The allegations and averments of paragraphs 1-45 are incorporated herein by reference as if stated verbatim.

47. The Plaintiffs allege and aver that Defendant Taylor wrongfully dissolved and terminated CPH. The Plaintiffs aver that Defendant Taylor failed to provide them with notice of the

proposed dissolution, winding up and termination of CPH as required by Tenn. Code Ann. §48-249-603 and that no meeting was held of the members at which a vote was taken to dissolve the CPH, followed by winding up and termination of CPH.

48.    Plaintiffs aver that Defendant Taylor wrongfully dissolved CPH and did so with the intention of depriving Plaintiffs of their ownership in CPH and in preventing them from protecting their interests or the interest of CPH. The Defendant has provided no information to the Plaintiffs regarding the liquidation of the business assets.

**Count IV- Fraud**

49.    The allegations and averments of paragraphs 1-47 are incorporated herein by reference as if fully stated verbatim.

50.    The Plaintiffs allege and aver that the Defendant intentionally deprived them of their property and rights by their exclusion from the business of CPH and the liquidation of the assets of CPH.  The transfer of the assets of CPH was accomplished by means of deception in that the Plaintiffs had no means to protect their interests since the Defendant failed to speak or provide information that the Defendants had a duty to disclose.

51.    The Plaintiffs aver that the actions of the Defendant were intentional, unlawful, and were meant to deprive the Plaintiffs of their property and their rights.  The Plaintiffs aver that Defendant Taylor transferred the valuable assets of CPH without notice to the Plaintiffs, under the guise of his authority as majority member of CPH.

The Plaintiffs allege that Defendant Taylor had a duty to speak and inform them of the actions he was taking at CPH at all times. The Plaintiffs aver that prior to them being forcibly expelled from the business, Defendant Taylor refused to allow the Plaintiffs to sell products which would have brought substantial income and profit to the business.

Instead, Defendant Taylor excluded them from the business and disposed of the assets of the business to his own benefit. Defendant Taylor told the Plaintiffs on other occasions that various sales opportunities should not be taken such as an exclusive deal to sell millions of dollars of product through a drug store. The Plaintiffs aver that Defendant Taylor used a fraudulent scheme to deprive them of their property.

**Count V- Punitive Damages**

52. The allegations and averments of paragraphs 1-54 are incorporated herein by reference as is stated verbatim.

53. The Plaintiffs aver that Defendant Taylor acted maliciously, intentionally, fraudulently, and/or recklessly and punitive damages should be awarded to them. .

**Count VI- Breach of Contract**

54. The allegations and averments of Paragraphs 1-56 are incorporated herein by reference as if fully stated verbatim.

55. The Plaintiffs aver that the Plaintiffs and Defendant Taylor entered into the Operating Agreement of CPH Brands, LLC and the Plaintiffs aver that Defendant Taylor breached the terms of the Operating Agreement as follows:

   a.   Article 3.2 provides that no member shall have the right to withdraw or reduce his contributed capital or receive any assets of the company, and no member shall have priority over any other member as to the return of contributed capital. The Plaintiffs aver that Defendant Taylor withdrew or reduced his contributed capital and received assets of the company and gave himself priority over the Plaintiffs on the return of contributed capital in violation of the Operating Agreement. The

Plaintiffs received nothing from the business and the Plaintiffs aver that Defendant Taylor profited from the business.

b.     Article 5.1 of the Operating Agreement provides that each member shall keep the other members informed at all times concerning the company's operation. The Plaintiffs aver that Defendant Taylor breached his obligation as he failed to inform them of the company's operations and dissolution and did so intentionally and in violation of the Plaintiff's rights.

c.     The Defendant failed to give notice of meetings as provided or as required in Article 5.5 of the Operating Agreement as the Plaintiffs were members entitled to notice not less than ten (10) days nor more than two months before the date of the meeting. Plaintiffs aver that they received no notice of any meetings relative to the operation and dissolution and winding up of the CPH's business.

d.     Plaintiffs aver that Defendant Taylor breached Article 8.1 of the Operating Agreement by failing to be just and faithful to the Plaintiffs at all times, in failing to give the Plaintiffs full information and truthful explanation of all matters relating to the affairs of the company and failing to afford every assistance in his power in carrying on the company's business for the Members' mutual advantage.

e.     Plaintiffs aver that they were effectively expelled from CPH by Defendant Taylor on or after April 26, 2019 in violation of Article 9.2 of the Operating Agreement which provides that no member shall have any power or authority to expel any member unless such membership would jeopardize the licenses or other regulatory approval of the business.

f.   Article 11.3 of the Operating Agreement provides for minority members to have tag along rights such that if the majority approves a sale of the company or all of the assets, then disapproving members must be allowed to tag along with the sale on the same terms and conditions. The Plaintiffs aver that Defendant Taylor breached the Operating Agreement by failing to afford the Plaintiffs their rights as minority members.

g.   The Plaintiffs aver that the Defendant Taylor sold, transferred or conveyed either the LLC or its assets and the Plaintiffs were not treated in the same manner as the majority member, Defendant Taylor as required by Article 11.3 of the Operating Agreement.

h.   Article 14.1 of the Operating Agreement provides for events causing dissolution including action of the Members pursuant to Tenn. Code Ann. §48-249-603 or upon the occurrences listed in Tenn. Code Ann. §48-249-601(a). The Plaintiffs aver that there was no occurrence of any event specified in Tenn. Code Ann.§ 48-249-601(a) and that pursuant to Tenn. Code Ann. § 48-249-603, the proposed dissolution of CPH was required to be submitted for approval in a meeting of members. Notice was to be provided to each member, whether or not entitled to vote. The Plaintiffs aver that Defendant Taylor caused CPH to be dissolved in violation of the terms of Article 14.1 of the Operating Agreement.

i.   Defendant Taylor breached the Operating Agreement by failing to properly wind up the affairs of CPH pursuant to Article 14.3 in that Taylor did not distribute the assets as provided in Article 14.4.

### Count VII – Unjust Enrichment

56. The allegations and averments in Paragraphs 1-58 are incorporated herein by reference as if stated verbatim.

57. The Plaintiffs aver that Defendant Taylor has been unjustly enriched as he sold or otherwise disposed of the assets of CPH for his own personal gain and was thereby unjustly enriched to the detriment of the Plaintiffs. The Plaintiffs aver that all of the owners of CPH had a right to receive a proportionate share of the value of the assets of CPH upon liquidation and had the right to recover all amounts owed to them prior to distribution. The Plaintiffs aver that they were not compensated for the time and effort they devoted to the business, the personal property they contributed to the business or any profit or gain upon dissolution. As a result, the Plaintiffs aver that Defendant Taylor was unjustly enriched.

### Count VIII – Accounting

58. The allegations and averments in Paragraphs 1-60 are incorporated herein by reference as if stated verbatim.

59. The Plaintiffs aver that the Court should order Defendant Taylor to account for all funds and other property which came into his possession as a member and president of CPH and to account for any and all expenditures made and especially any transactions between Defendant Taylor and/or CPH and Holston Hemp.

60. Under the terms of the Operating Agreement for CPH and T.C.A. § 48-249-403, Defendant Taylor had a duty and an obligation to account to CPH and to the Plaintiffs. Defendant Taylor failed to account for funds which came into his possession which were

paid during the operation of the business and the funds remaining after the liquidation and dissolution of CPH.

### Count IX – Damages

61. The allegations and averments in Paragraphs 1-63 are incorporated herein by reference as if stated verbatim.

62. The Plaintiffs aver that they have been damaged as a result of the actions of the Defendant as set forth herein and have been deprived of their valuable property.

WHEREFORE, PLAINTIFFS PRAY:

1. That process issue requiring the Defendant to appear and answer;

2. That the Court order the Defendant Taylor to account to the Plaintiffs as demanded in the Complaint and as required by the Operating Agreement and T.C.A. § 48-248-403;

3. That the Plaintiffs be awarded a Judgment against the Defendant in the amount not to exceed $6,000,000 in compensatory damages;

4. That the Plaintiffs be awarded Judgment against the Defendant in an amount not to exceed $5,000,000 in punitive damages;

5. That the Plaintiffs be awarded their reasonable attorney's fees, litigation expenses and discretionary expenses;

6. That a jury try this action;

7. That the costs of this cause be taxed to the Defendant; and

8. For such other and further relief to which the Plaintiffs may be entitled.

Respectfully submitted this the 17 day of March, 2021.

BRENT R. WATSON, #010154
Attorney for Plaintiffs
BUNSTINE, WATSON & BECKER
800 S. Gay Street, Suite 2001
Knoxville, Tennessee 37929
(865) 523-3022

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been mailed to Wade W.

Massie, 208 E. Main Street, Abingdon, Virginia 24210, Karissa H. Range, 804 Anderson Street,

Bristol, Tennessee 37620, and Kimberly D. Rhoton, 215 Cumberland Street, Kingsport,

Tennessee 37660, by U.S. Mail with sufficient postage thereupon to carry same to its destination

and facsimile transmission.

This the 17 day of March, 2021.

BRENT R. WATSON



## OPERATING AGREEMENT
## OF
## CPH BRANDS, LLC

**THIS OPERATING AGREEMENT,** (the "Agreement") is made and entered into and shall be effective as of this 23rd day of January, 2019, and is by and among **CPH BRANDS, LLC,** hereinafter referred to as the "Company" and **MICHAEL VAUGHN, TIMOTHY KENDRICK** and **RUSSELL E. TAYLOR** (collectively the initial "Members" and each, individually, a "Member").

### WITNESSETH:

WHEREAS, the Company has been formed as a limited liability company under the Tennessee Revised Limited Liability Company Act and the Members desire to set forth their mutual rights and obligations in this Agreement; and

WHEREAS, the Members desire that the Company be managed by its Members.

NOW, THEREFORE, in consideration of the mutual promises, covenants and undertakings hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement hereto agree as follows:

### ARTICLE I
### DEFINITIONS

1.1    **Definitions.** As used herein, the following terms shall have the indicated meanings:

(a)    "Act" means the Tennessee Revised Limited Liability Company Act, being set forth in **Tennessee Code Annotated** at Sections 48-249-101, *et seq.*, as it may be amended from time to time.

(b)    "Agreement" means this Operating Agreement and as it may be amended from time to time.

(c)    "Articles" means the Articles of Organization referred to in Section 2.1 of this Agreement.

(d)    "Available Cash Flow" means all cash receipts of the Company received during the calendar quarter and on hand at the end of each calendar quarter of each year, less (i) provision for payment of all liabilities of the Company due within thirty (30) days from the end of the quarter (including those which are in dispute) and (ii) provisions for adequate reserves for income tax liabilities of the Company and Members attributable to the Company; (iii) provision for reasonably anticipated expenses and contingencies (which may include Company indebtedness), but without deduction for depreciation or any other non-cash expenses; and (iv) provision of any other application of cash receipts described in Section 4.4.

1



(e)    "Business Assets" means the assets being contributed to the Company by the Members as set forth in Exhibit "A" to the Agreement and all other assets acquired by the Company which are used in its business operations.

(f)    "Capital Account" means, as to any Member, the capital account maintained for the Member in accordance with the Code and the regulations promulgated thereunder, including, but not limited to, the rules regarding the maintenance of partners' capital accounts set forth in Treasury Regulation Section 1.704-1.

(g)    "Code" means the Internal Revenue Code of 1986, as amended from time to time.

(h)    "Company" means CPH BRANDS, LLC, the limited liability company formed by the parties to this Agreement.

(i)    "Contributed Capital" means, with respect to any Member as of any particular time, the cumulative amount of all cash and other property, tangible or intangible, contributed by or on behalf of the Member to the Company and credited to his Capital Account, less all distributions of Contributed Capital made by the Company to the Member.

(j)    "Financial Interest" means each Member's fractional right, expressed as a percentage, to share (i) distributions of Available Cash Flow of the Company and (ii) receipt of liquidation distributions of the Company.

(k)    "Governance Interest" means each Member's fractional right, expressed as a percentage, to vote on matters presented to a vote of Members as provided in this Agreement. Each Member's initial Governance Interest shall be as set forth on Exhibit "A" attached hereto and incorporated herein by reference.

(l)    "Members" means, collectively, and "Member" means, individually, those persons listed on Exhibit "A" hereto, and any additional members admitted pursuant to the provisions of this Agreement.

(m)    "Membership Interest" means the aggregate of each Member's (i) Financial Interest, (ii) Governance Interest", and (iii) the rights to transfer or assign either or both of the Financial Interest or the Governance Interest.

(n)    "Net Losses" means the excess of all expenses of the Company over all income of the Company (including the amount of any gains or losses recognized by the Company on the sale or other disposition of Company assets) during a calendar year, all as determined in accordance with the method of accounting utilized by the Company for federal income tax purposes.

(o)    "Net Profits" means the excess of all income of the Company over all expenses of the Company (including the amount of any gains or losses recognized by the Company on the sale or other disposition of Company assets) during a calendar year, all as determined in

2

accordance with the method of accounting utilized by the
Company for federal income tax purposes.

(p) "Termination Event" shall be a dissociation of a member under the
Act.

## ARTICLE II
## FORMATION, PURPOSE AND BUSINESS

2.1  **Articles of Organization**. The Articles of Organization as filed with the
Tennessee Secretary of State on January 23, 2019 are hereby adopted and ratified by the
Members. In the event of a conflict between the terms of this Agreement and the terms
of the Articles of Organization, the terms of the Articles of Organization shall prevail.

2.2  **Adoption**. The parties hereto adopt this Agreement as the Operating
Agreement under and pursuant to the Act, subject to the terms and conditions set forth in
the Agreement.

2.3  **Name**. The name of the Company is CPH BRANDS, LLC. The
Company may conduct its business under any name chosen by the Members and the
Members may change the name under which the Company conducts its business in their
sole discretion from time to time. The Company shall file any assumed or fictitious name
certificates as may be required to conduct business in any state.

2.4  **Purpose**. The business to be conducted by the Company shall be (a) to
acquire, develop and/or grow plant products; (b) process such raw material into lawful
products for distribution at wholesale or sale at retail; and (c) to carry on any and all
activities necessary, proper, convenient, or advisable in connection therewith; and (d) to
undertake any other related lawful business activity, except as otherwise provided by the
laws of the State of Tennessee.

## ARTICLE III
## CAPITAL

3.1  **Initial Contributed Capital**. The Members will make initial
contributions to the capital of the Company in the amounts set forth on Exhibit "A"
attached hereto pursuant to contribution agreements.

3.2  **Withdrawal and Return of Contributed Capital**. No Member shall
have the right to withdraw or reduce his Contributed Capital, or to receive any assets of
the Company, except as specifically provided in this Agreement. No Member shall have
the right to demand or receive property other than cash in return for his Contributed
Capital, and no Member shall have priority over any other Member as to the return of
Contributed Capital.

3.3  **Statements of Membership Interests**. Membership Interests shall not be
represented by certificates. Within five (5) days after the written request of any Member,
the Company shall provide to the Member a written statement of the Member's
Membership Interest as of the date the Company makes the written statement. The
statement of Membership Interest shall not be deemed to be a certificated security, a
negotiable instrument, a bond or a stock certificate, and shall not be a vehicle by which
any transfer of any Member's Membership Interest may be effected.

3

## ARTICLE IV
## PROFITS, LOSSES, CASH FLOW

4.1     **Capital Accounts**. The Company will maintain for each Member an account to be designated the Member's "Capital Account". Each Capital Account shall be established and maintained in accordance with the provisions of Treas. Regs. Section 1.704-1(b)(2)(iv), which requires that the Capital Account shall be maintained at book value, and shall be interpreted and applied in a manner consistent with these Treasury Regulations. Accordingly, the Members shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes in accordance with Treas. Regs. Section 1.704-1(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Treas. Regs. Section 1.704-1(b). In general, each Capital Account shall be credited or debited according to the provisions of 4.3, below. No interest shall be paid on Contributed Capital or on balances in Capital Accounts. In the event any Member transfers all or any portion of his Financial Interest in the Company in accordance with the terms of this Agreement, the Member's transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Financial Interest.

4.2     **Additional Capital Contributions**. If Members holding a majority of the voting power of the Governance Interests determine that additional contributions of capital shall be made to the Company, these contributions shall be made by the Members according to their Financial Interest within twenty (20) days from the date this determination is made. If a Member does not make his proportionate contribution of capital, then the other Members shall have the option either to make a contribution to capital or make and treat their excess contributions as a loan to the Company and this option shall be available to each Member making a contribution. If a Member elects to treat his contribution as a loan, the loan shall constitute a debt of the Company and shall bear interest as provided in Section 13.1. Principal and accrued interest on any such loan shall be paid in full before any distribution shall be made to a Member in the form of Net Profits or Available Cash Flow as provided in Section 4.5.

4.3     **Allocations of Profit or Loss (including Gain or Loss on Disposition).** For purposes of determining Capital Account balances under this Section 4.3, Gain or Loss on disposition shall be allocated prior to reducing Capital Accounts by the distributions of Capital Receipts from the disposition.

4.3.1   Profit (including Gain or Loss on disposition) shall be allocated among the Members in the following order of priority:

4.3.1.1   First, to the Members in proportion to, and to the extent of, any deficit balances in their respective Capital Accounts until all such Capital Accounts have been restored to zero;

4.3.1.2   Second, after giving effect to the allocations made pursuant to Section 4.3.1.1, among the Members as necessary to cause the Capital Account balance of each Member to at least equal such Member's unpaid Contributed Capital;

4

*RT MV JHK*

4.3.1.3 Third, among the Members in proportion to their then respective Financial Interests.

4.3.2 Loss shall be allocated among the Members in the following order of priority:

4.3.2.1 First,; among the Members as necessary to cause the Capital Account balance of each Member to equal such Members' unrepaid Capital Contributions

4.3.2.2 Second, after giving effect to the allocations made pursuant to Section 4.3.2.1, among the Members as necessary to cause the Capital Account balance of each Member to equal zero;

4.3.2.3 Third, after giving effect to the allocations made pursuant to Sections 4.3.2.1 and 4.3.2.2, among the Members in proportion to their respective Financial Interests.

4.3.3 If there is insufficient Profit, Loss Or Gain or Loss on disposition to allocate to the Members pursuant to any subsection of Section 3.1 to cause every Member's Capital Account balance to equal the entire Capital Account balance described in such subsection with respect to such Member, the Profit or Loss (including Gain or Loss on Disposition) available to be allocated among the Members pursuant to said subsection shall be allocated in proportion to the amounts thereof that would have been allocated to each Member pursuant to such subsection if there had been sufficient amounts thereof to fully satisfy the requirements of such subsection with respect to every Member.

4.3.4 Except as is otherwise provided in this Article 4, an allocation of Company taxable income or taxable loss to a Member shall be treated as an allocation to such Member of the same share of each item of income, gain, loss and deduction that has been taken into account in computing such taxable income or taxable loss.

4.4 **Application of Cash Receipts**. Cash receipts of the Company shall be applied: (i) first to pay any federal, state or local taxes of any kind owed by the Company; (ii) to pay operating expenses, debt service requirements and other obligations of the Company currently due; (iii) to make capital expenditures or improvements or reduce indebtedness of the Company in the manner which the Members shall determine; and (iv) to fund a reasonable working capital reserve as may be established from time to time by the Members. The Net Profit or Net Loss of the Company shall be determined by reducing all income of the Company by all direct and indirect expenses for personnel, cost or materials, operational and all other reasonable, ordinary and necessary costs and expenses which shall be incurred in connection with or which shall be related to the operation of the Company.

4.5 **Distribution of Available Cash Flow**. The Members shall make periodic distributions of Available Cash Flow to the Members as of the dates and in the amounts as Members owning a majority of the Governance Interests shall agree. No distributions shall be made pursuant to this Agreement unless, after the distribution is made, the assets of the Company are in excess of all liabilities of the Company, determined on the cash method of accounting, except liabilities to Members on account of their contribution to the capital of the Company. Distributions shall be made on the following basis:

5

4.5.1 To each Member an amount equal to his unrepaid Contributed Capital. If there are inadequate funds to repay all Contributed Capital, then the repayment shall be proportional.

4.5.2 Any remaining balance shall be distributed to the Members (and holders of Financial Interests) in proportion to their Capital Account balances.

## ARTICLE V
## MEMBERS

5.1 **Management**.

(a) The management of the business and affairs of the Company shall be vested in its Members. It shall be the duty of each Member to keep the other Members informed at all times concerning the Company operations.

(b) No Member shall liable to the other Members or to the Company for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred by this Agreement. A Member shall be liable only for his acts and/or omissions amounting to gross negligence and for those involving intentional wrongdoing.

5.2 **Admission of New Members**. Except as hereinafter set forth, no other person or entity shall become a Member without the consent of the Members holding a majority of the voting power of the Governance Interests.

5.3 **Annual Meeting**. The annual meeting of the Members of the Company for the transaction of all business which may come before it shall be held at the principal office of the Company in the State of Tennessee on the second Saturday of January each year.

5.4 **Special Meetings**. Special meetings of Members may be called for any purpose or purposes by the Chief Manager or a Member upon providing to the Secretary a written demand for the meeting. The demand or demands must describe the purpose or purposes for which the meeting is to be held.

5.5 **Notice of Meetings**. A written notice of each meeting of Members stating the place, date and time of the meeting and, in the case of a special meeting, describing the purpose or purposes for which the meeting is called, shall be given to each Member entitled to a notice of the meeting not less than ten (10) days nor more than two (2) months before the date of the meeting. The notice shall be given as provided in Section 16.1 and shall be effective as provided in the Act.

5.6 **Waiver of Notice**. A Member may waive any notice required to be given by the Act, the Articles, or this Agreement before or after the date and time stated in the Notice. The waiver must be in writing, signed by the Member entitled to the Notice and delivered to the Company and filed in the Company's minutes or records, except that a Member's attendance or participation in a meeting may constitute a waiver of notice under the Act. Neither the business to be transacted at, nor the purpose of, any meeting of the Members need be specified in any waiver of notice.

5.7 **Quorum**. At all meetings of the Members, the Members holding a majority of the voting power of the Governance Interests entitled to vote at a meeting, present or represented by proxy, shall constitute a quorum. If a quorum is not present at any properly called meeting, a majority of the voting power present in person or by proxy

6

may adjourn the meeting from time to time and from place to place, without notice other than announcement at the meeting of the new date, time and place, until Members holding a majority of the voting power of the Governance Interests entitled to vote shall attend. At any adjourned meeting at which a quorum is present, any business can be transacted which could have been transacted at the meeting originally called. Provided, if the adjournment is for more than thirty (30) days or if, after the adjournment, a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member entitled to vote at the meeting.

5.8    **Chairman**. The President of the Company shall act as Chairman at the Members' meeting. The Members may appoint any Member to act as Chairman in the absence of the President from any meeting or with his consent, if present. The Secretary of the Company shall act as secretary at all meetings of the Members. If the Secretary is not present, the presiding officer may appoint any person to act as secretary of the proceeding and keep the minutes of the proceedings.

5.9    **Voting**. Members shall take action by the affirmative vote of the Members holding a majority of the Governance Interests present and entitled to vote on that item of business, unless the Articles, this Agreement or the Act provides otherwise.

5.10    **Adjournment**. Subject to Section 5.7, if a meeting of Members is adjourned to another date, time or place, notice need not be given of the adjourned meeting if the new date, time and place are announced at the meeting before the adjournment. At the adjourned meeting, the Company may transact any business which might have been transacted at the time originally designated for the meeting if a quorum existed at the time originally designated for the meeting.

5.11    **Agency**.

(a)    **Proxies**. A Member may appoint a proxy to vote at a meeting of Members or otherwise act for him by signing an appointment form, either personally or by his attorney-in-fact. An appointment of a proxy is effective when received by the Secretary or other manager or agent authorized to tabulate votes. An appointment is valid for eleven (11) months unless another period is expressly provided for in the appointment form. An appointment of a proxy is revocable by the Member, unless the appointment form conspicuously states that it is irrevocable and the appointment is coupled with an interest.

(b)    **Organizational Members**. Membership Interest of this Company standing in the name of a corporation, partnership, limited liability company, trust or other organization may be voted by the agent or proxy designated by the governing board, chief executive officer of such organization or trustee of any trust.

5.12    **Action by Written Consent**. Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting if all Members consent to the taking of the action without a meeting, by signing one or more written consents describing the action taken and indicating each Member's vote or abstention on the action. The affirmative vote of the aggregate Governance Interests which would be necessary to authorize or take action at a meeting of Members is the act of the Members without a meeting. The written consent or consents shall be included in the minutes or filed with the Company's records reflecting the action taken. Action taken by written consent is effective when the last Member signs the consent, unless the consent specifies a different effective date.

7

## ARTICLE VI
## MANAGEMENT/CHIEF MANAGER AND SECRETARY

6.1 **Management**. The management of the business and affairs of the Company shall be vested in the Members.

6.2 **President**. The President of the Company shall be elected by the affirmative vote of a majority of the Governance Interests. The President shall: (a) see that all orders and resolutions of the Members are carried into effect; (b) upon authorization, by order or resolution of the Members, sign and deliver in the name of the Company any deeds, mortgages, deeds of trust, bonds, contracts or other instruments pertaining to the business of the Company, except in cases where the authority to sign and deliver is required by law to be exercised by another person or expressly delegated by this Agreement or the Members; and (c) perform other duties prescribed by the Members. In the event the Company has a vacancy in the office of Secretary, and there is no assistant secretary, any notices, documents, or other matters that otherwise are required to go to the Secretary may be delivered to the President. The President, who must be a Member, shall hold office until the date a successor is elected. The initial president is Russell E. Taylor.

6.3 **Secretary**. The Secretary of the Company shall be elected by the affirmative vote of a majority of the Governance Interests. The Secretary shall: (a) keep accurate membership records for the Company; (b) maintain records of and, whenever necessary, certify all proceedings of the Members of the Company; (c) receive notices required to be sent to the Secretary and keep a record of these notices in the records of the Company; and (d) upon authorization, by order or resolution of the Members, sign with the President and deliver in the name of the Company any deeds, mortgages, deeds of trust, bonds, contracts or other instruments pertaining to the business of the Company, except in cases where the authority to sign and deliver is required by law to be exercised by another person or expressly delegated by this Agreement or the Members; and (e) perform other duties prescribed by the Members. The Secretary, who does not have to be a Member and who cannot also be the President, shall hold office until the date a successor is elected. The Members may elect one or more assistant secretaries to carry out the functions of the Secretary when the Secretary is unavailable.

6.4 **Treasurer.** The Treasurer of the Company shall be elected by the affirmative vote of a majority of the Governance Interests. The Treasurer shall maintain the accounts and financial records of the Company, receive income and pay expenses. The Treasurer, who does not have to be a Member, shall hold office until the date a successor is elected. The Members may elect one or more assistant treasurers to carry out the functions of the Treasurer when the Treasurer is unavailable. The Treasurer may also be the chief financial officer of the Company.

6.5 **Chief Compliance Officer.** The Chief Compliance Officer of the Company shall be elected by the affirmative vote of a majority of the Governance Interests. The Chief Compliance Office shall be responsible for implementing the procedures and policies necessary to establish compliance by the Company of regulatory rules, regulations, laws and rulings applicable to the business of the Company.

8

## ARTICLE VII
## FISCAL MATTERS

7.1 **Books and Records**. Full and accurate books and records of the Company (including, without limitation, all information and records required by the Act) shall be maintained at its principal place of business showing all receipts and expenditures, assets and liabilities, profits and losses, and all other records necessary for recording the Company's business affairs. All Members shall have access to the books and records of the Company, during regular business hours, at the Company's principal place of business, upon provision of notice in writing by any Member of the Company at least five (5) business days before the date on which any Member desires to inspect the books and records.

7.2 **Fiscal Year**. The fiscal year of the Company shall end on December 31 of each year.

7.3 **Tax Status; Elections**. Notwithstanding any provision hereto to the contrary, solely for purposes of the United States federal income tax laws, each of the Members hereby recognizes that the Company will be subject to all provisions of Sub-Chapter K of Chapter 1 of Subtitle A of the Code; provided, however, that the filing of U.S. Partnership Returns of Income shall not be construed to extend the purposes of the Company or expand the obligations or liabilities of the Members. At the request of any Member, the Company shall file an election under Section 754 of the Code. The Company shall elect a method of accounting based upon the advice and recommendations of the Company's appointed accountants.

7.4 **Bank Accounts**. All funds of the Company shall be deposited to the credit of its accounts in its name at commercial banks or other financial institutions which are designated by the Members. All orders for the payment or withdrawal of any funds of the Company shall require the signature of the individuals as designated by the Members. All bank accounts shall require the signature of at least two members. The handling of all accounts shall require, at a minimum, that persons writing the checks and making deposits do not balance the account statements.

## ARTICLE VIII
## CONDUCT OF MEMBERS

8.1 (a) Each Member shall:

(i) Punctually pay his separate debts and indemnify the Company against the same and all expenses on account thereof;

(ii) Pay all monies, checks and negotiable instruments received by the Member on account of the Company to the Company's bank account and within the normal course of business after receipt;

(iii) Be just and faithful to the other Members and, at all times, give to the other Members full information and truthful explanations of all matters relating to the affairs of the Company and afford every assistance in the Member's power in carrying on the Company's business for the Member's mutual advantage.

(b) No Member shall make, draw, accept or endorse any promissory note or obligation for the payment of money or pledge the credit of the Company in any

9

manner without the written consent of the other Members owning a majority of the Governance Interests.

## ARTICLE IX
## WITHDRAWAL AND EXPULSION OF A MEMBER

9.1     **Withdrawal of a Member.** Any Member may withdraw from the Company at any time upon not less than thirty (30) days prior written notice to the Company ("Termination Event"). No Member shall be entitled to any distribution from the Company as a result of the Member's withdrawal. A Member who has withdrawn shall have no right to vote on any matter to be determined by the Members. A Member who has withdrawn shall have no liability or obligation to make any additional contribution of capital to the Company determined by the Members subsequent to such Member's withdrawal.

9.2     **Expulsion of a Member.** The Members shall not have any power or authority to expel any Member except in the event that a Member's continued membership will jeopardize the licenses or other regulatory approval of the business.

9.3     **Continuation of the Company.** If a Member: (a) becomes bankrupt; (b) attempts to transfer any part of the Member's Membership Interest to any person or entity other than in accordance with the provisions of Section 11.2 herein; or (c) becomes physically or mentally incapacitated ("Termination Events") or upon the occurrence of any other Termination Event as defined in Sections 8.1(b), 9.1 or 10.4 of this Agreement, the Remaining Members shall have the right to continue the existence and business of the Company upon the consent of Members holding a majority of the voting power of the Governance Interests, without regard to the interest of the Terminating Member, provided this consent is obtained no later than ninety (90) days after the occurrence of the Termination Event. At any time due to a Termination Event, if less than two Members remain (or no Member remains if the provisions of the Act if effect at that time only require a limited liability company to have one member), the Company shall thereafter dissolve and conduct only those activities which are necessary to wind up its affairs.

## ARTICLE X
## DETRIMENTAL CONDUCT OF MEMBERS

10.1     **Company Option to Purchase.** If any of the events enumerated in Sections 8.1(b), 9.1 or 10.4 occur ("Termination Events"), the Member who acted or with respect to whom the act has occurred (herein "Terminating Member") shall be obligated to offer his Membership Interest for sale to the Company pursuant to Section 11.2(d). Except as otherwise provided in this Agreement, if any of the events described in Section 9.3 occur, the Member with respect to whom the act has occurred or the Member's estate ("Terminating Member") shall be obligated to offer his Membership Interest for sale to the Company pursuant to Section 11.2(d). The Company or the Remaining Members (if the Company assigns this right to the Remaining Members) shall have the right and option to either purchase the Terminating Member's Membership Interest, to dissolve and terminate the Company or to treat the event as not being a Terminating Event.

10

10.2  **Process to Purchase**. If the Company or its assigns elects to purchase the Terminating Member's Interest, it or they shall serve written notice of the election upon the Terminating Member within the time period specified in Section 11.2(d) after the Company has received notice of the Termination Event. The purchase shall be consummated within the designated time period after the date written notice is served by the Company, or its assigns, or as of the date the value of the Membership Interest to be purchased has been determined pursuant to Section 12.1 or 12.2, whichever shall last occur. The amount and method of computing the purchase price, the percentage and manner of purchase, the method of payment, interest rates and the other rights and obligations of the Terminating Member, the Company and the Remaining Members shall be the same as provided in ARTICLE XII and ARTICLE XIII.

10.3  **Process to Dissolve and Terminate**. If the Company and/or Members holding a majority of the voting power of the Governance Interest, without regard to the interest of the Terminating Member, elect to dissolve and terminate the Company, they shall serve written notice of this election upon the Terminating Member and all other Members who have not voted to dissolve the Company within thirty (30) days after they have received notice of the occurrence of the Termination Event. The procedure for dissolution and termination shall be as provided in Sections 14.3 and 14.4.

10.4  **Termination Events**. Termination events shall include the following:

10.4.1  A Member becomes bankrupt, insolvent or makes an assignment for the benefit of his creditors or his assets become subject to administration in any kind of voluntary or involuntary creditor's proceedings.

10.4.2  A Member withholds any cash or other assets from the Company contrary to the terms of this Agreement.

10.4.3  A Member has materially breached or is unable to perform his material obligations under this Agreement or the continued association of that Member with the Company is detrimental to the best interests of the Company or will cause the Company to lose its licenses necessary to the operation of the business.

10.4.4  A Member performs any grossly negligent or intentional act which, in the reasonable opinion of the Remaining Members, materially damages the reputation or assets of the Company.

10.4.5  A Member's Membership Interest is subject to being sold or is sold, attached or otherwise acquired through judicial process or other operation of law;

10.4.6  The occurrence of an event described in Sections 8.1(b), 9.1 or 9.3.

10.5  **Closing of Purchase**. If the Company and/or the Remaining Members elect to purchase the Membership Interest of the Terminating Member, the amount and method of computing the purchase price, the percentage and manner of purchase, the method of payment, interest rates and the other rights and obligations of the Terminating Member, the Company and Remaining Members shall be the same as provided in ARTICLE XII and ARTICLE XIII.

11

## ARTICLE XI
## TRANSFER; RESTRICTIONS

11.1    <u>Definitions</u>.  For purposes of this Agreement, the "transfer" or "assignment" of an interest in the Company shall mean any transfer, alienation, sale, assignment or other disposition of all or any part of an existing Membership Interest in the Company, whether voluntarily or involuntarily, whether for or without consideration, and shall include a transfer by operation of law, transfer incident to divorce, foreclosure, judicial sale or otherwise ("Termination Event").

11.2    <u>Transfer or Assignment of Membership Interest</u>.  No transfer or assignment of a Membership Interest in the Company shall be made except on the following conditions:

(a)    A Member may freely transfer the Member's Financial Interest in the Company to an *inter vivos* trust for the benefit of any one or more of the Member, Member's spouse or Member's descendants without the consent of the Company or any other Member.

(b)    A Member may freely transfer the Member's Membership Interest by will or intestacy.

(c)    A Member may freely transfer the Member's Membership Interest in the Company to any other individual or entity who owns a Membership Interest in the Company as of the date of the transfer.

(d)    Russell E. Taylor may transfer any part of his Financial and Governance Interests to Morgan A. Taylor with terms at his sole discretion.

(e)    Members holding a majority of the voting power of the Governance Interest, without regard to the interest of the Member proposing to transfer his interest, consent to the proposed transfer or assignment of the Member's Membership Interest in writing after full disclosure by the Member of the proposed transaction.

(f)    With respect to any proposed voluntary or assignment to a third party:

(i)    In the event that any Member desires to make a bona fide transfer or assignment of his Membership Interest in the Company to a person other than as expressly permitted in this Section 11.2 or if a majority of the Remaining Members do not consent to the proposed transfer as provided in Section 11.2(d), then the Member desiring to make the transfer or assignment ("Transferring Member") must first give the Company the option to buy the Member's Membership Interest. The Transferring Member shall deliver written notice to the Company, which notice shall state the name of the prospective bona fide purchaser and the price and terms offered by the prospective purchaser. The Company shall have the option to purchase the Membership Interest of the Transferring Member at the price and on the same terms as set forth in the written notice. The Company shall have fifteen (15) days following the receipt of the notice to exercise this option by giving notice of the election to the transferring Member and the Remaining Members. If the Company does not exercise its option to purchase, the Remaining Members shall have the option to buy the Transferring Member's Membership Interest for a period of fifteen (15) days thereafter. During the first ten (10) days, each Member shall have the option to purchase a percentage of the offered Membership Interest equal to the Member's percentage Membership Interest without

12

regard to the interest of the Transferring Member. If the Remaining Members do not exercise the option to purchase the offered interest, the Members desiring to purchase a portion of the offered Membership Interest shall be entitled, for a period of five (5) additional days, to purchase the balance of the offered Membership Interest by giving notice of the election to the Transferring Member and the Remaining Members. However, in no event shall the Transferring Member be required to sell less than all of the Membership Interest offered.

(ii)    In the event the option is not exercised within either fifteen (15) day period, as applicable, it shall expire and be of no further force and effect. If the Remaining Members holding a majority vote of the Governance Interest consent to the proposed transfer or assignment, the Membership Interest of the Transferring Member may be sold to the identified purchaser, but not for less than the price stated in the written notice or on the terms and conditions materially different from those stated in the written notice. If the proposed third party sale is not consummated within ninety (90) days after the expiration of the option period, the Transferring Member may not sell his Membership Interest in the company without again offering the Company or the Remaining Members the option to purchase, as provided in Section 11.2 (f)(i).

(iii)    The foregoing provisions shall be binding upon any transferee of a Membership Interest in the Company. A person who receives a transfer of a Governance Interest that is authorized by or complies with the provisions of this Section 11.2, and who affirmatively agrees in writing to be bound by the provisions of this Agreement shall become a Member as of the effective date of the transfer.

(iv)    In the event the option is not exercised within the applicable option periods and if the Remaining Members holding a majority vote of the Governance Interest do not consent to the proposed transfer or assignment of the Transferring Member's Membership Interest, the Company and/or the Remaining Members shall immediately proceed to dissolve and terminate the Company under the provisions of Sections 14.3 and 14.4.

(v)    Notwithstanding the foregoing, in no event shall any Member transfer or assign all or any part of his Membership Interest in the Company, no person or entity shall be admitted to the Company as a Member, and no Member shall withdraw from the Company if this action would result in a sale or exchange of 50% or more of the total Financial Interest in the capital and profits of the Company within a twelve month period, so that the Company would be considered as terminated under Section 708 of the Code, or so as to prevent the Company from continuing the use of accelerated methods of depreciation previously used by the Company in connection with depreciable property of the Company, without the prior approval of the Members holding a majority vote of the Governance Interests.

11.3.    **Tag Along/Drag Along Rights**. While a majority of the Governance Interests may vote to sell the Company or substantially all of its assets, no Member may refuse to sell his Membership Interest if the majority so approves a sale and the Members selling their interests must allow the disapproving Member)s) to tag along with a sale under the same terms and conditions.

13

## ARTICLE XII
## VALUE OF MEMBER'S INTEREST

12.1 **Value by Agreement**. It is anticipated that there will be no setting of value by agreement since all Members intend to remain members.

12.2 **Value Without Agreement.**

12.2.1 In the event the Members fail to agree or cannot agree as to the Value of the Company, the purchase price of a Terminating Member's Membership Interest shall be determined as follows: The Company (or the Remaining Members, if applicable) electing to purchase the Membership Interest shall appoint a business valuation expert; the Terminating member, or his successor in interest, shall also appoint a business valuation expert. Each such expert shall be a Certified Valuation Analyst, a CPA Accredited in Business Valuations or comparable qualification, and shall be free of any interest in the Company or with any Member. Each expert shall determine the fair market value of the Company. The average of the two valuations shall determine the value of the Company; provided, however, if the fair market value of the Company shown by the two experts differs by more than ten percent (10%), the two experts shall select a third expert who shall make the same determination of the Company's fair market value and the average of the two valuations closest in value shall be the fair market value of the Company. No allowance shall be made for good will or other intangible assets except as those assets that have been reflected on the Company books. The value of the Company so determined shall be final and binding for the purposes of this Agreement. The value so determined shall then be multiplied by the ownership percentage of the Terminating Member to determine its fair market value. No discount shall be allowed based on any presumed lack of marketability of the Membership Interest, lack of liquidity or premium based on control.

12.2.2 In the event the Company or the Terminating Member shall refuse or shall be unable to appoint an expert or in the event the experts appointed shall be unable to agree as to the identity of the third expert, then the appointment shall be made on a petition filed by any interested party with a court of competent jurisdiction in Sullivan County, Tennessee. If such proceedings be required, the costs thereof, including reasonable attorneys fees, shall be borne by the party whose failure to act resulted in the necessity to file the petition.

## ARTICLE XIII
## PAYMENT OF PURCHASE PRICE AND CLOSING

13.1 **Payment**. The purchase price for the Membership Interest of a Terminating Member shall be paid to the terminating Member or to his personal representative as follows: The purchase price shall be paid in cash as of the date specified for the purchase of the Terminating Member's Membership Interest under the provision of Section 11.2(d); provided, however, if the purchase price for the Membership Interest exceeds Twenty-five Thousand Dollars ($25,000.00), the first Twenty-five Thousand Dollars ($25,000.00) of the purchase price shall be paid in cash as

14

of the specified date. On the same date, the Company shall execute and deliver a negotiable promissory note (the "Note") for the balance of the purchase price, payable to the Terminating Member or his personal representative. The Note shall be dated as of the date of the Termination Event and shall be payable in five (5) equal annual installments of principal plus interest on the unpaid principal balance at the prime lending rate published in the Wall Street Journal nearest the initial date before the Note, to be applicable for the initial 12 month period. The interest rate shall be adjusted as of each anniversary date based on the prime lending rate similarly determined. The first payment of principal, plus accrued interest, shall be due and payable 12 months after the date of the Note, with a like payment of principal, plus accrued interest, due and payable on the same day of each succeeding year until the principal balance, together with all accrued interest thereon, has been paid in full. The maker of the Note shall have the option to prepay any portion or all of the principal owed on the Note, plus accrued interest to date o payment, at any time prior to maturity and without penalty.

13.2 **Closing.** Simultaneously with the delivery of the Note to the Terminating Member or to his personal representative, the Terminating Member or his personal representative shall deliver to the Company duly executed instruments assigning, conveying and transferring good and marketable title to the Terminating Member's entire Membership Interest, free from any liens or encumbrances or rights of others therein other than those which are Company obligations and which have been taken into account in determining the value of the Terminating Member's Membership Interest. At the same time, the Company shall deliver to the Terminating Member or his personal representative proper instruments by which it shall assume sole liability for all claims against and all obligations of the Company, and by which it shall agree to hold the Terminating Member or his estate free and harmless from any liability to the Company creditors only if the obligations have been taken into account in determining the value of the Membership Interest.

13.3 **Transfer of Entire Interest.** The transfer of the Terminating Member's Membership Interest shall consist of all his right, title and interest in and to the Company, its firm name and all assets thereof, including, without limitation, his Capital Account at the date of the Termination Event, his share of any undrawn profits for any fiscal year up to the date of the Termination Event and his share of profits from the beginning of the fiscal year in which the Termination Event occurs and for all periods after the Termination Event. The Membership Interest of the Terminating Member shall not be deemed to include any debts or liabilities of the Company owed him for loans and advances made by him and these debts shall be repaid by the Company as required by the terms of the loans and advances.

## ARTICLE XIV
## DISSOLUTION AND TERMINATION

14.1 **Events Causing Dissolution.** The Company shall be dissolved (a) by action of the Members pursuant to **Tennessee Code Annotated** Section 48-249-603; (b) upon the occurrence of any event specified in **Tennessee Code Annotated** Section 48-249-601(a); (c) upon the loss or failure to obtain within four (4) weeks after the filing of Articles of Organization for the Company of the licenses necessary to conduct the

15

business; (d) upon the sale or other disposition of all or substantially all of the assets of the Company and the distribution of the net proceeds therefrom; or (e) as may be otherwise provided by law or by this Agreement.

14.2 **Continuation in Certain Circumstances upon Dissolution**. If an event described in Section 14.1(b) occurs and if at that time there are at least two Remaining Members of the Company (or at least one remaining Member if the provisions of the Act in effect at that time only require a limited liability company to have one member), the Company may be continued by the consent of the Remaining Members holding a majority of the Governance Interests, provided consent is obtained no later than ninety (90) days after the occurrence of the event described in Section 14.1(b). If consent is properly obtained, then the Company shall not be dissolved and shall not be required to be liquidated. In the event consent is not obtained, then the Company shall be dissolved in accordance with provisions of Section 14.3.

14.3 **Winding Up Affairs on Dissolution**. Except as provided in Section 14.2, upon the occurrence of any event described in Section 14.1, the Company shall be dissolved by the Members or other persons required or permitted by law to carry out the dissolution. In that event, the person or persons shall promptly notify all Members of the dissolution; shall wind up the affairs of the Company; shall prepare and file all instruments or documents required by law to be filed to reflect the dissolution of the Company; and, after paying or providing for the payment of all liabilities and obligations of the Company, shall distribute the assets of the Company as provided by the terms of this Agreement.

14.4 **Distributions Upon Termination**. Upon dissolution of the Company and the winding up of its affairs, all assets of the Company shall be distributed as set forth below:

      (a)    To pay all outstanding liabilities and expenses of the Company, including liquidating expenses and obligations;

      (b)    To establish reserves for unknown or contingent liabilities including, without limitation, reserves for environmental matters, as the Members may determine;

      (c)    To each Member an amount equal to his unrepaid Capital Contributions. If there are inadequate funds to repay all Capital Contributions, then the repayment shall be proportional.

      (d)    Any remaining balance shall be distributed to the Members (and holders of any Financial Interests) in proportion to their Capital Account balances.

## ARTICLE XV
## PERMISSIBLE ACTIVITIES

15.1 **Dealings with the Company**. In its discretion and from time to time, the Company may perform or purchase or acquire from any Member or from any entity in which any Member has an equity interest, any goods or services which may at any time be necessary, proper, convenient or advisable in carrying on the business affairs of the Company or in disposing of some or all of its assets. Provided, the compensation or price paid to the Member or related entity for these goods or services shall not materially

Case 2:21-cv-00061-TRM-CRW   Document 1-1   Filed 03/23/21   Page 244 of 272   PageID #: 249

exceed that generally prevailing in comparable transactions in the geographical area in which the Company conducts business.

15.2 **Members Engaging in other Business**. A Member may engage in and/or possess an interest in other business ventures, independently or with others, but not in competition with the Company; the Members agree to execute covenants not to compete with the Company extending from the date of this Agreement to three years from the date of their departure from the Company in a market area of all jurisdictions where the business or any part of the business can be lawfully conducted within the States, Provinces and territories of the United States and Canada. Neither the Company nor any Member shall have any legal rights by virtue of this Agreement in or to any Member's independent ventures or to any income or profits which may be derived therefrom. A Member shall be under no obligation to present a business or investment opportunity to the company even if the opportunity is of a character which, if presented to the Company, could be taken by the Company. Each Member shall have the right to invest for his own account or to recommend to others any particular business or investment opportunity.

15.3 **Members Incurring Expenses in Behalf of the Company**. As member managers, each Member shall be responsible for routine expenses, e.g., phone charges, mileage, office type supplies, etc. and may report these as permitted on their individual income tax returns. Items that are purchased for the Company, e.g., repair and maintenance items or advances by a Member for the payment of services for the Company shall be reimbursed by the Company. A Member may request to advance funds or incur expenses in behalf of the Company and may, upon consent of the Members holding a majority of the Governance Interests, obtain reimbursement for those advances or expenses.

## ARTICLE XVI
## GENERAL PROVISIONS

16.1 **Notices**. All notices, consents, waivers, directions, requests, votes or other instruments or communications provided for under this Agreement shall be in writing, signed by the party giving the same, and shall be deemed properly given three (3) business days after mailing if sent by registered or certified mail, postage prepaid, addressed:

  (a)  In the case of the Company, to the President at the address shown on Exhibit A.

  (b)  In the case of any Member, to the address shown on Exhibit A; or to any other address which a Member may specify in writing to the Remaining Members.

16.2 **Integration**. This Agreement embodies the entire agreement and understanding among the Members and supersedes all prior agreements and understandings, if any, among and between the Members relating to the subject matter hereof.

16.3 **Applicable Law**. This Agreement and the rights of the Members shall be governed by and construed and enforced in accordance with the laws of the State of Tennessee.

17

16.4    **Severability**. In the event any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and any other application thereof shall not in any way be affected or impaired thereby.

16.5    **Binding Effect**. Except as herein otherwise provided to the contrary, this Agreement shall be binding upon and inure to the benefit of, the Members and their respective heirs, executors, administrators, successors, transferees and assigns; provided, however, this provision shall not be construed to create a right of transfer or assignment in addition to those set forth elsewhere in this Agreement.

16.6    **Terminology**. All personal pronouns used in this Agreement, whether used in the masculine, feminine, or neuter gender, shall include all other genders; and the singular shall include the plural, and vice versa, where appropriate. Titles and Articles are for convenience only and neither limit nor amplify the provisions of the Agreement.

16.7    **Amendment**. This Agreement may be amended, modified or supplemented only by a writing executed by all Members and persons holding a Financial Interest.

16.8    **Section Captions**. Section and other captions contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

IN WITNESS WHEREOF, this Agreement is executed effective as of the date first above written and may be executed in counterparts.

CPH BRANDS, LLC

By: _____
           President

_____
Michael Vaughn

_____
Timothy Kendrick

_____
Russell E. Taylor

18

Exhibit A
Operating Agreement
CPH Brands, LLC

Initial Contributed Capital
Initial Financial Interests
Initial Governance Interests

|  | Initial Financial Interest | Initial Governance Interest | Initial Contributed Capital |
|---|---|---|---|
| Michael Vaughn<br>3334 Blooxingdale rd.<br>Kpt. TN. 37660 | 24.5% | 24.5% | $288,000.00, consisting of all equipment currently purchased with his funds for the business; all licenses, applied for and/or issued, however owned. |
| Timothy Kendrick<br>3233 Forest view Rd<br>Kpt TN 37660 | 24.5% | 24.5% | $1.00 |
| Russell E. Taylor<br>1043 Fordtown Road<br>Kingsport, TN 37663 | 51% | 51% | $100,000.00 cash* |

*

- Russell Taylor, a part owner of Taylor Properties #1, L.P., the owner of 1736 N. Eastman Road, Kingsport, TN, has arranged for a lease between the Company and the owner. For up to Three (3) months, the rent under said lease shall be accrued, but does not have to be paid. Thereafter, rent shall be paid currently and the accrued rent shall be caught up from initial cash flow of the business prior to distributions to members.
- Russell Taylor agrees also to advance up to $36,000.00 for initial business expenses, which shall be repaid prior to any distributions to members.

19

- Russell Taylor agrees to provide up to $4,200, plus a convenience fee of 3% for the acquisition or rental of the cold press machine, which shall be repaid prior to any distributions to members.

Lease Agreement



**THIS LEASE AGREEMENT** ("Lease") is made as of January 23, 2019 by and among Taylor Properties #1, L.P., with offices at 1043 Fordtown Road, Kingsport, Tennessee 37663 ("Landlord") and CPH BRANDS, LLC, a Tennessee limited liability company ("Tenant") whose address for notice is 1736 North Eastman Road, Kingsport TN 37664.

WITNESSETH:

1.     Demise.

For and in consideration of the Rent (as hereinafter defined) and other amounts hereinafter stipulated to be paid and the provisions of this Lease, Landlord hereby demises and lets to Tenant, and Tenant hereby takes and leases from Landlord, subject to the provisions hereinafter set forth, that certain parcel of land located in the 11ᵗʰ Civil District of Sullivan County Tennessee, City of Kingsport, commonly referred to as 1736 North Eastman Road, approximately 2.01 acres more or less, being more particularly described as Lot 7, as shown on plat of record in the Register's Office for Sullivan County at Blountville Tennessee in Plat Book 38, page 100, together with all buildings and improvements located thereon and that certain 30' ingress and egress easement as shown on said plat (the "Premises").

2.     Title; Condition of Premises.

The Premises are demised and let without representations or warranties, express or implied, by Landlord, as to the state of the title thereto existing at the commencement of the term of this Lease, as to the zoning of the Premises at the commencement of the term of this Lease, as to any state of facts which an accurate survey or physical inspection might show, and to all applicable laws, rules, regulations, ordinances, and restrictions now or hereafter in effect. Tenant has leased the Premises and accepts the same, AS IS WHERE IS AND WITHOUT ANY WARRANTIES OF ANY NATURE, EXPRESS OR IMPLIED, IT BEING THE INTENTION OF THE LANDLORD AND TENANT EXPRESSLY TO NEGATE AND EXCLUDE ALL WARRANTIES EXPRESS OR IMPLIED, IN FACT OR BY LAW, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.

3.     Use.

The Premises may be used and occupied for the operation of a **pharmaceutical processing facility** and office space incidental thereto and for no other purpose. Tenant shall obtain all necessary permits, registrations, and approvals for any alterations of the Premises and for the conduct of its business in the Premises and shall comply strictly with the terms and conditions of such permits, if any, and with all applicable laws, rules, regulations, zoning or other ordinances, and restrictive covenants affecting the Premises or the Tenant's operations in or about the Premises. Tenant shall not use, or permit to be used, all or any portion of the Premises for any illegal purpose or activity or in any way that would constitute a nuisance.

4.     Term.

Commencing on the date hereof (the "Commencement Date") Tenant shall lease the Premises on a month to month basis (the "Term") which shall continue until terminated by either Landlord or Tenant upon thirty (30) days' advance written notice delivered by the terminating party to the other party on or before the first day of a calendar month.

5.     Rent.



1

A.     Base Rent (as hereinafter defined) shall accrue hereunder commencing on the Commencement Date. Rent shall be payable to Landlord at the address specified above, in advance, without notice, demand, offset or abatement. As used herein "Rent" shall mean Base Rent together with any and all other payments or charges which are the responsibility of the Tenant hereunder, including but not limited to, real property taxes, insurance, utilities, maintenance or other expenses whether paid to Landlord or a third party. Each consecutive twelve-month period during the Term beginning with the Rent Commencement Date is herein called a "Lease Year."

B.     Commencing on the Commencement Date Tenant shall pay to Landlord monthly base rent ("Base Rent") in the amount of One Thousand and no/100 Dollars ($1,000.00) per month. In addition to all other rights and remedies hereunder and not in lieu thereof, in the event rent is not paid within ten (10) days of the date due (excluding any initial partial month), Tenant shall pay to Landlord a late fee equal to five percent (5%) of the amount then due and owing. Landlord and Tenant agree and acknowledge that this amount represents a fair estimation of Landlord's damages in the event rent is not paid timely.

6.     Late Payment.

In the event Tenant fails, for any reason whatsoever, to pay Rent on or before such payment shall become due and owing, it is agreed that the amount thus due shall bear interest at the rate of ten percent (10%) per annum, such interest to accrue continuously on any unpaid balance due to Landlord by Tenant during the period commencing with the aforesaid due date and terminating with the date in which Tenant makes full payment of all amounts owing to Landlord at the time of said payment (including the five percent (5%) late fee set forth herein). Notwithstanding this late payment provision, Tenant may defer payment of rent without late payment fee or interest for up to the first three months of the term and, thereafter, shall pay the subsequent months currently and pay the deferred portion from business cash flow as it is received.

7.     [Reserved]

8.     Gross Lease.

This Lease is and shall be deemed and construed to be a gross lease. From the moment that Tenant shall first enter into the Premises, Landlord shall be responsible for the following expenses.

A.     **Utilities.** Landlord covenants and agrees to retain all utility billings in Landlord's name and to pay fully and promptly all utility charges billed if any for each and every month in the Term. As used herein the term "utility" is used to mean all electricity, gas, oil, water, sewer, garbage service, security services and any other type of service provided for or furnished to or for the benefit of the Premises.

B.     **Alterations, Maintenance and Repair.** Tenant shall be responsible for all costs, expenses and fees associated with improvements to the Premises and shall maintain the Premises at Tenant's sole risk, cost, and expense. Tenant shall at all times maintain the Premises in a clean, sightly and safe condition free from any dangerous condition, nuisance, or waste, in compliance with all applicable laws, and shall make all repairs thereto, ordinary and extraordinary, foreseen and unforeseen. Landlord does not warrant that the HVAC system will be adequate for Tenant's particular purpose. Tenant, at Tenant's sole installation and maintenance cost, may extend or add additional duct work or capacity to the HVAC system.

C.     **Taxes.** Landlord shall pay all real property taxes assessed against the Premises.

D.     **Other Expenses.** Tenant shall pay all other expenses of any nature or kind relating to the Premises, now or hereafter existing. Tenant, at Tenant's sole cost and expense shall maintain the insurance coverage set forth herein below.

9.     Indemnification.

2

Tenant is and shall be in exclusive control of the Premises and Landlord shall not have any liability to Tenant or any third party in connection therewith. Therefore, notwithstanding any allegation or determination of relative responsibility, Tenant shall pay, and shall protect, indemnify and hold Landlord harmless from and against, any and all liabilities, losses, damages, costs, expenses (including, without limitation, attorneys' fees and expenses), causes of action, suits, claims, demands, or judgments, of any nature whatsoever, whether foreseen or unforeseen, ordinary or extraordinary, arising or alleged to arise, (collectively "Liabilities") from or in connection with (i) any injury to, or the death of, any person or any damage to or loss of property, (ii) the violation by Tenant of any provisions of this Lease or of any law, rule, regulation, ordinance, restriction, or insurance policy, now or hereafter in effect, or of any agreement to which Tenant is a party or by which it is bound, now or hereafter in effect, or of any agreement of which Tenant has notice and which is now in effect, affecting or applicable to the possession, use, occupancy, maintenance or repair of the Premises or any portion thereof or of adjoining passageways, sidewalks or streets; (iii) any subletting of the Premises or assignment of the Lease. This provision shall survive the termination or expiration of this Lease.

10.     Alterations and Additions; Encumbrances.

Tenant shall not subject the fee title, the Premises, or any interest therein to any easements, encumbrances, restrictions, covenants or conditions or to any liens of mechanics, laborers, materialmen, contractors or subcontractors, or to any other liens or charges whatsoever arising out of the construction, maintenance or repair of buildings, structures, or other improvements, or arising in any other manner. Tenant agrees to immediately discharge (either by payment or by filing of the necessary bond, or otherwise) any mechanic's, materialmen's, or other lien against the Premises which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies, or equipment alleged to have been furnished to or for Tenant or any subtenant in, upon or about the Premises.

11.     Condemnation and Casualty.

A.      In the event that the title to all or substantially all of the Premises shall be taken by condemnation proceedings or any right of eminent domain, this Lease shall terminate and expire on the date of such taking and Landlord and Tenant shall each be entitled to receive the proceeds resulting from such taking attributable to its interest provided Tenant's award for condemnation does not diminish or subtract from Landlord's award. Tenant acknowledges it will not be entitled to condemnation proceeds until Landlord is made whole. In the event of a partial taking which does not take the building, Tenant acknowledges that Landlord shall be entitled to the entire award.

B.      A casualty loss suffered on the Premises shall not cause an abatement of Rent, and Tenant shall promptly demolish and reconstruct any damaged improvements so as to maintain a sightly and safe Premises.

12.     Insurance.

A.      Tenant shall, at all times during the term hereof and at its sole cost and expense, maintain and keep in force the following policies of insurance which shall be acceptable to Landlord in amount, substance, and carrier:

        (1.)     Insurance for Tenant's personal property located on the Premises, the building, and the leasehold improvements in the amount of the full insurable value of such personal property, building, and leasehold improvements, with full replacement cost endorsement (no deduction for depreciation), against loss or damage caused by fire and any of the risks covered by insurance of the type now known as "fire, extended coverage, and broad form perils, with deductibles consistent with insurance industry practices." Adequate limits of liability must be maintained to comply with appropriate coinsurance requirements.

        (2.)     Statutory Worker's Compensation insurance (as applicable).

        (3.)     Commercial general liability insurance policy, including (but not limited to) insurance against assumed or contractual liability under this Lease, with respect to liability arising out of the ownership, use, occupancy, or maintenance of the Premises and all areas appurtenant thereto, to afford protection with respect to

3

personal injury, death or property damage or not less than One Million Dollars ($1,000,000) per occurrence combined single limit Three Million Dollars ($3,000,000) general aggregate (but not less than $1,000,000 per location aggregate); and

B.     Every insurance policy relating to the Premises (excluding Tenant's personal property) shall name Landlord as an additional insured, and shall provide that 30 days prior to cancellation, written notice of cancellation shall be given to Landlord, shall not be invalidated by any act or neglect of Landlord or Tenant, nor by any foreclosure or any other proceedings or notices thereof relating to the Premises or any interest therein, nor by any change in the title or ownership of the Premises for purposes more hazardous than are permitted by such policy. No such policy shall contain a provision relieving the issuer thereof of liability for any loss by reason of the existence of other policies of insurance covering the Premises against the peril involved.

C.     Tenant shall deliver to Landlord promptly after the execution and delivery of this Lease, certificates of insurance evidencing all the insurance that is then required to be maintained by Tenant, and Tenant shall, not less than 30 days prior to the expiration or material change of any insurance, deliver certificates of insurance to Landlord evidencing the renewal or change of such insurance.

D.     Tenant shall request its insurance carrier to endorse all applicable policies waiving the carriers' right of recovery under subrogation or otherwise, in favor of the Landlord and provide a certificate of insurance verifying this waiver.

13.     Expiration or Termination.

In the event of the expiration or termination of this Lease for any reason, the obligation and liabilities of Tenant, actual or contingent, under this Lease which shall have arisen, but which shall not have been performed or satisfied, shall survive such termination. Tenant shall remain obligated to deliver all proceeds of insurance then held by Tenant in respect of any casualty, which occurred prior to such termination.

14.     Subletting; Assigning.

A.     Tenant shall not assign this Lease nor sublet the Premises without the prior written consent of Landlord. Notwithstanding any such subletting or assignment, Tenant shall remain primarily liable for all of its obligations under this Lease and such obligation shall continue undiminished and as the obligations of a principal as though no such subletting or assignment had been made. Any sublease or assignment by Tenant not in compliance with the provisions of this Section shall be void.

B.     Landlord may mortgage, assign, convey, or otherwise transfer its estate, right, title, and interest hereunder or in the Premises, or any portion thereof, without the consent of Tenant. Tenant shall subordinate its interest in this Lease and attorn to any mortgagee of the Premises, provided that such mortgagee agrees not to disturb Tenant's possession of the Premises so long as it is not in default hereunder. In the event of any such transfer of title of its estate in this Lease, Landlord shall automatically be relieved of all its obligations upon the transferee's assuming such obligations. Any estate, right, title, or interest assigned as permitted by this Section may be assigned and reassigned in like manner by any assignee thereof.

C.     Tenant shall provide an estoppel certificate from time to time within ten (10) days of Landlord's request, confirming that the lease is in full effect and that no default exists hereunder. Any estoppel not returned by Tenant within ten (10) days following request therefor shall be deemed given and Tenant shall be deemed to have waived any adverse matters possibly contained in such estoppel.

15.     Advances by Landlord.

If Tenant fails to make or perform any payment or act on its part to be made or performed under this Lease, then Landlord may (but need not), without waiving any default or releasing Tenant from any obligation, make such payment or perform such act for the account and at the cost and expense of Tenant. All amounts so paid by Landlord

4

and all necessary and incidental costs and expenses (including, but not limited to, attorneys' fees and expenses) incurred in connection with the performance of any such act by Landlord, together with interest at the highest rate allowable under the applicable law from the date of the making of such payment or of the incurring of such costs and expenses by Landlord, shall be payable by Tenant to Landlord on demand as additional Rent.

16.     Conditional Limitations - Events of Default and Remedies.

A.     Any of the following occurrences or acts shall constitute an "Event of Default" under this Lease:

      (1.)     If Tenant shall:

            (a)     Fail or refuse to timely pay Rent when due, or other monetary sum payable hereunder; or

            (b)     Default in the observance or performance of any provisions of this Lease to be observed or performed by Tenant hereunder; or

            (c)     If the Premises shall be abandoned by Tenant for a period of thirty (30) consecutive days, provided, however, that the Premises shall not be deemed to have been abandoned if Tenant shall observe and perform the provisions of this Lease to be observed and performed by Tenant and if Tenant is continuing to manage and operate the Premises; or

            (d)     If Tenant shall file a petition in bankruptcy or for reorganization or for an arrangement pursuant to the Bankruptcy Act or under any similar federal or state law, now or hereafter in effect, or shall be adjudicated a bankrupt or become insolvent, or shall make an assignment for the benefit of its creditors, or shall admit in writing its inability to pay its debts generally as they become due, or shall be dissolved, or shall suspend payment of its obligations, or shall take any corporate action in furtherance of any of the foregoing; or

            (e)     If a petition or answer shall be filed proposing the adjudication of Tenant as a bankrupt or its reorganization pursuant to the Bankruptcy Act or any similar federal or state law, now or hereafter in effect, and (i) Tenant shall consent to the filing thereof, or (ii) such petition or answer shall not be discharged or denied within sixty (60) days after the filing thereof; or

            (f)     If a receiver, trustee, or liquidator (or other similar official) shall be appointed for or take possession or charge of Tenant or of all or any substantial portion of the business or assets of Tenant or of Tenant's estate or interest in the Premises, and shall not be discharged within sixty (60) days thereafter or if Tenant shall consent to or acquiesce in such appointment.

            (g)     If Tenant rejects this Lease after filing a petition in bankruptcy or insolvency or for reorganization or arrangement under Federal bankruptcy laws or under any state insolvency act.

B.     This Lease and the term and estate hereby granted are subject to the limitation that whenever an Event of Default shall have occurred, Landlord may, at its election, during the continuance of such Event of Default:

      (1)     Proceed by appropriate judicial proceedings, either at law or in equity, to enforce performance or observance by Tenant of the applicable provisions of this Lease or to recover damages for the breach thereof; or

      (2)     By written notice to Tenant, as provided herein, terminate this Lease, whereupon Tenant's estate and all rights of Tenant to the use of the Premises shall forthwith terminate as though this Lease had never been made, but Tenant shall remain liable as hereinafter provided; and thereupon Landlord shall have the immediate right of re-entry and possession of the Premises and the right to remove any or all persons or property there from and alter locks and other security devices at the Premises; and Landlord may thenceforth hold, possess, and enjoy the Premises free from any rights of Tenant and any person claiming through or under Tenant; and Landlord shall have the right to recover forthwith from Tenant:

            (a) any and all Rent and all other amounts payable by Tenant hereunder which may then be due and unpaid or which may then be accrued and unpaid;

5



(b) as liquidated damages for loss of the bargain and not as a penalty, an amount equal to the excess of the aggregate of all unpaid Rent which would have been payable if this Lease had not been terminated prior to the end of the Term over the aggregate fair rental value of the Premises at the date of termination of this Lease for the period from such termination date to the end of the Term both discounted in accordance with accepted financial practice to then-present worth; provided, however, the Landlord shall not owe any sums to Tenant if such discounted fair rental value is greater than such discounted unpaid rent; and

(c) any and all damages and expenses (including, without limitation, attorneys' fees and expenses), which Landlord shall have sustained by reason of the breach of any provision of this Lease or the termination of this Lease.

C.    Unless the Term of this Lease shall have terminated or as permitted by law, if Landlord shall obtain possession of the Premises or any portion thereof following an Event of Default hereunder, Landlord shall have the right, without notice, to repair or alter the Premises or any portion thereof in such manner as the Landlord may deem appropriate consistent with Tenant's obligations as provided in this Lease, to put the same in good order and to make the same rentable, and shall have the right to re-let the Premises or any portion thereof, and Tenant agrees to pay to Landlord on demand all fees, costs, and expenses incurred by Landlord in obtaining possession, and in repairing and putting the Premises or any portion thereof in good order and condition, and in reletting the Premises or any portion thereof including reasonable fees and expenses of attorneys, engineers, mechanics, and other skilled persons, and other reasonable expenses and commissions.

D.    At the request of Landlord upon the occurrence of an Event of Default hereunder, Tenant will quit and surrender the Premises to Landlord or its agents, and Landlord may without further notice enter upon, re-enter and repossess the Premises by summary proceedings, ejectment or otherwise. The words "enter", "re-enter", and "re-entry" are not restricted to their technical meaning.

E.    No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy, and every right and remedy shall be cumulative and in addition to any other legal or equitable right or remedy given hereunder, now or hereafter existing. The failure of Landlord to insist upon the strict performance of any provision or to exercise any option, right, power, or remedy contained in this Lease shall not be construed as a waiver or relinquishment thereof for the future. Receipt by Landlord of any Rent payable hereunder with knowledge of the breach of any provisions contained in this Lease shall not constitute a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless made under the signature of an officer of Landlord. Landlord shall be entitled, to the extent permitted by law, to injunctive relief in case of the violation, or attempted or threatened violation, of any provision of this Lease, or to a decree compelling observance or performance of any provision of this Lease, or to any other legal or equitable remedy.

F.    Should Landlord deem it necessary in Landlord's sole discretion to retain an attorney or other third party consultant for the purpose of enforcing or interpreting this Lease, or resolving a dispute with Tenant, even if no formal legal proceedings are instituted by Landlord or Tenant, then the Tenant shall pay Landlord's reasonable attorneys fees.

17.    Notices.

Any notice provided for in or permitted under this Lease shall be made in writing and may be given or served by (i) delivering the same in person to the party to be notified, (ii) if to Tenant, by delivery to the Premises, including posting of the Premises, (iii) depositing the same in the mail, postage prepaid, registered or certified with return receipt requested, and addressed to the last known address of the party to be notified, or (iv) by a nationally known expedited delivery service. If notice is deposited in the mail, it will be effective three (3) days from the mailing thereof provided the notice is sent to the last known address of the party to be notified. If sent by express service, the notice shall be effective upon receipt by the party to be notified. For the purpose of notice, the addresses of the parties shall be until changed:

If to Landlord:        Taylor Properties #1, L.P.
                       Mr. Stewart A. Taylor
                       1043 Fordtown Road

6

Kingsport, TN 37663

With copy to                T. Arthur Scott, Jr.
                            Attorney at Law
                            Nevermore Lane
                            Kingsport TN 37664

If to Tenant:               delivered or posted at Premises

18.    Surrender.

A.    Upon the expiration or earlier termination of the term of this Lease, Tenant shall surrender the Premises to Landlord empty, clean, and ready for immediate occupancy by a subsequent lessee, in the same condition in which the Premises were originally received from Landlord except as repaired, rebuilt, restored, altered, or added to as permitted by any provision of this Lease or as agreed upon in writing by Landlord and Tenant and except for ordinary wear and tear. Any personal property of Tenant or any allowed subtenant which shall remain in the Premises after the termination of this Lease and the removal of Tenant or such subtenant from the Premises, may, at the option of Landlord, be deemed to have been abandoned by Tenant or such subtenant and may be either retained by Landlord as its property or be disposed of, without accountability, in such a manner as Landlord may see fit (including having the same stored at the risk and expense of Tenant), or if Landlord shall give written notice to Tenant to such effect, such property shall be removed by Tenant at Tenant's sole cost and expense.

B.    Except for surrender upon the expiration or earlier termination of the term hereof, no surrender to Landlord of this Lease or of the Premises or any portion thereof or of any interest therein shall be valid or effective unless agreed to and accepted under signature of Landlord, and no act by any other representative or agent of Landlord, and no act by Landlord, other than such an agreement and acceptance so signed, shall constitute an acceptance of any such surrender.

C.    Upon the expiration or termination of this Lease and surrender of the Premises to Landlord, Tenant shall provide to Landlord, at Tenant's sole cost and expense, an environmental report certifying that the Premises is free of Toxic and Hazardous Substances (as hereinafter defined), unlawful substances, and controlled substances.

D.    In the event that Tenant holds over or Tenant fails to surrender the Premises upon the termination or expiration of this Lease, then the Base Rent for the holdover period shall be the then Base Rent, as adjusted, plus an additional 25% as a holdover fee.

19.    Severability.

Each provision contained in this Lease shall for all purposes be construed to be separate and independent. The breach of any provision hereof by Landlord shall not discharge or relieve Tenant from Tenant's obligation to observe and perform each provision of this Lease, unless such breach materially interferes with Tenant's use of the Premises. If the application of any provision hereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, and the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and each provision of this Lease shall be valid and shall be enforceable to the full extent permitted.

20.    Entire Agreement.

Landlord and Tenant intend this Lease to represent the entire agreement and expression of the agreement by and between the parties hereto. Landlord and Tenant also intend this Lease to be fully integrated and constitute a full and final expression of the Landlord and Tenant's understanding and all prior and contemporaneous agreements, representations, and otherwise, whether oral or written, are merged in this Lease. This Lease may not be modified orally or in any other manner than by an agreement in writing signed by all parties hereto or their respective successors in interest.

7

21.    Tenant Finish.

Tenant shall make alterations to the Premises in accordance with the plans submitted to Landlord for approval, subject to any requirements, changes or conditions requested by Landlord. Subsequent to the initial improvements to the Premises Tenant may, at Tenant's sole cost and expense, construct and install such tenant finish desired by Tenant and approved by Landlord prior to the commencement of any alterations.

With respect to the initial alterations or any subsequent alterations, Tenant shall submit to Landlord in advance Tenant's planned alterations, a construction budget and evidence of financial ability to complete the project. Landlord may refuse to consent to such alterations, or require modifications to the construction plan. Landlord may require additional conditions including, but not limited to, escrow of funds designated to complete the alterations and progress reports as to the status of the construction. All construction work performed on the Premises shall be performed in a good and workmanship like manner, in compliance with all governmental requirements, and in such a manner to minimize any interference with the transaction of business adjacent businesses. Tenant shall indemnify Landlord from and against any liability, loss or damage resulting from such work, and Tenant shall, upon request, furnish bond against such loss, liability or damage. Landlord shall have the right to approve Tenant's contractor, and to require such further assurances from Tenant and Tenant's contractor, as Landlord deems necessary in its sole discretion.

22.    Signage.

Tenant at Tenant's sole cost shall be entitled to install its signage on the exterior of the Premises and shall be entitled to install on the Premises a monument sign identifying Tenant's business, all in compliance with all rules, laws, ordinances, deed restrictions, and permits. The location, dimensions, appearance of the proposed sign shall be approved by Landlord, not to be unreasonably withheld. Landlord will cooperate, at no expense to Landlord with seeking the necessary approvals and permits for Tenant's signage.

23.    Memorandum of Lease.

This Lease shall not be recorded or circulated without Landlord's prior consent, provided, however; either party hereto may record a memorandum of this Lease containing a brief description of the Premises, the parties hereto and the Term.

24.    Governing Law.

This Lease shall be governed and construed in accordance with the laws of the State of Tennessee to the exclusion of the laws of all other jurisdictions.

25.    Jurisdiction and Venue.

Landlord and Tenant agree that this Lease was made and entered into, executed, delivered and to be performed in Sullivan County, Tennessee. Should any litigation occur as a result of or arising out of this Agreement Landlord and Tenant agree that proper venue for such litigation shall be Sullivan County, Tennessee, to the exclusion of all other jurisdictions and venues, with the exception of the Federal Court for the Eastern District of Tennessee located in Greeneville, Tennessee, should federal law require that suit be brought in that court.

26.    Force Majeure.

In the event that the Landlord shall be delayed, hindered, or prevented from the performance of any act required hereunder, by reason of governmental restrictions, scarcity of labor, materials, strikes, or for reasons beyond its control, the performance of such acts shall be excused for the period of delay, and the period for the performance of any such acts shall be extended for the period necessary to complete performance after the end of the period of such delay.

8

27. Headings.

The headings of this Lease are inserted only as a matter of convenience and are for reference only and in no way define, limit, or describe the scope of this Lease or the intent of any provision of this Lease.

28. Real Estate Brokers.

Tenant represents that it has had no dealings with any real estate broker for which Tenant expects Landlord to pay the broker or reimburse Tenant with respect to this Lease in any manner. Tenant shall hold Landlord harmless from all damages resulting from any claims asserted against Landlord by any real estate broker or finder with whom Tenant has purportedly dealt.

29. Successors and Assigns, Joint and Several Liability.

This Lease shall be binding upon Landlord, its successors and assigns, and upon Tenant, its successors and assigns. If more than one person or party joins in this Lease as Tenant, then each of such person or parties shall be and is jointly and severally liable for all of the obligations and conditions of Tenant under this Lease and the term "Tenant" when used in this lease shall include each and all of said persons or parties.

30. Identity of Drafter.

This Lease shall be construed without regard to the identity of the drafter and as though the parties participated equally in drafting the same.

31. Environmental Matters.

Neither Tenant, its successors or assigns, nor any permitted assignee, permitted sublessee, licensee or other person or entity at the direction or with the consent of Tenant shall (i) manufacture, treat, use, store or dispose of any Toxic or Hazardous Substance on the Premises in violation of any Environmental Law, (ii) permit the "release" of a Toxic or Hazardous Substance on or from the Premises.

Tenant indemnifies and covenants and agrees, at its sole cost and expense, to indemnity, protect and save Landlord harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, or expenses of any kind or of any nature whatsoever (including, without limitation, attorney's fees and expert's fees) which may at any time by imposed upon, incurred by or asserted or awarded against Landlord arising from or out of any Toxic or Hazardous Substance on, in, under or affecting the Premises, relating to or alleged to relate to Tenant's use or occupancy of the Premises, or arising during the Term hereof.

As used in this Lease:

A.    "Toxic or Hazardous Substances" shall include, without limitation, petroleum, natural gas, liquids, asbestos, radioactive materials or any other substances defined as a "hazardous substance," "hazardous material" or "toxic substance" (or words of similar meaning or import) in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601, et, seq.), the Hazardous Materials Transportation Act as amended (49 U.S.C. § 1801 et seq.), the Resource Conservation and Recovery Act as amended (42 U.S.C. §6901, et seq.) and under all other Environmental Laws.

B.    "Environmental Laws" shall include without limitation those federal laws listed in (a) above, the Federal Water Pollution Control Act as amended (33 U.S.C. §1251, et seq.), the Clean Air Act as amended (42 U.S.C. §7401 et seq.), and any other federal laws or laws of the jurisdiction in which the Premises are located, and the regulations there under (including local, state and/or federal laws or regulations) and any amendments thereto that govern: the existence, clean-up and/or remediation of contamination on the Premises; the protection of the environment from spilled, deposited, released or otherwise emplaced Toxic or Hazardous Substances; the control of Toxic or

9

Hazardous Substances; or the use, generation, transport, treatment, removal or recovery of Toxic or Hazardous Substances, including without limitation building materials.

The term "release" shall have the meaning given to such term in Section 101(22) of CERCLA (42 U.S.C. §9601 et seq.), the Hazardous Materials Transportation Act as amended (49 U.S.C. §1801 et seq.), the Resource Conservation and Recovery Act as amended (42 U.S.C. §6901 et seq.), and under all other Environmental Laws.

32.     Execution of Lease.

Should Landlord provide an executed Lease to Tenant then Tenant shall have fifteen (15) business days to return to Landlord an original Lease executed by Tenant, or Landlord shall have the right to terminate its offer to lease, and this Lease shall be of no force and effect.

33.     Right of Offer.

Provided no Event of Default, no notice of termination of lease delivered by either party, and no notice of Landlord that a sale of the Premises has been contracted with a third party, has occurred during the Term hereof, Tenant shall have the right to offer to purchase the Premises at a net purchase price to the Landlord of Nine Hundred Thousand Dollars ($900,000.00). Tenant shall exercise its right of offer by providing Landlord thirty (30) days advance written notice together with tendering an amount equal to two (2) month's pre-paid Base Rent. The Tenant shall close the purchase within thirty (30) days thereafter. The pre-paid Base Rent shall be credited at closing to Base Rent which accrues from the date of the notice to the date of the consummation of the closing on a pro-rated basis. Landlord shall deliver title to the Premises in "AS IS" physical condition, by Special Warranty Deed, subject to all matters of record, but free and clear of any deed of trusts or mortgages. Should Landlord elect to accomplish the purchase as a tax deferred 1031 exchange, then Tenant shall cooperate with same, at no additional expense to Tenant. All closing costs, recording fees, commissions and fees shall be the expense of the Tenant such that the net proceeds of the purchase to Landlord shall be no less than Nine Hundred Thousand Dollars. This Lease and the obligation to pay Rent hereunder shall terminate on the date of closing, and real property taxes for the year in which the sale occurs shall not be pro-rated, but shall be the responsibility of the Tenant. Tenant's right of offer to purchase the Premises shall terminate and be of no force and effect upon the expiration or termination of this Lease or the sale or transfer of the Premises to a third party.

IN WITNESS WHEREOF, this instrument has been duly executed by the parties hereto as of the day and year first above written.

//Signature page to follow//



10

**TAYLOR PROPERTIES #1, L.P.**

By: Tri-Cities Consolidation Corp., its General
Partner

By: _____
     Stewart Taylor
     President

**CPH BRANDS, LLC**

By: _____
     Russell E. Taylor
     President

11

# AGREEMENT OF COVENANT NOT TO COMPETE, NON-DISCLOSURE AND NON-UTILIZATION

THIS AGREEMENT OF COVENANT NOT TO COMPETE, NON-DISCLOSURE AND NON-UTILIZATION (this "**Agreement**") is made and entered into this 24th day of January, 2019, by and between **CPH BRANDS, LLC**, a Tennessee limited liability company (the "**Company**") and **MICHAEL VAUGHN** (the "**Recipient**");

## WITNESSETH:

**WHEREAS**, by Operating Agreement dated January 23, 2019, Recipient has become a member in the Company; and

**WHEREAS**, the Company is engaged in starting a business whereby Recipient and the other parties to the Operating Agreement will obtain Proprietary and Confidential Information of the Business, its trade secrets, its opportunities for expansion and its customers; and

**WHEREAS**, the parties to the Operating Agreement have an interest in protecting the value of the Company.

NOW, THEREFORE, in consideration of the recited benefits above, the parties agree as follows:

## ARTICLE 1  DEFINITIONS

1.1.    **Defined Terms**. As used herein, the terms below shall have the following meanings:

"**Business**" means the business of the Company in the growing, processing, purchase of raw material and sale of finished product derived from industrial hemp. Recipient and Company acknowledge that the trend of expanded legalization of related raw material and products may in the future result in opportunities for expansion into those raw materials and products. Accordingly, the Business shall also extend to those related raw materials and products as they become lawful in any of the Territory defined herein.

"**Customer**" means any Person which is a customer or Prospective Customer of the Company or, to the knowledge of the Recipient, an entity that is a direct or indirect parent, subsidiary or sister entity of a Customer or Prospective Customer on the Termination Date or which was a customer of the Company or an entity that is a direct or indirect parent, subsidiary or sister entity of a Customer within three (3) years prior to the Termination Date.

"**Effective Date**" means the date hereof.

"**Goodwill Consideration**" means the value received by the Recipient in his becoming a member in the Company as consideration for the covenants made by the Recipient to protect the Company's Goodwill.

EXHIBIT
C

"**Governmental Entity**" means any government or agency, district, bureau, board, commission, court, department, official, political subdivision, tribunal, taxing authority or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"**Law**" means any constitutional provision, statute or other law, rule, regulation, or interpretation of any Governmental Entity and any Order.

"**Order**" means any decree, injunction, judgment, order, award, ruling, assessment or writ by a court, administrative agency, other Governmental Entity, arbitrator or arbitration panel.

"**Person**" means an individual, corporation, partnership, limited partnership, limited liability company, syndicate, person, trust, association or entity or government, political subdivision, agency or instrumentality of a government.

"**Proprietary and Confidential Information**" means any information of the Company that is not generally known to the public or to the Company's competitors in the industry, is used in the business of the Company, and gives the Company an advantage over businesses that do not know the information. "Proprietary and confidential information" includes but is not limited to: know-how (other than general know-how known within the industry), trade secrets, employee lists, customer lists, supplier lists, referral source lists, sales representative list, broker/commissioned agent list, costs, profits or margin information, markets, sales, pricing policies, operational methods, plans for future development, data drawings, samples, processes, products, software, the financial condition, results of operations, business, properties, assets, liabilities, or future prospects of the Company with respect to the Business. Because of the nature and sensitivity of this information, the Recipient acknowledges that the Company has legitimate business and competitive interests and legal rights to require non-disclosure of the information to other companies and/or individuals and to require that it be used only for the Company's benefit.

"**Prospective Customer**" means, at any particular time, any Person to whom the Company, through any of its officers, employees, agents or consultants (or persons acting in a similar capacity) has within twelve (12) months prior to such time offered (by means of a personal meeting, telephone call, letter, email, written proposal or other direct communication) to provide the services and/or sell or market the services of the Company, except where such offer was made on a website or as a part of a blanket mailing/emailing, telemarketing, or advertising, such as through magazines, newspapers, emails, and sponsorship of public events and does not result in a request by the recipient for further information or presentation.

"**Restricted Period**" means the period beginning with the Effective Date and ending on the Termination Date.

2

"**Sales Representatives**" means the Company's sales representatives, brokers, commissioned agents or other Persons having similar functions with respect to the Business, regardless of whether such Persons are employed by the Company or are independent, and regardless of whether they are dedicated solely to the Business or not.

"**Supplier**" means any Person which (i) is or was a supplier of any product or service, including subcontractors and sub-consultants, to the Company on the Termination Date or which, prior to the Termination Date, was a supplier to, or subcontractor or sub-consultant of, the Company within three (3) years prior to the Termination Date, or (ii) is a vendor of the Company on the Termination Date, or which, prior to the Termination Date, was a vendor to the Company within three (3) years prior to the Termination Date; provided, however, that "Supplier" is meant to include only Persons who provide or provided the Company with goods and services specific to the Business and does not include generic suppliers of stationery or office equipment, insurance companies, landlords, utilities, healthcare providers, lawyers, accountants and other suppliers of generic goods and services.

"**Termination Date**" shall mean the date which is three (3) years after the date when the Recipient no longer is a member in the Company.

"**Territory**" shall mean the (i) United States of America, including its States, districts, territories and commonwealths and (ii) Canada, including its provinces, territories and commonwealths. Recipient acknowledges that Company is beginning business with the strategy of expanding the Business into additional areas as it becomes lawful to do so.

## ARTICLE 2  COVENANTS TO PROTECT THE COMPANY'S PROPRIETARY AND CONFIDENTIAL INFORMATION AND GOODWILL

### 2.1.    Proprietary and Confidential Information.

2.1.1. **General.** The Recipient acknowledges that the Company is engaged in a competitive industry. The Recipient further acknowledges that, as part of his being a member in the Company, he will have access to and/or gain knowledge of the Company's Proprietary and Confidential Information that is vital to the Goodwill, interests and success of the Company. As consideration for this Agreement the Company agrees to continue to provide the Company's Proprietary and Confidential Information, which will enable the Recipient to perform (or continue performing) his job with the Company. The Recipient acknowledges that the provision of the Proprietary and Confidential Information is necessary and desirable for the Recipient's personal success at the Company.

2.1.2. **Non-Disclosure and Non-Use.** In order to protect the Company's Proprietary and Confidential Information and the Company's Goodwill, and in exchange for the Goodwill Consideration, the Recipient agrees he shall not disclose, nor use, directly or indirectly, either for the Recipient's own benefit or for the benefit of any other individual or business, any Proprietary and Confidential Information, except in the carrying out of his responsibilities for Company. The Recipient further acknowledges that, irrespective of this Agreement, he has a duty not to disclose the Company's Proprietary and Confidential

3

Information and contractually warrants that he will not violate this duty. Notwithstanding any contrary provision of this Agreement, the Recipient may disclose or use any such information (i) as has become generally available to the public other than through a breach of this Agreement by the Recipient, (ii) as may be required in any report, statement or testimony required to be submitted to any Governmental Entity having or claiming to have jurisdiction over it, or as may be otherwise required by applicable Law, or as may be required in response to any summons or subpoena or in connection with any litigation, (iii) as may be required to obtain any governmental approval or Consent required in order to consummate the transactions contemplated by this Agreement or the Stock Sale Agreement or (iv) as may be necessary to establish the Recipient's rights under this Agreement; provided, further, that in the case of clause (ii), the Recipient shall promptly notify the party to whom it is obliged to keep such information confidential and, to the extent practicable, provide such party a reasonable opportunity to prevent public disclosure of such information. All files, records, inventories, accounts, lists, or other documents, in whatever form maintained, relating to the Company's Proprietary and Confidential Information, whether prepared by the Recipient or otherwise coming into the Recipient's possession during his employment with Company, shall be the exclusive property of Company and shall be delivered to the Company upon termination of membership for any reason, or upon the Company's request.

        **2.2.**    **Non-Solicitation**. In exchange for the Goodwill Consideration and in order to protect the Company's Proprietary and Confidential Information and the Company's Goodwill, the Recipient hereby covenants that during the Restricted Period the Recipient shall not directly or indirectly through any Person:

        2.2.1. employ, solicit for employment or consultancy or induce to become employed or to be a consultant to any individual who is, or was at any time during the three (3) year period prior to the Termination Date, an employee, consultant or Sales Representative of the Company, (ii) cause such individual to terminate or refrain from renewing or extending his or her employment by or consulting relationship or Sales Representative relationship with the Company, or (iii) cause such individual to become employed by or enter into a consulting relationship or Sales Representative relationship with a Person other than the Company and its Affiliates.

        2.2.2. solicit, persuade or induce any Customer or any Sales Representative to terminate, reduce, disrupt or refrain from renewing or extending its contractual or other relationship with the Company in regard to the purchase of services sold, by the Company; or

        2.2.3. solicit, persuade or induce any Supplier to terminate, reduce, disrupt or refrain from renewing or extending his, her or its contractual or other relationship with the Company, directly or indirectly in regard to the sale of products similar or identical to those sold by the Company.

        2.2.4. solicit, persuade or induce any business that is a potential acquisition candidate of the Company that was identified to the Recipient during employment with the Company to terminate, reduce, disrupt or refrain from renewing or extending acquisition discussions with the Company.

MV

4

**2.3.** **Non-Compete**. In exchange for the Goodwill Consideration and in order to protect the Company's Proprietary and Confidential Information and the Company's Goodwill, the Recipient hereby covenants that during the Restricted Period the Recipient shall not directly or indirectly, in his own capacity or through one or more Affiliates, whether as owner, consultant, executive, partner, member, manager, officer, director, venturer, agent, through stock ownership, investment of capital, lending of money or property, rendering of services, or otherwise, engage or assist others to engage in the Business in the Territory or engage in any business dealings related to the Business; provided, that the Recipient may own not more than three (3%) percent of the outstanding shares of a company engaged in such Business if such shares are listed on The New York Stock Exchange, The NASDAQ Stock Exchange or another national securities exchange.

**2.4.** **Non-Disparagement**. The Recipient agrees n o t to in any way publicly disparage the Company, members, equity holders, officers, directors, employees or agents or the Company and the Company agrees not to in any way publicly disparage the Recipient, in either case, other than as required by Law or in connection with enforcing their respective rights under this Agreement in good faith.

**2.5.** **Equitable Relief.**

2.5.1. The Recipient acknowledges that a breach of the covenants contained in this Article 2, will cause irreparable damage to the Business and the Company, the amount of which will be difficult to ascertain, and that the remedies at Law for any such breach will be inadequate. Accordingly, nothing in this Agreement shall prevent a party from seeking preliminary injunctive relief from a court of competent jurisdiction. The Recipient agrees that, in addition to any other remedy which may be available at Law or in equity, any Person within the Company shall be entitled to specific performance and injunctive relief with or without posting a bond (as determined by any court of competent jurisdiction) to prevent any actual, intended or likely breach.

2.5.2. The parties acknowledge that the time, scope and other provisions of this Article 2 have been specifically negotiated by sophisticated commercial parties, each who could consult separate qualified counsel, and agree that all such provisions are reasonable and fair and necessary to protect the interests of the Company and to prevent the Recipient from unfairly taking advantage of contacts established during employment by the Company. Accordingly, the Recipient agrees not to contest the validity or enforceability of any provision of Article 2 of this Agreement. In the event that any provision in this Article 2 or any other provision contained in this Agreement shall be determined by any court of competent jurisdiction to be unenforceable such provisions shall be interpreted to extend only over the maximum period of time for which they may be enforceable and/or over the maximum geographical area as to which it may be enforceable and/or to the maximum extent in all other respects as to which they may be enforceable, all as determined by any such court in such action so as to be enforceable to the extent consistent with then applicable law.

**ARTICLE 3** **MISCELLANEOUS PROVISIONS.**

**3.1.** **Assignment and Successors**. The rights and obligations of the Company under this Agreement may be assigned and shall inure to the benefit of and be binding upon the

5

successors and assigns of the Company. The Recipient's rights or obligations hereunder may not be assigned to or assumed by any other person.

3.2. **Notices.** Any notice, request, instruction or other document or communication to be given hereunder shall be in writing and shall be deemed to have been duly given (i) if mailed, at the time when mailed in any general or branch office of the United States Postal Service, enclosed in a registered or certified postage-paid envelope, (ii) if sent by facsimile transmission, when so sent and receipt acknowledged by an appropriate facsimile receipt, or (iii) if sent by other means (including e-mail), when actually received by the party to which such notice has been directed, in each case at the respective addresses or numbers set forth below or such other address or number as such party may have fixed by notice; provided, however, that in the event of delivery under clauses (ii) or (iii) (otherwise than by receipted hand delivery), such notice shall be promptly followed by notice pursuant to clause (i):

If to any Person in the Company, to the Company:

      CPH BRANDS, LLC

      1736 N. Eastman Road

      Kingsport, TN 37664

      E-mail: _____

With a copy (which shall not constitute notice) to

      _____

      _____

      _____

      E-mail:

If to the Recipient:

      Michael Vaughn

      _____

      _____

      E-mail:

With a copy (which shall not constitute notice) to:

      _____

      _____

6

E-mail:

_____

**3.3.**  **Severability**.  If any provision or portion of this Agreement shall be or become illegal, invalid or unenforceable in whole or in part for any reason, such provision shall be ineffective only to the extent of such illegality, invalidity or unenforceability without invalidating the remainder of such provision or the remaining provisions of this Agreement. Upon such determination that any term or other provision is illegal, invalid, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the agreements contemplated hereby are fulfilled to the extent possible.

**3.4.**  **Amendment, Waiver etc.**.   This Agreement may only be amended by a writing signed by all parties.

**3.5.**  **Counterparts**.  This Agreement may be executed and delivered (including by facsimile or .pdf transmission) in counterparts, and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

**3.6.**  **Non-Waiver of Rights and Breaches**.  No failure or delay of any party hereto in the exercise of any right given to such party hereunder shall constitute a waiver thereof unless the time specified herein for the exercise of such right has expired, nor shall any single or partial exercise of any right preclude other or further exercise thereof or of any other right. The waiver of a party hereto of any default of any other party shall not be deemed to be a waiver of any subsequent default or other default by such party, whether similar or dissimilar in nature.

**3.7.**  **Governing Law**.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TENNESSEE WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.

**3.8.**  **Dispute Resolution**: Consent to Jurisdiction.

3.8.1. Costs.  The Company, on the one hand, and the Recipient, on the other hand, shall bear their own costs, expenses and legal fees in the event of any action with regards to this Agreement.

3.8.2. Consent to Jurisdiction/Venue.  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any court of competent jurisdiction sitting in Sullivan County, Tennessee.

**3.9.**  **Expenses**.  Each party shall bear his or its own fees and expenses in connection with the preparation, negotiation and execution of this Agreement.

**3.10.**  **Survival**.  Unless otherwise provided herein, the provisions of Articles 2 and 3 hereof shall survive the termination of the Restriction Period or termination of this Agreement.

MV

**3.11. Interpretation.** The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The language in all parts of this Agreement shall in all cases be construed according to its fair meaning, and not strictly for or against any party hereto. In this Agreement, unless the context otherwise requires, the masculine, feminine and neuter genders and the singular and the plural include one another.

**3.12 Member Enforcement.** The parties hereto acknowledge that this Agreement is entered into as a requirement of Operating Agreement and, therefore, the members in the Company are third party beneficiaries of this Agreement and may enforce the provisions of this Agreement independent of whether the Company proceeds on its own to enforce them.

**3.13. Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes any prior agreement or understanding among them respect to the subject matter hereof.

**IN WITNESS WHEREOF**, the parties, intending to be legally bound, executed this Agreement as of the date first above written.

THE COMPANY

CPH BRANDS, LLC

By: Michael Vaughn
Name:
Title: CEO

RECIPIENT



# ESCROW AGREEMENT
## RE:
## CPH BRANDS, LLC

**THIS ESCROW AGREEMENT**, (the "Agreement") is made and entered into and shall be effective as of this 3rd day of May, 2019, and is by and among **CPH BRANDS, LLC**, hereinafter referred to as the "Company", **MICHAEL VAUGHN** and **TIMOTHY KENDRICK** ("Purchasers") and **RUSSELL E. TAYLOR** ("Seller").

WITNESSETH:

WHEREAS, Seller owns 51% of Company and Purchasers own 49% of Company; and

WHEREAS, by action of the members of the Company on April 26, 2019, the Company began to wind down its operations; and

WHEREAS, Purchasers proposed to Seller to purchase his 51% interest for the sum of $50,000.00 to be paid by 12:00 noon on May 3, 2019 and to cause the Company to enter into a new lease for its location at 1736 North Eastman Road, Kingsport, Tennessee.

NOW, THEREFORE, in consideration of the mutual promises, covenants and undertakings hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement hereto agree as follows:

1



1. **Escrow**. Purchasers, upon the execution of this Agreement, deposit immediately available funds to the T. Arthur Scott, Jr. Escrow Account in the amount of $64,335.54.

2. **Inventory**. Following that deposit, Purchasers shall be given accompanied access to the Company's facility for four hours to conduct an inventory of raw material, finished product, equipment and machinery.

3. **Assignment of Seller's Interest**. At the end of the four hour period, if Purchasers have found no material change in the raw material, finished product, equipment and machinery from what existed at the opening of business on April 26, 2019, adjusted for sales and receipts for such sales, then the escrowed funds shall become non-refundable and shall be disbursed as hereinafter set out and Seller shall deliver to Purchasers an assignment of his 51% interest in the Company and his resignation as President of the Company, which shall be taken by Purchasers subject to any liabilities of the Company.

4. **Material Adverse Change**. If Purchasers contend there is a material change, then they shall specifically identify in writing the changes they claim to be material. For this purpose, "material change" shall mean aggregate changes amounting to more than $10,000.00 adverse. Purchasers shall then elect to continue with the purchase of Seller's 51% interest or cancel the purchase and receive return of the funds in escrow.

5. **Cancellation of Purchase**. If Purchasers elect to cancel the purchase, then the escrowed funds shall be returned to them and the Company shall continue the process of liquidation without interference by Purchasers. In that event,

Purchasers shall be allowed accompanied access to the premises to remove personal effects.

6. **Lease**.  If the purchase of Seller's interest proceeds, then the Company shall enter into a new lease with Taylor Properties #1, L.P., with rent at $6,270 per month, triple net with pro rated taxes and insurance paid each month and a one month security deposit.  As the current lease is in default, the improvements to the current facility, including, but not limited to all fixtures, the security fence, equipment and system shall remain with the landlord after the Company vacates the premises.  The lease shall have a term of _____.  Until the new lease is signed, the Purchasers shall not take possession of the premises.

7. **Mutual Release**.  In either event, this Agreement replaces any prior agreements or understandings between the parties and the execution of this Agreement binds all parties to this resolution. In consideration of the payment, and the covenants and agreements contained herein, the parties do hereby release and forever discharge, and by these presents do for themselves, and their successors, and assigns release and forever discharge the other parties and their heirs, personal representatives, agents, successors, and assigns of and from any and all claims, demands, damages, actions, causes of action, or suits at law or in equity, of whatsoever kind or nature, whether known or unknown, and including, but not limited to, any claim arising out of or related in any way to the facts or circumstances referenced above. This Agreement shall be a complete bar to all claims, demands, damages, actions, causes of action, or

suits at law or in equity, of whatsoever kind or nature, which could have been brought by the parties for any and all injuries or damages of whatsoever nature arising or to arise from the facts and circumstances indicated or referenced above.

8. **Disbursement of Escrow**.

   a. If the purchase transaction proceeds, then the escrowed funds, without further direction from any party, shall be disbursed by the Escrow Agent as follows:

      i.    $50,000.00 to Russell E. Taylor.

      ii.   $8,065.54 to Taylor Properties #1, L.P. as first month's rent of $6,270.00 and $1,795.54 for one month's prorated property taxes and property insurance.

      iii.  $6,270.00 to Taylor Properties #1, L.P. as security and damage deposit.

   b. If the purchase transaction does not proceed, then the escrowed funds, without further direction from any party, shall be disbursed by the Escrow Agent to the Purchasers.

9. **Escrow Agent**. The parties hereto jointly and severally agree to hold the Escrow Agent harmless from any and all claims, demands, actions and costs of any sort.

IN WITNESS WHEREOF, this Agreement is executed effective as of the date first above written and may be executed in counterparts. Escrow Agent joins in this

4

Agreement solely for the purpose of agreeing to the provisions that deal with the escrowed funds.

CPH BRANDS, LLC

By: _____
            Russell E. Taylor, President

PURCHASERS:

_____
Michael Vaughn

_____
Timothy Kendrick

SELLER:

_____
Russell E. Taylor

ESCROW AGENT:

_____
T. Arthur Scott, Jr.