UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| MICHAEL VAUGHN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | 2:21-CV-0061 |
| | ) | |
| vs. | ) | |
| | ) | |
| RUSSELL E TAYLOR, | ) | |
| | ) | |
| Defendant | ) | |

## **REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), this matter has been referred [Doc. 77] by the District Judge to the undersigned for a Report and Recommendation as to damages due to Defendant/Counter-Plaintiff Russell E. Taylor ("Defendant") and to address Defendant's Motion for Rule 11 Sanctions. [Doc. 52]. For reasons set forth below, the undersigned recommends that Defendant be awarded compensatory damages in the amount of $138,362.00, to be borne jointly and severally by Plaintiffs. The undersigned further recommends that Plaintiffs each be required to pay one-half of the $140,410.11 in attorney's fees and costs that Defendant incurred in litigating this matter as a sanction for violating Rule 11 of the Federal Rules of Civil Procedure.[1] Additionally, the undersigned recommends that a non-monetary Rule 11 sanction be imposed upon Plaintiffs in the form of a formal declaration finding that Plaintiffs committed fraud. Finally, the undersigned recommends that Defendant be awarded punitive

---

[1] Plaintiffs were previously ordered to pay $9,791.50 in attorney's fees and costs as a Sanction for violations of Rule 37 of the Federal Rules of Civil Procedure. [Docs. 63, 74].

damages in the amount of $10,000.00, with each Plaintiff bearing responsibility for one-half of the award.

## I. BACKGROUND AND PROCEDURAL HISTORY

On June 1, 2020, Plaintiffs filed an amended complaint ("complaint") in Sullivan County Circuit Court against Defendant asserting breach of fiduciary duty, breach of duty of good faith and fair dealing, fraud, conspiracy, breach of contract, and unjust enrichment and seeking six million dollars in compensatory damages as well as five million dollars in punitive damages. [Doc. 1-1]. Defendant removed the case to federal court [Doc. 1], after which he filed a Motion to Dismiss [Doc. 6]. Additionally, Defendant filed an Answer and Counterclaim against Plaintiffs asserting intentional misrepresentation and seeking, jointly and severally, $200,000.00 in compensatory damages and $200,000.00 in punitive damages. [Doc. 1-1, p. 108-112; Doc. 8]. After a briefing period, the Motion to Dismiss was granted in part and denied in part. [Doc. 18]. The parties then proceeded with the discovery process, and on September 13, 2021, Defendant filed a Motion to Compel. [Doc. 28]. A Response and Reply were subsequently submitted. [Docs. 30-31]. Before the discovery motion was ruled on, Plaintiffs' counsel filed a motion seeking to withdraw, which was granted on October 26, 2021. [Docs. 35, 41].

Plaintiffs were provided with an opportunity to retain new counsel but failed to do so and instead proceeded *pro se*. Despite being duly noticed, Plaintiffs failed to appear as ordered before the undersigned for a status conference on November 15, 2021. [Docs. 43, 45]. An order was entered following the hearing which memorialized Plaintiffs' absence and their responsibilities related to discovery moving forward. [Doc. 46]. Then, on December 27, 2021, Defendant filed a Motion for Summary Judgment and a Motion for Sanctions in which

Defendant sought the imposition of sanctions under Rules 11 and 37 of the Federal Rules of Criminal Procedure. [Docs. 50, 52]. After a further hearing, at which Plaintiffs did appear, they were ordered to pay $9,211.50 in attorney's fees and $580.00 in expert fees as sanctions for their ongoing failure to cooperate with discovery in violation of Rule 37. [Docs. 63, 74] Additionally, the undersigned recommended the dismissal of Plaintiffs' claims because of their failure to cooperate with discovery given the importance of the information they had failed to provide to Defendant. [Doc. 63]. Prior to ruling on the undersigned's recommendations, the District Court entered an Order [Doc. 72] noting that since Plaintiffs' counsel withdrew, Plaintiffs have "generally declined to participate in this case, including the discovery process." [Doc. 72, p. 1]. Specifically, the Court noted that, in addition to failing to appear for the November 2021 status conference, Plaintiffs also 1) ignored an order compelling them to produce discovery; 2) failed to show up for two noticed appointments with Defendant's forensic expert; 3) and disregarded the Court's order by not participating in the filing of joint proposed jury instructions. [Doc. 72]. The District Court placed Plaintiffs on notice that they were required to appear for a final pretrial conference on March 21, 2022, and that failure to appear would result in sanctions, including default judgment being awarded to Defendant on his counterclaim. *Id.* Plaintiffs did not appear as instructed, and the District Court entered an Order [Doc. 74] adopting the undersigned's recommended sanctions against Plaintiffs including dismissal of their claims and awarding default judgment in favor of Defendant on his counterclaim. The District Court then referred Defendant's Motion for Rule 11 Sanctions [Doc. 52] and the issue of what damages should be awarded to Defendant under his counterclaim to the undersigned for a report and recommendation. [Doc. 77].

In his Motion for Sanctions, Defendant provides a case history and details the reasons he asserts that Plaintiffs claims against him are fraudulent. Specifically, he claims that Plaintiffs made two false representations that were crucial in inducing him to invest money in CPH Brands, LLC. [Doc. 52, p. 1]. Those representations were that (1) Plaintiff Vaughn owned and would contribute a $225,000 piece of equipment which would be used by the company, and (2) Plaintiff Vaughn possessed and would transfer certain permits to the LLC which would be required for it to operate. *Id*. Defendant notes that Plaintiff Vaughn provided Defendant with an invoice showing that he had purchased a supercritical extractor for $225,000. *Id*. at 2. However, Defendant characterizes the invoice as a fabrication and contends that the president and chief executive officer of Applied Extracts, Inc., the business which purportedly issued the statement, "has given a declaration and deposition stating that the invoice is not from his company and that his company did not sell any supercritical extractor—or any other equipment—to Vaughn." *Id*. (citing Joint Appendix[2] at 232-235, 370). Defendant emphasizes that Plaintiffs have produced no other documents which would evidence that Plaintiff Vaughn purchased this piece of equipment. *Id*. at 3. Defendant further advises that Plaintiff Vaughn failed to contribute the licenses he already possessed to the LLC as promised but instead applied for new licenses for the LLC. *Id.* (citing Joint Appendix at 206-08, 281-82). Defendant characterizes Plaintiffs' conduct in furthering these falsehoods as fraudulent, taken in bad faith, and violative of court orders. *Id*.

Defendant suggests that sanctions under Rule 11 are appropriate here. *Id.* at 8. Defendant sent a draft motion for sanctions to Plaintiffs' former counsel on October 11, 2021, as required

---

[2] The Joint Appendix is available as an attachment to Defendant's Summary Judgment Memorandum. *See* Document 51-1. Pin cites to the Joint Appendix reflect numbers listed in black at the bottom of each page.

by Rule 11. *Id.* (citing Doc. 41); [Ex. 2]. Shortly thereafter, Plaintiffs' counsel withdrew, but Plaintiffs continued to pursue their claims. *Id.* As such, Defendant submits the facts support Rule 11 sanctions. Defendant seeks an award of attorney's fees and litigation costs for all fees and costs incurred in conjunction with the litigation. *Id.* As support, Defendant notes the Court's inherent authority to make such awards where a party litigates in bad faith, vexatiously, or for oppressive reasons. *Id.* (citing *First Bank of Marietta v. Hartford Underwriters Inc. Co.*, 307 F.3d 501, 512 (6th Cir. 2002)). Defendant further submits that an award of attorney's fees and costs is appropriate where a party has fabricated evidence. *Id.* at 7-8 (citing *Plastech Holding Corp. v. WM Greentech Automotive Corp.*, 257 F. Supp.3d 867, 874 (E.D. Mich. 2017)).

The Court scheduled a hearing to address the issues of Rule 11 sanctions and damages for May 5, 2022; however, when the hearing commenced the Court discovered that only Plaintiff Vaughn had been sent a notice regarding the hearing.[3] As a result, the Court reset the hearing for June 13, 2022, to provide adequate time for notice to be provided to both Plaintiffs, which at the Court's direction was sent by both first-class and certified mail. Despite being duly noticed, Plaintiffs did not appear as instructed and only Defendant and his counsel were present during the June 13, 2022 damages and sanctions hearing. During the hearing, the Court heard additional arguments for damages and Rule 11 sanctions, heard testimony from Defendant, and accepted the following exhibits into evidence:

1. Declaration of Pete Dedes;[4]
2. Correspondence from Defendant's counsel to Plaintiffs' former counsel and draft motion for sanctions;

---

[3] The error by the Clerk's Office was understandable given the nature of the case.
[4] The number listed beside each exhibit is the exhibit number that Defendant's counsel had assigned to it. The Court found that several exhibits Defendant intended to offer into evidence were not evidentiary in nature and should not be admitted, which is the reason that the numbers are not sequential.

3. Email from Plaintiff Michael Vaughn (bigdaddymv@live.com) to Mr. Taylor's counsel;
4. Email from Office Depot to Michael Vaughn (fatbellybbq@icloud.com);
7. Plaintiffs' Motion for continuance and motion to dismiss Defendant's motion for sanctions filed on January 26, 2022 [Doc. 54];
9. Transcript of February 22, 2022 hearing on Defendant's motion for sanctions;
13. Excerpt from deposition of Plaintiff Michael Vaughn;
14. Excerpt from deposition of Plaintiff Timothy Kendrick;
15. Excerpt from deposition of Defendant Russell E. Taylor;
16. Declaration of Forooz Smalley, Certified Public Accountant;
17. Excerpt from deposition of James R. White; and
18. Third declaration of Wade W. Massie, counsel for Mr. Taylor.

After the hearing and with the Court's permission, Defendant filed a Supplemental Memorandum on Punitive Damages and Sanctions [Doc. 89] providing supplemental authority to support Defendant's requests for both punitive damages and Rule 11 sanctions, as well as to support Defendant's request for the imposition of non-monetary Rule 11 sanctions against Plaintiffs.

## I.    FACTUAL FINDINGS

Defendant co-founded CPH Brands, LLC ("CPH") with Plaintiffs in January 2019. Defendant held a majority 51% interest in the company and initially contributed $100,000.00 cash in capital and an additional $36,000.00 in loans to the business. Plaintiff Vaughn's main contribution to the business, given in exchange for a 24.5% interest, was supposed to be a supercritical extractor, a piece of equipment that he allegedly purchased for $225,000 from Applied Extracts [Ex. 13, p. 22-23].[5] Plaintiff Vaughn told Defendant that the supercritical extractor was valued at over $500,000.00 but he was able to purchase it for the reduced price of $225,000.00. [Ex. 15, p. 50]. There was no space for the supercritical extractor to be set up in CPH's processing area and its primary value was that it could be liquidated to fund CPH if

---

[5]  Plaintiff Kendrick also owned a 24.5% interest, despite his capital contribution being denoted as $1 in the operating agreement. [Ex. 14, Attach. 4, p. 19].

needed. *Id.* at p. 50, 53; [Ex. 13, p. 43]. Plaintiff Vaughn was also to contribute a processing license, a growing license, and an FDA food license. [Ex. 13, p. 56; Ex. 15, p. 28-29].

During the hearing before the undersigned, Defendant testified that Plaintiff Vaughn's contribution of such a high-value piece of equipment was very important to his decision to invest in the business. Additionally, during his deposition Defendant stated that he never would have gone into business with Plaintiffs had he known they did not have the supercritical extractor. [Ex. 15, p. 141]. However, Defendant never saw the supercritical extractor, explaining that Plaintiff Vaughn always had a reason why it was not available. *Id.* at p. 54. At one point Plaintiff Vaughn told Defendant that the extractor was inside a storage unit which had been padlocked because he and Plaintiff Kendrick had not paid their storage fees. *Id.* Defendant then paid $1,200.00 in storage fees to Gateway Self Storage so Plaintiffs could access the supercritical extractor, but still they never showed him the extractor. *Id.* Instead, the only proof Defendant was ever provided with to verify Plaintiff Vaughn's ownership of the equipment was an invoice allegedly verifying Plaintiff Vaughn's purchase of it from Applied Extracts. This invoice was later determined to be fraudulent when the president and CEO of Applied Extracts testified that his company did not sell an extractor to Plaintiff Vaughn and in fact had not done business of any kind with Plaintiff Vaughn. [Ex. 17, p. 9-10]. Notably, Plaintiff Vaughn was unable to remember by what method he paid for the extractor, or even in what bank account he had the $225,000.00 he purportedly used to purchase the extractor. [Ex.13, p. 23-25, 31-33, 52-53]. During a February 22, 2022, hearing before the undersigned Plaintiff Vaughn initially stated[6] he bought the supercritical extractor from "a guy on eBay." [Ex. 9, p. 28]. Upon questioning from the Court as to why he

---

[6] During the hearing, the Court placed both Plaintiffs under oath. The Court asked if all statements made by Plaintiffs to that point had been true and they stated they had been. They continued providing their answers under oath for the remainder of the hearing. [Ex. 9, p. 17-18].

could not obtain records of the purchase from eBay, Plaintiff Vaughn then claimed the purchase did not actually go through eBay, the seller removed the extractor from eBay so he did not have to pay a seller's fee to eBay and instead sold it directly to him. *Id.* at p. 30. Plaintiff Vaughn claimed the supercritical extractor was delivered to him via freight carrier but was unable to remember the name of the freight carrier. [Ex. 13 at p. 31-32]. Despite continuing to insist under oath during his deposition that he had purchased the supercritical extractor, Plaintiff Vaughn also admitted that he had no records or photographs aside from the fraudulent invoice to verify the purchase or delivery of the supercritical extractor. *Id.* at p. 40-41. Plaintiff Vaughn further stated during the February 22, 2022 hearing that he no longer has access to the email address he used in purchasing the supercritical extractor and for that reason was unable to provide any purchase confirmation documents that were exchanged via email between him and the seller. [Ex. 9, p. 29-30]. He further claimed that he has not had access to this email address since right after his barbeque restaurant closed, which was before he went into business with Defendant. *Id.* Plaintiff Vaughn stated the email address was one that required payment and he stopped paying for it once the restaurant closed which was why he could no longer access it. *Id.* at p. 30. However, Defendant's counsel provided a copy of an email from Plaintiff Vaughn's email address in question, fatbellybbq@icloud.com, that was provided during the pendency of this case, meaning that Plaintiff Vaughn had to have access to this email address later than he claimed including during the discovery phase of this case. [Ex. 4]. The Court further notes that icloud email addresses are provided at no charge and would not have become inaccessible unless Plaintiff Vaughn took the step of removing the account altogether.

Defendant testified that Plaintiff Vaughn told him he already had the licenses the business would need to operate and could transfer them to CPH, but Plaintiff Vaughn did not make good

on his promise. In his deposition, Plaintiff Vaughn stated he already had a grow license and processing license before forming CPH but was unsure if he could have transferred the licenses to CPH, but either way, he did not attempt to do so. [Ex. 13, p. 56-57]. Additionally, although Plaintiff Vaughn applied for a FDA food license, he did not even know if the license had been granted to CPH. *Id.* at 60. Licenses were not obtained for CPH until after it had ceased operations such that CPH was operating without proper licenses the entire time it existed. [Ex. 15, p. 30]. However, the lack of proper licenses did not significantly impact Defendant's decision to wind down the business. *Id.* at p. 33.

While CPH was in existence, Plaintiffs were primarily in charge of the day-to-day operations of the business, and Defendant was primarily an investor. Plaintiffs each received an $8,000.00 distribution while the business was still in operation as compensation for the daily running of the business. [Ex. 14, p. 44-45]. Defendant testified that CPH was only in business for three or four months and sales were nowhere near what was projected. [Ex. 15, p. 93]. He described CPH as a "sinking ship" causing him to decide that instead of loaning the business more money, he would wind it down. *Id.* By this point, Defendant had loaned to business a total of over $100,000.00 in addition to his original $100,000.00 cash investment. *Id.*; [Ex. 16, p. 3]. Additionally, Defendant believed Plaintiffs were embezzling hemp flour and MCT oil from the business. [Ex. 15, p. 107]. While Plaintiffs did not agree that the business should be wound down, Defendant preceded down that path, selling the remaining assets for a total of $50,000 to Holston Hemp. [Ex. 15, p. 121; Ex. 13, Attach. 8]. Defendant deposited the proceeds of the sale into the CPH checking account and eventually used the funds to reimburse himself for some of the loans he had made to the business. [Ex. 15, p. 121].[7]

---

[7] This is in accordance with Article XIV, ¶14.4 of the Operating Agreement for CPH.

After the assets of CPH had been sold to Holston Hemp, Plaintiffs entered the premises formerly occupied by CPH ostensibly to remove their personal possessions. [Ex. 14, p. 89, 92]. While doing so, Plaintiffs also removed property that formerly belonged to CPH which had already been sold to Holston Hemp, including a tote of hemp flour, a lab in a black case, and a DVR. [Ex. 14, p. 89, 92, 96, 98; Ex. 13, p. 99-101]. Plaintiffs sold the hemp flour to Catch-22 for $10,000.00 and split the proceeds between them. [Ex. 13, p. 99-100; Ex. 14, p. 103]. Plaintiff Vaughn testified during his deposition that he was still in possession of the lab and DVR but never produced them to Defendant despite being ordered by the Court to do so. [Ex. 13, p. 101].

During the hearing, Defendant testified as to the impact this litigation had on him and his family. He stated the allegations Plaintiffs made against him have taken a toll on him and his family, emotionally as well as financially. Defendant stated that he is seeking punitive damages and sanctions against Plaintiffs because they have abused the judicial process, committed fraud against him, and stolen from Holston Hemp. Defendant stated that if anything positive could come out of this it would be for others to be deterred from similar behavior. Defendant asked the Court to specifically find that Plaintiffs committed fraud to further his goal of deterrence.

## II. ANALYSIS

### a. Compensatory Damages

An award of compensatory damages is intended to make a plaintiff whole. *Meals ex rel. Meals v. Ford Motor Co.*, 471 S.W.3d 414, 419 (Tenn. 2013); *see also Stiso v. Int'l Steel Grp.*, 640 F. App'x 494, 500 (6th Cir. 2015). An award of damages may compensate for any economic or pecuniary losses that naturally resulted from wrongful conduct, as well as non-economic loss or injury. *Meals*, 471 S.W.3d at 419-20. In cases of misrepresentation or fraud, the prevailing party is entitled to recover "the pecuniary loss to him of which the misrepresentation is a legal

cause, including…loss suffered…as a consequence of the [party's] reliance upon the misrepresentation." *Estate of Lambert v. Fitzgerald*, 497 S.W.3d 425, 456 (Tenn. Ct. App. 2016).

Defendant has provided competent proof demonstrating that he has incurred $138, 362.00 in losses as a direct and proximate result of his investment in CPH. [Ex. 16, p. 3]. Certified Public Accountant Forooz Smalley reviewed the financial records of CPH and prepared a report supported by CPH's financial records in which he concluded that Defendant's total loss from his investment in CPH was $138,362.00. *Id.* at 3-4. Consistent with the Operating Agreement and deposition testimony taken in this matter, the report demonstrated that Defendant initially invested $100,000.00 in cash in CPH. *Id.*; [Ex. 13, p. 86; Ex. 16, p. 3]. Additionally, he loaned the business a total of $110,582.00, of which only $72,222.00 was repaid, leaving a balance of $38,362.00. [Ex. 13, p. 3]. The proceeds from the sale of CPH's assets to Holston Hemp was included in the funds used to repay a portion of Defendant's loans to the company. Thus, even after Defendant sold CPH's assets to mitigate his damages, he still has a direct net loss of $138,362.00 due to his investment in CPH. Defendant only agreed to invest in CPH due to the false representations made to him by Plaintiffs, i.e., that Plaintiff Vaughn owned and would contribute a supercritical extractor to the business as well as the licenses necessary for the business to legally operate and that both Plaintiffs had expertise regarding the CBD business to contribute.[8] As such, Defendant should be awarded a judgment for the full amount of his lost investment in CPH pursuant to his counterclaim. *See Estate of Lambert*, 497 S.W.3d at 456; *Meals*, 471 S.W.3d at 419-20.

---

[8] During his deposition, Defendant testified that Plaintiffs portrayed themselves as experts in the CBD business, had been researching the CBD business for a year-and-a-half to two years and spoken with multiple scientists and experts, and that they had expertise and knowledge in obtaining the necessary and proper licenses to operate a CBD business. [Ex. 15, p. 25-27].

### b. Rule 11 Sanctions

Defendant previously filed a motion seeking sanctions against Plaintiffs pursuant to Rule 11 of the Federal Rules of Civil Procedure. [Doc. 52, p. 8]. Specifically, Defendant asserts that Rule 11 sanctions are appropriate where a party litigates in bad faith, vexatiously, or for oppressive reasons. *Id.* (citing *First Bank of Marietta v. Hartford Underwriters Inc. Co.*, 307 F.3d 501, 512 (6th Cir. 2002)). Further, Defendant submits an award of attorney's fees and costs is appropriate where a party has fabricated evidence. *Id.* at 7-8 (citing *Plastech Holding Corp. v. WM Greentech Automotive Corp.*, 257 F. Supp.3d 867, 874 (E.D. Mich. 2017)).

"If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any…party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c).[9] This rule "imposes on litigants a continuing duty of candor, and a litigant may be sanctioned "for continuing to insist upon a position that is no longer tenable." *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 395 (6th Cir. 2009) (citing *Ridder v. City of Springfield*, 109 F.3d 288, 293 (6th Cir. 1997)). "A district court has broad discretion in deciding the nature and extent of sanctions to impose under Rule 11." *Lindsay v. Pizza Hut of America*, 57 F. App'x 648, 651 (6th Cir. 2003). Rule 11 allows for the award of all reasonable attorney's fees and other expenses incurred due to the sanctionable conduct. Fed. R. Civ. P. 11(c)(2); *Elsman v. Standard Fed. Bank*, 46 F. App'x 792, 800 (6th Cir. 2002). For an award of attorney's fees to be imposed as a Rule 11 sanction, it must be shown that the fees were incurred because of the filing of an improper pleading…[and] a trial court must analyze the impact upon the moving party of discrete acts of claimed misconduct." *Id.* (quoting

---

[9] Rule 11(b) requires, among other things, that claims be warranted and not frivolous and that factual contentions have evidentiary support or are expected to have evidentiary support after a reasonable opportunity to investigate.

*Bodenhamer Bldg. Corp. v. Architectural Research Corp.*, 989 F.2d 213, 218 (6th Cir. 1993)). Additionally, the court must evaluate the reasonableness of the requested costs and fees. *Id.*

Here, Defendant asserts that an award of attorney's fees and costs is an appropriate Rule 11 sanction because Plaintiffs brought their suit in bad faith and fabricated evidence, specifically the invoice for the purchase of the supercritical extractor. Defendant provided adequate notice to Plaintiffs of his intention to seek Rule 11 sanctions by sending a letter and draft motion for sanctions to Plaintiffs' then-counsel by both U.S. Mail and e-mail on October 11, 2021. [Ex. 2]. Plaintiffs were also provided with multiple opportunities to respond to the motion for sanctions, including an opportunity to appear and answer to Defendant's request for sanctions during the June 13, 2022 hearing held by the undersigned.

The record now before the Court establishes that Plaintiffs knew at the time the litigation commenced their claims had no merit and as such, they were not entitled to damages. Still, they continued to pursue the litigation and continued to prosecute their claims. Ultimately, Plaintiffs simply stopped participating in the proceeding, despite themselves initiating the action. At no time did Plaintiffs attempt to dismiss their case prior to the Court granting default judgment to Defendant. As stated in the above sections, throughout the proceedings Plaintiffs continued to assert that they had contributed a supercritical extractor with a value of at least $225,000.00 to the business. [Ex. 13, p. 22-23; Ex. 9, p. 28-31]. However, the invoice that was originally provided as proof of the extractor's existence was shown to be fraudulent. [Ex. 17]. Despite being given opportunities to do so, Plaintiffs were unable to provide any proof whatsoever that the extractor ever existed. Moreover, Plaintiffs were unable to explain by what method the extractor was

purchased, what financial institutions were involved, or the specifics of how the extractor was delivered. [Ex.13, p. 23-25, 31-33, 52-53].

The Court finds that nearly all the pleadings filed by Plaintiffs in this matter contained inaccurate statements that Plaintiffs knew were false and further knew that they could not support with evidence. Specifically, the Complaint [Doc. 1-1], Plaintiffs' Response to Defendant's Motion to Dismiss [Docs. 11-12], and Plaintiffs' Response to Defendant's Motion to Compel [Doc. 30] all contain assertions that Plaintiffs contributed a supercritical extractor to the business. Additionally, in their Response to the Motion to Compel [Doc. 30], Plaintiffs continued to deny that the invoice for the purchase of the supercritical extractor was fraudulent. These pleadings, coupled with Plaintiffs' refusal to dismiss their frivolous claims and the fabrication of the invoice for the purchase of the supercritical extractor form the basis for the entirety of the litigation that has occurred in the case and all the attorney's fees and costs that Defendant has incurred. The creation of the fraudulent invoice and Plaintiffs' continued refusal to cooperate in the discovery process required Defendant to retain the services of experts who were hired to retrieve electronic data to assist Defendant in defending against Plaintiffs' claims. *See* [Ex. 1]. Those costs were exacerbated by Plaintiffs' failure to keep appointments with one of these experts and their continued failure or comply with the Court's orders requiring them to meaningfully participate in discovery. As such, the Court finds it appropriate and necessary to sanction Plaintiffs by requiring them to pay Defendant's attorney fees and costs, including expert witness fees. The Court will now turn to the reasonableness of the award amount requested.

Defendant has requested a total award of $159,413.11 in attorney's fees and costs, supported by the Third Declaration of Wade W. Massie [Ex. 18], Defendant's lead counsel. The

Court first notes that it has already addressed a previous Declaration [Doc. 60-1] detailing attorney's fees and costs related to the Motion to Compel Discovery [Doc. 28] and Motion for Sanctions [Doc. 52] when imposing Rule 37 sanctions against Plaintiffs in this matter. [Docs. 63,74]. The Court found that 82.8 hours were billed in association with the discovery disputes addressed by the Court for a total of $18,423.00 but that not all of that cost could be attributed to the conduct of Plaintiffs. *Id.* The Court awarded $9,211.50 in attorney's fees and $580.00 in expenses to Defendant as a sanction against Plaintiffs for their discovery violations and does not find it necessary to revisit that determination at this juncture. *Id.* The Court has reviewed Mr. Massie's Third Declaration and noted that it includes the previously addressed fees and expenses and has subtracted the previously considered $18,423.00 from the total attorney's fees of $151,179.00, leaving $132,756.00 in requested attorney fees to be addressed. Additionally, Defendant seeks a total of $8,234.11 in expenses, $580.00 of which were previously awarded as a Rule 37 sanction, which results in remaining expenses at issue of $7,654.11. The amount of previously unaddressed attorney's fees and costs in this matter total $140,410.11. Mr. Massie's declaration states that attorney's fees were reduced by approximately $25,000.00 over the course of the case as an accommodation to Defendant. [Ex. 18, p. 1-2]. The hourly rates billed in this matter were $260 for principal attorneys, $185 for associate attorneys, and $120 for paralegals. [Doc. 60-1, p. 2]. Mr. Massie's prior declaration states that in his experience these rates are reasonable and customary for cases of this type in this region. *Id.*

"The starting point for determining a reasonable fee is the lodestar method, which is the product of the number of hours billed and a reasonable hourly rate." *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 616 (6th Cir. 2007). The lodestar method for calculating attorney's fees and actual charges for costs is generally sufficient for determining the reasonableness of attorney's fees and

costs for purposes of a Rule 11 sanction. *See Jackson v. L. Firm of O'Hara, Ruberg, Osborne & Taylor*, 875 F.2d 1224, 1231 (6th Cir. 1989). At the same time, fees that were unnecessarily incurred defending patently frivolous claims, where the defendant failed to take action to try to obtain dismissal of the claims, are not considered reasonable. *Id.* at 1230.

Here, a total of 573.6 hours were billed in this case, exclusive of the 82.8 hours the Court previously considered when imposing a Rule 37 sanction upon Plaintiffs. [Ex. 18]. These services were rendered between September 30, 2020 and June 13, 2022. In other words, Defendant's legal team spent a total of 656.4 hours on this matter plus those hours that his lead counsel noted the team did not bill for as a courtesy to Defendant. This means that members of Defendant's legal team spent a collective total of 16.41 weeks at forty billed hours per week in representing Defendant, in addition to the time written off by Defendant's counsel.

Given that the litigation took place over a period of a little less than two years, that Plaintiffs sought a very large amount in damages, that there were several different claims brought, and that Plaintiffs' fraud clearly justified significant investigation, the Court finds that significant billing by Defendant's counsel was justified. At the same time, in reviewing the docket in this matter to consider the number of pleadings prepared by counsel, and further considering the number of hearings and depositions that occurred, the Court finds that the number of hours billed represents the very top end of what the Court could approve as reasonable. The primary reasons that the Court will award the full number of hours billed (except those previously reduced), is the fact that when Plaintiffs discontinued their participation in the very proceedings they instituted, Defendant's counsel was required to make extensive efforts to communicate with and obtain cooperation from them, and their failure to act created a need for additional hearings and travel time for Defendant

and his counsel. Given the totality of the circumstances, the Court finds the number of hours expended in this case to be reasonable.

There is no question that Defendant made the required efforts to bring the litigation to a timely end. Defendant initially responded to Plaintiffs' complaint with a motion to dismiss and supporting memorandum. Thereafter, Defendant filed dispositive motions, asking the court at multiple points in the litigation to dismiss Plaintiffs' claims, both on substantive and procedural grounds.

The Court must then consider the various hourly rates being billed by Defendants' legal team. The Court is very familiar with the reasonable and customary billing rates in the local legal market for attorneys and legal support staff, and finds the affidavit submitted by Defendant's counsel accurately asserts that those charged by him, and other members of the legal team are in keeping with those market rates. As such, the Court will recommend to the District Court that Defendant's request for payment of his attorney fees in the total amount of $140,410.11, representing 573.6 hours billed at the respective hourly rates listed above for his primary attorney, associate attorneys, and paralegals, pursuant to the lodestar calculation addressed herein, and the costs incurred on behalf of Defendant.

The Court finds it appropriate to recommend that the District Court sanction each Plaintiff with one-half of the total amount of attorney's fees and costs the Defendant incurred during the pendency of this litigation, less the attorney's fees and costs that were already addressed and partially awarded to Defendant as a Rule 37 sanction against Plaintiffs. *See* [Docs. 63, 74]. It appears to the Court that requiring each Plaintiff to bear one-half of these fees and costs is the minimum sanction necessary to deter such conduct in the future. *Rentz*, 556 F.3d at 399-400. Although this award may well pose a financial hardship for Plaintiffs, given that they stopped

participating in the litigation and presented no evidence regarding their financial means, the Court cannot assume that they are without the ability to pay the fees and costs awarded to Defendant. *See id.* at 400-01. At the same time, Plaintiffs did make statements in Court that they had been unable to retain new counsel after their attorney withdrew because they did not have the $30,000.00 to $50,000.00 they had been quoted to represent them, and made other statements about financial hardships they were experiencing. [Ex. 9, p. 23-25]. At the same time, given the clear willingness by Plaintiffs to commit fraud on Defendant and the Court in this matter, without financial documentation being supplied, it would be wholly inappropriate for the Court to take Plaintiffs' statements in Court at face value. Still, given the extensive nature of the fees awarded, the Court does find it reasonable to recommend to the District Court that each Plaintiff be required to pay one-half of the total as opposed to making the Plaintiffs jointly and severally liable for the entire amount.

The Court further notes that the evidence presented does not indicate to the Court that one Plaintiff was more or less culpable than the other, and for that reason the Court finds it appropriate to recommend that the District Court equally divide the fees between Plaintiffs as opposed to assigning different percentages to one versus the other.

In addition to monetary sanctions, Defendant has asked that non-monetary Rule 11 sanctions be imposed against Plaintiffs, namely Defendant requests that the Court affirmatively find that Plaintiffs committed fraud. One of the primary purposes of Rule 11 sanctions is to deter frivolous lawsuits. *Lockheed Martin Energy Sys., Inc. v. Slavin*, 190 F.R.D. 449, 459 (E.D. Tenn. 1999). The court may impose appropriate, non-monetary sanctions upon a party when warranted by specific conduct that violates Rule 11. *See id.* at 461. Here, it is

abundantly clear from the record that Plaintiffs committed fraud when claiming to own a supercritical extractor.[10] Plaintiffs had ample opportunity to provide proof of their ownership or the existence of the extractor and failed to do so. Additionally, it is not reasonable that Plaintiff Vaughn was unable to explain the specifics of how he purchased the extractor or recall in which bank he had deposited the funds he used for the purchase. Plaintiff Vaughn's explanation that he was unable to access the email address used during the purchase also rings false, as at least one email from the address was retrieved and provided to Defendant's counsel during litigation [Ex. 4]. Additionally, the Court finds persuasive Defendant's testimony and argument that such an affirmative finding would deter Plaintiffs from engaging in frivolous and fraudulent litigation in the future. Therefore, the Court finds that it is necessary to impose the non-monetary Rule 11 sanction requested by Defendant, affirmatively holding that both Plaintiffs committed fraud as demonstrated by the record in this case.

### c. Punitive Damages

Defendant has also requested punitive damages in an amount equal to his award for compensatory damages. While the purpose of compensatory damages is to make a party whole, "punitive damages are aimed at the different purposes of deterrence and retribution." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 408-09 (2003). "Punitive damages 'should operate to punish the defendant and deter others from like offenses.'" *Pruett v. Skouteris*, 743 F. Supp. 2d 718, 727 (W.D. Tenn. 2010) (quoting *Hodges v. S.C. Toof & Co.*, 822 S.W.2d 896, 900 (Tenn. 1992)). "[T]he primary purpose of a punitive award is to deter misconduct." *Hodges*, 822 S.W.2d at 902. Tennessee law permits punitive damages to be awarded "in cases involving fraud, malice,

---

[10] The issue of misrepresentation of licenses is likely meritorious as well; however, because the Court has found fraud related to the extractor to be so clear, it is unnecessary to further address the issue of the licenses.

gross negligence, oppression, evil motives, conscious indifference, and reckless conduct implying disregard of social obligations." *Pruett v. Skouteris*, 743 F. Supp. 2d at 727 (quoting *Hodges*, 822 S.W.2d at 901-02). However, "punitive damages are to be awarded only in the most egregious of cases…" *King v. Delfasco, LLC*, --- S.W.3d ---, No. E2020-01038-COA-R3-CV, 2021 WL 4304756, at *13 (Tenn. Ct. App. 2021) (quoting *Hodges*, 822 S.W.2d at 901-02). A showing by clear and convincing evidence that a party acted intentionally, fraudulently, maliciously, and/or recklessly on its own is not enough to warrant an award of punitive damages. *Id.* "Fraudulent, intentional, malicious, or reckless conduct which warrants an award of compensatory damages does not necessarily qualify for an award of punitive damages." *Id.* Instead, even where such actions support an award for compensatory damages, unless they are of a particularly egregious nature punitive damages should not be awarded. *Id.* at 13-14. "Failure to consider whether a case is among the most egregious of cases when deciding whether punitive damages are warranted would be to ignore [precedent]." *Id.* at 13.

Here, the facts demonstrate by clear and convincing evidence that Plaintiffs' conduct was intentional and fraudulent. Plaintiffs induced Defendant to invest large sums of money in a business based upon wholly fraudulent assertions, including that they were contributing to the business a piece of equipment for which they paid $225,000.00 and which had an even greater value than what was paid to purchase it, going so far as to fabricate an invoice for the purchase of the equipment. Had Plaintiffs stopped there, the Court might find their fraud not to be of the most egregious nature. However, given that Plaintiffs took the further step of suing Defendant after the business at issue was dissolved, seeking millions in compensation and knowing that they had no basis for the lawsuit, the Court concludes that Plaintiffs' fraud is among the most egregious cases. By filing and prosecuting the instant action, Plaintiffs continued to commit fraud against

Defendant and attempted to commit fraud on the Court as well. Having found that Plaintiffs should be liable for punitive damages, the Court now turns to the question of the appropriate amount to be awarded.

Under Tennessee law, once it is determined that a party is liable for punitive damages, at least the following factors, to the extent relevant, shall be considered when determining the amount of the award: 1) the liable party's financial affairs, condition, and net worth; 2) the nature and reprehensibility of the wrongful conduct including the impact of the conduct on the injured party and the wrongdoer's relationship to the injured party; 3) the liable party's awareness of the amount of harm caused and the motivation in causing the harm; 4) the duration of the misconduct and whether there were attempts to conceal the conduct; 5) the expense the injured party has borne in the attempt to recover the losses; 6) whether the wrongdoer profited from the activity and if so, whether the punitive award should be in excess of the profit to deter similar future behavior; 7) whether, and to what extent, the liable party has been subjected to previous punitive damage awards based on the same wrongful act; 8) whether, once the misconduct became known to the liable party any remedial action was taken or an attempt to make amends was made by offer of a prompt and fair settlement for actual harm caused; and 9) any other circumstances shown by the evidence that are relevant to determining the proper amount of punitive damages. *Pruett*, 743 F. Supp. 2d at 728 (quoting *Hodges*, 822 S.W. at 901-02). Here, Plaintiffs fraudulently induced Defendant to invest over two hundred thousand dollars in a business and then, via this litigation, made unfounded allegations against Defendant after the business was dissolved. Even though CPH was only in business for a few months, Plaintiffs continued their intentional and fraudulent conduct for nearly two years by prosecuting this lawsuit against Defendant. At no time did Plaintiffs admit that Plaintiff Vaughn did not actually purchase the supercritical extractor, nor

did Plaintiffs make any attempt to dismiss their frivolous legal claims against Defendant prior to them being dismissed involuntarily by the Court. Plaintiffs' ongoing fraud caused Defendant to incur significant legal fees in defending against their claims and took an emotional toll on Defendant and his family, too. Further, Plaintiffs benefited financially from their fraud, specifically by unlawful removing hemp flour from the premises formerly occupied by CPH, which Plaintiffs then sold for $10,000.00 Each Plaintiff then took one-half of the proceeds to use for their personal benefit.

While Plaintiffs specific financial condition is unknown, primarily because they have stopped participating in this case, all indications are that Plaintiffs' presently have limited financial means. [Ex. 9, p. 23-25]. On the other hand, Defendant appears to be a person with some means. Additionally, Defendant's testimony indicated to the Court that he had significant business acumen. As such, had Defendant done his due diligence and research before going into business with Plaintiffs, the Court cannot help but conclude that he likely would have discovered that the supercritical extractor did not exist, and that Plaintiffs did not possess the amount of knowledge of the CBD business as they portrayed. [Ex. 15, p. 33, 50, 52-54]. Of course, this lack of due diligence in no way justifies or excuses Plaintiffs' fraud, but it does place some modicum of the blame for Defendant's circumstances at his own feet.

Upon considering all these factors, the Court concludes that an award to Defendant of $10,000.00 in punitive damages, with each Plaintiff bearing responsibility for one-half of the award, is appropriate. This sum will disgorge Plaintiffs of the profits they derived from their intentional and fraudulent behavior.[11] The Court finds this amount to be sufficient to deter similar

---

[11] The Court does not consider the $8,000 each Defendant received in salary distributions to be a profit from punishable conduct as these monies were received in exchange for running the day-to-day operations of CPH and in accordance with the Operating Agreement.

behavior from Plaintiffs and others in the future and to punish Plaintiffs for their egregious conduct, given the large amount of attorney fees and costs awarded to Defendant separately herein as sanctions. *See Pruett*, 743 F. Supp. 2d at 728.

## III.    CONCLUSION

Accordingly, the undersigned **RECOMMENDS**[12] that Defendant be awarded the sum of **$138, 362.00** in compensatory damages and the sum of **$10,000.00** in punitive damages. The Court **RECOMMENDS** that the Plaintiffs be held jointly and severally responsible for the compensatory award but that as to the punitive damages that each Plaintiff be individually liable for one-half of the award. The undersigned further **RECOMMENDS** that Plaintiffs be required to pay **$140,410.11** in attorney's fees and costs Defendant incurred in litigating this matter as a sanction for violating Rule 11 of the Federal Rules of Civil Procedure with each Plaintiff being individually liable for one-half of the award of attorney's fees. Lastly, the Court **RECOMMENDS** that an affirmative finding be made that Plaintiffs committed fraud against Defendant when they asserted that they owned and were contributing a supercritical extractor to the business.

RESPECTFULLY SUBMITTED,

s/ Cynthia Richardson Wyrick
United States Magistrate Judge

---

[12]   Objections to this Report and Recommendation must be filed within 14 days after service of this recommended disposition on the objecting party.  28 U.S.C. 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Such objections must conform to the requirements of Fed. R. Civ. P. 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985).   The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).